# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| CASA DE MARAVILLA, LLC, | § | Civil Action No. 4:25-cv-6183 |
| | § | |
| *Plaintiff,* | § | TRIAL BY JURY DEMANDED |
| | § | |
| v. | § | |
| | § | |
| | § | |
| BONNER, WILLIAM; FORD, MARK; | § | |
| TURNER, MATTHEW; MAISH, LUCAS; | § | |
| CURREY, CHRIS; COSTANTINO, PAUL; | § | |
| SEMENZA, MATT; GEERLING, GAIL; | § | |
| BOOTHBY, CHRISTOPHER; | § | |
| MONUMENT & CATHEDRAL | § | |
| HOLDINGS, LLC F/K/A AGORA, INC.; | § | |
| TOLA DEVELOPMENT GROUP, LLC; | § | |
| RANCHO SANTANA, INC.; | § | |
| PROPIEDADES HABITACIONALES | § | |
| INTERNACIONALES, S.A.; RANCHO | § | |
| SANTANA INC. & CÍA LTDA., | § | |
| | § | |
| *Defendants.* | § | |

### PLAINTIFF CASA DE MARAVILLA, LLC'S  ORIGINAL COMPLAINT

Plaintiff, Casa de Maravilla, LLC ("CDM"), by and through its undersigned

attorney, files this Original Complaint against Defendants, William Bonner

("Bonner"); Mark Ford ("Ford"); Matthew Turner ("Turner"); Lucas Maish

("Maish"); Chris Currey ("Currey"); Paul Costantino ("Costantino"); Matt

Semenza ("Semenza"); Gail Geerling ("Geerling"); Christopher Boothby

("Boothby"); Monument & Cathedral Holdings, LLC formerly known as Agora, Inc. ("Agora"); Tola Development Group, LLC ("Tola"); Rancho Santana, Inc. ("RS Inc."); Propiedades Habitacionales Internacionales, S.A. ("International Living"); and Rancho Santana Inc. & Cía Ltda. ("Rancho SRL") (collectively, "Defendants"). CDM alleges as follows:

### DECEPTION, FRAUD, RACKETEERING, AND COLLUSION: THE REAL "MASTER PLAN" OF RANCHO SANTANA

1.  This action concerns a long pattern of deception, fraud, and anti-competitive collusion involving individuals, all Americans, connected to a development on the Pacific coast of Nicaragua known as Rancho Santana.  According to its co-founders, Defendants Bonner, Ford, and Turner (collectively, the "Syndicate"), Rancho Santana was "the ultimate 'accidental Development.'"  Where "[t]here never was and never will be a master plan."

2.  The Syndicate's original pitch was to market retirement international living along California-like coastline, at a fraction of California prices, to the million-plus subscribers of the myriad subsidiaries of the Syndicate's Baltimore-based information publishing powerhouse, Defendant Agora.

3.  The original managing members of CDM were among those many subscribers.

4. The Syndicate's ethos mirrored that of Agora's stated core mission: "bringing the best new and unconventional viewpoints, perspectives and strategies to the global marketplace."[1]

5. As such, the Syndicate represented Rancho Santana as an unincorporated, unrestricted development in which American purchasers like CDM could diversify their lifestyles, enter the international real estate market, reduce their costs of living, and earn rental income from their purchases.

6. Whether the Syndicate actually believed in its original pitch, at the very beginning of Rancho Santana, is open to question.[2] What is not open to question are the events that transpired over the next two decades: events constituting mail and wire fraud, extortion, money laundering, group boycott and price-fixing conspiracies involving competing property owners, false advertising, and other illegal activities—with the United States "written all over it." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 286 (2010) (Stevens, J., concurring).

7. The unlawful activities of the Syndicate and its co-conspirators have directly injured and continue to injure CDM.

---

[1] *About Us*, *The Agora.*, https://theagora.com/ (last visited December 16, 2025).

[2] *Cf.* Emily Baker-White, *This Secretive Company Built An Empire By Hawking Bad Financial And Health Advice On Facebook*, *Forbes* (July 8, 2025, 09:43am EDT), https://www.forbes.com/sites/emilybaker-white/2025/07/07/this-secretive-company-built-an-empire-by-hawking-bad-financial-and-health-advice-on-facebook/.

8.   CDM therefore files claims under, among others, the Racketeer Influenced and Corrupt Organizations (RICO), Sherman and Clayton Antitrust, and Lanham Acts and will show that it is entitled to relief, based on the facts below.

## PARTIES

9.   Plaintiff Casa de Maravilla, LLC is a Texas limited liability company with its principal place of business in Harris County, Texas. CDM was formed to acquire and manage property for profit in the development of Rancho Santana, Nicaragua. CDM's current managing member is Venodhar Julapalli ("Julapalli"), an individual citizen of Texas who resides in Harris County.

10. Defendant William Bonner is an individual citizen residing in Maryland.

11. Bonner is the founder of Agora and co-founder of Rancho Santana, as well as a longtime homeowner there.

12. Defendant Mark Ford is an individual citizen residing in Florida.

13. Ford has been associated with Bonner and Agora since 1987.  He is co-founder of Rancho Santana, as well as a longtime homeowner and renter there.

14. Defendant Matthew J. Turner is an individual citizen residing in Maryland.

15. Turner has served as Agora's General Counsel, is co-founder of Rancho Santana, and is a longtime homeowner there.

16. Defendant Lucas Maish is a United States individual who lives in Nicaragua but whose residence is unknown to CDM at this time.

17. Maish studied accounting in college and in 2020 became CEO of what is now Rancho SRL.

18. Defendant Chris Currey is a United States individual who lives in Nicaragua but whose residence is unknown to CDM at this time.

19. Currey has collaborated with the Syndicate since at least 2010, sits on the Board of Rancho SRL, serves as its Executive Vice President of Real Estate, and is a longtime homeowner in Rancho Santana.

20. Defendant Paul Costantino is an individual citizen residing in Maryland.

21. Costantino has been with Agora since at least 2001 and is also the Chief Financial Officer ("CFO") of Rancho SRL.

22. Defendant Matt Semenza is a United States individual who lives in Nicaragua but whose residence is unknown to CDM at this time.

23. Semenza is Rancho SRL's Architectural Review Committee ("ARC") Administrator.

24. Defendant Gail Geerling is a United States individual who lives in Nicaragua but whose residence is unknown to CDM at this time.

25. Geerling was International Living's General Manager from 1997-2001, served as its legal representative, and is a longtime homeowner in Rancho Santana.

26. Defendant Christopher Boothby is an individual citizen residing in New Hampshire.

27. Boothby has been a homeowner in Rancho Santana since the 2000s.

28. Defendant Monument & Cathedral Holdings, LLC, formerly a corporation known as Agora, Inc., is a Maryland limited liability company with its principal place of business at 14 West Mt. Vernon Place, Baltimore, Maryland, 21201.

29. Agora transacts or has transacted business in this District and throughout the United States.

30. Defendant Tola Development Group, LLC was a Maryland limited liability company with its principal place of business at 14 West Mt. Vernon Place, Baltimore, Maryland, 21201. Tola was terminated on March 18, 2024.

31. Bonner, Ford, and Turner comprised Tola's members.

32. During the events giving rise to the CDM's claims, Tola transacted business in this District and throughout the United States.

33. Defendant Rancho Santana, Inc. is a British Virgin Islands business company, incorporated on December 24, 2019, that acts as a shell company. Its principal place of business is unknown to CDM at this time.

34. RS Inc. transacts or has transacted business in this District and throughout the United States.

35. Defendant Propiedades Habitacionales Internacionales, S.A. is a Nicaragua corporation whose principal place of business is unknown to CDM at this time.

36. International Living's original owners included Bonner, Ford, Turner, and Agora.

37. RS Inc. replaced Agora as 99.8-percent shareholder of International Living and serves on its Board of Directors as President.

38.  Turner currently has a slight ownership interest in International Living and serves as its General Counsel and Secretary of its Board of Directors.

39.  Bonner currently has a slight ownership interest in International Living and serves on its Board of Directors as Treasurer.

40.  International Living transacts or has transacted business in this District and throughout the United States.

41. Defendant Rancho Santana Inc. & Cía Ltda. is a Nicaragua limited liability company whose principal place of business is unknown to CDM at this time.

42. Rancho SRL's ownership includes RS Inc. (99 percent) and Bonner (one percent).

43. Rancho SRL transacts or has transacted business in this District and throughout the United States.

## JURISDICTION AND VENUE

44. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964, 28 U.S.C. § 1331, 15 U.S.C. § 15, 15 U.S.C. § 26, and 28 U.S.C. § 1367.

45. This Court has personal jurisdiction over all Defendants in this action:

   a. One or more Defendants (i) have purposefully availed themselves to this forum and (ii) have substantial forum connections from which CDM's claims arise, such that specific jurisdiction exists in this forum.

   b. 18 U.S.C. § 1965 provides for nationwide service of process, and all Defendants have had minimum contacts with the United States.

   c. Because (i) personal jurisdiction exists over one or more Defendants, (ii) Defendants are co-conspirators in this action, and (iii) substantial acts to further the conspiracy occurred in this forum, personal jurisdiction exists over all Defendants.

   d. 15 U.S.C. § 22 also provides for nationwide service of process.

   e. 18 U.S.C. § 1956(f) provides for extraterritorial jurisdiction in this action.

46. Venue is proper in this Court for all Defendants in this action:

a. Pursuant to 28 U.S.C. § 1391(b)(2), a substantial part of the events giving rise to CDM's claims occurred in this District.

b. Alternatively, pursuant to 28 U.S.C. § 1391(b)(3), personal jurisdiction exists over one or more Defendants in this District.

c. Pursuant to 28 U.S.C. § 1391(c)(3), Defendants who are not residing in the United States may be sued in this District.

d. Pursuant to 18 U.S.C. § 1965, (i) one or more Defendants have transacted their affairs in this District, (ii) there is no one District in which all Defendants reside, and (iii) the ends of justice require that Defendants with residences other than in this District be brought before this Court.

e. Pursuant to 15 U.S.C. § 22, Agora, Tola, RS Inc., International Living, and Rancho SRL have transacted business, as co-conspirators with other Defendants, in this District.

## FACTS

47. Spanning over 30 years, the relationship among the members of the Syndicate—Bonner, Ford, and Turner—revolves around Agora.

48. Founded by Bonner in 1978, Baltimore-based Agora is a network of dozens of companies, operating in more than a dozen countries around the world, that publish newsletters and magazines in investing, travel, business, and health.

49. As described by a former employee, Agora is the $1 billion-plus revenue-generating "uncontested 800lb gorilla of the financial publishing world."

50. Agora is a copywriting and marketing behemoth, with Agora-related YouTube channels accumulating more than 100 million views and its top newsletters going out to millions of subscribers.

51. As the parent company, Agora provides human resources, legal, technology, and financial infrastructure for all the companies in its sprawling network.

52. Ford first connected with Bonner and Agora when he sold his investment newsletter, *The Oxford Club*, to Agora in 1987.

53. In or around 1991, Ford was hired by Bonner and Agora to build its business. With Ford's involvement, Agora's revenues grew exponentially.

54. Agora's affairs have also intimately involved Turner, who has served as Agora's General Counsel since the 1990s.

55. Bonner, Ford, and Turner, the three Syndicate members, are the co-founders of Rancho Santana. Consistently on Rancho Santana's website, ranchosantana.com, the Syndicate has insisted that "Rancho Santana is the ultimate 'accidental Development,'" where "[t]here never was and never will be a master plan":

## THE HISTORY OF RANCHO SANTANA

*We all have accidents. That's life.*

*For us – Rancho Santana was a great accident. We say "great" because it was both big and it was wonderfully life-changing for us. "Us" because where you see "Tola Development Group" you're actually reading about a small group of colleagues – friends really. We are these fortunate persons. The accidental developers.*

*We caught wind of some land on the southwest Pacific coast of Nicaragua. A ranch. 2,700 acres. Some of us recall it seemed far for a ranch. But we heard "five beaches" and the next thing we knew, we were climbing out of helicopters, wide-eyed and awed.*

*Walking along an untouched pristine ocean side landscape is a difficult experience to put into words. None of us tried. We all knew – we were all thinking the same thing. We had landed somewhere truly special.*

*In 1997 we bought it. We began grooming it, and then shortly thereafter began sharing it. It moved slowly at first. One partner admitted thinking that in the worst case scenario – being that if we never sold a thing – it would be OK. We would visit with our families once a year and enjoy the ranch ourselves.*

*We all agreed with him but we've learned since that this is quite unusual for "developers." That most would come, build, sell, and leave. But in fact, every stakeholder in Tola Development Group has a home or is building a home on the ranch.*

*But then people came. They bought and built. They built homes that would fit nicely in destinations like Santa Barbara, Cote d'Azur or the Amalfi Coast. Of course, we eagerly took note of our new residents and their interests in a certain lifestyle, and the ranch developed rather naturally from there.*

*There never was and never will be a master plan. And in that way, Rancho Santana is the ultimate "accidental Development." And we're okay with that.*

*Welcome to our accident.*

*Sincerely,*

**Bill, Matt, Lisa, Mark, Myles and Elizabeth a.k.a**
**Rancho Santana**

56. The events proceeding belie the Syndicate's statements.

## The Not-So-Accidental Development of Rancho Santana

57. Agora's first ever publication was *International Living*, a magazine devoted to working, investing, and retiring overseas. *International Living* had been heavily promoting Nicaragua, including its Pacific Southwest region, as a "perfect retirement or second home destination," with costs of real estate, living, and business at a fraction of such costs in the United States.

58. In late 1997, as told by Ford in Rancho Santana's 25th-anniversary film *The Pacific Frontier: The Story of Rancho Santana* ("The Story"), the Syndicate channeled the resources of *International Living* to seek out property abroad.[3]

59. *International Living*'s intent was to have its own development in Nicaragua, "something big" that, according to Ford, "we could buy and then we could 'lottify' and sell to our customers."[4]

60. The "customers" included the numerous subscribers in the Syndicate's Agora network, particularly those of *The Oxford Club*.

61. Ford claimed that his original plan was "just to sell property to make money. We're not professional real estate developers; we were publishers."[5]

62. The Syndicate settled on a 2,700-acre area along the Pacific Southwest coast—the "Emerald Coast"—of Nicaragua. The area became known as Rancho Santana.

63. Nicaragua's Emerald Coast is unique in that it offers one of the world's most consistent conditions for perfect surf. Rancho Santana sits right in the middle of that world-class surf zone, with access to five of the world's top breaks. No other location along the Pacific Coast of the Americas offers that level of access.

---

[3] Rancho Santana, *The Pacific Frontier: The Story of Rancho Santana*, *YouTube* (Aug. 24, 2023), https://youtu.be/hLpEaP7HbuM?si=jNvF4XT-4Xy1jmkj&t=113 [hereinafter *The Story*].
[4] *Id.*
[5] *Id.* at https://youtu.be/hLpEaP7HbuM?si=1N5hHvTYg0ctK-nA&t=302.

64. Ford explained, "When we first saw how beautiful this place was, we thought, well, we could sell lots to our subscribers. But then we thought, well, let's keep some of it for ourselves."[6]

65. Bonner, Ford, and Turner would each go on to build homes for themselves in Rancho Santana.

66. Ford, however, knew early on that the more expensive part of development would not be buying the land itself but establishing the infrastructure; "so then we thought, well, maybe we should do something that allows us to bring in more income. And so that's where we got the idea of actually having a community."[7]

67. In Ford's mind, "we thought that if we invited our subscribers, the people that read our publications, to come with us, we would have people that had the same idea about the world that we did, and we'd be good neighbors."[8]

68. The Syndicate thus created International Living, which purchased the land in late 1997.

69. Turner, International Living's General Counsel, wrote the first sales letter to sell the initial set of Rancho Santana lots to subscribers of *The Oxford Club*. Those lots sold out in about 48 hours, which gave International Living the money to develop Rancho Santana's infrastructure.

---

[6] *Id.* at https://youtu.be/hLpEaP7HbuM?si=G_R56fmr3NOP02k1&t=449.
[7] *Id.* at https://youtu.be/hLpEaP7HbuM?si=Mg-atrT7sLe4LxVz&t=558.
[8] *Id.* at https://youtu.be/hLpEaP7HbuM?si=O9c92dgf9QowxElq&t=487.

70.  The pitch the Syndicate made to prospective buyers aligned with the values of *The Oxford Club*: a community of shrewd investing, autonomy, political freedom, and minimal encroachment on personal liberty.

71. On May 12, 2000, the Syndicate advertised on ranchosantana.com lots "for a fraction of what you'd expect to pay . . . a home in the tropics or an investment of a lifetime . . . 10 to 50 times" less than in the United States, with "privacy in mind." No mention was made of the future plans to build or operate a multi-million-dollar resort on the property.

72.  Turner specifically emphasized home rental as a means to finance buying into and retiring in the community of Rancho Santana, at its inception and for many years afterward.

73.  However, a residential community may never have been the sole endgame.

74. As Currey revealed in The Story, the vision of both the original sellers of the 2,700 acres and the Syndicate was to develop Rancho Santana into a resort, and "doing so, they would need the resources and influence from foreign investors . . . ."[9]

---

[9] *Id.* at https://youtu.be/hLpEaP7HbuM?si=9cNIbZpSb91hXBB7&t=228.

**The Syndicate and Agora Marketing Muscle Leads CDM to Rancho Santana**

75. In 2011 Ford co-founded *Palm Beach Letter* under the Agora umbrella, a newsletter that focused on providing investment, entrepreneurial, and retirement advice, including having a revenue-producing second home in Nicaragua.

76. Ford used Agora's marketing muscle to solicit subscribers far and wide, including in Texas.

77. In 2012 Venodhar Julapalli, managing member of CDM, became one of those subscribers.

78. Through a *Palm Beach Letter* series called "Retire Next Year," Ford sent Julapalli regular emails from October 1, 2012, through December 16, 2013, designed to "inspire you to consider some retirement lifestyles that you may have never considered before," including "blueprints for relocating outside of North America and Europe, to places where you can live like royalty on a modest income." Those places included areas in and around Rancho Santana.

79. In a *Palm Beach Letter* on December 15, 2012, Ford sent Julapalli an email explaining Ford's investment in Rancho Santana: "I got involved in Nicaragua about 16 years ago when *International Living*, Agora's newsletter that covers the 'retire overseas' beat, recommended it as a beautiful and safe country with great values. That's still the case today."

80. In that same email, Ford had his sales manager at Rancho Santana explain the benefits of "retiring" there:

> Rancho Santana is a spectacularly beautiful property in a country that boasts the lowest crime rate in Central America. Foreign investment, tourism, and exports are at all-time highs, and Nicaragua is positioned to be the next Costa Rica. With an extremely low cost of living and great values on real estate, Rancho Santana is attracting investors, second homeowners, and retirees.

81. In a *Palm Beach Letter* on February 9, 2013, Ford sent Julapalli an email explaining that the majority of homeowners in Rancho Santana lived there only part-time and that "[m]any of them rent out their houses or condos when they are not in residence, as I do."

82. In an email on May 22, 2013 titled "Retire Next Year #7: Retire Like a King on a Pauper's Budget," Ford shared the story of his childhood friend, Tom Gordon ("Gordon").  Gordon had settled in Rancho Santana, selling real estate there as an independent broker and managing seasonal rentals for some of the residents he had befriended while working in the past in Rancho Santana's property management office.

83. In a *Palm Beach Letter* series called "Rental Real Estate 101," Ford sent Julapalli regular emails from October 16, 2012, through August 14, 2013, on how to invest sensibly in rental real estate.

84. In an email on August 14, 2013, titled "Rental Real Estate 101 Lesson #10: Investing From Afar," Ford extolled the idea of investing in real estate overseas at a relative bargain—specifically in Nicaragua:

> I own a lot of property in Nicaragua. I have a million-dollar home, direct ownership of several lots that are worth hundreds of thousands of dollars, partial ownership of Rancho Santana, a community of 3,000 acres, and a stake in another 3,000 acres down the coast.

> My initial investment in Rancho Santana was the best investment in real estate I ever made. I put up $50,000 and have turned that into several million dollars. This is not something you can easily replicate. But it is possible.

> And if your net worth is such that you are actively reading our Retire Next Year program, you should definitely consider buying property overseas.

85. In that same email, Ford endorsed the idea that managers of property overseas must be subject to an accountability system to hold charged fees in check and reduce the possibility of their taking advantage of the property owner.

86. In late 2012, shortly after receiving *Palm Beach Letter*, Julapalli also became subscribed to an email list called "Rancho Santana's Update from the Pacific Frontier."  Regular emails were generated from blog posts written by the Rancho Santana sales manager at ranchosantana.com.

87.    Between late 2012 and spring 2013, Julapalli went directly to ranchosantana.com to read the blog posts and learn more about Rancho Santana. In one, dated March 1, 2010, he learned the following:

> The truth is after you have found a nice spot of earth, it's the developer behind each development that means everything.
>
> The key to a safe "ex-pat" retirement or getaway home in a world where developers go bankrupt every other day, is to know the developer and the development in a way that you can trust. And that isn't easy. Accounting books can be "cooked" and legal title can be sugarcoated. You just can't be sure. In fact, banks lend more in Costa Rica, but when the bank credit lines to developers dried up last year, most developments went "belly up." So much for "stable Costa Rica."
>
> And this is precisely what makes an oceanfront project like Rancho Santana a safe and prudent decision because some of the very folks that provide you with international property information everyday actually own here! It was a big factor for me over five years ago. And that history proved very wise because when the chips were down, they stepped up. Heck, they're renovating the Clubhouse while most projects are going bust!!
>
> They put their money where their mouths are in this development. When the developer's executives themselves build homes and spend time with their families here, that is a fact you can trust, and rely on.
>
> You should take a look. Many of the owners are themselves *International Living* subscribers, which makes for a nice community.

88. Trust was a big factor for Julapalli as well.  After getting repeated cross-promotions of investing and retiring in Nicaragua between *Palm Beach Letter* and *International Living* and reading the blog posts, Julapalli became an email and

post-mail subscriber to the online and print versions, respectively, of *International Living* on March 9, 2013.

89. Through that subscription on that day, Julapalli received email access to "20 Beach Towns Where You Can Buy For Less Than $100,000." In that report, *International Living* promoted Rancho Santana's "very affordable" prices and "luxurious surroundings, yet casual and relaxed. Think super high-end California without the pretensions. No place for pretensions here, in Rancho Santana on Nicaragua's southern Pacific coast."

90. Meanwhile, on March 6, 2013, Julapalli had contacted *Palm Beach Letter* to follow-up on its Nicaragua investment/retirement ideas and was referred to Gordon.

91. Gordon arranged a visit by Julapalli to Rancho Santana in early April 2013.

92. That visit eventually led to an agreement to purchase an unimproved lot ("G16") in Rancho Santana from a private property owner.

93. G16 abuts the Pacific Ocean to the southwest; the only ingress to the lot is from the northeast via the main road leading from entry gates manned by Rancho SRL security:



94.  Key to Julapalli's decision to purchase G16 in particular was its proximity to the Pacific and those world-class surf breaks, which were pitched as significantly raising private residential and vacation rental real estate market value.

95. On May 14, 2013, Julapalli organized CDM, under whose authority the Rancho Santana property would be owned and operated.

96.  On that same day, CDM signed a property purchase and sale agreement.

97. The agreement represented the following:

    a. CDM and G16 were subject in perpetuity to the Declaration for Rancho Santana Master Homeowners Association ("Master Association," or "APROSA") and Bella Vista sub-association documents.

    b. The agreement incorporated the terms and conditions of the homeowners association (HOA) documents.

    c. On conveyance and recording of the deed, CDM would then become a member of both HOAs.

    d. As a member, CDM would be required to pay dues for the maintenance of common elements.

98. The deed of transfer of G16 was executed on July 24, 2013, and included the excerpt below:

| | |
|---|---|
| 18 | MEMBRESIA).- Debido a que el lote de terreno Número **G GUIÓN DIECISEIS (G-16)** descrito y deslindado, objeto de la |
| 19 | presente Escritura se encuentra físicamente ubicado dentro de la urbanización privada de viviendas o sitios para descanso y |
| 20 | habitación, denominada **"RANCHO SANTANA"**, cuyos propietarios se encuentran jurídicamente organizados dentro de dos |
| 21 | Asociaciones sin fines de lucro, denominadas, la primera **"APROSA"**, con personalidad jurídica y debidamente legalizada ante |
| 22 | las instituciones competentes, rigiéndose por su Acta Constitutiva, Estatutos y Reglamentos internos, y la Asociación de |
| 23 | Propietarios de la Vecindad; su representada, la Sociedad **CASA DE MARAVILLA, LLC**, se obliga a suscribir los |
| 24 | documentos para incorporarse como miembro de la asociaciones referidas, con todos los derechos y obligaciones inherentes a |
| 25 | cada miembro. Obligándose inmediatamente después de suscribir esta escritura a incorporarse como miembros activos de las |
| 26 | Asociaciones, obtener su Certificado de Membresía y su Registro en el Libro de Registro de miembros de la Asociación; y a |
| 27 | cumplir con todos los requisitos y pagos establecidos para los miembros activos.- Hablan los señores **DONALD** |

99.  Translated into English, the deed reiterated that owners in Rancho Santana were legally organized in two active non-profit associations, one being APROSA, and that CDM would carry all the rights and obligations of a member:

> Due to the fact that the plot of land designated as Number **G GUION DIECISEIS (G-16)** described and bounded, which is the object of this deed, is physically located within the private residential or vacation development known as "**RANCHO SANTANA**", whose owners are legally organized in two associations without purpose for profit, one being named "**APROSA**", with legal personality and duly legalized before the competent institutions, governed by its Constitutive Act, Statutes, and internal Regulations; and the Association of Property Owners of the Neighborhood; its representative, **CASA DE MARAVILLA, LLC**, undertakes to subscribe the documents necessary to incorporate as a member of the aforementioned associations, with all rights and obligations inherent in each member.  Immediately after signing this deed, it obligates itself to incorporate as active members of the Associations, obtain its Membership Certificate and Registration in the Book of Registry of Members of the Association; and to comply with all requirements and payments established for active members.

**Phase 1 of the "No-Master-Plan" Master Plan: APROSA and Its Progeny**

100.    To this day, ranchosantana.com represents that the Syndicate never had a master plan there and that Rancho Santana's growth developed naturally from the interests of its residents:

**RANCHO SANTANA**    About ▾   Stay ▾   Experience ▾   Events ▾   Real Estate ▾        Login    Eng ▾    | Reserve Now |

# Frequently Asked Questions

## Who owns Rancho Santana?                                                    —

Rancho Santana is owned by Tola Development Group which is comprised of a group of colleagues and friends who, in 1997, bought the land that Rancho Santana now sits on. There never has been and never will be a "master plan", and in that way, Rancho Santana is the ultimate "accidental development". The Ranch's growth has and continues to develop naturally from the interests our residents have in a certain lifestyle.

101.     The lack of a master plan proved to be expedient for the ultimate aim of the Syndicate and Agora, which would compete against the natural interests of many residents: turn Rancho Santana from a private residential community into a Syndicate-controlled luxury resort.

<u>APROSA</u>

102.     On June 2, 1998, shortly after the Syndicate purchased Rancho Santana through International Living, an HOA, "La Asociación de Propietarios de Playa Rosada" ("APROSA") was constituted and municipally recorded.

103.     APROSA's formation document, which included bylaws, laid the groundwork for governance of Rancho Santana through an HOA—not through the Syndicate, International Living, or Agora:

   a.  APROSA was to serve as a non-profit organization.

   b.  APROSA's duration was to be "indefinite."

c. APROSA's Board of Directors was to consist of no less than three and no more than five Directors.

d. APROSA was to consist of the founding members and members who owned lots in Rancho Santana.

e. Rights were to be enjoyed equally among members, whether founding or non-founding.

f. Members could resign from APROSA.

g. Decisions were to be made democratically through voting procedures.

104.    In May 2002 several early property owners, including John Edwards ("Edwards") were flown to Baltimore by International Living and Agora.

105.    Each of the three members of the Syndicate also attended the May 2002 meeting in Baltimore.

106.    In Baltimore, the Syndicate, International Living, and the property owners formed the first neighborhood HOA, "Playa HOA," and held their first board meeting.

107.    Already, however, questions would be raised on how the HOA was executing its duties.

108.    For example, Edwards received an invoice dated October 25, 2003, for HOA dues and property tax payments for his lots from Geerling.

109.     On November 20, 2003, Geerling sent owners a letter lauding the growth of Nicaragua's "premier private residential community." She then explained the need for a shift in expenses from International Living to the HOA for ongoing costs, including improvements, amenities, maintenance, security, and staff.

110.     Geerling reassured owners, "As we continue to add more sections and more lots, the per-lot amount should come down, as more lot owners will be sharing in the common amenities."

111.     Geerling noted that the HOA fees were to be paid to APROSA and would be deposited directly into the HOA bank account.

112.     However, the October 2003 invoice itself directed payments to be sent to Geerling herself at a P.O. Box address in Miami, Florida.

113.     In an email on December 24, 2003, to "Il Rancho" at ranchosantana@internationalliving.com, Edwards questioned Geerling on the governance structure, building ownership, expense allocation, and due diligence processes of the HOA, based on its bylaws.  Edwards reminded Geerling of his attendance at the first HOA meeting in Baltimore in May 2002 and noted, "[T]hat was the last I heard of any organized approach to the issues at hand."

114.    In a reply email to Edwards on December 25, 2003, Geerling did not address Edwards's questions but forwarded them to, among others, Turner and Ford.

The 2004 Covenants

115.    The Syndicate, International Living, and Agora pressed on.  In a letter from Turner in Baltimore to owners on March 3, 2004, Turner pitched the creation of a new HOA, with new and expanded powers. In that letter, Turner made several representations to owners:

a.  "I am also, like you, a lot owner . . . . Bill Bonner, Mark Ford and Kathleen Peddicord[10] and her husband Lief Simon are lot owners as well. We all work for [International Living's] parent company Agora, Inc. in some capacity or another. [International Living] now is wholly owned by Agora, Inc."

b.  Development had been "[s]upported by the world wide advertising and public relations muscle of Agora, Inc. (reaching more than a million investors a year) . . . ."

c.  "Mark Ford has recently taken over the development process. Working closely with Gail [Geerling], and communicating regularly with lot

---

[10] At that time, Kathleen Peddicord was the publisher of *International Living*.

owners, he hopes to create a development that is beautiful, efficient, ecologically sound and economically viable for all."

d.  "Mark [Ford] is also in the process of hiring a professional manager to head up guest and homeowner services. He is looking at candidates with many years of senior management responsibility in the hotel and resort industry . . . ."

e.  Because "only the HOA is recorded and no by-laws were ever officially adopted or recorded . . . under Nicaraguan law the creator of the HOA, [International Living], can adopt any set of by laws [sic] it now wishes to govern Rancho Santana as it currently exists."

f.  Turner desired for new bylaws that "allow flexibility" and "as little bureaucracy as possible."

g.  "[T]he document allows the Developer to control the development until it hands it over to the members . . . . [I]t needs to have the final say until the HOA takes over."

h.  "During that transition period, [International Living] will continue to pay for all of its development costs and a significant share of what would be HOA costs . . . . [W]e have set an upper limit on lot owner fees of $1,500 a year."

      i.  "If we need to go above that (and Mark [Ford] is hoping the fees will decrease as he creates more lots to sell) it will be done only with your approval."

      j.  On the new bylaws, "We think they're very good and, as a lot owner myself, I think they will work well for us in the future."

116.    The new 2004 Declaration of Covenants (the "2004 Covenants"), the bylaws referenced in Turner's letter, created an HOA known as "Rancho Santana Association, S.A." ("RSA").

117.    Highlights of the 2004 Covenants, dated January 1, 2004,  include the following representations and/or covenants made by International Living:

      a.  International Living created RSA "as a community association to *own and govern* the community aspects of the Property" (emphasis added).

      b.  International Living intended to have the 2004 Covenants "burden, affect, bind, and run with the title to the land . . . ."

      c.  International Living "desires to establish an association to develop, maintain and operate common areas or facilities necessary or desirable for the functioning and continued operation of the Property and formed the Association [RSA] for this purpose."

d. International Living formed RSA "to provide a non-profit civic organization to serve as the representative of the Owners" regarding dues, enforcement of the 2004 Covenants, and the operation of the facilities covered by the 2004 Covenants.

e. "Association Land" was defined as land owned by RSA or a successor.

f. Dues were set at $600, with maximum annual increase of 10 percent unless two-thirds of owners voted for a greater increase.

g. RSA had the right to enforce payment of dues by a recourse first lien and foreclosure proceedings; if a court refused enforcement of the lien, RSA still had the right to sell the property at a public or private sale.

h. RSA would establish and maintain as two separate funds (i) a "Rancho Santana General Purpose Fund" to pay for the operation and maintenance of the Common Facilities" and (ii) a "Rancho Santana Capital Improvement Fund" to "share the burden of major repair and replacement of, and construction of new, Common Facilities."   Decisions on "Common Facilities" were at the sole discretion of the Board of RSA.

i.  International Living "may offer to convey to the Association [RSA] from time to time after the recordation of this Declaration common areas . . . [that] shall become part of the Common Facilities . . . ."[11]

j.  Every owner, guest, and invitee was to have a non-exclusive right and easement of enjoyment to all such common facilities, and such easement was to be appurtenant and pass with every lot upon transfer, subject to regulations promulgated by RSA and/or the Board.

k.  Every owner was to be a member of RSA.

l.  Membership would be split between two classes: Class A (every owner but International Living) and Class B (International Living alone).

m.  International Living had the right to appoint three of the six Directors of the Board, which would only decrease proportionate to International Living's contribution to RSA's funding.

n.  The Board was to establish an "Architectural Committee" to advise the Board on architectural matters, and the Board reserved disapproval with grounds of any structures to be built on lots.

o.  The 2004 Covenants were to continue until December 31, 2045, and then automatically extend for successive periods of ten years.

---

[11] In the final draft, "may offer" had replaced "intends" in an earlier version.

p.  The 2004 Covenants could be amended only by International Living until (i) such time that International Living relinquished its power to appoint a majority of the Board members or (ii) execution of an instrument signed by 75 percent of the owners that ordered relinquishment by International Living of such power.

q.  To be effective, any amendment had to be recorded among the land records or in another appropriate place at the time of execution.

r.  The Board had the final say on construction or interpretation of the 2004 Covenants unless a court of competent jurisdiction intervened.

The 2005 Covenants

118.    On February 18, 2005, International Living introduced the 2005 Declaration of Covenants (the "2005 Covenants"), proposing Greater Rancho Santana Association, S.A. ("GRSA"), a super-HOA above RSA and all other sub-associations.

119.    Highlights of the 2005 Covenants include the following representations and/or covenants made by International Living:

a.  The new GRSA could bind and even sue all lower associations in its chain.

b. Each sub-association was to be a member of GRSA and get at least one Board member. This included an entity called "Nicaraguan Housekeeping," which owned and operated a small four-unit hotel that might be expanded in the future.

c. International Living would in good faith not randomly create new associations that would skew the GRSA Board toward International Living's interest.

d. Dues were to be $500.00 annually and would not exceed annual increases of 10 percent without two-thirds vote of the Board.

e. "Common Facilities" were now called "Main Services."

f. The 2005 Covenants were to extend to December 31, 2060, and then automatically be renewed for successive periods of ten years.

g. The 2005 Covenants could be amended only with two-thirds approval of the Board and needed to be municipally recorded to be effective.

h. References to "Association Land" and offers by International Living to convey land to the HOA from time to time were dropped.

120.     On April 28, 2005, Turner sent to Edwards, then-President of Playa HOA, by FedEx from Baltimore two signed copies of the 2005 Covenants and a signed resolution for Playa HOA to join GRSA. Bonner also signed the 2005

Covenants as President of International Living. Edwards's own signature made the 2005 Covenants effective.

121.    For approximately two years, from 2004-2005 and 2005-2006, Edwards and other officers ran the HOAs and collected dues from owners. The HOAs reviewed bids from competing providers and paid International Living annually through collected dues for any agreed-upon services provided.

The 2006 Covenants

122.    In 2006, without following the existing HOA bylaws, International Living introduced yet another set of covenants called the "Master Declaration of Covenants, Conditions and Restrictions For Rancho Santana Community" (the "2006 Covenants")—a declaration that went up from the 27-page 2004 Covenants and 12-page 2005 Covenants to now over 90 pages.

123.    The 2006 Covenants were the brainchild of the Syndicate, International Living, Agora, and Edward Popkin ("Popkin"), a Florida-based attorney and real estate developer.

124.    Highlights of the 2006 Covenants, dated October 4, 2006, include the following representations and/or covenants made by International Living:

  a.  Excepting certain land reserved to itself, International Living was selling
      Rancho Santana to a Nicaragua limited liability company, Granados

Centeno y Compañia Limitada, doing business as Pinnacle Properties Nicaragua ("PPN SRL"). PPN SRL's Board of Directors included Bonner, Ford, and Popkin.

b. All reference to the 2004 and 2005 Covenants were omitted, and the 1998 APROSA formation document itself was purportedly amended.

c. The reformulated APROSA, now called "Rancho Santana Community Association" ("RSCA") was recast "as a master-planned mixed-use community." It was to be "comprised of all Rancho Santana Community property owners, current and future, to own, operate, and/or maintain various common areas and community improvements . . . ."

d. The term of this "Master Declaration" was 50 years, with automatic renewal for successive 10-year periods, unless at least 75% of owners terminated it.

e. Exclusive Class B control was given to International Living/PPN SRL until (i) 95% of all residential lots were owned by Class A Members, (ii) December 31, 2036, or (iii) International Living/PPN SRL determined in its sole discretion to relinquish control.

f.  A new category of "Private Amenities" was created, defined as current and future real property and facilities not owned by RSCA such as a hotel, inn, or similar accommodations.

g.  RSCA had no right to unreasonably interfere with the operations of Private Amenities.

h.  However, owners, operators, guests, and invitees would have access to any Private Amenities developed.

i.  The RSCA Board could propose changes to use restrictions at any time, subject to veto by a Class A majority *or* by International Living.

j.  Each owner was a member of RSCA.

k.  The Board could enforce sanctions on non-compliant owners such as imposing fines, suspending an owner's right to vote, suspending RSCA-provided services, exercising self-help eviction and personal property removal methods, and bringing legal or equitable suits.  However, International Living, its affiliates, and its lots were exempt from such sanctions.

l.  RSCA could exercise all rights given expressly or "by reasonable implication" by the 2006 Covenants and could, through the Board, exercise all its rights and powers without a vote of the membership.

m. "Central Water Utility Company," a new Nicaragua for-profit company, would own, operate, and maintain water delivery infrastructure to all residents, making itself the sole source of running water in Rancho Santana.

n. RSCA could attach a first lien on each lot to secure payment of assessed costs, and even for capital improvements.

o. Certain assessments were categorized, but any lots owned by International Living/PPN SRL, with some exceptions, were exempt from such assessments.

p. International Living/PPN SRL could choose to convey property to RSCA, including a to-be-built Welcome Center.

q. Anyone acquiring an interest in Rancho Santana was to acknowledge that "Rancho Santana is a master planned community, the development of which is likely to extend over many years . . . ."

r. International Living/PPN SRL reserved special right to appoint or remove any officer of RSCA or any Board member at any time during the Class B control period.

s. No amendment could be passed, even with a 75% super-majority of members, without International Living/PPN SRL's written consent as

long as International Living or its affiliates owned any property subject to the 2006 Covenants.

125.    On Jan 19, 2007, the APROSA formation document from 1998 was amended to parallel the 2006 Covenants and municipally recorded:

a. An owner would become a Class A member on purchasing a lot.

b. A member could no longer resign from APROSA.

c. The "Developer" (International Living/PPN SRL) would be the sole Class B member.

d. The Developer could not vote but could appoint the majority of the members of the Board of Director during its control period. The Developer had the exclusive right to exercise control of the Board of Directors and appoint or remove any of the Directors.

e. The Developer also  had "the exclusive right to develop (build) properties within Rancho Santana, taking all the actions it deems required or desirable for the construction, development, market, sale, administration, ownership and operation of Rancho Santana."

f. Lots were divided into residential and non-residential lots.

g. An extensive "Special Clause B" created a formula for the allocation of votes and payments for common expenses, with residential and non-

residential unimproved lots at 0.25 equivalence. Lots owned by the Developer were exempt from payments.

h. The same five "members" who presented the amendments to APROSA declared that they were elected to positions as Directors for two-year terms, including a President, Vice President, and Secretary/Treasurer.

i. The Secretary was to prepare and register minutes for Board meetings and prepare annual reports.

j. The Treasurer was to maintain records of all assets of APROSA.

126. The introduction of the 2006 Covenants was not well received by many owners in the Rancho Santana community.

127. According to Edwards, Popkin and International Living refused to recognize the pending third-year election for Directors of the then-existing HOA.

128. Also according to Edwards, the position of legal counsel of the Syndicate and Popkin was that membership in APROSA obligated all present and future owners to pay HOA fees levied by APROSA, enforceable by lien and foreclosure.

129. Owners at that time emphasized a number of concerns:

a. The main reason why most owners had bought into Rancho Santana was that the Syndicate, International Living, and Agora had represented Rancho Santana as a private, gated, residential community—not a resort.

b. Many owners were avid surfers drawn to the world-class surfing that the Emerald Coast of Nicaragua offered.  Those owners were particularly concerned about the instability of the water supply and how proposed modifications of the local river emptying into the ocean would affect the shoreline.

c. Owners had been assured that the water system would be turned over to the HOA; the 2006 Covenants amounted to monopolization of the water system by a for-profit company.

d. The Syndicate's "Master Plan" was purposefully a moving target that amounted to a bait-and-switch on the owners.

**Phase 2 of the "No-Master-Plan" Master Plan: the "HOA Dues" Shell Game**

130.    In The Story, Ford acknowledged that Rancho Santana's original buyers were indeed mainly surfers.[12] But, as Currey related, Turner's vision was to continue what the Syndicate had been talking about—and take it to another level.[13]

---

[12] *The Story*, *supra* note 3, at https://youtu.be/hLpEaP7HbuM?si=SdNi_ky01ys_uT2Y&t=1546.
[13] *Id.* at https://youtu.be/hLpEaP7HbuM?si=A3h2tIoO7PGMOT4n&t=1741.

The Rise of the Resort, the Fall of the HOA

131.    On December 5, 2005, Turner formed "Pacifica Riviera Development, LLC."  The entity became Tola on January 12, 2006.

132.    On December 27, 2006, a Florida limited liability company named PPNDS, LLC ("PPNDS") was formed.  Its initial managing members were Ford and Popkin.

133.    After the 2006 Covenants were established, no governance in accordance with the HOA provisions occurred.  There were no minutes of Board meetings, no annual reports, and no records kept of all HOA assets.

134.    Nevertheless, ranchosantana.com on March 7, 2007, had a link, "Homeowner's Association Documents," leading to documents that included the 2006 Covenants, a "Master Plan of Rancho Santana," "Proposed Community Structure," "Formula For Votes," and "Frequently Asked Questions" ("FAQ").

135.    The FAQ document represented, "The Master Association [RSCA] owns or will own the Community's recreational, infrastructure and other commonly used facilities such as the roads, entry gates, the Beach Club and tennis courts . . . ."

136.    On November 12, 2007, ranchosantana.com added a "Developer" link that posted the following:

> Under Pinnacle's direction, Rancho Santana has a new master plan that takes advantage of all the best this amazing property offers . . . . The new master plan has been carefully crafted to enhance and preserve the natural beauty of the land, while still providing all the luxuries and services you would expect from a world-class resort.[14]

137.     December 2009 showed the last captured snapshots of the "Homeowner's Association Documents" and "Developer" pages; by 2010, the pages had disappeared.

138.     However, ranchosantana.com continued to represent, "A master association and various sub-associations exist so that you can be assured that high and consistent standards of quality will be maintained. See the Master Plan for specific subdivisions." The dates of those representations are at least as follows:

| | | |
|---|---|---|
| March 31, 2009 | May 1, 2009 | September 19, 2009 |
| December 17, 2009 | January 9. 2010 | January 22, 2010 |
| March 5, 2010 | March 30, 2010 | April 30, 2010 |
| May 1, 2010 | May 14, 2010 | May 16, 2010 |
| June 6, 2010 | July 4, 2010 | July 18, 2010 |
| August 4, 2010 | August 28, 2010 | September 17, 2010 |
| September 29, 2010 | October 31, 2010 | November 17, 2010 |
| December 1, 2010 | December 27, 2010 | January 17, 2011 |
| January 28, 2011 | January 29, 2011 | March 1, 2011 |
| March 2, 2011 | March 20, 2011 | April 3, 2011 |
| May 4, 2011 | May 19, 2011 | May 21, 2011 |
| June 5, 2011 | July 5, 2011 | July 20, 2011 |
| July 22, 2011 | August 5, 2011 | September 20, 2011 |

---

[14] *Developer*, https://web.archive.org/web/20071112033940/http://www.ranchosantana.com/developer.php.

| | | |
|---|---|---|
| September 24, 2011 | October 22, 2011 | November 15, 2011 |
| November 20, 2011 | December 16, 2011 | January 14, 2012 |
| January 19, 2012 | February 19, 2012 | March 20, 2012 |
| March 27, 2012 | April 21, 2012 | May 24, 2012 |
| May 27, 2012 | June 27, 2012 | July 28, 2012 |
| August 2, 2012 | | |

139.     In addition, according to a current homeowner who had sold property in Rancho Santana as an agent, Turner continued to pitch Rancho Santana to numerous groups of clients as a "Residential, resort community with a capital 'R' on 'Residential' and a lowercase 'r' on 'resort.'"  According to that former agent, over one hundred new owners were sold on that pitch.

140.     Meanwhile, by 2010 Popkin had disappeared from the "Master Plan" for Rancho Santana.

141.     By March 5, 2010, PPNDS's principal place of business was moved from Florida to Baltimore, at the same address as Agora.

142.     By January 4, 2011, Turner replaced Popkin as managing member of PPNDS, alongside Ford. (PPNDS was ultimately dissolved on September 23, 2022.)

143.     In September 2010 PPN SRL changed its corporate name to Tola Development Group, LLC y Cía Ltda ("Tola SRL").  In May 2021 this entity became Rancho SRL.

144.     "The second phase of Rancho Santana," as Rancho SRL CEO Maish put it, had begun in earnest: "the phase of building the resort, putting Rancho Santana on the map."[15]

145.     Turner, Maish's predecessor as CEO, led the way.  Realizing that no residential community, "even if you're renting the homes," would get the travel press coverage he needed, Turner convinced the Syndicate to demolish the small four-unit hotel and erect a 17-room inn.  The inn opened in March 2015.[16]

146.     Eventually, more accommodations and amenities were added to promote the resort: condos, residential suites, five-star chefs, wedding packages, and surfing and wellness retreats.

147.     To owners including CDM, the Syndicate and Rancho SRL continued to represent in purchase and sale agreements and transfer deeds that APROSA still operated as an HOA, binding owners to payment of Rancho Santana Owner Dues (the "Dues").

148.      The Dues enforcer has been Costantino, Rancho SRL's CFO.

149.     From 2013-2024 Costantino's email exchanges with Julapalli and CDM have come from several different domains: agorapublishingggroup.com, agora-inc.com,  rsownerdues@ranchosantana.com,  and  14west.us,  the  domain

---

[15] *The Story*, *supra* note 3, at https://youtu.be/hLpEaP7HbuM?
si=eiHNeLPQTAAPIXVE&t=2109.
[16] *Id.* at https://youtu.be/hLpEaP7HbuM?si=hUeZ3SytKJfRnZDz&t=1962.

name for 14 W Administrative Services, LLC—which used to be known as Agora Management, LLC.

150.    On an email dated November 21, 2013, Costantino introduced himself to Julapalli as "the CFO of Rancho Santana and I keep an 'owner's file' for myself here in Baltimore." Requesting address information, he stated, "I only use this information in case email does not work as a form of communication when it comes to collecting Owner Dues at Rancho Santana."

151.    On February 21, 2014, Costantino emailed to Julapalli, "Attached is the invoice for your 2014 Rancho Santana Owner's dues and credit card authorization form if you are paying with a credit card. Your payment is due by April 15, 2014. The 2014 dues are $2,040 ($1,945 last year) which is a 4.8% increase." The attached invoice represented that the 2014 Dues should be paid to either APROSA or "Publishing Services, LLC" (formerly Agora Publishing, LLC); in either case, Costantino directed the money to the United States:

**If paying by check:**

Please **DEDUCT $50** and make check payable to APROSA and mail to:

*APROSA*
c/o Paul Costantino
14 West Mount Vernon Place
Baltimore, MD 21201

**If paying by wire please use these instructions:**

Wire Transfer Instructions:

Our Address:
Publishing Services, LLC
14 W Mount Vernon Place
Baltimore, MD 21201
USA

Our Bank's Address:
Citi Bank
6 Saint Paul Street
Baltimore, MD 21201
USA

| | |
|---|---|
| Account Name: | Publishing Services, LLC |
| Account Number: | ▮▮▮▮▮▮ |
| Routing Number: | 254070116 |
| Swift ID: | CITIUS33 |

152.    Julapalli paid for the 2014 Dues by wire transfer from a Houston, Texas, bank to Publishing Services, LLC in Baltimore.

153.    On an email dated May 25, 2014, Julapalli sent Costantino a copy of the deed, clarifying that CDM purchased and owned title to G16; Costantino acknowledged receipt of the deed by email on May 27, 2014.

154.     On February 20, 2015, Costantino emailed to Julapalli, "Attached is the invoice for your 2015 Rancho Santana Owner's dues, wire information and a credit card authorization form if you would like to pay with a credit card. Your payment is due by April 30, 2015. The 2015 dues are $2,140 ($2,040 last year) which is a 4.9% increase."   The attached invoice showed the same transaction instructions as in 2014.

155.     Julapalli paid for the 2015 Dues by wire transfer from a Houston bank to Publishing Services, LLC in Baltimore.

156.     On February 19, 2016, Costantino emailed to Julapalli, "Attached is the invoice for your 2016 Rancho Santana Owner's dues. Your payment is due by April 30, 2016. The 2016 dues are $2,240 ($2,140 last year) which is a 4.7% increase from last year."   The attached invoice showed the same transaction instructions as in 2014 and 2015.

157.     Julapalli paid for the 2016 Dues by mailing a check from Houston, payable to APROSA, to Costantino in Baltimore.

158.     On February 18, 2017, Costantino emailed to Julapalli, "Attached is the invoice for your 2017 Rancho Santana Owner Dues. Your payment is due by April 30, 2017. The 2017 dues are $2,350 ($2,240 last year) which is a 4.9%

increase from last year. For your convenience and as a test run for 2018, we are only accepting payments via credit card."

159.    The reference to the "test run," as Costantino explained in the email, was to streamline the Dues collection process from owners through automated recurring charges on credit card. The credit card information would also be used to open a "folio account" at Rancho Santana for purchases at private amenities. On the email, Costantino incentivized owners to complete the attached credit authorization form early and get discounts on bookings at the inn and other accommodations.

160.    Julapalli emailed Costantino the credit card authorization form on March 19, 2017. Costantino transacted the 2017 Dues payment by credit card and forwarded an email receipt on that same day of payment received. The email receipt showed paypal.com as the sender, pcostantino@pinnaclepropertiesnica.com as the recipient, and "PPNDS, LLC" (PPNDS) as the merchant.

161.    On February 20, 2018, Costantino emailed Julapalli, "Attached is the invoice for your 2018 Rancho Santana Owner Dues. Your credit card will be charged the week of April 16th, 2018. The 2018 dues are $2,400 per lot ($2,350 last year) which is a 2.1% increase from last year." Costantino stated that a

consultant was coming to Baltimore to ensure that the automated process went smoothly.

162.     Costantino transacted the 2018 Dues payment by credit card on or around April 21, 2018.  "TDG*Rancho Santana 310-9295221 MD" was noted as the merchant on the credit card statement.[17]

163.     On February 24, 2019, Costantino emailed Julapalli, "Attached is the invoice for your 2019 Rancho Santana Owner Dues. Your credit card will be charged the week of April 15th, 2019. The 2019 dues are $2,520 per lot ($2,400 last year) which is a 5% increase from last year." Costantino stated that a consultant was coming to Baltimore a final time to ensure that the automated process went smoothly.  He also noted that any check should be sent to  APROSA, c/o Paul Costantino, 1217 Saint Paul Street, Baltimore, MD 21202.

164.     Costantino transacted the 2019 Dues payment by credit card on or around April 18, 2019. "TDG*Rancho Santana 000-0000000 MD" was noted as the merchant on the credit card statement.

165.     On March 6, 2020, Costantino emailed Julapalli, "Attached is the invoice for your 2020 Rancho Santana Owner Dues. The 2020 dues are $2,650 per lot ($2,520 last year) which is a 5% increase from last year." He stated that he was

---

[17]A payment toward the annual property tax that Costantino had transacted through the same credit card about a month earlier had shown "NICARAGUA 4108640807 MD" as the merchant.

coming to Rancho Santana later that month to get the annual Dues process started.

He also now noted that any check should be sent to Tola Development Group, LLC

(changed from APROSA), c/o Paul Costantino, 1217 Saint Paul Street, Baltimore,

MD 21202. Attached wire instructions were directed to a United States bank:

Routing Transit Number:  121000248

Bank Name: Wells Fargo Bank, N.A.

Bank Address:    420 Montgomery St.
                 San Francisco, CA 94104

Wells Fargo Account Number: 

Beneficiary Name: Tola Development Group, LLC Compania LI
                  14 West Mount Vernon Place
                  Baltimore, MD 21201

166.    That March 6, 2020, email was copied to Currey, who announced in

the same email that "a more substantial fee increase is unavoidable without

somehow compromising our progress.  In order for the Ranch to reach its full

potential as a viable and sustainable community, . . . [a]n increase of $1,500 will

occur next year (2021) for the same fiscal year."

167.     On August 25, 2020, Costantino transacted the 2020 Dues payment by credit card and forwarded an email receipt on that same day of payment received. The email receipt showed paypal.com as the sender, pcostantino@14west.us as the recipient, and "PPNDS, LLC" as the merchant.

168.     On March 5, 2021, Costantino emailed Julapalli, "Attached is the 2021 Rancho Santana Owner Dues invoice for $4,150"—a 57% increase from 2020.  Attached check and wire instructions were directed to the United States:

Rancho Santana Owner Dues for January 2021 - December 2021

1 lot at $4,150 per lot………………………..………………………............................…..……. $4,150

1.) Paying by credit card - Please fill out the attached form or ask to conform that card that we have on file.  The card we have on file will be charged unless a new card is provided, or other arrangements are made to pay the dues by April 2nd.

2.) Paying by check - Please make payable to Rancho Santana and mail to:

Rancho Santana
c/o Paul Costantino
1217 Saint Paul Street
Baltimore, MD 21202

3.) Paying by wire - Please send funds to our US Wells Fargo account:

Account #███████████
Routing #121000248

Tola Development Group, LLC Compania Limitada
14 West Mount Vernon Place
Baltimore, MD 21201

169.     On April 5, 2021, Costantino transacted the 2021 Dues payment by credit card.  On the same day, Julapalli received an email receipt showing "PPNDS LLC" as the merchant, with the same Agora headquarters address of 14 W. Mt. Vernon Place in Baltimore.

170.     The 2021 Dues budget showed that $1,993,561 had been collected that year.

171.     On March 16, 2022, Costantino emailed Julapalli an invoice for the 2022 Dues, then up to $4,358 and up 5% from 2021.  The invoice showed yet another change of check and wire instructions, this time with check recipient back to "APROSA" and wire recipient as "14W Administrative Services, LLC":

Rancho Santana Owner Dues for January 2022 - December 2022

1 lot at $4,358 per lot……………………….........................………………………….........................…..……… **$4,358**

1.) ***Paying by credit card*** - Please fill out the attached form or email us to confirm that card that we have on file is still valid.  The card we have on file from last year will be charged unless a new card is provided, or if other arrangements are made to pay the dues by April 18th. Please note that there is a 3.50% convenience fee associated with this payment method. We can also send you a link to pay the owner dues via our local bank's secure credit card platform.

2.) ***Paying by check*** - Please make payable to APROSA and mail to:

Rancho Santana
c/o Paul Costantino
1217 Saint Paul Street
Baltimore, MD 21202

3.) ***Paying by wire*** - Please send funds to our PNC account 14W Administrative Services, LLC:

Account # ▮▮▮▮▮▮▮▮
Wire Routing #031000053
ACH Routing #054000030

172.    Julapalli paid for the 2022 Dues by mailing a check from Houston, payable to APROSA, to Costantino in Baltimore.

173.    The 2022 Dues budget showed that $2,041,030 had been collected that year.

174.    APROSA had been expedient as an HOA with enforcement power, perpetuated through CDM's purchase and sale agreement, deed, and repeated email communications with Costantino through Julapalli over nearly a decade.  But that expediency would come to an end.

175.    On October 31, 2022, the Nicaraguan government published an announcement that APROSA had failed to report its Board of Directors or financial statements from 2014 to 2021, was therefore noncompliant with the law governing non-profits, and was, as a result, terminated.

176.    The Syndicate and Rancho SRL may have anticipated as much this termination.  New "Rancho Santana Community Guidelines," (the "Community Guidelines") effective June 1, 2022, were discovered to have been posted without notice to owners on ranchosantana.com in November 2022, replacing the 2006 Covenants. Though many clauses were copied straight from the 2006 Covenants, the Community Guidelines were down to nine pages from over 90 and had their own highlights:

a.   The Community Guidelines were stated by Rancho SRL, acknowledged to be "formerly known as Tola Development Group"; the Community Guidelines mentioned no other past association.

b.   "The initial governance structure envisioned for Rancho Santana has since been repurposed by Developer [Rancho SRL], and transformed into a developer operated project, which allows for uniformity of the offer."

c.   The conditions for turnover of Rancho Santana to owners were all eliminated.

d.   Rancho SRL had the exclusive right to limit access to its property, as well as to charge separate fees for such access that would be retained by Rancho SRL.

e.   Rancho SRL was responsible for maintaining the common areas and providing security.

f.   "In order to provide a cleaner, cohesive, and comprehensive tourism offering to advance relative rental and property values and compete with other resort-developments," Rancho SRL would be the exclusive property manager, with exceptions, of all private properties in Rancho Santana.

g.  Rancho SRL could change the "Master Plan" at its discretion and need not give notice or seek consent for such changes except as required by law.

h.  Rancho SRL was authorized to collect regular assessments from owners to pay for the common areas.

i.  Rancho SRL reserved the right to decide what would be dedicated as common areas.

j.  Rancho SRL would prepare a budget of estimated common expenses for each coming year.  The budget could be reviewed by owners but was not subject to their approval.

k.  "Properties created by [Rancho SRL] but not yet sold to a third-party owner" were exempt from assessments.

l.  Liens on owner property to secure payment of assessments could still be attached, now by Rancho SRL.

m. Property sales were subject to Rancho SRL's issuing a "Clearance Certificate" showing that the seller owed no payments.

177.    Many owners—CDM included—with "APROSA" represented in their purchase and sale agreements and deeds as a binding HOA remained highly confused about the legal existence of an HOA governing Rancho Santana.

178.    Indeed, after the Syndicate and Rancho SRL had unilaterally raised the Dues by over 50 percent in 2021, another owner had been repeatedly asking Maish, Costantino, Currey, and Rancho SRL's legal counsel for current legal documentation that bound Rancho SRL and owners to each other.  That owner had received either conflicting responses to those inquiries (the HOA Board is developer-run and private, the HOA does not exist) or no responses at all.

179.    On November 23, 2022, Maish was emailed by yet another owner a series of questions regarding the history of Rancho Santana, APROSA, and what legal documents bound a property owner to Rancho SRL.

180.    When no response to those questions was forthcoming, Maish was asked again to address the questions in an email on or around February 1, 2023.

181.    On February 7, 2023, Rancho SRL's legal counsel sent a letter explaining that APROSA served as a non-profit legal vehicle to receive the Dues and avoid taxes.  "With the recent change in tax law and NGO law, the use of the entity ceased to be practical.  The new regulations created compliance challenges, and the Nicaraguan government canceled its existence."  No mention was made that the Nicaraguan government had canceled APROSA's existence in October 2022 because it had failed to report its Board of Directors or financial statements for years.

182.    Rancho SRL's legal counsel added, "APROSA does not longer exist and considering you cannot be part of something that does not exist, this obligation is null and void."  According to counsel, the Community Guidelines would now be the only document that determined the rights and obligations of everyone at Rancho Santana.

183.    On March 20, 2023, Maish sent owners as a whole an email titled "State of The Union, Rancho Santana," in which he directly addressed the history of APROSA:

> "APROSA" is often affiliated with owner dues. It was a corporation started in the early years of Rancho Santana, with the initial intent of establishing a working homeowners association. The process failed, or rather, the process failed to offer an attractive path forward for anyone involved, and the initiative was abandoned for good. Many years later, the process of creating a homeowners association would be complex. If possible, the most an HOA could govern would be what a group of property owners agree they can do with their private properties beyond what's already defined by the law. There is no clear path to an HOA governing the private property and enterprise of Rancho Santana, nor is there any motivation to move this direction. It's intentional, as it was predicted an HOA-managed Rancho Santana would be problematic and conceivably impossible from a financial perspective. All to say, we intend to continue to manage the development under the current structure that's led Rancho Santana to 25 years of advancement in becoming the premier residential resort community of Nicaragua (and one of the premier communities of Central America), and we ask for your trust, support, and alignment as we continue this journey.

184.    In the same email, Maish echoed Rancho SRL's legal counsel explanation from a month before, that "the APROSA corporation was maintained independently for one purpose: it offered a legitimate tax shield for property owners . . . ." He, too, made no mention of why the Nicaraguan government in fact canceled APROSA, except to state that the "interference" of "a private investigation on APROSA led by an RS property owner or group of owners drew attention to the status of the corporation, causing APROSA to be closed by tax authorities . . . ."

185.    In the same email, Maish finally confirmed, "APROSA no longer exists, and therefore, if this reference exists in your deed, it holds no legal effect or binding implication . . . . The governing document for the relationship between enterprise, community, and development of Rancho Santana, will be [the Community Guidelines] . . . ."

186.    Given the uproar among many owners that the ballooning Dues, obscured status of APROSA, and other controversies[18] had caused, Maish announced the first in-person "Owners Meeting" to be held at Rancho Santana on May 15, 2023.

---

[18] *See infra.* p. 69.

187.     Julapalli flew down from Houston to attend the meeting. Maish and Currey, but no members of the Syndicate, attended the meeting.

188.     The meeting included the following representations by Maish:

a.   The vision of Rancho Santana was a "high-end residential resort community.  We're currently the leader in Nicaragua, and we're one of the leaders in Central America."

b.   The Dues had to rise significantly because of (i) the Syndicate/Rancho SRL's mismanagement of the budget from lack of systems in place, (ii) a budget loss of $1.1 million having accumulated from 2020-2022, and (iii) inflation.

c.   The Dues were "fee for service" such as electricity and water, even for owners with an unimproved lot.  All owners would be required to pay equally to maintain the infrastructure. However, the Dues did not go toward Rancho SRL's private amenities.

d.   The Dues approach was intended to make Rancho Santana an attractive place in which to live, invest, and spend time and money.

e.   No outside firm had been hired or would be hired to audit the Dues budget; Rancho Santana was a privately owned and operated, gated resort-community enterprise, not a publicly owned municipality.

f.  Rancho SRL had no legal authority to attach an interest to an owner's property for refusing to pay the Dues.

g.  However, on an owner's inquiring what Maish was doing about those who decided not to pay the Dues: "We're going to have to get real about that." "Get real" meant denying access of anyone but the owner to one's property and denying services such as electricity and water.

h.  Any buyer of property from an owner would have to cover the unpaid Dues. "It wouldn't go to court. If you're going to buy it, this is what's attached to it."

i.  Maish and Rancho SRL had the right to impose rules to enforce the Dues, with consequences for failure to pay. "We've looked at the consequences in doing all of this. None of this is reckless; this is all kind of thought through and structured in a way that should be accommodating to future investment."

j.  There would be no voting on issues because (i) "that's not how things were set up," and (ii) voting was pointless when decisions were going to be made by Rancho SRL anyway.

k.  There were no plans to resurrect an HOA, and the position of the Syndicate was not to talk to the owners but rather to grant Maish full authority to govern accordingly.

l.  On getting buy-in from owners as to Rancho SRL's methods: "Many, many, many owners have already bought into it."

189.    Maish's representations at the May 15, 2023, Owners Meeting had been endorsed by all three members of the Syndicate in its "onward and upward" memorandum dated September 21, 2022—though whether the Syndicate meant "amenity expense" to include Rancho SRL's private amenities was unclear:

Memorandum

To: Concerned Fellow Rancho Santana Owners
Fr: Rancho Santana Board of Directors
Re: Chief Executive Officer ("CEO" duties)
Dt: September 21, 2022

As with all Board of Directors, we hire a CEO to make tough decisions. Mr. Luke Maish has authority for his reasoned and fully considered decision to move the Ranch forward as a place where all renters experience the amenities and all owners share in the amenity expense on a fair level. The decision was his and he has full authority to implement it as well as adjust it upon listening to each owner's unique concerns. But decisions have to be made with a multitude of factors to be balanced. Luke has our complete faith that he will ultimately make the soundest decisions for the Ranch's long term success.

This corporate model may not be perfect, but we chose it over the "owner controlled" model that we believe creates more dissension, inferior product, group think and group battles, and usually lousy food!

We celebrate 25 years of amazing success, and we are fully confident under Luke's direction and judgments we will be celebrating many more happy anniversaries.

Onward and upward,

William Bonner    BB
Mark Ford    MF
Matthew Turner    MT
Myles Norin    MN

190.     Since the initial Owners Meeting, Rancho SRL, Maish, Geerling, and at least one member of the Syndicate have continued to make misleading or false representations of the existence of an HOA, with its typical power.

191.     To date on ranchosantana.com, an "Employers' Compliance" document has three separate references to an HOA, including a social

responsibility policy setting out "recommendations to our members of the Association of Owners of Houses of Playa Rosada"—that is, APROSA.

192.   To date on ranchosantana.com, the most current version of the Guidelines, effective March 1, 2024, still grants Rancho SRL a lien that could attach to owner property to secure payment of delinquent assessments.

193.   In an email response to an owner on July 17, 2023, Maish noted, "Some property owners would prefer an HOA type approach, but that's simply not how we've ever managed the property, and many of our owners and buyers understand and support our method to running the property."

194.   Yet, on his own blog site on June 6, 2023, Ford represented that Rancho Santana still had HOA bylaws (and, ironically, his hypocrisy):

> A friend of ours, a bestselling author, developed his own version of our residential community in Argentina about ten years after we started Rancho Santana. When it comes to Libertarianism, he's about as hardcore as it gets. And yet, the last time I visited his resort, *their book of homeowner association bylaws looked to be even thicker than ours*!

> What's the point?

> The point: It's easy to be a Libertarian or a Marxist or an anarchist when you are young and unburdened with responsibility. But as you grow older and take on the responsibilities of adulthood, those glittering ideologies become impossible to keep.

> Except, of course, if you are a hypocrite — i.e., you make your living as a university professor, a politician, or a book and essay writer (like me)![19]

195.    On a September 14, 2023, email sent to an emailing list of many owners including Geerling and Julapalli (the "Listserv"), Edwards called out Maish's misrepresentations. Edwards noted that he had sent copies of the 2005 Covenants establishing GRSA to Maish, Ford, and Turner.

196.    On a Listserv email dated September 15, 2023, Geerling asked Edwards if he had evidence that the 2005 Covenants were legally executed in Spanish, "to legitimize in Nicaragua the English documents you've provided."

197.    Edwards responded by Listserv email to Geerling on that same day. He stated that he assumed Geerling has always been aware of the existence of the 2005 Covenants, recalled the 2002 meeting in Baltimore where the first neighborhood HOA had been formed, emphasized intent over legal technicalities, and asked Geerling where her personal stance on the HOA situation lies.

198.    A fellow owner made a similar inquiry of Geerling on a Listserv email dated September 18, 2023, asking her to share information on the HOA situation as she understood it—especially since she had been employed by International Living and was its legal representative during the early years of Rancho Santana.

---

[19] Mark Ford, *Rules: Who Needs Them?* (June 6, 2023), https://www.markford.net/2023/06/06/ (emphasis added).

199.    On September 19, 2023, Geerling replied back to that owner and Edwards on the Listserv: she believed there had been official meetings of the Board of Directors of APROSA but could not form an opinion because she had no written record of them or access to the minutes book.  As she saw it, "[t]hose corporate Board documents would be different than a meeting that took place out of country, minuted in English with English agreements."

200.    On a Listserv email dated October 30, 2023, the owner reminded Geerling that the original Playa HOA Board, which had included three homeowner representatives and two developer representatives, had been annulled by International Living due to apparent errors in the filing of paperwork.  The owner then asked Geerling point-blank: "Can you let me know why you think the Developer never called elections for our Home Owner Association after 2007?"

201.    To date, Geerling has not responded to that question.

CDM Stops Paying the "Dues"

202.    On March 21, 2023, the day after Maish had sent his "State of The Union, Rancho Santana" email, Costantino emailed Julapalli the invoice for the 2023 Dues, then up to $4,576 and up 5% from 2022.  Check and wire instructions were still directed to the Baltimore area.

203.    When pressed to provide more details regarding line items in the budget provided, Costantino responded to Julapalli on May 22, 2023:

> Mostly all the questions were answered according to Luke [Maish] at the meeting and in his FAQ document. If there is a additional data you would like to see you [sic] in next year's budget, please send your request to Luke and I [sic] and we will review it during the budgeting period . . . We are not hiding anything, but at the same time don't have the bandwidth to field questions from 400+ owners.

204.    After several more email exchanges about the budget, Julapalli emailed Costantino on May 28, 2023, that he was open to making a payment but first needed more trust about what the payment would be buying.  Julapalli noted that along with many other owners he had been under the assumption for years, based on numerous representations, that the annual payments had the authority of an HOA behind them—when no such HOA had existed, as management had known all along.

205.     Costantino's email response on June 7, 2023, included the following ultimatum: "If you are opting to (sic) not to pay, then you will be passed on to our legal team and that will give us cause to cut water and electrical service to your lot."  He added, "Again, I hope all is going well with your house and I will be sure to drive by it when I am there in a few weeks since I didn't know you were building."[20]

---

[20] *See infra.* p. 76.

206.    Costantino then sent emails to Julapalli on July 17, 2023, declaring the unpaid Dues delinquent and on August 12, 2023, assessing interest.  Julapalli responded to Costantino on August 13, 2023, that (a) there was no agreement between Costantino's company and CDM regarding the payments, (b) any demand for payment had no basis until there was an agreement, and (c) any charged interest would be usurious.  Costantino responded by email later that day that water and electricity to G16 would be cut off.

207.    Julapalli and CDM did not make the 2023 Dues payment.

208.    The 2023 Dues budget showed that $2,100,384 had been collected that year.

209.    On March 5, 2024, Costantino emailed Julapalli an invoice for the 2024 Dues, then up to $5,250 and up 15% from 2023.

210.    On May 27, 2024, Costantino emailed Julapalli that "any owner who is 2+ years delinquent will have no access to our private property other than your lot or house." Costantino explained that visiting any area of Rancho Santana other than the owner's own property would be considered trespassing.

211.    On the same email Costantino added the following warning:

Rancho Santana will not be obligated to provide electrical infrastructure to your lot or house since this is covered under the annual Owner Dues that are delinquent. If a property is transferred or sold to another party without paying the debt, they will not have

access to the infrastructure that the Owner Dues cover. Finally, our real estate team will be reaching out to all brokers to send them a list of all properties that are currently delinquent. They will notify these brokers that the lot is not eligible for electrical infrastructure set up until the outstanding dues are paid in full.

212.     Finally, on the same email Costantino explained that other owners agreed with and demanded enforcement of the Dues policy:

As you can tell from my willingness to work with you, this is the last step that any of us at Rancho Santana want to take. We implemented these restrictions because we need to protect the 95% of owners who are paying or have committed to pay their annual dues each year. We had our annual owners meeting last week at the Ranch, and this was a lengthy and heated discussion point.[21] The owners who are paying or committed to pay want to make sure that they are not covering delinquent owner dues, AND that these types of restrictions are in place and enforced. We have owners that are demanding more from us, but at this time we feel this is the appropriate action to take for those who are delinquent with their dues.

213.     On information and belief, Boothby has been one of those owners "demanding more from us."

214.     On July 17, 2024, Costantino sent Julapalli an email, copied to Maish and Currey, warning Julapalli of the consequences for failure to pay the Dues.  In addition to those noted by email on May 27, 2024, Costantino added that (a) no guests of a delinquent lot owner would be allowed to enter Rancho Santana unless physically accompanied by the owner (and would have access only to the owner's

_____

[21] Costantino flew down from Baltimore to attend the 2024 annual Owners Meeting.

property); (b) Rancho SRL's security team would be enforcing the blockade; (c) no electricity or water would be provided by Rancho SRL to the lot; and (d) enforcement of the policy would begin August 1, 2024.

215.    In an email on October 24, 2024, copied to Maish and Currey, Costantino sent Julapalli a "quarterly update" on the outstanding balance owed, including interest: $10,596.95.

216.    Julapalli and CDM did not make the 2024 Dues payment.

217.    The 2024 Dues budget showed that $2,388,750 had been collected that year.

218.    On February 18, 2025, Costantino sent Julapalli a "semi-annual email" that the balance owed on the Dues was $10,977.62.

219.    On March 15, 2025, from a new domain "theagora.com," Costantino emailed Julapalli an invoice for the 2025 Dues, now at $5,950 and up 13% from 2024.

220.    On August 27, 2025, Costantino sent Julapalli a semi-annual update that the balance owed on the Dues was $17,552.62.

221.    Julapalli and CDM did not make the 2025 Dues payment.

222.    The 2025 Dues budget estimates $2,516,850 as total dues to be collected from owners other than the developer, which amounts to 423 independently owned current lots at Rancho Santana.

**Phase 3 of the "No Master Plan" Master Plan: One Resort to Rule Them All**

<u>The Resort Fee</u>

223.    The flashpoint that ultimately led months later to the discovery that there had been no functioning HOA for years at Rancho Santana was a letter sent by Maish to select owners in late August 2022.

224.    In the letter, Maish announced that beginning in 2023, third-party vacation rentals would not be permitted in Rancho Santana.  All rentals would be funneled through the exclusive Rancho Santana Vacation Rentals program ("RSVR"), owned by Rancho SRL.

225.    As part of the rationale for introducing the restrictive policy, Maish noted that "Rancho Santana should be differentiating itself and competing with other destinations rather than competing against ourselves."

226.    Then-existing owners managing their properties through a third-party vacation rental company would be grandfathered if they paid a resort fee of $250 per month.  If ownership of the property changed or a rental management arrangement discontinued, the grandfathered exception would end.

227.     Such owners would be subject to home inspections up to once per quarter, for quality control.

228.     The third-party rental companies would be invited to partner with Rancho SRL to earn commissions on Rancho SRL's own accommodations, including its inn and RSVR portfolio.

229.     On August 31, 2022, responding to this new policy, over one hundred owners including CDM sent a letter to Maish and the Syndicate, "concerned about the direction Rancho Santana is taking, as we believe it affects our property values, lifestyle and investments."

230.     Maish responded by modifying the policy, which now constitutes the Rancho Santana Rental Guidelines (the "Rental Guidelines"), updated in September 2023:

a.  The Rental Guidelines dictate that Rancho SRL charges a resort fee of $15 plus taxes per guest per full day (capped at 15 days) (the "Resort Fee") for guests renting out self-managed or third-party-managed owner properties who access Rancho SRL's private amenities.

b.  Collecting the Resort Fee is the owner's responsibility, not Rancho SRL's, and the owner is subject to paying the Resort Fee and a penalty should a guest access a private amenity.

c.  Non-RSVR owners must report guest names, email addresses, and phone numbers to reservations@ranchosantana.com within 72 hours of booking.

d.  Guests are requested to check in at Rancho SRL's front desk, where they will be prompted to open a charge account with a credit card on file.

e.  Noncompliant property managers are subject to fines and suspensions.

231.　　The Rental Guidelines reiterate the general rule in Rancho Santana: third-party commercial activity is not allowed:

> The *Rental Guidelines* are *not* intended to stifle rental activity or complicate the landscape of owning property. Our belief is in order to truly maximize quality, experience, consistency, and marketability – and what comes as a result of those improvements – rental management options should be limited to Rancho Santana's program offerings, while partnering with third parties to act as a booking agents for referrals. Third party commercial activity is not allowed in Rancho Santana as a general rule, and the guidelines here represent one of the current exceptions. The policy and theme of allowing third party rental operations will continue only for as long as it's proving to be valuable and productive.

232.　　Non-commercial guests of owners, regardless of their participation in RSVR, are not charged the Resort Fee.

233.　　However, walk-in commercial guests, e.g., those who make dinner reservations at Rancho SRL's restaurants, are also not charged the Resort Fee.

234.    RSVR owners are not charged the Resort Fee.  Rancho SRL fixes their rental prices by agreement and takes a monthly fee, along with 35% of the gross rental income.

235.    In return, Rancho SRL markets independent RSVR properties—alongside its own competing properties—on ranchosantana.com, other travel websites and publications, and social media.

236.    One of those RSVR properties, "Alma Del Mar," is owned by Boothby.

237.    Boothby, a self-described "original era owner," vigorously supported Maish's initially proposed rental policy.  On a September 6, 2022, Listserv email to fellow owners titled "A Step in the Right Direction," he described the new policy as "fiscal and amenity equity."  He noted further, "We have had a small number of us who haven't contributed fully to our Community.  They rent their homes at submarket rates and provide their guests a submarket experience."

238.    Boothby sent another Listserv email to fellow owners on April 25, 2023, titled "Contribute to Our Rancho Santana Community."  Acknowledging, "We are not the Marriot [sic] vacation club," he went on to urge owners to contribute to Rancho Santana because "[t]he Developer has invested tens of millions of dollars into the project without profit as a motivator." For Boothby,

"Rancho Santana has got to be about what each of us is contributing to RS not taking out of the place by asking other owners to pay your portion of the annual dues."   Boothby ended with some advice to those owners who had been questioning the bases of the Dues or Resort Fee:

> If you cannot see this future with you in it than (sic) life is way too short to create a mythical battle over low annual dues or $25 a day resort fee.  It might be a healthier choice to benefit financially and then find a new option for yourself. Owners should be collaborating with the developer's ongoing subsidy which facilitates the maturity of service delivery, continued capital maintenance, enhanced facilities and produces a community which will continue to be better than it ever has been.  Owners should be contributing in time, talent and treasure to our collective communities future.

239.    The Rental Guidelines joined preexisting "Broker Regulations and Requirements" (the "Broker Regulations") for brokers independent of Rancho SRL's own brokerage.  Dated September 4, 2024, the current version includes as follows:

a.  As soon as a broker engages with a client within the Rancho Santana community, the broker must register the client's name by sending an email to realestate@ranchosantana.com. "Engagement" includes sharing content about Rancho Santana properties.

b.  A broker cannot represent past, present, or future guests renting any Rancho SRL accommodation.

c. The broker must share the listing agreement, including list price, with Rancho SRL.

d. The broker must share the buyer and seller closing statements with the Rancho SRL real estate team before closing, which must include a reconciliation of the Dues. "Failing these requirements will result in broker privileges being revoked and possible access restrictions to the new owner."

240.    The Broker Regulations have been favorable to Rancho SRL.  At the Owners Meeting on May 15, 2025,[22] Maish reported that in 2024 over $19 million in real estate sales and 50-plus transactions had occurred in Rancho Santana, with 94 percent handled in-house through Rancho SRL's own brokerage.  Maish also reported that almost all new buyers come as resort guests—whom independent brokers cannot represent because it is prohibited by the Broker Regulations.

241.    On August 18, 2022, Maish spoke by phone with a non-RSVR owner who felt his property value, rental income, and ultimate livelihood would be threatened by the preexisting Broker Regulations and the new Rental Guidelines Maish had installed.  Indeed, Turner and other principals at Rancho Santana had

---

[22] Costantino again flew down from Baltimore to attend the 2025 annual Owners Meeting.

specifically represented the freedom of home rentals as a means to buy into the Rancho Santana community.

242.    On that call, Maish repeatedly referred to Rancho Santana as a "resort property" and opined that the Syndicate was free to manage it at will.

243.    Maish also noted on the call that the Syndicate and Board of Rancho SRL were aware of and involved in crafting the new Rental Guidelines.

244.    Currey was one of those members on board.  According to Currey, Rancho SRL was marketing Rancho Santana to prospects in a higher wealth class than legacy owners, prospects for whom rental income was not as important. Nevertheless, and even amid a financial loss to the RSVR owner, "having the resort component allows us to have the price points, the occupancy, and the type of guest that you'd want to stay in your home [through RSVR] . . . ."[23]

245.    "Having the resort component" has proven expedient to Currey, as Rancho SRL has been known to shunt guests away from RSVR homes to Rancho SRL's inn.

246.    Rancho SRL has also been known to house multiple employees overnight in empty RSVR homes without owner knowledge. Currey has admitted

---

[23] *The Story*, *supra* note 3, at https://youtu.be/hLpEaP7HbuM?si=8Ocxqu5qclFrQLgW&t=2411.

as much, though the overnight stays were purportedly for quality control purposes only.

247.　Non-RSVR owners are not spared either, as resort representatives have also been known to shunt guests of non-RSVR homes to RSVR homes.

The Blockade of G16

248.　As taught by Ford back in 2012 in *Palm Beach Letter*'s "Rental Real Estate 101," Julapalli had always intended, through CDM, to build a vacation rental home on G16.  And he had always intended to use a third party to rent it out.

249.　To that end, CDM broke ground on building a home on G16 in late June 2022.

250.　Before breaking ground, Semenza, the ARC Administrator, requested two payments by email: a "Conceptual Review" fee of $1,000 plus tax on September 6, 2021, and a "Construction Review and Inspections" fee of $2,677 (calculated based on square footage) on April 7, 2022.  CDM paid for the fees by wire transfer on October 8, 2021, and April 7, 2022, respectively.  On both occasions the wire transfers went to a United States Wells Fargo account with "Tola Development Group, LLC" at 14 West Mt. Vernon Place in Baltimore as the recipient.

251.    Julapalli never received nor signed building guidelines from Semenza, Rancho SRL, Tola, or any of the other Defendants either at the time of purchase of G16 or around the time of build.

252.    From August 28, 2023, through September 6, 2023, after CDM had not made the 2023 Dues payment, Maish and Costantino attempted to follow through on their threats to "get real."

253.    On multiple occasions during that period, Rancho SRL personnel tampered with the water meter and attempted to destroy the pipes leading to G16 and the adjacent lot of a neighbor, who had also stopped paying the Dues until he knew exactly what they were purchasing.

254.    One occasion involved an attempt to dig out the water line with a backhoe, which the neighbor, having just returned from surfing, stymied with an hours-long sit-in:





255.    During this water skirmish, the neighbor witnessed Rancho SRL personnel entering onto the private property of G16 and hiding in CDM's partially built home:



256.    Nicaraguan civil law guarantees basic services to consumers such as drinking water and electricity.

257.    Rancho SRL was eventually forced to concede, on reprimand from the national water authority, that it could not cut off water or electricity to the property of CDM or any other owner.

258.    Nevertheless, on a call in Nicaragua between Maish, a homeowner, and an attorney on May 12, 2025, Maish stated that he had acted to cut the water to G16 and the neighbor's adjacent home under the authority of the Nicaraguan government.

259.    On May 14, 2025, when the neighbor posted to fellow owners on the Listserv details about rights to water and electricity guaranteed under Nicaragua Law, Boothby responded on the Listserv,  "Guys, Weren't you going to take this offline and argue with the other 2 owners who have decided not to contribute to the Rancho Santana community?  This isn't the forum to air personal grievances. Move it off of this community wide communication channel please."

260.    The harassment has not ended. On April 10, 2024, Semenza emailed Julapalli that the build on G16 had run well past the allowable 18-month timeline; "There is some talk amongst the ARC to start imposing penalties or fines soon."

261.     On July 31, 2024, Semenza emailed Julapalli that the build project was liable for fines of $2,500 per month beginning in August 2024 for being past the Rancho SRL building guidelines' 18-month deadline.  Semenza also added a couple of warnings.  If the fine was not paid, contractor and third-party access to G16 would no longer be permitted.  After completion of construction, third-party access would not be permitted until the outstanding Dues were paid.

262.     On November 20, 2024, with the home build on G16 nearing completion, Rancho SRL closed its gates—literally—to CDM's contractor. This was confirmed by email exchange between Semenza and Julapalli on the same day.

263.     On November 21, 2024, Costantino emailed Julapalli that the $2,500/month fine was to have started in February 2024; however, Maish approved waiving the fine until November 2024.  The monthly fine would continue to be assessed each month until construction was complete. Costantino attached wiring instructions directed to 14 West Administrative Services, LLC in Baltimore.  He then reminded Julapalli in a second email on that day that (a) if the fine was not paid, contractor and third party access to G16 would remain blocked and (b) after construction completion, third-party access would be blocked until the Dues were paid in full, with interest.

264.     Costantino's second email on November 21, 2024, was copied to Milton Javier Tapia, Rancho SRL's head of security, who confirmed by email on that day that access was restricted to the contractor.

265.     On November 22, 2024, Julapalli emailed Tapia, Costantino, Semenza, Maish, and the ARC, asking who exactly was fining him and restricting access to build on G16.   After no response, he sent another email to the same recipients on November 27, 2024, asking the same question again.   That day, Semenza responded in a reply-all email, "Rancho Santana and the Architectural Review Committee are imposing the fine as outlined in the Building Guidelines, for failing to complete the construction of your home in the 18 month allowable timeline."

266.     On December 2, 2024, Julapalli replied back to all parties by email. He asked who was on the ARC and who was Rancho Santana, given that there was no governing HOA as owners were led to believe.   Semenza replied back by email to all parties on that same day, directing Julapalli to Rancho SRL's building guidelines. Semenza then claimed that Julapalli had received the building guidelines when he had purchased the property.

267.     Later that day Julapalli emailed back to all parties one more time, seeking again to get an answer as to who was the author of the building guidelines,

and who exactly is Rancho Santana, if it is not an HOA. To date, there has been no response to that question.

268.    With access blocked to contractors and third parties, the home on G16 remains uncompleted and, despite mitigation efforts, has fallen into significant disrepair.

269.    On information and belief, Rancho SRL has continued to enter multiple times onto G16 and into CDM's partially built home, with intent to vandalize the private property of CDM.

**COUNT I**
**Violation of RICO**
**[18 U.S.C. § 1962(c)]**
**(against Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Geerling, Boothby, and Agora)**
**(collectively, "RICO(c) Defendants")**

270.    CDM re-alleges and incorporates by reference the allegations in paragraphs 1-269 above.

271.    Pursuant to 18 U.S.C. § 1961(3), RICO(c) Defendants are all "persons" capable of holding a legal or beneficial interest in property.

272.    Pursuant to 18 U.S.C. § 1961(4), RICO(c) Defendants, together with Tola, RS Inc., International Living, and Rancho SRL, constitute the § 1962(c) enterprise (the "Agora Enterprise").

273.    At the hub of the Agora Enterprise are the Syndicate and Agora. Tola, RS Inc., International Living, and Rancho SRL have been its spokes. Maish, Currey, Costantino, Semenza, Geerling, and Boothby have been the managers at its rims.

274.    Collectively, RICO(c) Defendants have used the Agora Enterprise in a continuous and ongoing pattern over two decades to further the real Master Plan of Rancho Santana: lure prospects to purchase property in a "residential community" with the promise of a functioning HOA, steal money and property from owners including CDM through fake HOA powers, then launder the proceeds to fund a resort—and themselves.

275.    RICO(c) Defendants have violated 18 U.S.C. § 1962(c) through multiple predicate acts.

**Predicate Acts of Racketeering**

Mail Fraud and Wire Fraud [18 U.S.C. §§ 1341, 1343]:

276.    RICO(c) Defendants Bonner, Ford, Turner, Currey, Geerling, and Agora represented Rancho Santana as a residential community, with rental opportunities and a functioning HOA—while they furthered a fraudulent scheme to transform Rancho Santana into a developer-operated resort, through a fake HOA.

Numerous mails and wires by RICO(c) Defendants furthered that scheme.   For example:

a. In repeated email and post-mail cross-promotions by Agora's *Palm Beach Letter* and *International Living* from October 1, 2012, through December 16, 2013, Ford and Bonner pitched Julapalli the promise of investing, retiring, and making rental income in Nicaragua—including specifically Rancho Santana.

b. In a letter sent from Baltimore to owners on March 3, 2004, Turner pitched the 2004 Covenants, which replaced purportedly invalid bylaws, created a new HOA complete with lien power, limited annual increases in the Dues to 10 percent without two-thirds owner approval, and declared the covenants to run with the land.

c. By FedEx from Baltimore on April 28, 2005, Turner and Bonner sent to Edwards two signed copies of the 2005 Covenants, which were intended to extend to December 31, 2060,  and created an HOA that actually ran for only two years.

d. On numerous dates from March 7, 2007, through August 2, 2012, Currey, as longtime Board Member and Executive Vice President of Rancho SRL, was responsible along with the Syndicate for representing on

ranchosantana.com that operative HOAs existed—when Currey and the Syndicate knew they did not.

e. Published to YouTube on August 24, 2023, The Story featured Currey revealing that to transform Rancho Santana into a resort, the Syndicate "would need the resources and influence from foreign investors . . . ."

f. A March 6, 2020, email from Currey to owners including CDM announced an "unavoidable" $1,500 increase in the 2021 Dues that was needed for Rancho Santana "to reach its full potential as a viable and sustainable community."

g. In a letter to owners on November 20, 2003, Geerling (working closely with Ford) represented Rancho Santana as Nicaragua's "premier private residential community," while announcing an increase in HOA fees to cover for International Living expenses. She noted the fees were to paid to APROSA and deposited directly into the HOA bank account, while her invoice had payments sent to herself at an address in Miami.

h. On December 25, 2003, after being questioned by Edwards on the organization of the HOA, Geerling simply forwarded the questions by email to Turner and Ford, among others.

i.  In a series of email exchanges between Geerling and owners from September 15, 2023, through October 30, 2023, Geerling played a shell game and played dumb about her knowledge of the HOAs and their legal legitimacy.

j.  The Syndicate represented to CDM on its July 24, 2013, deed that CDM was to become a member of APROSA, with all attendant rights and obligations.

k.  The Syndicate sent a memorandum to owners on September 21, 2022, endorsing Maish, as CEO, with full authority to install the "corporate model" over the "'owner controlled' model" that might, among other things, lead to "lousy food!"

l.  As late as June 6, 2023, on his own blog site, Ford represented that Rancho Santana still had HOA bylaws.

277.    RICO(c) Defendants Maish, Costantino, and Semenza knew that Rancho Santana had no operative HOA, at least as far back as 2007 when no duties attendant to a properly functioning HOA were being performed. Yet, they have continued to make numerous representations over mail and wire to further the fraudulent scheme of extracting payments from owners in the name of fees and "Dues." For example:

a.  In emails to Julapalli from November 21, 2013, through March 16, 2022, Costantino (often from Agora domains) repeatedly and fraudulently represented annually requested payments as "dues."  CDM's reliance on Costantino's characterizing the payments as "dues" was justified because its purchase and sale agreement and transfer deed explicitly stated that CDM was subject to APROSA, with all rights and obligations, backed by the power of lien.

b.  Julapalli's payments, dictated by Costantino's numerous emails, have occurred through wire transfers from Houston, post-mails by check from Houston, and credit card transactions.  There has been a motley crew of beneficiaries: Publishing Services, LLC (formerly Agora Publishing, LLC); APROSA; and PPNDS, LLC.  The destination, however, has always been Baltimore.

c.  In an email on March 20, 2023, Maish admitted to Julapalli and fellow owners that APROSA had been considered a failure and **intentionally** abandoned as an HOA.  Maish then represented that APROSA had been used as a tax dodge and fraudulently represented that it had been closed in late 2022 by tax authorities—when it had actually been shut down

because it had not fulfilled its legal obligations as an HOA under Nicaragua law for years.

d.  It was after Maish's admission that CDM decided to stop paying the so-called Dues until Julapalli could get a more transparent accounting of services being provided. Yet, in numerous emails from March 21, 2023, through August 27, 2025, Costantino has continued to fraudulently represent the annual payments as "dues," not as a demand for payment with no contractual agreement in place for transparently defined services between Rancho SRL (or other appropriate entity) and CDM.

e.  Maish has fraudulently concealed the history of HOAs at Rancho Santana.  Along with Costantino and Currey and through Rancho SRL's legal counsel, he gave conflicting responses to a fellow owner's repeated inquiries on the current existence of an operative HOA. Under his leadership, Rancho SRL pulled down the 2006 Covenants from ranchosantana.com and replaced it with the Community Guidelines, whose effective date was five months *before* the Nicaraguan government terminated APROSA. And in an email response to an owner on July 17, 2023, he represented that regarding an HOA, "that's simply not how we've ever managed the property . . . ."  That's simply not true—and

Maish knew that because he, Ford, and Turner had already been sent copies of the 2005 Covenants that had established an HOA.

f. Semenza sent email requests for two payments on September 6, 2021, and April 7, 2022, respectively, as "review" fees under building guidelines that were purportedly enforceable on CDM's home build on G16. CDM wired payments for the fees on October 8, 2021, and April 7, 2022, respectively—to Baltimore, as always, and under the impression that CDM was subject to an HOA.

g. On multiple emails to Julapalli from April 10, 2024, through December 2, 2024, Semenza declared that fines would ensue for failure to comply with Rancho SRL's building guidelines. Semenza knew that there was no signed agreement between his company and Julapalli or CDM binding both parties to building terms. In an email to Julapalli on December 2, 2024, he also represented that Julapalli had received the building guidelines when he had purchased the property. That is false—but even if it were true, Semenza furthered the fraudulent scheme of enforcing building guidelines and Community Guidelines giving him and his co-conspirators quasi-HOA powers—including lien power—when they knew there was no HOA.

Extortion [18 U.S.C. § 1951]:

278.    RICO(c) Defendants Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Boothby, and Agora (collectively, "RICO(c) Extortion Defendants") have all either committed, attempted to commit, or conspired to commit extortion.

279.    RICO(c) Extortion Defendants have known over decades that there was no operative HOA binding owners to pay dues.

280.    Yet, still calling them the Dues, they have extorted payments from CDM and many other owners for "services" that they refuse to disclose fully or have audited by an independent third party.

281.    They have done so under color of official right held by a false HOA with lien power that the Community Guidelines erroneously proclaims to this day.

282.    Executing their "get real" plan, they threaten any owner who holds making payments until there is more transparent accounting and mutual agreement on services with cutting off electricity, water, and access of guests and invitees to the owner's property.

283.    They do so under color of an official right, as Maish expressed when he acted to cut off CDM's water under the authority of the Nicaraguan government.

284.     The reality is the exact opposite.   Under Nicaragua law, Rancho Santana would be considered "horizontal property"—property belonging to different owners in independent sections that have access to public roads through a common passage.[24]

285.     Under Nicaragua law, horizontal property *must* have important parts—common passages, security, electricity, water, and the like—become common property, owned and governed by all independent owners through a structure similar to that in condominium law in the United States.[25]

286.     In CDM's case, RICO(c) Extortion Defendants have flouted Nicaragua law by attempting and/or conspiring to extort even more money from CDM in the form of building-guidelines penalties.

287.     To up the ante on CDM even more, RICO(c) Extortion Defendants have shut or conspired to shut the gates to workers building the home on G16.

288.     RICO(c) Extortion Defendants have even resorted to commit, attempt to commit, or conspire to commit trespass and vandalism to CDM's G16 and forcibly unfinished home.

---

[24] Ley Nº. 1909, *Legislación de Nicaragua: Normas Jurídicas* (Sept. 23, 1971), http://legislacion.asamblea.gob.ni/normaweb.nsf/9e314815a08d4a6206257265005d21f9/ b173fe6969cd32be0625726c00616934?OpenDocument.
[25] *Id.*

289.     The penalties, blockade, and trespass/vandalism are, to be sure, retaliation for CDM's not paying the Dues.

290.     As such, RICO(c) Extortion Defendants are extorting "dues"—or as Boothby euphemizes them, "Contribute[s] to Our Rancho Santana Community"—from every owner making payments under threat of retaliation, to this day.

Money Laundering [18 U.S.C. §§ 1956, 1957]:

291.     RICO(c) Defendants Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, and Agora (collectively, "RICO(c) Money-Laundering Defendants") have committed money laundering and unlawful monetary transactions throughout the Agora Enterprise.

292.     RICO(c) Money-Laundering Defendants have known over decades that there was no HOA through which they were authorized to collect "dues" and architectural "review fees."

293.     Nevertheless, they have collected the Dues fraudulently and extorted the Dues from owners under color of official right or by threat of violence to property.

294.     The color of official right has included invoking the obligations to an HOA, APROSA, that they knew was fraudulent in hundreds of Rancho Santana

purchase and sale agreements and property transfer deeds brokered over the years by employed or affiliated agents.

295.    Over decades RICO(c) Money-Laundering Defendants have conducted numerous financial transactions transferring the unlawful proceeds by wire, credit card, check, or other means between banks of owners from around the world and banks primarily in Baltimore.

296.    The financial transactions have encompassed a byzantine web of Syndicate- and Agora-associated entities, with sister companies spanning the United States and Nicaragua (Tola-Tola SRL, PPNDS-PPN SRL).

297.    The byzantine web even includes RS Inc., a shell company in the British Virgin Islands that has a nearly 100-percent interest in both Rancho SRL and International Living.

298.    Having been forced in 2023 to disclose definitively that an operative HOA has been extinct for years and whose illegitimate shell had been exploited only as a tax dodge, RICO(c) Money-Laundering Defendants are now brazen about what they are doing.  They continue to transact payments across international borders, in the name of "dues"—without an actual association, without an independent audit of their purported budgets, without Board oversight, and without any contractual agreement for the services they feel they can just deliver by fiat.

299.    Since at least 2007, the financial transactions have involved tens of millions of dollars.  Since 2021 alone, when budget figures first started to be distributed annually to owners in the wake of the major Dues hike, RICO(c) Money-Laundering Defendants have exploited the Agora Enterprise to transfer over $11 million in "dues."

Transporting Stolen Money [18 U.S.C. §§ 2314, 2315]:

300.    RICO(c) Money-Laundering Defendants transferred more than $5,000 in "dues" and architectural "review fees" based on HOA authority they knew was fraudulent.

301.    In 2024 and 2025 alone, individual owners had to pay $5,250 and $5,950 in so-called dues, respectively.

302.    As stated in paragraph 299, collection of the Dues since 2021 alone amounts to over $11 million in transported stolen money.

Traveling in Aid of Racketeering [18 U.S.C. § 1952]:

303.    RICO(c) Defendants Bonner, Ford, Turner, Costantino, and Agora (collectively, "RICO(c) Travel Act Defendants") have engaged in international travel or used the United States mail to further the fraudulent scheme of the Agora Enterprise.

304.    RICO(c) Travel Act Defendants all live or are based in the United States.

305.    The Syndicate engaged in international travel when all its members attended the May 2002 meeting in Baltimore, where Rancho Santana's first neighborhood HOA was created and convened.

306.    Agora has sent numerous United States mails via its publishing empire to promote Rancho Santana.

307.    Over 25 years, The Syndicate has also traveled back and forth between the United States and Nicaragua to promote investment in Rancho Santana by subscribers in Agora's vast publishing network, including CDM's agent Julapalli.

308.    Turner, in particular, has traveled between the United States and Nicaragua to pitch Rancho Santana to numerous groups of clients as a "Residential, resort community with a capital 'R' on 'Residential' and a lowercase 'r' on 'resort.'"

309.    Costantino has also engaged in such travel, including in mid-March 2020 to start up the Dues process that year, May 2024 and May 2025 to attend the annual Owners Meeting, and June 2023 to do a drive-by of CDM's house when it had not paid the Dues.

310.     RICO(c) Travel Act Defendants committed these acts, while their vision all along, as recalled in The Story, was to put a lowercase "r" on "residential" and a capital "R" on "Resort."

**COUNT II**
**Violation of RICO**
**[18 U.S.C. § 1962(a)]**
**(against Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Agora, Tola, RS Inc., International Living, and Rancho SRL)**
**(collectively, "RICO(a) Defendants")**

311.     CDM re-alleges and incorporates by reference the allegations in paragraphs 1-310 above.

312.     Pursuant to 18 U.S.C. § 1961(3), RICO(a) Defendants are all "persons" capable of holding a legal or beneficial interest in property.

313.     RICO(a) Defendants have all received income from years of "dues" and architectural "review fees" made illegitimate by the lack of an operative HOA.

314.     The income has been funneled to various companies, including those based in the United States: Tola, PPNDS, and Agora itself, the Baltimore-based company at the hub of the Agora Enterprise.

315.     The income has also been funneled into the pockets of the Syndicate members, along with the managers who run Rancho SRL's daily operations and implement its policies: Maish, Currey, Costantino, and Semenza.

316.    The Syndicate has re-invested its unlawfully captured income into Rancho Santana's common areas and resort, both of which it ultimately owns.

317.    The Syndicate members, Currey, Boothby, and Geerling all own homes in Rancho Santana.  At least two of them, if not more, rent their homes.

318.    CDM competes in the real estate market at Rancho Santana, as a fellow homeowner and prospective renter.

319.    RICO(a) Defendants' actions have led to a blockade of CDM's efforts to finish building the home on G16.

320.    CDM has therefore suffered not only injury from fraudulently transferred payments but also investment injury from RICO(a) Defendants' erecting a literal barrier to entry of CDM into the competitive real estate market.

321.    RICO(a) Defendants have also used their racketeering income to establish a Resort Fee, which again shunts money to the Syndicate, with its resort, at the expense of competing non-RSVR property owners including CDM.

322.    In addition, RICO(a) Defendants have used their racketeering income to cover up the racketeering by fraudulently concealing the  history of HOAs at Rancho Santana, refusing independent owner or third-party auditing of the Dues budget, and diverting the income to at least one offshore shell company—all to enrich themselves.

323.     RICO(a) Defendants have therefore violated 18 U.S.C. § 1962(a).

## COUNT III
### Violation of RICO
### [18 U.S.C. § 1962(b)]
### (against Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Agora, Tola, RS. Inc, International Living, and Rancho SRL)
### (collectively, "RICO(b) Defendants")

324.     CDM re-alleges and incorporates by reference the allegations in paragraphs 1-323 above.

325.     RICO(b) Defendants have violated 18 U.S.C. § 1962(b) because their racketeering activity has enabled them to acquire control of virtually all of Rancho Santana, itself an enterprise as an association in fact, if not in law.

326.     RICO(b) Defendants declare that control up front in the current Community Guidelines: "The initial governance structure envisioned for Rancho Santana has since been repurposed by Developer, and transformed into a developer operated project, which allows for uniformity of the offer."

327.     The initial governance structure envisioned for Rancho Santana was an HOA.

328.     Functioning HOAs had existed in Rancho Santana's early years. Provisions had been in place in various covenants for those HOAs to take ownership of Rancho Santana's common areas.  Those common areas had been

subsidized not only by the Syndicate, as Defendants are quick to point out, but also by hundreds of owners over two decades to the tune of tens of millions of dollars.

329.    However, to RICO(b) Defendants that was no master plan.  The real Master Plan was not merely to "repurpose" the initial HOA governance structure but to take control of it and wipe out HOAs altogether—while still acting like one.

330.    Indeed, RICO(b) Defendants have explicitly chosen the "corporate model" over the "'owner controlled model,'" which has enabled them to hide their books, shirk accountability, and entrench their control over all of Rancho Santana.

331.    Owners independent of RICO(b) Defendants' "corporate model" including CDM have no equity to show for their longtime contributions to Rancho Santana's common areas.

332.    Not only that, RICO(b) Defendants have injured CDM directly in its business and property by engaging in a pattern of racketeering, causing trespass to its land and home, and taking control of CDM's investment, to the unjust enrichment of their own interests.

## COUNT IV
**Violation of RICO**
**[18 U.S.C. § 1962(d)]**
**(against All Defendants)**

333.    CDM re-alleges and incorporates by reference the allegations in paragraphs 1-332 above.

334.    Defendants are 14 persons who all agreed to facilitate the operation of the Agora Enterprise through a pattern of racketeering spanning more than two decades.

335.    All Defendants participated in the conspiracy with knowledge of the essential nature of the real Master Plan: transform Rancho Santana from a "premier private residential community," as Geerling put it in 2003, to a premier developer-operated resort.

336.    Defendants' agreement manifested through multiple racketeering offenses committed by themselves and/or their co-conspirators: mail and wire fraud, extortion, money laundering, transport of stolen money, travel in aid of racketeering, investment of racketeering-derived income to further the Agora Enterprise, and racketeering-enabled control of Rancho Santana.

337.    Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b) and (c) in violation of 18 U.S.C. § 1962(d), which has caused injuries to CDM's business and property.

**COUNT V**
**Violation of Sherman Act Section 1**
**[15 U.S.C. § 15(a), 26]**
**(against Bonner, Ford, Turner, Currey, Geerling, Boothby, Agora, Tola, RS Inc., International Living, and Rancho SRL)**

**(collectively, "Antitrust Defendants")**

338.    CDM re-alleges and incorporates by reference the allegations in paragraphs 1-337 above.

339.    The relevant geographic market is all of the United States, where the majority of visitors and owners of Rancho Santana reside.[26]

340.    There are two relevant product markets: (1) the higher-end private residential real estate market along Nicaragua's Emerald Coast and (2) the higher-end vacation rental real estate market along Nicaragua's Emerald Coast.

341.    The two relevant product markets, as defined, are conservative because they include private residential and vacation rental real estate properties along the Emerald Coast that do not offer the kind of access to world-class surf that properties within Rancho Santana uniquely do.

342.    The three Syndicate members, along with Currey, Geerling, and Boothby (collectively, "Antitrust Individual Defendants"), all own homes in Rancho Santana.  At least two in this group, Ford and Boothby, rent their homes to the United States market.  As independent homeowners, all Antitrust Individual Defendants have independent economic interests in one or both of the relevant product markets.

---

[26] Amber Gibson, *Nicaragua's Accidental Resort Community Celebrates 20 Years*, *Forbes* (July 26, 2017, 03:50pm EDT), https://www.forbes.com/sites/ambergibson/2017/07/26/nicaraguas-accidental-resort-community-celebrates-20-years/.

343.     Antitrust Individual Defendants have conspired with each other, certain fellow property owners, and one or more of Agora, Tola, RS Inc., International Living, and Rancho SRL (collectively, "Antitrust Corporate Defendants") to attempt to destroy CDM, a horizontal competitor in both relevant product markets.

344.     The conspiracy involves two actions that are per se illegal under United States federal antitrust law: group boycott and price fixing.

**Group Boycott**

345.     Antitrust Individual Defendants have conspired with each other and one or more of Antitrust Corporate Defendants to create and/or enforce the Community Guidelines.  As Maish himself emphasized in the inaugural Owners Meeting, the conspiracy has been intentional, and "[m]any, many, many owners have already bought into it."

346.     Maish himself explained the common purpose of the conspiracy when he introduced the new Rental Guidelines:  "Rancho Santana should be differentiating itself and competing with other destinations rather than competing against ourselves."

347.     In the minds of Maish and his co-conspirators, transforming Rancho Santana into a Syndicate-operated project "allows for uniformity of the offer."

348.     In other words, Maish and his co-conspirators have acted to homogenize away horizontal competitors in the relevant markets owning property in Rancho Santana.

349.     Furthermore, Costantino has threatened CDM and other non-Dues-paying owners that their properties will be blacklisted with respect to all prospective brokers.

350.     Antitrust Defendants' conspiracy to enforce the Community Guidelines, based no less on fraudulent authority, amounts to a group boycott of CDM.  CDM has literally been barred from finishing its home on G16 and entering the relevant markets to compete with Antitrust Defendants for the United States consumer.

**Price Fixing**

351.     RSVR serves a price-fixing scheme.  As Currey himself pointed out in The Story, the Syndicate's resort dictates the price points that RSVR fixes for independently owned rental properties in Rancho Santana, which are the resort's horizontal competitors.

352.     In the mind of Boothby, an RSVR owner, the scheme—rather than the free market—should define what are "submarket rates" and a "submarket experience."

353.     The Rental Guidelines (even if legally binding, which they are not) are nothing more than an attempt by Antitrust Defendants to force RSVR onto competing independent owners wanting to rent their properties.

354.     As the Rental Guidelines explicitly state, "[t]hird party commercial activity is not allowed in Rancho Santana as a general rule . . . ." The Resort Fee is deemed an exception but, according to the Rental Guidelines, "will continue only for as long as it's proving to be valuable and productive."

355.     What's valuable and productive for Antitrust Defendants—but blatantly anti-competitive conduct—is for non-RSVR owners and their commercial guests to be assessed the Resort Fee usage tax, while RSVR owners and their commercial guests, non-commercial guests, and walk-in commercial guests accessing the resort get a pass.

356.     The discriminatory Resort Fee reveals Antitrust Defendants' real aim: eliminate competition from owners who might charge lower rental prices in staying away from RSVR and its bloated, unprofitable fees.

357.     Higher rental prices under RSVR do not benefit the owner's bottom line; they pass as monthly fees and commissions into the pockets of Rancho SRL and its controllers.

358.     To Antitrust Defendants, horizontally competing non-RSVR owners pose a threat to the Master Plan.  CDM planned to be one of those owners. Antitrust Defendants are punishing it for its perceived insolence.

359.     Antitrust Defendants have therefore violated 15 U.S.C. § 1, and CDM seeks damages and injunctive relief for its antitrust injury.

360.     Entering judgment against Antitrust Defendants would not only uphold United States antitrust law but also be in comity with Nicaragua horizontal property law.

**COUNT VI**
**Violation of Lanham Act Section 43(a)**
**[15 U.S.C. § 1125(a)(1)(B)]**
**(against Bonner, Ford, Turner, Maish, Currey, Agora, Tola, RS Inc.,**
**International Living, and Rancho SRL)**
**(collectively, "Lanham Act Defendants")**

361.     CDM re-alleges and incorporates by reference the allegations in paragraphs 1-360 above.

362.     Lanham Act Defendants have violated 15 U.S.C. § 1125(a)(1)(B) because they are responsible for making numerous false or misleading material representations in advertising Rancho Santana to the international real estate buyer.

363.     The commercial advertisements go as far back as May 2000, when the Syndicate pitched Rancho Santana on its website as an affordable residential community developed with "privacy in mind"—not as a developer-dominated

resort.

364.    Later in 2007,  the FAQ document published on ranchosantana.com represented that the HOA then in place owned or would own Rancho Santana's common facilities.  That never happened.

365.    The commercial advertising continued in March 2010 with a blog post from the sales manager reassuring the audience that "Rancho Santana is a safe and prudent decision" where you would "know the developer and the development in a way that you can trust," and where the accounting books wouldn't be "'cooked.'" That siren song concealed the rise and fall of the HOA governance structure that occurred all through Rancho Santana's first decade.

366.    The Syndicate, Currey, and their corporations represented on numerous occasions on ranchosantana.com that HOAs existed "so that you can be assured that high and consistent standards of quality will be maintained."  They did not.

367.    Ford's posts in *Palm Beach Letter* in December 2012 carried on the tune that "[w]ith an extremely low cost of living and great values on real estate, Rancho Santana is attracting investors, second homeowners, and retirees."  As Ford described it, you could "Retire Like a King on a Pauper's Budget" in Rancho Santana.

368.    Bonner's *International Living* in March 2013 advertised Rancho Santana's "very affordable" prices and "super high-end California" vibes "without the pretensions.  No place for pretensions here . . . ."

369.    But, there has been a place for pretensions.  They have come from Bonner on down.  The numerous misrepresentations have been part of Agora's real Master Plan at Rancho Santana: sell prospects on the promise of a private residential community, build a base of dues-paying owners by hyping HOAs, sweep those HOAs under the rug, then condition all those owners that they are better off without them—while transforming Rancho Santana into a resort under their very noses.  That has been Lanham Act Defendants' organized campaign to penetrate the international real estate market along Nicaragua's Emerald Coast.

370.    Today, under Maish's management, ranchosantana.com falsely represents that it is owned by "Tola Development Group," a group of colleagues and friends managing an "'accidental development'" that "has and continues to develop naturally from the interests our residents have in a certain lifestyle."  That belies the truth buried in the Community Guidelines, where every owner must acknowledge that "Rancho Santana is a master planned community," controlled by developers who have assumed the power of an HOA, who feel no need to be bogged down by formalities like a contract manifesting mutual agreement on

services offered.  That would get in the way of building a world-class resort in the middle of a residential community.

371.    Per se illegality aside, Currey has misleadingly represented in The Story that the Syndicate's resort sets price points, occupancy rates, and guest types that RSVR owners would want.  The truth is that RSVR owners have rarely profited from RSVR, had their homes occupied by employees overnight, and had their guests shunted to the Syndicate's own inn.

372.    CDM competes with Lanham Act Defendants for those guests and has been injured by their misrepresentations, as they and others suggest that it pack up and move on.

## <u>COUNT VII</u>
## Violation of Texas Free Enterprise and Antitrust Act ("TFEAA")
## [Tex. Bus. & Com. Code § 15.21]
## (against Antitrust Defendants)

373.    CDM re-alleges and incorporates by reference the allegations in paragraphs 1-372 above.

374.    Antitrust Defendants have engaged in a conspiracy to restrain trade that is per se unlawful.

375.    Antitrust Defendants' unlawful conduct has hurt competition and injured consumers in Texas, where CDM resides.

376.     Antitrust Defendants' unlawful conduct has injured CDM's business and property.

377.     Antitrust Defendants' unlawful conduct has been willful and flagrant.

378.     CDM therefore brings action against Antitrust Defendants under the TFEAA for violating §15.05(a).

**COUNT VIII**
**Common-Law Fraud**
**(against Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Agora, Tola, RS Inc., International Living, and Rancho SRL)**
**(collectively, "Fraud Defendants")**

379.     CDM re-alleges and incorporates by reference the allegations in paragraphs 1-378 above.

380.     Fraud Defendants made multiple material and false representations to CDM.

381.     Fraud Defendants either knew the representations were false or made the representations recklessly, as positive assertions, and without knowledge of their truth.

382.     Fraud Defendants made the representations with the intent that CDM act on them.

383.     CDM's reliance on the representations have caused it injuries.

384.     CDM seeks actual and exemplary damages for its injuries.

## COUNT IX
### Trespass to Real Property
### (against Rancho SRL)

385.    CDM re-alleges and incorporates by reference the allegations in paragraphs 1-384 above.

386.    CDM owns real property, G16 and the partially complete home on it.

387.    One or more agents of Rancho SRL entered onto G16 and into the home.

388.    On information and belief, the entry has occurred multiple times.

389.    The entry was physical, intentional, voluntary, and unauthorized.

390.    The trespass has been deliberate and willful and caused actual property damage.

391.    The trespass has resulted from fraud, malice, or gross negligence.

392.    Rancho SRL's trespass has caused injury to CDM's right of possession.

393.    As a result, CDM seeks actual and exemplary damages, as well as injunctive relief.

## COUNT X
### Tortious Interference with Prospective Business Relations
### (against All Defendants)

394.    CDM re-alleges and incorporates by reference the allegations in paragraphs 1-393 above.

395.    There was a reasonable probability that CDM would have entered into a business relationship by marketing its home on G16 once completed.

396.    Defendants intentionally interfered with the formation of that relationship.

397.    Defendants' actions were independently tortious, through one or more of fraud, extortion, illegal boycott, and trespass.

398.    Defendants' interference has caused injuries to CDM, for which it seeks actual and exemplary damages.

## COUNT XI
### Civil Conspiracy
### (against All Defendants)

399.    CDM re-alleges and incorporates by reference the allegations in paragraphs 1-398 above.

400.    Defendants knowingly combined to facilitate the operation of the Agora Enterprise or interfere with CDM's business relations through one or more of deception, fraud, racketeering, anti-competitive collusion, and trespass.

401.    One or more of the co-conspirators committed unlawful, overt acts to further the operation of the Agora Enterprise.

402.     CDM has suffered injuries as a result of those wrongful acts, including actual and exemplary damages.

## PRAYER FOR RELIEF

403.     Accordingly, CDM prays that this Court enter judgment against Defendants and award the following:

a. actual damages, including general damages and special damages of (i) loss of anticipated profits, (ii) mental anguish, (iii) cost of repair of land and improvements, (iv) loss of use of land and improvements including loss of rental value, (v) mitigation costs, and (vi) stigma damages;

b. treble damages;

c. exemplary damages;

d. profits derived by Lanham Act Defendants' wrongful acts;

e. reasonable attorney's fees;

f. court costs;

g. prejudgment interest at the highest rate allowed by law;

h. postjudgment interest at the highest rate allowed by law;

i. permanent injunctive relief; and

j. all other and further relief to which CDM may be justly entitled.

Dated: December  22, 2025

Respectfully submitted,

**JULAPALLI LAW FIRM, P.C.**

By: */s/ Venodhar Julapalli*
**Venodhar R. Julapalli**
Texas Bar No. 24149116
Southern District of Texas
Federal ID No. 3943389
2950 F.M. 2920, Suite 180
Spring, Texas  77388
Telephone: (832) 699-1007
Facsimile: (281) 880-4889
drj@julapalliforjustice.com

ATTORNEY-IN-CHARGE
FOR PLAINTIFF
CASA DE MARAVILLA, LLC