**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CASA DE MARAVILLA, LLC** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | **CIVIL ACTION NO: 4:25-cv-06183** |
| **WILLIAM BONNER,** *et al.,* | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## DEFENDANTS' MOTION TO DISMISS

Defendants, William Bonner, Mark Ford, Matthew Turner, Lucas Maish, Chris Currey, Paul Costantino, Matt Semenza, Gail Geerling, Christopher Boothby, Monument & Cathedral Holdings, LLC ("Agora"), Tola Development Group, LLC ("Tola"); Rancho Santana, Inc. ("RS Inc."); Propiedades Habitacionales Internacionales, S.A. ("International Living"); and Rancho Santana Inc. & Cía Ltda. ("Rancho SRL"), hereby file this Motion to Dismiss ("Motion").

Respectfully submitted,

By: */s/ Emma L. Short*
    **Emma L. Short**
    Texas Bar No. 24101001
    Federal ID No. 3501711
    **BAKER, DONELSON, BEARMAN,**
    **CALDWELL & BERKOWITZ. P.C.**
    1301 McKinney Street, Suite 3700
    Houston, Texas 77010
    Telephone: (713) 650-9700
    Facsimile:  (713) 650-9701
    eshort@bakerdonelson.com

    *Attorney for Defendants*

## TABLE OF CONTENTS

DEFENDANTS' MOTION TO DISMISS .................................................................................. 15

I.    Introduction. ................................................................................................................ 15

II.    Summary of Allegations. ............................................................................................. 15

    A.    The Origin of Rancho Santana. ................................................................. 15

    B.    The Governance of Rancho Santana. ........................................................ 16

    C.    The Palm Beach Letter Reaches Venodhar Julapalli. ............................... 17

    D.    Julapalli Forms CDM, Which Purchases the G16 Lot. .............................. 17

    E.    For a Time, CDM Pays the Dues. .............................................................. 18

    F.    The Rental Guidelines. ............................................................................... 19

    G.    The Termination of APROSA by the Republic of Nicaragua. ................... 19

    H.    In-Person Meeting of Owners on May 15, 2023. ....................................... 20

    I.    CDM Stops Paying Its Dues in 2023. ....................................................... 20

    J.    The "Blockade" of CDM's Property. ........................................................ 21

    K.    Allegations Specific to Defendants Currey, Semenza, Geerling, and
Boothby. ..................................................................................................... 22

        1.    Chris Currey. ................................................................................. 22

        2.    Matt Semenza. .............................................................................. 23

        3.    Gail Geerling. ................................................................................ 23

        4.    Christopher Boothby. .................................................................... 24

III.    Argument. .................................................................................................................... 25

    A.    This Court Should Dismiss the Complaint Under the Forum Non
Conveniens Doctrine. ................................................................................ 25

        1.    Nicaragua Provides an Adequate Alternative Forum. .................. 25

        2.    The Public and Private Interest Factors Weigh in Favor of
Dismissal. ..................................................................................... 26

    B.    This Court Should Dismiss for Lack of Personal Jurisdiction. ................... 28

        1.    None of the Defendants Is Subject to General Jurisdiction in
Texas. ........................................................................................... 28

        2.    None of the Defendants Is Subject to Specific Jurisdiction in
Texas. ........................................................................................... 29

            a.    No Purposeful Availment by Any Defendant. .............................. 30

                i.    Bonner. ............................................................................. 30

                ii.    Ford. ................................................................................. 31

                iii.    Turner. ............................................................................. 31

iv.    Maish..................................................................... 32

v.    Currey. ................................................................ 32

vi.    Costantino. ......................................................... 32

vii.    Semenza. ............................................................ 33

viii.    Geerling.............................................................. 33

ix.    Boothby.............................................................. 33

x.    Agora................................................................... 34

xi.    Tola. .................................................................... 34

xii.    RS, Inc................................................................. 34

xiii.    International Living. ........................................... 34

xiv.    Rancho SRL. ....................................................... 35

b.    CDM's Claims Do Not "Arise out of or Relate to" Any Texas Contacts. ................................................................. 35

c.    Exercising Jurisdiction Would Be Unfair and Unreasonable.................................................................. 36

3.    RICO's Nationwide Service Provision Does Not Apply. ......................... 36

4.    The Clayton Act's Nationwide Service Provision Does Not Apply. ......... 38

5.    18 U.S.C. § 1956(f) Does Not Apply......................................................... 39

6.    Conspiracy-Based Personal Jurisdiction Cannot Cure the Defects. ......... 39

C.    This Court Should Dismiss the Complaint for Failure to State a Claim Upon Which Relief Can Be Granted. ................................................................. 40

1.    Legal Standard. ......................................................................................... 40

2.    This Court Should Dismiss the Counts I to IV (RICO Claims)................ 41

a.    All Four RICO Counts Fail to Define the "Enterprise."............... 41

b.    This Court Should Dismiss Count I (18 U.S.C. § 1962(c)). ......... 42

i.    Elements of a Claim Under 18 U.S.C. § 1962(c).............. 42

ii.    CDM's Count I Fails to Plead Facts to Show a "Domestic Injury."............................................................ 43

iii.    In the Alternative, CDM Fails to Plead Facts Sufficient to Show an Injury Attributable to Defendants Maish, Constantino, Semenza, Boothby, or Agora. ............................................................. 45

(a)    Extortion. .............................................. 45

(b)    Money Laundering............................... 46

(c)    Transporting Stolen Money. ................ 48

(d)    Traveling in Aid of Racketeering. ....... 48

3

(e)      Because Extortion, Money Laundering, Transporting Stolen Money, and Traveling in Aid of Racketeering Fail, So Too Do CDM's Claims Against Defendants Maish, Costantino, Semenza, Boothby, and Agora Under Count I. ...................................................... 49

c.    This Court Should Dismiss Count II (18 U.S.C. § 1962(a)). ........ 49

i.    Elements of a Claim Under 18 U.S.C. § 1962(a). ............. 49

ii.   CDM's Count II Fails to Plead Facts to Show an "Investment Injury." ......................................................... 50

iii.  CDM's Count II Fails to Plead Facts to Show a "Domestic Injury." ............................................................. 51

iv.   CDM's Count II Fails to Plead Facts to Show a Nexus to Foreign Commerce. .......................................... 51

v.    In the Alternative, CDM, Count II Fails to Plead Facts Sufficient to Show an Injury Attributable to Defendants Maish, Costantino, Semenza, Agora, Tola, RS Inc., International Living, or Rancho SRL Attributable to a Violation of 18 U.S.C. § 1962(a) or Any RICO Predicate Act. ............................................ 52

d.    This Court Should Dismiss Count III (18 U.S.C. § 1962(b)) for Failure to State a Claim Upon Which Relief Can Be Granted. ........................................................................................ 52

i.    Elements of a Claim Under 18 U.S.C. § 1962(b). ............ 53

ii.   CDM's Count III Fails to Plead Facts Showing That Defendants Infiltrated an "Enterprise." ........................... 53

iii.  CDM's Count III Fails to Plead a Distinct Injury Proximately Caused by Any Defendant Acquiring an Interest in the Enterprise. ............................................ 54

iv.   CDM's Count III Fails to Plead Facts to Show a "Domestic Injury." ............................................................. 54

v.    CDM's Count III Fails to Plead Facts to Show a Nexus to Foreign Commerce. .......................................... 55

vi.   In the Alternative, CDM's Count III Fails to Plead Facts Sufficient to Show Defendant Maish, Costantino, Semenza, Boothby, or Agora Participated in a RICO Predicate Act. ............................. 55

e.    This Court Should Dismiss Count IV (18 U.S.C. § 1962(d)) for Failure to State a Claim Upon Which Relief Can Be Granted. ........................................................................................ 55

3. The Court Should Dismiss Count V (Sherman Act) for Failure to State a Claim Upon Which Relief Can Be Granted. ................................. 56

  a. Legal Standard. ............................................................. 57

  b. CDM Has Failed to Plausibly Plead a Per Se Antitrust Violation. ...................................................................... 59

  c. Market Definition, Market Power, and Rule-of-Reason Defects. ....................................................................... 61

  d. CDM Does Not Plead Antitrust Injury and Proximate Causation........................................................................ 62

  e. Extraterritoriality and the Foreign Trade Antitrust Improvements Act Bar the Claim as Pleaded. ............................. 63

4. This Court Should Dismiss Count VI (Lanham Act)............................... 64

  a. The Alleged Misrepresentations Are Not "Commercial Advertising or Promotion.".............................................. 65

  b. The Alleged Misrepresentations Are Non-Actionable Puffery and/or Opinions.................................................. 66

  c. CDM Has Inadequately Pleaded Materiality and Competitive Injury. ....................................................... 67

5. This Court Should Dismiss the Remaining Tort Claims. ......................... 68

  a. This Court Should Decline to Exercise Jurisdiction Over the Tort Claims Not Within Its Original Jurisdiction. ................. 68

  b. If this Court Retains Jurisdiction, It Should Dismiss the Tort Claims for Failure to State a Claim Upon Which Relief Can Be Granted. ................................................. 68

    i. Count VII (Texas Free Enterprise and Antitrust Act). ............................................................... 68

    ii. Count VIII (Fraud)............................................. 70

    iii. Count IX (Trespass). .......................................... 72

    iv. Count X (Tortious Interference). ..................................... 72

    v. Count XI (Civil Conspiracy)............................................ 73

IV. Conclusion. ........................................................................... 73

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. Singh*,
480 F.3d 351 (5th Cir. 2007) .................................................................................. 53

*Agar Corp. Inc. v. Multi-Fluid Inc.*,
No. 95-5105, 1997 WL 829340 (S.D. Tex. June 25, 1997) ...................................... 29

*Agar Corp. v. Electro Circuits Int'l, LLC*,
580 S.W.3d 136 (Tex. 2019) .................................................................................... 73

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
483 U.S. 143 (1987) .................................................................................................. 51

*Allstate Ins. Co. v Plambeck*,
802 F.3d 665 (5th Cir. 2015) .............................................................................. 42, 53

*Apani Sw., Inc. v. Coca Cola Enters., Inc.*,
300 F.3d. 620 (5th Cir. 2002) ............................................................................. 58, 61

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................. 40

*AT&T Mobility LLC v. T-Mobile USA Inc.*,
No. 22-cv-760, 2023 WL 311287 (E.D. Tex. Jan. 18, 2023) .................................... 66

*Atkinson v. Anadarko Bank & Tr. Co.*,
808 F.2d 438 (5th Cir. 1987) .................................................................................... 41

*Austin Legal Video, LLC v. Deposition Solutions, LLC*,
2024 WL 5184485 (W.D. Tex. 2024) ........................................................................ 57

*Bar Grp., LLC v. Bus. Intelligence Advisors, Inc.*,
215 F. Supp. 3d 524 (S.D. Tex. 2017) ...................................................................... 40

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................... 40, 57, 69

*Blanchard & Co., Inc. v. Contursi*,
2000 WL 574590 (E.D. La. May 11, 2000) .............................................................. 54

*Boltex Mfg. Co. v. Galperti, Inc.*,
827 F. App'x 401 (5th Cir. 2020) ............................................................................. 64

*Bristol-Myers Squibb Co. v. Superior Court,*
  582 U.S. 255 (2017) .......................................................................................................... 35

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) .................................................................................................... 59, 62

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985) .......................................................................................................... 31

*C.E. Servs., Inc. v. Control Data Corp.,*
  759 F.2d 1241 (5th Cir. 1985) .......................................................................................... 61

*C & H Transp. Co. v. Jensen & Reynolds Constr. Co.,*
  719 F.2d 1267 (5th Cir. 1983) .......................................................................................... 32

*Calder v. Jones,*
  465 U.S. 783 (1984) .......................................................................................................... 29

*California Clippers, Inc. v. U. S. Soccer Football Ass'n,*
  314 F. Supp. 1057 (N.D. Cal. 1970) ................................................................................. 39

*Caller-Times Publ'g Co. v. Triad Commc'ns, Inc.,*
  826 S.W.2d 576 (Tex. 1992) ............................................................................................. 69

*Chu v. Hong,*
  249 S.W.3d 441 (Tex. 2008) ............................................................................................. 73

*Coinmach Corp. v. Aspenwood Apartment Corp.,*
  417 S.W.3d 909 (Tex. 2013) ............................................................................................. 72

*Collins v. Morgan Stanley Dean Witter,*
  224 F.3d 496 (5th Cir. 2000) ............................................................................................. 41

*Crownover v. Crownover,*
  No. DR-15-CV-132-AM, 2016 U.S. Dist. LEXIS 203425 (W.D. Tex. Sept. 20, 2016) .......... 40

*Daimler AG v. Bauman,*
  571 U.S. 117 (2014) .......................................................................................................... 28

*de Pacheo v. Martinez,*
  515 F. Supp. 2d 773 (S.D. Tex. 2007) .............................................................................. 39

*Defense Distributed v. Grewal,*
  971 F.3d 485 (5th Cir. 2020) ............................................................................................. 29

*Den Norske Stats Oljeselskap AS v. HeereMac Vof,*
  241 F.3d. 420 (5th Cir. 2001) ........................................................................................... 63

7

*Destec Energy, Inc. v. Southern California Gas Co.*,
5 F. Supp. 2d 433 (S.D. Tex. 1997) ............................................................................... 69

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
123 F.3d 301 (5th Cir. 1997) ........................................................................................ 62

*Dubai Islamic Bank v. Citibank, N.A.*,
126 F. Supp. 2d 659 (S.D.N.Y. 2000) ........................................................................... 39

*Dunsby v. Transocean, Inc.*,
329 F. Supp. 2d 890 n.5 (S.D. Tex. 2004) ................................................................... 27

*Eastman Chem. Co. v. Plastipure, Inc.*,
775 F.3d 230 (5th Cir. 2014) ........................................................................................ 66

*Evans v. United States*,
504 U.S. 255 (1992) ...................................................................................................... 46

*Fellows v. Universal Rests., Inc.*,
701 F.2d 447 (5th Cir. 1983) ........................................................................................ 37

*Frank v. PNK (Lake Charles) LLC*,
947 F.3d 331 (5th Cir. 2020) ........................................................................................ 28

*Gen. Retail Servs. v. Wireless Toyz Franchise, LLC*,
255 F. App'x 775 (5th Cir. 2007) ................................................................................. 29

*Glenn v. BP p.l.c.*,
27 F. Supp. 3d 755 (S.D. Tex. 2014) ............................................................................ 27

*Gonzalez v. Bayer Healthcare Pharmaceuticals, Inc.*,
930 F. Supp. 2d 808 (S.D. Tex. 2013) .......................................................................... 69

*GovernmentGPT Inc. v. Axon Enter. Inc.*,
769 F. Supp. 3d 959 (D. Ariz. 2025) ............................................................................ 39

*Green v. State Bar of Texas*,
27 F.3d 1083 (5th Cir. 1994) ........................................................................................ 63

*Guardino v. Hart*,
2023 WL 3818378 (5th Cir. June 5, 2023) ................................................................... 42

*Hanson v. Denckla*,
357 U.S. 235 (1958) ...................................................................................................... 29

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010) .......................................................................................................... 47

8

*Holland v. CryptoZoo Inc.,*
No. 1:23-CV-00110, 2025 WL 2493065 (W.D. Tex. July 7, 2025)........................................ 37

*Hydrokinetics, Inc. v. Alaska Meek, Inc.,*
700 F.2d 1026 (5th Cir. 1983) ............................................................................................... 32

*In re BP p.l.c. Sec. Litig.,*
51 F. Supp. 3d 693 (S.D. Tex. 2014) ..................................................................................... 71

*In re Flat Glass Antitrust Litig.,*
385 F.3d 350 (3d Cir. 2004)................................................................................................... 60

*In re Pool Products Distribution Market Antitrust Litigation,*
988 F. Supp. 2d 696 (E.D. La. 2013)..................................................................................... 60

*Ipsen Biopharm Ltd. v. Galderma Lab'ys, L.P.,*
660 F. Supp. 3d 538 (N.D. Tex. 2023) .................................................................................. 27

*Johnson v. TheHuffingtonPost.com, Inc.,*
21 F.4th 314 (5th Cir. 2021) .................................................................................................. 30

*Karim v. Finch Shipping Co.,*
265 F.3d 258 (5th Cir. 2001) ................................................................................................. 25

*Leegin Creative Products, Inc. v. PSKS,*
551 U.S. 877 (2008)................................................................................................................ 60

*Lexmark International Inc. v. Static Control Components, Inc.*
572 U.S. 118 (2015)................................................................................................................ 57

*Logan v. Burgers Ozark Country Cured Hams, Inc.,*
263 F.3d 447 (5th Cir. 2001) ................................................................................................. 65

*McFadin v. Gerber,*
587 F.3d 753 (5th Cir. 2009) ................................................................................................. 29

*MM Steel L.P. v. JSW Steel (USA) Inc.,*
806 F.3d 835 (5th Cir. 2015) ................................................................................................. 57

*Monkton Ins. Services, Ltd. v. Ritter,*
2013 WL 12100550 (W.D. Tex. Aug. 23, 2013).................................................................... 32

*Motorola Mobility LLC v. AU Optronics Corp.,*
775 F.3d 816 (7th Cir. 2015) ................................................................................................. 64

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare,*
781 F.3d 182 (5th Cir. 2015) ................................................................................................. 56

*Nat'l Indus. Sand Ass'n v. Gibson*,
   897 S.W.2d 769 (Tex. 1995)...................................................................... 40

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*,
   56 F.4th 1026 ........................................................................................... 62

*Norris v. Hearst Tr.*,
   500 F.3d 454 (5th Cir. 2007) ................................................................... 57

*Northern Pacific R. Co. v. United States*,
   356 U.S. 1 (1958)...................................................................................... 58

*Ocasio v. United States*,
   578 U.S. 282 (2016).................................................................................. 46

*Ohio v Am. Express Co.*,
   585 U.S. 529 (2018).................................................................................. 58

*Pace v. Cirrus Design Corp.*,
   93 F.4th 879 (5th Cir. 2024) .................................................................... 35

*Patterson v. Dietze, Inc.*,
   764 F.2d 1145 (5th Cir. 1985) ................................................................. 32

*Pervasive Software, Inc. v. Lexware GMBH & Co. KG*,
   688 F.3d 214 (5th Cir. 2012) ................................................................... 29

*Piper Aircraft Co. v. Reyno*,
   454 U.S. 235 (1981)............................................................................ 25, 26

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
   227 F.3d 489 (5th Cir. 2000) ................................................................... 66

*Plotkin v. IP Axess Inc.*,
   407 F.3d 690 (5th Cir.2005) .................................................................... 70

*Pohl v. Cheatham*,
   718 S.W. 3d 173 (Tex. 2025).................................................................... 69

*Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*,
   784 F.2d 674 (5th Cir. 1986) ................................................................... 66

*PSKS, Inc. v. Leegin Creative Leather Prods.*,
   615 F.3d 412 (5th Cir. 2010) ................................................................... 58

*PSKS, Inc. v. Leegin Creative Leather Products, Inc.*,
   2009 WL 938561 (E.D. Tex. 2009) ......................................................... 59

10

*Reed v. Marshall*,
   699 F. Supp. 3d 563 (S.D. Tex. 2023) ................................................................... 68

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
   842 F.3d 883 (5th Cir. 2016) .................................................................................. 59

*Richardson-Eagle, Inc. v. William M. Mercer, Inc.*,
   213 S.W.3d 469 (Tex. App. 2006) ........................................................................... 72

*RJR Nabisco v. European Community*,
   579 U.S. 325 (2016) .............................................................................. 43, 44, 51, 55

*Rush v. Savchuk*,
   444 U.S. 320 (1980) ................................................................................................ 29

*Rx Solutions, Inc. v. Caremark, LLC*,
   164 F.4th 436 (5th Cir 2026) ............................................................... 58, 61, 62, 63

*Sanger Ins. Agency v. HUB Int'l Ltd.*,
   802 F.3d 732 (5th Cir. 2015) .................................................................................. 62

*Seiferth v. Helicopteros Atuneros, Inc.*,
   472 F.3d 266 (5th Cir. 2006) ...................................................................... 29, 35, 36

*Seven-Up Co. v. Coca-Cola Co.*,
   86 F.3d 1379 (5th Cir. 1996) .................................................................................. 65

*Sheshtawy v. Conservative Club of Houston, Inc.*,
   No. 4:16-CV-733, 2016 WL 5871463 (S.D. Tex. Oct. 7, 2016) ............................. 55

*Sonnier v. State Farm Mut. Auto. Ins. Co.*,
   509 F.3d 673 (5th Cir. 2007) .................................................................................. 41

*Spectators' Commc'n Network v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) .................................................................................. 58

*St. Paul Mercury Ins. Co. v. Williamson*,
   224 F.3d 425 (5th Cir. 2000) .................................................................................. 49

*State Oil v. Khan*,
   522 U.S. 3 (1997) .................................................................................................... 58

*Steed v. HB1 Alternative Holdings, LLC*,
   2024 WL 1590159 (S.D. Tex. Mar. 8, 2024) ......................................................... 42

*Sullivan v. Leor Energy, LLC*,
   600 F.3d 542 (5th Cir. 2010) .................................................................................. 71

*Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*,
    346 U.S. 537 (1954) ............................................................................................... 59

*Tilton v. Marshall*,
    925 S.W.2d 672 (Tex. 1996) .................................................................................. 73

*United States v. Fuchs*,
    467 F.3d 889 (5th Cir. 2006) ................................................................................. 47

*United States v. Pennell*,
    409 F.3d 240 (5th Cir. 2005) ................................................................................. 47

*United States v. Rashad*,
    687 F.3d 637 (5th Cir. 2012) ................................................................................. 46

*United States v. Rosenthal*,
    805 F.3d 523 (5th Cir. 2015) ................................................................................. 56

*United States v. Turkette*,
    452 U.S. 576 (1981) ............................................................................................... 41

*Vanderbilt Mortgage & Finance, Inc. v. Flores*,
    735 F. Supp. 2d 679 (S.D. Tex. 2010) ........................................................ 50, 53, 54

*Vasquez v. Bridgestone/Firestone, Inc.*,
    325 F.3d 665 (5th Cir. 2003) ................................................................................. 25

*Veba-Chemie A.G. v. M/V Getafix*,
    711 F.2d 1243 (5th Cir. 1983) ............................................................................... 25

*Viazis v. American Ass'n of Orthodontists*,
    314 F.3d 758 (5th Cir. 2002) ............................................................................ 58, 62

*Walden v. Fiore*,
    571 U.S. 277 (2014) ......................................................................................... passim

*Wesdem, L.L.C. v. Illinois Tool Works, Inc.*,
    70 F.4th 285 (5th Cir. 2023) ............................................................................ 70, 71

*Whelan v. Winchester Production Co.*,
    319 F.3d 225 (5th Cir. 2003) ................................................................................. 41

*Williams v. WMX Technologies, Inc.*,
    112 F.3d 175 (5th Cir. 1997) ................................................................................. 70

*World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*,
    803 F. Supp. 3d 1136 (W.D. Wash. 2025) .............................................................. 39

*Yegiazaryan v. Smagin,*
  599 U.S. 533 (2023) ................................................................................................ 44, 47

## Statutes

15 U.S.C. § 6a ........................................................................................................ 63

15 U.S.C. § 22 .................................................................................................. 38, 39

15 U.S.C. § 1125(a) ............................................................................................... 67

15 U.S.C. § 1125(a)(1)(B) ..................................................................................... 64

18 U.S.C. § 1951 ................................................................................................... 46

18 U.S.C. § 1951(b)(2) .......................................................................................... 45

18 U.S.C. § 1952(a) ............................................................................................... 48

18 U.S.C. § 1952 ................................................................................................... 48

18 U.S.C. § 1956 ........................................................................................ 39, 46, 47

18 U.S.C. § 1956(a)(1), (a)(2)(A), (a)(3)(A), & (c)(7) ......................................... 47

18 U.S.C. § 1956(f) ............................................................................................. 3, 39

18 U.S.C. § 1957(a) & (f)(3) ................................................................................. 47

18 U.S.C. § 1961(1) ............................................................................................... 45

18 U.S.C. § 1962 .............................................................................................. 43, 51

18 U.S.C. § 1962(a) .......................................................................................... passim

18 U.S.C. § 1962(b) .......................................................................................... passim

18 U.S.C. § 1962(c) ......................................................................................... 3, 42, 45

18 U.S.C. § 1962(d) ....................................................................................... 4, 55, 56

18 U.S.C. § 1964 ................................................................................................... 41

18 U.S.C. § 1964(c) ........................................................................................ 43, 44, 45

18 U.S.C. § 1965 .............................................................................................. 36, 37

18 U.S.C. § 1965(a) ............................................................................................... 38

18 U.S.C. § 1965(b) ................................................................................................ 37, 38

18 U.S.C. § 1965(d) ..................................................................................................... 38

18 U.S.C. § 2314 .......................................................................................................... 48

18 U.S.C. § 2315 .......................................................................................................... 48

28 U.S.C. § 1332(a) ..................................................................................................... 68

28 U.S.C. § 1367 .......................................................................................................... 68

28 U.S.C. § 1367(c)(3) ................................................................................................. 68

TEX. BUS. & COM. CODE § 15.04 ................................................................................ 69

TEX. BUS. & COM. CODE § 15.25 ................................................................................ 70

TEX. CIV. PRAC. & REM. CODE § 16.003(a) ............................................................... 72

TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4) ........................................................... 71

## DEFENDANTS' MOTION TO DISMISS

Defendants, William Bonner, Mark Ford, Matthew Turner, Lucas Maish, Chris Currey, Paul Costantino, Matt Semenza, Gail Geerling, Christopher Boothby, Monument & Cathedral Holdings, LLC ("Agora"), Tola Development Group, LLC ("Tola"); Rancho Santana, Inc. ("RS Inc."); Propiedades Habitacionales Internacionales, S.A. ("International Living"); and Rancho Santana Inc. & Cía Ltda. ("Rancho SRL"), hereby file this Motion to Dismiss ("Motion").

## I.    Introduction.

Over 113 pages, Plaintiff Casa de Maravilla, LLC ("CDM") seeks to leverage the jurisdiction of this Court to address a dispute involving a parcel of property on the Pacific Coast of Nicaragua. The Complaint is badly over pleaded, as CDM scours the United States Code and the common law to manufacture claims that might lead to relief in this Court. This Court should dismiss for three reasons: (1) under *forum non conveniens* to be heard in Nicaragua; (2) for lack of personal jurisdiction; and (3) for failure to state any plausible claim for relief.

## II.    Summary of Allegations.[1]

CD's Complaint spans 403 paragraphs. It can be summarized as follows:

### A.    The Origin of Rancho Santana.

1.    This action concerns an area in the Pacific Coast of Nicaragua known as Rancho Santana, *see* Compl. ¶ 1, which includes a lot identified as "G16" that came to be owned by CDM in 2013, *see id*. ¶¶ 92–98.

2.    Rancho Santana was founded by Defendants Bonner, Ford, and Turner, *see id*. ¶ 55, each of whom were involved in a publishing venture, *id*. ¶¶ 47–48. One such publication, *International Living*, promoted Nicaragua as a retirement or second-home destination. *Id*. ¶ 57.

---

[1] Defendants assume the truth of all allegations for the purposes of this Motion only.

3.  Bonner, Ford, and Turner identified an area in Nicaragua for Rancho Sanatana, *id.* ¶ 63, and all three built homes there, *id.* ¶ 67.

4.  International Living purchased the surrounding land in 1997, *id.* ¶ 68, and marketed an initial set of lots, *id.* ¶ 69. International Living used the proceeds to develop the infrastructure for Rancho Santana. *Id.*

5.  Bonner, Ford, and Turner are alleged to have planned to develop Rancho Santana into a resort. *Id.* ¶ 74.

**B.    The Governance of Rancho Santana.**

6.  In 1998, an HOA known as APROSA was formed at Rancho Santana. *Id.* ¶ 102.

7.  In 2002, a neighborhood HOA, "Playa HOA," was also formed. *Id.* ¶ 106.

8.  In 2004, Defendant Turner pitched a new HOA. *Id.* ¶ 115. Turner explained that Nicaraguan law allowed the creator of the HOA to adopt new bylaws. *Id.* ¶ 115(e).

9.  The new 2004 Declaration of Covenants referred to in Turner's letter created an HOA known as Rancho Santana Association, S.A. *Id.* ¶ 116.

10.  In 2005, International Living introduced a new set of 2005 Covenants proposing Greater Rancho Santana Association, S.A. as a super-HOA. *Id.* ¶ 118.

11.  In 2006, International Living introduced a new set of 2006 Covenants, which CDM alleges were the "brainchild" of Defendants Turner, Ford, Bonner, International Living, Agora, and a non-party Florida attorney and real estate developer. *Id.* ¶ 122.

12.  The 2006 Covenants reformulated APROSA as "Rancho Santana Community Association." *Id.* ¶ 124(c).

13.  In 2007, the APROSA formation document was amended to parallel the 2006 Covenants and was recorded. *Id.* ¶ 125.

16

14. CDM alleges that, after the 2006 Covenants, the governance did not occur in accordance with the HOA provisions. *Id*. ¶ 133. The 2006 Covenants and documents relating to the HOA were, however, posted on ranchosantana.com. *Id*. ¶¶ 133–134.

15. By 2010 or 2011, Rancho SRL had begun the "second phase of Rancho Santana" by developing a resort and inn, which opened in 2015. *Id*. ¶¶ 144–145.

**C.    The *Palm Beach Letter* Reaches Venodhar Julapalli.**

16. In 2011, Ford began publishing the *Palm Beach Letter* under the Agora umbrella, which provided financial and retirement advice. *Id*. ¶ 75.

17. Venodhar Julapalli ("Julapalli") (later the managing member of CDM, *see id*. ¶ 77) subscribed to and received content from the *Palm Beach Letter* between 2012 and 2013. *Id*. ¶ 78.

18. The *Palm Beach Letter* recommended retirement lifestyles abroad, which "places included areas in and around Rancho Santana." *Id*. ¶ 78; *see also* ¶¶ 79–85.

19. In late 2012, Julapalli also subscribed to a list where he received emails from Rancho Santana's sales manager, and, between late 2012 and spring 2013, Julapalli read blog posts at ranchosantana.com. *Id*. ¶¶ 86–87.

20. On March 9, 2013, Julapalli subscribed to *International Living*, through which he received an email promoting Rancho Santana. *Id*. ¶ 89.

21. Collectively, the above messages spoke about Rancho Santana's affordability, safety, value as a source of rental income, and luxurious surroundings. *See generally id*. ¶¶ 76 *et seq*.

**D.    Julapalli Forms CDM, Which Purchases the G16 Lot.**

22. Julapalli came to visit Rancho Santana on April 13, 2013. *Id*. ¶ 92. This visit led Julapalli to form CDM on May 14, 2013, *id*. ¶ 95, and CDM then contracted to purchase unimproved lot known as "G16" on that same day, *id*. ¶¶ 92–98.

23.     CDM admits that the "key" fact behind the decision to purchase G16 was "its proximity to the Pacific and those world-class surf breaks, which were pitched as significantly raising private residential and vacation rental real estate market value." *Id*. ¶ 94.

24.     CDM purchased G16 from a private property owner. *Id*. ¶ 92.

25.     The purchase agreement disclosed that G16 was subject to the Rancho Santana Master Homeowners Association ("APROSA"), *id*. ¶ 97.a, and was to pay dues for maintenance of common elements, *id*. ¶ 97.d. The deed, likewise, reflected that the owners were legally organized into two nonprofit associations. *Id*. ¶ 99.

**E.      For a Time, CDM Pays the Dues.**

26.     Subject to the representations in the purchase and sale agreement and transfer deed, CDM paid its dues for a time. *See id*. ¶¶ 47 *et seq*.

27.     Defendant Costantino, Rancho SRL's Chief Financial Officer, served as "dues enforcer." *Id*. ¶ 148.

28.     On February 21, 2014, Costantino emailed Julapalli an invoice for CDM's 2014 Rancho Santana's owner dues, to be paid to either APROSA or "Publishing Services, LLC" (formerly Agora Publishing, LLC), *id*. ¶ 151, which Julapalli paid for by a wire to Publishing Services, LLC in Baltimore, *id*. ¶ 152.

29.     CDM received similar invoices in 2015 and 2016, which were paid in the same manner by wire or check to Publishing Services, LLC or (through Costantino in Baltimore) to APROSA. *Id*. ¶¶ 154-157.

30.     CDM alleges that, in 2017 through 2022, it paid its annual owner dues by credit card. *Id*. ¶¶ 160, 162, 167, 169, 171–172.

18

**F.      The Rental Guidelines.**

31.      In August 2022, Defendant Maish wrote the owners announcing that, beginning in 2023, all third-party vacation rentals would need to be funneled through a program owned by Rancho SRL. *Id*. ¶¶ 223–224.

32.      Maish explained that the reason was to allow Rancho Santana to compete with other destinations rather than having owners compete against themselves. *Id*. ¶ 225.

33.      Some owners expressed concerns, which resulted in Maish modifying the policy and issuing different Rental Guidelines. *Id*. ¶ 230.

**G.      The Termination of APROSA by the Republic of Nicaragua.**

34.      On October 31, 2022, APROSA was terminated by the Nicaraguan government for failure to make reports concerning its governance and finances. *Id*. ¶ 175.

35.      Contemporaneously, a new set of Community Guidelines effective June 1, 2022, were posted on ranchosantana.com, which replaced the former 2006 Covenants. *Id*. ¶ 176. The Community Guidelines recited that Rancho SRL had repurposed the initial governance structure and assumed certain rights to charge fees and assessments and responsibilities to maintain the common areas and provide security. *Id*.

36.      In response to inquiries from owners, legal counsel to Rancho SRL explained that APROSA had been established as a nonprofit legal vehicle to receive dues and avoid taxes, which was no longer practical because of recent changes in tax law and NGO law. *Id*. ¶ 181. Rancho SRL confirmed the APROSA no longer existed. *Id*. ¶ 182.

37.      In a March 20, 2023 email, Maish confirmed that APROSA was intended to provide a tax shield for property owners, but that APROSA no longer existed. *Id*. ¶ 184.

19

**H.      In-Person Meeting of Owners on May 15, 2023.**

38.      Maish called an in-person meeting of the owners at Rancho Santana on May 15, 2023. *Id*. a ¶ 186. Julapalli attended. *Id*. ¶ 187.

39.      At the meeting, Maish allegedly stated that the dues had risen significantly because of a budget shortfall that had accumulated over the prior 20 years and due to inflation. *Id*. ¶ 187. Maish is allegedly stated that the dues were "fee for service" such as electricity and water. *Id*. Maish is alleged to have stated that Rancho SRL could not attach an interest in a property for refusing to pay the dues, but that "[w]e're going to have to get real" about those who did not pay, which is alleged to mean refusing access to an owner to other community property and services such as electricity and water. *Id*.

40.      The Complaint alleges that Defendants Bonner, Ford, and Turner had approved Maish's message by a memorandum eight months earlier. *See id*. ¶ 189.

41.      The Complaint also alleges that ranchosantana.com still contains references to an HOA and lien rights for delinquent assessments. *Id*. ¶¶ 191–192.

**I.      CDM Stops Paying Its Dues in 2023.**

42.      On March 21, 2023, Costantino sent Julapalli the invoice for CDM's annual owner dues. *Id*. ¶ 202. Julapalli questioned paying the dues, *id*. ¶ 204, and Costantino stated that if CDM did not pay that it would be passed on to the legal team and would give cause to cut water and electrical service to the property, *id*. ¶ 205.

43.      CDM did not make its annual payment for 2023. *Id*. ¶ 207.

44.      On March 5, 2024, Costantino sent Julapalli the invoice for CDM's 2024 dues, stating that any owner that was more than two years delinquent would not be allowed on Rancho Santana property other than the owner's own property. *Id*. ¶ 210. Costantino reiterated the steps

that would be taken to ensure that delinquent owners paid their share of the dues for common expenses. *Id*. ¶¶ 211–212.

45.     On July 17, 2024, Costantino cautioned Julapalli that, if CDM did not pay its dues, Rancho SRL would not allow CDM's guests to be unaccompanied on the common areas, and that Rancho SRL would not provide CDM with electricity or water. *Id*. ¶ 214.

46.     CDM did not make its annual payment for 2024 or 2025. *Id*. ¶¶ 216, 221.

**J.      The "Blockade" of CDM's Property.**

47.     CDM alleges that, after CDM stopped paying its annual dues in 2023, Maish and Costantino took steps to enforce those obligations. This is alleged to have occurred between August 28, 2023 and September 6, 2023. *Id*. ¶ 252.

48.     CDM alleges that Rancho SRL attempted to disconnect the water line leading to CDM's property and the property of another neighbor who was delinquent on his dues. *Id*. ¶ 253.

49.     One of those efforts, occurring between August 28 and September 6, 2023, resulted in a sit-in, during which CDM alleges that an unidentified member of Rancho SRL personnel entered CDM's property on G16. *Id*. ¶¶ 252–255.

50.     CDM alleges that Maish has continued to assert that Rancho SRL has the right to cut off water to G16 and the adjoining delinquent neighbor under the authority of the Nicaraguan government. *Id*. ¶ 258.

51.     CDM further alleges that Defendant Semenza emailed Julapalli on April 10, 2024 that the construction on G16 had exceeded the 18-month timeline and that there had been talk among Rancho SRL's Architectural Review Committee of imposing penalties or fines. *Id*. ¶¶ 23, 260. CDM alleges that, on July 31, 2024, Semenza began imposing those fines and, thereafter, closed Rancho Santana's gates to CDM's contractor. *Id*. ¶¶ 261–262.

21

**K.    Allegations Specific to Defendants Currey, Semenza, Geerling, and Boothby.**

52.    Four Defendants (Currey, Semenza, Geerling, and Boothby) have particularly attenuated dealings, or no dealings at all, with CDM under the allegations of the Complaint.

**1.    Chris Currey.**

53.    Chris Currey is a homeowner in Rancho Santana who sits on the Board of Rancho SRL and serves as the Executive Vice President of Real Estate. *Id*. ¶ 19.

54.    Currey is alleged to have stated in a 2023 YouTube video that the original vision was to develop Rancho Santana into a resort. *Id*. ¶¶ 74, 130.

55.    Currey was copied on various emails requesting annual dues payments. *Id*. ¶¶ 166, 214, 215. Of those, Currey was alleged to have provided additional comment once, defending the fee increase in March 2020. *Id*. ¶ 166.

56.    Currey is alleged to have received questions from another unidentified owner in or around 2021 concerning the documentation binding the owners to Rancho SRL. *Id*. ¶ 178.

57.    Currey is alleged to have been present at the May 15, 2023 meeting of the owners. *Id*. a ¶ 187.

58.    Currey is alleged to have supported and benefitted from the Rental Guidelines. *Id*. ¶¶ 244–246.

59.    In vague, collective, and conclusory allegations, Currey is said to have represented that Rancho Santana is a residential community with rental opportunities and a functional HOA. *Id*. ¶ 276.

60.    In equally vague allegations, Currey is alleged to have stated in a 2023 YouTube video that the resort at Rancho Santana sets price points, occupancy rates, and guest types that Rancho Santana Vacation Rentals owners would want, which CDM suggests was misleading. *Id*.

22

¶ 371. This statement, of course, was ten years after CDM chose to purchase the property at Rancho Santana. *See id*. ¶¶ 92–98.

### 2. Matt Semenza.

61. CDM alleges that Julapalli never received or signed building guidelines from Semenza or any other Defendant at the time of purchase or the time of the build. *Id*. ¶ 251.

62. On April 10, 2024, Semenza notified Julapalli that CDM's build had exceeded the allowable 18-month timeline and that there was "some talk amongst the [Architectural Review Committee] to start imposing penalties or fines soon." *Id*. ¶ 260.

63. On July 31, 2024, Semenza emailed Julapalli that CDM was liable for fines of $2,500 per month beginning in August 2024 for exceeding the 18-month deadline under the Rancho SRL building guidelines, and that if the fine was not paid, contractors and third parties would not be allowed access to G16. *Id*. ¶ 261.

64. On November 20, 2024, Semenza confirmed that Rancho SRL was closing its gates to CDM's contractor. *Id*. ¶ 262.

65. On November 27, 2024, Semenza responded to an email from Julapalli stating that Rancho Santana and the Architectural Review Committee were imposing fines as outlined in the building guidelines. *Id*. ¶ 265.

66. On December 2, 2024, Semenza responded to a further email directing Julapalli to the building guidelines CDM received when it purchased the property. *Id*. ¶ 266.

### 3. Gail Geerling.

67. Gail Geerling, as alleged, was the General Manager of International Living from 1997 to 2001, and Geerling is a homeowner in Rancho Santana. *Id*. ¶ 25.

68. Geerling is alleged to have sent communications to and collected HOA fees from owners in 2003, *see id*. ¶¶ 108–114, which is nearly a decade before CDM was formed and purchased its lot in Rancho Santana, *see id*. ¶¶ 92–98.

69. Twenty years later, on September 14, 2023, Geerling received an email directed to many owners from one of the owners, John Edwards. *Id*. ¶¶ 104, 195. Edwards's email referred to a set of 2005 Covenants establishing GRSA as a separate HOA. *Id*. ¶ 195. Geerling responded by asking whether the 2005 Covenants had been executed in Spanish. *Id*. ¶ 196. In that same email exchange, Edwards asked for her opinion on the HOA situation based on her involvement some 20 years before, Geerling responded that she believed that there had been official meetings of the Board of Directors of APROSA but that she did not have a written record of it or access to the minutes book. *Id*. ¶ 199.

### 4. Christopher Boothby.

70. Christopher Boothby is a homeowner in Rancho Santana. *Id*. ¶ 27.

71. CDM alleges, "on information and belief," that Boothby is one of the owners who has been pressing Constantino to collect dues from delinquent owners. *Id*. ¶ 213.

72. CDM alleges that Boothby had, as an owner, supported a policy funneling third-party vacation rentals through Rancho SRL's Vacation Rentals program. *Id*. ¶¶ 236–237.

73. Finally, CDM alleges that Boothby had asked that a communication on the owners' Listserv concerning water and electricity rights be taken offline, as Boothby believed that the Listserv was not the forum to air personal grievances. *Id*. ¶ 259.

III.    **Argument.**

A.    **This Court Should Dismiss the Complaint Under the *Forum Non Conveniens* Doctrine.**

First, this Court should dismiss the Complaint under the doctrine of *forum non conveniens*. *Forum non conveniens* "enables a court to decline to exercise its jurisdiction if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum." *Karim v. Finch Shipping Co.*, 265 F.3d 258, 268 (5th Cir. 2001). The moving party must show "(1) the existence of an available and adequate alternative forum and (2) that the balance of relevant private and public interest factors favor dismissal." *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003). Private factors include:

> the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; the possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981), and the public factors include:

> the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Id*.

1.    **Nicaragua Provides an Adequate Alternative Forum.**

Here, Nicaragua provides an available and adequate alternative forum. This element has two components. First, the moving defendant or defendants must be "amenable to process" in the alternative forum. *Veba-Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1246 (5th Cir. 1983). This is met. Nearly all the Defendants reside or own homes in Nicaragua, and, in filing this Motion, all

25

consent to personal jurisdiction in Nicaragua for this dispute. The second component is that the alternative forum be "adequate," *i.e.*, that "there is no danger that [a plaintiff] will be deprived of any remedy or treated unfairly." *Piper Aircraft*, 454 U.S. at 255. Under *Piper Aircraft*, this is satisfied unless "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all . . . ." *Id*. at 254. Here, as shown in the Affidavit of Professor Manuel A. Gómez (attached as **Exhibit A** hereto), the courts of Nicaragua are adequate to decide and remedy each of CDM's core grievances, *i.e.*, its obligations to pay dues and fees, whether CDM is bound by Rancho Santana's covenants and guidelines, and whether Rancho SRL interfered with or trespassed upon CDM's property. Indeed, as this Court can observe from CDM's Notice of Related Litigation filed at ECF No. 1-1, CDM is already litigating in Nicaragua over an easement issue for the same property. If CDM, as plaintiff in that case, can present a case to a Nicaraguan court concerning one aspect of CDM's property rights, it stands to reason that the same court can address CDM's grievances in this Complaint.

       2.       **The Public and Private Interest Factors Weigh in Favor of Dismissal.**

The private factors counsel for dismissal under the doctrine of *forum non conveniens*. While CDM is domiciled in Texas, "if the balance of conveniences suggests that trial in the [plaintiff's] chosen forum would be unnecessarily burdensome for the defendant[s] or the court, dismissal is proper." *Piper*, 454 U.S. at 255 n.23. In this case, the "relative ease of access to sources of proof" and access to witnesses points to this case being heard in Nicaragua. Here: (1) the property at issue is in Nicaragua and can only be examined there; (2) ten of the Defendants are domiciled or own homes in Nicaragua, *see* Compl. ¶¶ 11, 13, 15–16, 18, 22, 24, 27, 35, 41; (3) all the essential nonparty witnesses are in Nicaragua, *id*. ¶ 104 (homeowner John Edwards) ¶¶ 254–255 (unidentified persons involved in "water skirmish") and generally *id*. (other homeowners); and (4) access to any governmental records relating to the various HOA regimes will be easier in

Nicaragua than in the United States (and would need to be translated if the case is heard in this District). It also should not be difficult for the plaintiff to travel to and litigate in Nicaragua. CDM's principal member, Julapalli, has travelled there at least twice just within the facts alleged, *see* Compl. ¶¶ 92, 187, and CDM's apparent sole purpose is to own property in Nicaragua. *See id*. ¶¶ 95–96. And, it bears repeating, CDM is already litigating a civil matter in Nicaragua's courts. *See supra*. For these reasons, the private factors favor dismissal.

Even if the private factors did not alone warrant dismissal, the public factors tip the balance in favor of Nicaragua. The "local interest in having localized controversies decided at home," *see Dunsby v. Transocean, Inc.*, 329 F. Supp. 2d 890, 895 n.5 (S.D. Tex. 2004), is obvious. This is a dispute among Nicaragua landowners concerning their respective property rights. Nicaragua has an interest in those issues. *See* Ex. A at ¶¶ 15, 22–26, 29, 34–35. Texas—and indeed the United States—has no such stake in this matter.

Perhaps more importantly, the need to apply foreign law is a factor that, here "strongly favors dismissal." *See Ipsen Biopharm Ltd. v. Galderma Lab'ys, L.P.*, 660 F. Supp. 3d 538, 554 (N.D. Tex. 2023); *see also Glenn v. BP p.l.c.*, 27 F. Supp. 3d 755, 766 (S.D. Tex. 2014) ("[T]he need to apply foreign law is a very important factor in the forum non conveniens analysis.") , *aff'd*, 602 F. App'x 199 (5th Cir. 2015). This, too, is plain on the face of the Complaint, which *itself* invokes several principles of Nicaragua law. *See, e.g.*, Compl. ¶¶ 175, 277(c) (citing Nicaragua law governing nonprofits); ¶¶ 256, 259 (claiming water and electricity rights under Nicaragua civil law); ¶¶ 285–286 (citing principles of Nicaragua horizontal property law); ¶ 360 (praying antitrust claims "in comity with Nicaragua horizontal property law). Combining this with CDM's tort claims (Counts VII to XI), each of which could involve issues of Nicaragua law, this Complaint

places a heavy task on this Court to apply foreign law and eventually places the same heavy task on a Southern District jury to apply that law to its factfinding.

Thus, this Court should dismiss CDM's Complaint to allow it to be brought in an available and adequate forum in Nicaragua.

### B.     This Court Should Dismiss for Lack of Personal Jurisdiction.

Should this Court not dismiss under the doctrine of *forum non conveniens*, it remains that *this District* is not the proper forum. None of the Defendants is subject to personal jurisdiction in Texas. CDM's claims do not arise out of any purposeful contacts with Texas to establish specific jurisdiction, and the nationwide service provisions of RICO and the Clayton Act do not provide a jurisdictional hook in this District, as those statutes require threshold showings CDM cannot make. Even the Complaint's fallback theories do not cure these defects. The Court should dismiss the Complaint as to all Defendants for lack of personal jurisdiction.

### 1.     None of the Defendants Is Subject to General Jurisdiction in Texas.

None of the Defendants is subject to general jurisdiction in this District. Indeed, CDM does not even claim that any Defendant is, as CDM's jurisdictional allegations are focused on specific jurisdiction and the nationwide-service statutes. *See* Compl. ¶ 45. Nor could CDM do so. In *Daimler AG v. Bauman*, the Supreme Court ruled that the only two places where a corporate defendant is "at home," and thus subject to general jurisdiction, absent an "exceptional case," are in the state of incorporation and at the principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 138–39 & n.19 (2014). Similarly, "for an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *See Frank v. PNK (Lake Charles) LLC*, 947 F.3d 331, 337 (5th Cir. 2020). None of the individual Defendants is alleged to reside in Texas, *see* Compl. ¶¶ 11–12, 14, 16, 17, 20, 22, 24, 26, and none of the corporate Defendants is alleged to be incorporated in or maintain a principal place of business in Texas. *See id.* ¶¶ 28, 30, 33, 35, 41.

28

### 2.    None of the Defendants Is Subject to Specific Jurisdiction in Texas.

Nor has CDM pleaded facts to show specific jurisdiction over any of the Defendants. The

Fifth Circuit "has framed the [specific jurisdiction] inquiry as a three-step analysis:

> whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*See Defense Distributed v. Grewal*, 971 F.3d 485, 490–91 (5th Cir. 2020). "[S]pecific personal

jurisdiction is a claim-specific inquiry," so a plaintiff must identify how each of the defendants'

conduct gives rise to each cause of action. *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009).

Obviously, "[i]t is essential . . . that there be some act by which the defendant purposefully avails

itself of the privilege of conducting activities within the forum state." *Pervasive Software, Inc. v.*

*Lexware GMBH & Co. KG*, 688 F.3d 214, 222 (5th Cir. 2012) (quoting *Hanson v. Denckla*, 357

U.S. 235, 253 (1958)). As a result, a plaintiff must "ascribe[] specific conduct or statements" to

individual defendants. *Gen. Retail Servs. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 793

(5th Cir. 2007) (citing *Rush v. Savchuk*, 444 U.S. 320, 332–33 (1980)). "A plaintiff bringing

multiple claims that arise out of different forum contacts of the defendant must establish specific

jurisdiction for each claim." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir.

2006). In addition, "[e]ach defendant's contacts with the forum State must be assessed

individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984).

Here, CDM alleges a website subscription service operated by certain Defendants

establishes personal jurisdiction. Defendant Ford's circulation of articles to Julapalli through his

subscription in the 2012-to-2013-time frame, *see* Compl. ¶¶ 77–78, does not give rise to personal

jurisdiction over Ford, let alone any of the remaining Defendants. *See Agar Corp. Inc. v. Multi-*

*Fluid Inc.*, No. 95-5105, 1997 WL 829340, at *5 (S.D. Tex. June 25, 1997) (holding "periodic

29

mailings of national newsletters and publications to Texas residents as part of nationwide mailings do not give rise to personal jurisdiction"). Nor does having a website that was visited by a Texas resident. *Johnson v. TheHuffingtonPost.com, Inc*., 21 F.4th 314, 320 (5th Cir. 2021) ("Making a website that's visible in Texas, of course, does not suffice. . . . That result would not be fair or consistent with defendants' reasonable expectations. Grannies with cooking blogs do not, and should not, expect lawsuits from Maui to Maine.").

### a.    No Purposeful Availment by Any Defendant.

CDM generally alleges certain corporate Defendants "transact or has transacted business in this District and throughout the United States." *See* Compl. ¶¶ 29, 32, 34, 40, 43. Glaringly, the Complaint omits any allegation or facts regarding the corporate Defendants' alleged business in this District. At bottom, the only reason to hale Defendants into Texas is that CDM's principal visited the site, ranchosantana.com, *see* Compl. ¶¶ 55, 71, 86–87, 100. But as far as CDM has alleged, this only reflects the website's universal accessibility, not its purposeful availment in Texas. Accessibility alone is unsustainable in this jurisdiction, otherwise, lack of personal jurisdiction would be no defense at all. *Johnson*., 21 F.4th at 320. Moreover, CDM admits this action is "connected to a development on the Pacific coast of Nicaragua known as Rancho Santana" and that its claims arise from or are related to work performed and conduct in Nicaragua. *See generally* Compl.

Defendants will address the personal jurisdiction as to each Defendant individually:

### i.    Bonner.

The Complaint ties Bonner to his role at certain corporate Defendants, namely, Agora, International Living, Rancho SRL and Rancho Santana, Inc., which involved project-level strategy and historical covenants. *See* Compl. ¶¶ 2, 48–71, 89–97, 270–277, 361–371. CDM fails to plead,

30

however, that Bonner specifically targeted or had any significant, relevant contacts with Texas. Broad, national marketing through publications does not constitute purposeful availment.

Indeed, CDM must establish the relationship arises out of contacts that the "defendant himself" creates with the forum State. *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'" *Id.* (citation omitted). CDM attempts to bootstrap jurisdiction through CDM's residence and the nationwide nature of the website and subscriptions. This is insufficient to establish Bonner's contacts with Texas.

### ii.   Ford.

CDM alleges Ford's *Palm Beach Letter* emails from 2012-2013, that were part of a nationwide "Retire Next Year" and rental series, constituted purposeful availment. *See* Compl. ¶¶ 75–85, 90–97. Yet, this is plaintiff-side receipt, not forum-directed conduct. *Walden* teaches that plaintiff's location cannot supply the contact; rather, Ford must create the Texas link. *Walden*, 571 U.S. at 284–86. CDM fails to establish e-newsletters distributed to a national list reflect purposeful availment as it is not a Texas-aimed action.

### iii.   Turner.

CDM attributes HOA covenants and letters sent from Baltimore as well as governance frameworks to Turner. *See* Compl. ¶¶ 115–121, 130–147. Simply drafting instruments later circulated nationwide is not Texas purposeful availment. CDM, therefore, fails to establish Turner purposefully availed himself in Texas.

#### iv.    Maish.

CDM alleges Maish sent policy enforcement messages to an owners' list, not that he singled out Texas or engaged in Texas-specific negotiation. *See* Compl. ¶¶ 183–186, 210–214. Generalized, project-wide emails do not equal Texas purposeful availment under *Walden*.

#### v.    Currey.

CDM alleges Currey was "copied" on a 2020 dues email, a 2024 warning, and listed on historical website content. *See* Compl. ¶¶ 134–39, 166, 214. Passive receipt, including being copied or mentioned on a global website, is simply not Texas-directed conduct.

#### vi.    Costantino.

CDM emphasize in its Complaint that CDM mailed checks or wired funds from Houston to Costantino in 2014, 2015, and 2016. Compl. ¶¶ 152, 155, 157, 172. The location where CDM initiated payment, however, does not establish minimum contacts. *Walden* bars reliance on a plaintiff's unilateral forum ties, and the *Monkton* court held that banking transactions initiated by a plaintiff does not create personal jurisdiction over the out-of-state payee. *See Walden*, 571 U.S. at 284–86; *see also Monkton Ins. Services, Ltd. v. Ritter*, 2013 WL 12100550, at *5 (W.D. Tex. Aug. 23, 2013) ("In addition, given the material performance occurred in the Cayman Islands, the fact that Butterfield wired money between Geneva's account with Butterfield and Ritter's personal account in Texas does not weigh heavily in the determination."), *aff'd*, 768 F.3d 429 (5th Cir. 2014); *Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1147 (5th Cir. 1985) (finding all material performance occurred in Mexico despite the wiring of payments to Texas); *C & H Transp. Co. v. Jensen & Reynolds Constr. Co.*, 719 F.2d 1267, 1270 (5th Cir. 1983) (holding the fact that payment mailed to Texas is hardly significant in terms of purposeful availment); *Hydrokinetics, Inc. v. Alaska Meek, Inc.,* 700 F.2d 1026, 1029 (5th Cir. 1983) (stating "nor do we weigh heavily the fact

32

that Alaska Mechanical may have mailed payment checks into the forum state . . . .”). Therefore, Costantino has not purposefully availed himself of the forum.

### vii.   Semenza.

CDM's Complaint alleges Semenza emailed with Julapalli in 2024 regarding the Architectural Review Committee's discussion of imposing fines for the build on the property in Nicaragua due to it running past the allowed 18-month timeline. *See* Compl. ¶¶ 260–267. Notably, Semenza's only "contact" with Julapalli related to construction on a Nicaraguan property and on-site access rules in Nicaragua. *Id.* There is no question the content of the contact relates to allegations wholly outside of Texas. Simply sending notices to an owner who happens to be a Texas resident does not equal purposeful activity in Texas.

### viii.   Geerling.

CDM's sole allegations related to Geerling include that she sent an email to the owners in Rancho Santana in 2003 regarding the shift in expenses from International Living to the HOA for ongoing costs, and listserv posts in 2023 to owners in Rancho Santana regarding the HOA. *See* Compl. ¶¶ 108–114, 195–201. Each of these allegations are merely generic owner communications regarding property in Nicaragua that are not Texas-tailored acts.

### ix.   Boothby.

Like Geerling, CDM's sole allegations against Boothby relate to an email he sent to the owner list-serv advocating for the proposed rental policy. *See* Compl. at ¶¶ 237–239. The list-serv includes a broad audience, not just CDM in Texas. It belies credulity to argue that sending an email on a community listserv should cause the sender to believe he or she might be haled into court far from that community. CDM's Complaint fails *Walden's* forum-focus requirement.

### x.  Agora.

CDM's Complaint alleges Agora circulated publications, such as the *Palm Beach Letters* and *International Living*, to Texas, but this is insufficient to establish Agora purposefully availed itself in Texas. *See* Compl. ¶¶ 28–32, 47–55, 75–90. The publications were national/international in nature and not specifically directed at Texas. Moreover, *Walden* forbids relying on a plaintiff's location to convert nationwide speech into forum targeting. *Walden*, 571 U.S. at 284–86.

### xi.  Tola.

CDM's Complaint provides Tola received payment in Maryland for the Rancho Santana owner dues that were due in 2020. *See* Compl. ¶¶ 165–167. The allegations regarding Tola's wire instructions reflect where Tola chose to bank, *i.e.*, in Maryland at Wells Fargo, not that Tola availed itself of Texas as a forum. CDM's choice as a Texas resident to send funds from Texas does not create jurisdiction. *See Monkton*, 768 F.3d at 433–36.

### xii.  RS, Inc.

CDM alleges RS, Inc.'s corporate ownership and control of other entities establish jurisdiction in Texas, but this is insufficient to do so absent RS's own Texas-directed acts. Notably, the Complaint does not allege RS Inc. sent messages, took payments, or negotiated business in Texas. *See* Compl. ¶¶ 33–39, 41–43. CDM fails to establish RS Inc. purposefully availed itself of Texas as a forum. *Walden*, 571 U.S. at 284–86; *Monkton*, 768 F.3d at 433–36.

### xiii.  International Living.

CDM asserts that Julapalli subscribed to International Living on March 9, 2013, but the fact he chose to subscribe to that content does not constitute purposeful availment, because it was not International Living's targeted entry into Texas. *See* Compl. ¶¶ 88–90, 35–40, 57–73. Rather, the Complaint merely reflects it was the receipt of content in Texas as the only contact from International Living. *Id.* This is insufficient as a jurisdictional hook. *Walden*, 571 U.S. at 284–86.

Moreover, the allegedly false advertising concerns Nicaragua property; no Texas transaction, performance, or forum-specific advertising is pleaded. *Seiferth*, 472 F.3d at 274.

### xiv.    Rancho SRL.

CDM generally alleges Rancho SRL's conduct in Nicaragua regarding the home, construction, and community policies somehow establishes personal jurisdiction in Texas. *See* Compl. ¶¶ 166–177, 183–198, 202–221, 239–268. As noted above, the acts complained of (gate closures, utility actions, penalties, inspections) occurred in Nicaragua, with funds processed in Maryland or other United States accounts—but nothing in Texas. *Id.* Moreover, the emails containing the policies to owners from Nicaragua do not establish that Rancho SRL expressly aimed at suit-creating conduct in Texas, rather, the emails and policies strictly address operations on a Nicaraguan development. Forcing a Nicaragua operator to litigate in Texas over on-site policies exceeds due process where forum contacts are, at most, incidental communications to an out-of-state owner who happens to reside in Texas. *Walden*, 571 U.S. at 284–86.

### b.    CDM's Claims Do Not "Arise out of or Relate to" Any Texas Contacts.

The second step of a personal jurisdiction analysis requires the case to arise out of or relate to a defendant's purposeful forum contacts. *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017). There must be "an 'adequate link between the State and the nonresidents' claims.'" *Pace v. Cirrus Design Corp.*, 93 F.4th 879, 901 (5th Cir. 2024) (quoting *Bristol-Myers Squibb*, 582 U.S. at 262). Absent this link, specific jurisdiction is lacking. *Id*.

The Complaint does not show any Defendant expressly aimed tortious conduct in Texas. The focal point of the alleged conduct and harm is rooted in restrictions, property access, and services at a Nicaraguan development. The mere fact CDM resides in Texas is insufficient. *Walden*, 571 U.S. at 284–286.

35

The communications and conduct cited by CDM, particularly as to Geerling and Boothby, are historically remote and not the operative cause of any injuries. *Seiferth*, 472 F.3d at 274. The allegations regarding any Defendant implementing fines or restricting access all occurred in Nicaragua, thereby breaking the forum nexus. *Walden*, 571 U.S. at 285.

Even if any Defendant had some minimal contact, each claim—RICO predicates, Lanham, antitrust, fraud, trespass, interference—must independently arise from that Defendant's Texas contact. *Seiferth,* 472 F.3d at 274. CDM's Complaint reflects the operative acts—policies, guidelines, gate closures, on-site inspections, and processing of funds in Maryland—occurred outside of Texas, thereby severing the *Seiferth* nexus. *Id.*

### c.    Exercising Jurisdiction Would Be Unfair and Unreasonable.

Litigating foreign-situs property and market claims against non-Texas Defendants in Texas, based on attenuated communications into Texas and Plaintiff's initiated payments from Texas, is inconsistent with fair play and substantial justice. This forum's interest is minimal relative to Nicaragua's interest. Indeed, the burden on the nonresident Defendants is substantial as Defendants would be litigating a Nicaragua-centered property dispute in a forum far from that community. Not only would Defendants have to travel to Texas to litigate this dispute, but Defendants would have to submit to the jurisdiction of a court in a state with which they have no relevant contacts.

The efficiency of litigating where the property, witnesses, and operations are located tilt against jurisdiction here, and the judicial system's interest in efficient resolution counsels against adjudicating foreign property disputes in Texas.

### 3.    RICO's Nationwide Service Provision Does Not Apply.

CDM also invokes the nationwide service of process under the RICO Act as a basis of personal jurisdiction. *See* Compl. ¶ 45(b) (citing 18 U.S.C. § 1965). "When a plaintiff relies on a

36

federal statute providing for nationwide service of process, the court will have personal jurisdiction over a properly served defendant provided that (1) the federal claim is colorable, and (2) the exercise of personal jurisdiction satisfies the Fifth Amendment's Due Process Clause." *Holland v. CryptoZoo Inc.,* No. 1:23-CV-00110, 2025 WL 2493065, at *16 (W.D. Tex. July 7, 2025) (citation omitted). Defendants dispute CDM's RICO claims are colorable and that the exercise of personal jurisdiction comports with due process.

RICO's venue and personal-jurisdiction clause provides that a civil action "may be instituted" where a defendant "resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965. Only if at least one defendant is properly before the court under that clause may a plaintiff utilize § 1965(b) to serve other defendants, and only if the "ends of justice" so require. *Id.* Although the Fifth Circuit has yet to explicitly clarify the breadth of RICO's nationwide process provisions, Texas federal courts have noted "[t]he more widely recognized and sound approach is to determine if a plaintiff has raised a 'colorable' RICO claim." *Holland,* 2025 WL 2493065 at *20 (citation omitted).

Although at times considered a surmountable burden, a district court may dismiss RICO claims on jurisdictional grounds if it determines "(1) that the federal claim is immaterial and made solely for the purpose of obtaining jurisdiction, or (2) that the federal claim is wholly insubstantial and frivolous." *Fellows v. Universal Rests., Inc*., 701 F.2d 447, 449 (5th Cir. 1983). Whether CDM's RICO claim will ultimately prevail on the merits is not at issue; rather, the Court's narrow finding must involve determining whether CDM has alleged facts sufficient to support the finding of personal jurisdiction over Defendants as to the RICO claim. Here, for the same reasons outlined below in Part III.C.2, *infra*, regarding Defendants' 12(b)(6) dismissal of the RICO claims, Plaintiff has not pleaded a colorable RICO claim.

CDM does not plausibly allege that any RICO defendant resides, is found, has an agent, or "transacts [its] affairs" in this District as that standard is applied. Without an "anchor" defendant in this District, § 1965(b) is unavailable. Nor does § 1965(d) independently authorize aggregating all Defendants in a district that lacks personal jurisdiction over any of the Defendants. In any event, CDM has not shown that the "ends of justice" require bringing out-of-state and foreign defendants into this District for foreign-centered claims.

Even if CDM were to contend that any particular Defendant "transacts his affairs" here, Defendants preserve, in the alternative, that such contacts do not satisfy § 1965(a) and that venue and personal jurisdiction would still be improper as to the remaining Defendants under § 1965(b). Therefore, the ends of justice do not require Defendants to be brought before the Court under RICO's nationwide service provision, where minimum contacts with the State of Texas are wholly lacking and all Defendants can be sued in Nicaragua.

### 4.    The Clayton Act's Nationwide Service Provision Does Not Apply.

CDM further cites 15 U.S.C. § 22 (Clayton Act § 12) as a basis for jurisdiction. *See* Compl. ¶ 45(d). Section 12 provides that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." 15 U.S.C. § 22. The Clayton Act's nationwide service provision operates if the antitrust corporate defendant "inhabit," be "found," or "transact business" in the district. CDM's conclusory allegations that certain corporate Defendants "transact business" in this District, without facts showing substantial, continuous business activity here by any antitrust defendant, does not satisfy the statute. Without proper venue, nationwide service is unavailable, and personal jurisdiction cannot rest on nationwide contacts.

In the alternative, to the extent CDM argues any Defendant "transacts business" here, the venue prong remains unsatisfied on the pleaded facts and, even if venue were proper as to one Defendant, nationwide service would not extend to the remaining Defendants. Finally, on its terms, Section 12 applies only to actions "against a corporation," *see id.*, and would not apply to the claims against any of the nine individual Defendants in this matter, *see, e.g.*, *California Clippers, Inc. v. U. S. Soccer Football Ass'n*, 314 F. Supp. 1057, 1065 (N.D. Cal. 1970) (finding that Section 12 "is directed only at corporations, not individuals"), nor against the two unincorporated associations (Monument & Cathedral Holdings, LLC ("Agora"), and Tola Development Group, LLC), *see GovernmentGPT Inc. v. Axon Enter. Inc.*, 769 F. Supp. 3d 959, 979 (D. Ariz. 2025) ("As an LLC, and not a corporation, it is not subject to the jurisdictional hook that 15 U.S.C. § 22 provides."); *see also World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*, 803 F. Supp. 3d 1136, 1170 (W.D. Wash. 2025).

### 5.　18 U.S.C. § 1956(f) Does Not Apply.

CDM further cites, in passing 18 U.S.C. § 1956(f) as a basis for personal jurisdiction. *See* Compl. ¶ 45(e). Subsection 1956(f) is not well cited. Subsection 1956(f) is contained within a criminal statute involving laundering of monetary instruments, and it merely provides for extraterritorial jurisdiction over that criminal conduct. As this Court held in *de Pacheo v. Martinez*, "the federal courts have not recognized a private right of action for breach of § 1956, the money laundering statute." *See* 515 F. Supp. 2d 773, 787 (S.D. Tex. 2007) (citing *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659 (S.D.N.Y. 2000)). Thus, subsection 1956(f) is not a basis for jurisdiction over any Defendant.

### 6.　Conspiracy-Based Personal Jurisdiction Cannot Cure the Defects.

Finally, CDM implies that the "conspiracy theory" of jurisdiction might apply in this case. *See* Compl. ¶ 45(c). Texas law is clear, however, that merely "alleging a conspiracy . . . does not

39

provide an independent basis for jurisdiction." *See Crownover v. Crownover*, No. DR-15-CV-132-AM, 2016 U.S. Dist. LEXIS 203425, at \*35 (W.D. Tex. Sept. 20, 2016) (citing *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995)). Instead, "a plaintiff must show that each defendant individually, and not as part of a conspiracy, purposely established minimum contacts with Texas that would satisfy due process." *Bar Grp., LLC v. Bus. Intelligence Advisors, Inc.,* 215 F. Supp. 3d 524, 539 (S.D. Tex. 2017). CDM's Complaint does not make this showing as to each of the Defendants. Thus, CDM's conspiracy count does not establish personal jurisdiction over Defendants, nor that any Defendant purposefully availed itself of Texas law.

For all these reasons, this Court should dismiss this case for lack of personal jurisdiction under Federal Rule 12(b)(2).

### C. This Court Should Dismiss the Complaint for Failure to State a Claim Upon Which Relief Can Be Granted.

Should this Court decide that this case should and can be heard in this Court, all Counts nonetheless fail on the merits. This Court should dismiss under Federal Rule 12(b)(6).

#### 1. Legal Standard.

A court should dismiss a complaint if the plaintiff's factual allegations do not show a right to relief that is plausible and above mere speculation. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).. (internal citations and quotation marks omitted). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

To avoid a dismissal for failure to state a claim, a plaintiff must plead specific facts, not merely conclusory allegations. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). The "[f]actual allegations must be enough to raise a right to relief above the speculative level. . . ." *Sonnier v. State Farm Mut. Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007).

### 2.   This Court Should Dismiss the Counts I to IV (RICO Claims).

CDM's first four Counts each claim violations of RICO. The Complaint fails multiple elements of the civil RICO statute at 18 U.S.C. § 1964, the statute describing the underlying violations at Section 1962, and the criminal statutes detailing qualifying predicate acts of racketeering. This Court should dismiss Counts I through IV.

### a.   All Four RICO Counts Fail to Define the "Enterprise."

Globally, each of Counts I through IV should be dismissed for failure to plead an "enterprise" under civil RICO. In short, "[t]he existence of an enterprise is an essential element of a RICO claim." *Atkinson v. Anadarko Bank & Tr. Co.*, 808 F.2d 438, 440 (5th Cir. 1987). The case law defines "enterprise" as "a group of persons or entities associating together for the common purpose of engaging in a course of conduct." *Whelan v. Winchester Production Co.*, 319 F.3d 225, 229 (5th Cir. 2003) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

CDM makes minimal effort to define the "enterprise." It is not until Paragraph 272 that CDM identifies all 14 Defendants as constituting the "§ 1962(c) enterprise," which CDM then terms the "Agora Enterprise." *See* Compl. ¶ 272. CDM only pleads two additional facts about the "Agora Enterprise." First, CDM alleges that it is a hub-and-spoke enterprise. *Id*. ¶ 273. Second, CDM alleges that certain of the Defendants "have used the Agora Enterprise in a continuous and ongoing pattern over two decades to further the real Master Plan of Rancho Santana: lure prospects to purchase property in a 'residential community' with the promise of a functioning HOA, steal money and property from owners including CDM through fake HOA powers, then launder the

proceeds to fund a resort—and themselves." *Id.* ¶ 274. CDM pleads nothing further as to the structure, organization, or purpose of the "Agora Enterprise."

CDM does not allege that all 14 Defendants were connected though a legal entity, so Defendants presume that CDM imagines an "association-in-fact enterprise." Such an enterprise, however, "must have an existence 'that can be defined apart from the commission of the predicate acts.'" *Steed v. HB1 Alternative Holdings, LLC*, 2024 WL 1590159, at *7 (S.D. Tex. Mar. 8, 2024), *report and recommendation adopted*, 2024 WL 2779853 (S.D. Tex. May 30, 2024) (quoting *Guardino v. Hart*, 2023 WL 3818378, at *5 (5th Cir. June 5, 2023)). This requires that such an enterprise "be 'an entity separate and apart from the pattern of activity in which it engages.'" *Id.* (quoting *Guardino*, 2023 WL 3818378, at *5). A plaintiff must therefore show "'an ongoing organization'" and that its members "'function as a continuing unit as shown by a hierarchical or consensual decision making structure.'" *Allstate Ins. Co. v Plambeck*, 802 F.3d 665, 673 (5th Cir. 2015) (citation omitted).

This is lacking in the scant allegations in Paragraph 273 of the Complaint, and the allegations of the activities of "Agora Enterprise" define that enterprise solely by the same actions constituting the alleged predicate offenses. Such is insufficient for "enterprise" under RICO. Consequently, this Court should dismiss Counts I through IV.

### b.    This Court Should Dismiss Count I (18 U.S.C. § 1962(c)).

Individually, CDM's RICO counts have additional failings, each of which warrants dismissal. Defendants will begin with Count I under 18 U.S.C. § 1962(c).

### i.    Elements of a Claim Under 18 U.S.C. § 1962(c).

Under § 1962(c), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

racketeering activity or collection of unlawful debt." Section 1964(c), in turn, provides for a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . ." 18 U.S.C. § 1964(c).

### ii.    CDM's Count I Fails to Plead Facts to Show a "Domestic Injury."

Under Supreme Court jurisprudence, a civil RICO claim may only lie where the plaintiff alleges a "domestic injury." CDM's claims fail on that score. The seminal case is *RJR Nabisco v. European Community*, 579 U.S. 325 (2016). *Nabisco* concerned the claims of European Community member states that RJR Nabisco was involved in a scheme with foreign drug traffickers in which drug money was used to pay for shipments of cigarettes into Europe. *Id*. at 332. The Eastern District of New York dismissed the plaintiff's civil RICO claim as improperly extraterritorial. *Id*. at 333–34. The Second Circuit reversed. *Id*. at 334. On certiorari, the Supreme Court agreed with the district court and reversed the Second Circuit.

*Nabisco* focuses on the "presumption against extraterritoriality" in statutory interpretation. *See id*. at 335, *et seq.* The Supreme Court concluded that certain *criminal* provisions of RICO overcame the presumption and that, therefore, "a pattern of racketeering that includes predicate offenses committed abroad" could apply extraterritorially. *Id*. at 340. A claim for *civil* RICO under 18 U.S.C. § 1964(c), however, cannot. The Court began with the premise that "[a]llowing recovery for foreign injuries in a civil RICO action, including treble damages, presents [a] danger of international friction," *id*. at 348, and found that nothing in the text of Section 1964(c) clearly indicated congressional intent to create a private right of action for injuries suffered outside of the United States, *id*. at 349. Thus, where a civil RICO claim "rest[s] entirely on injury suffered abroad," it "must be dismissed." *Id.* at 354.

43

Seven years later, in *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), the Supreme Court further developed what constitutes a "domestic injury" for purposes of civil RICO. *Yegiazaryan* resolved a circuit split between a "'rigid, residency-based test'" placing the location of the injury at the domicile of the plaintiff, and a "'context-specific' approach to the domestic-injury inquiry." *Id.* at 540. The Supreme Court adopted the latter, holding that "in assessing whether there is a domestic injury, courts should engage in a case-specific analysis that looks to the circumstances surrounding the injury." *Id.* at 545. Thus, the Court found that a resident of Russia stated a claim of a "domestic injury" against a California resident for evasion of a California judgment. The residency of the plaintiff was less important in identifying where the injury occurred than where the rights that were violated arose. *See id.* at 546.

Here, that context-specific approach leads to dismissal of Count I for want of a domestic injury. CDM's Complaint is about CDM's rights in its property in Nicaragua. While the *owner* of that property is an LLC domiciled in Texas, the *property* alleged to be impacted is in Nicaragua. To conclude that the domicile of the owner is the situs of the RICO injury would effectively turn *Yegiazaryan* on its head, and it would call on this Court to rule upon legal issues of Nicaraguan property law and the viability of a horizontal property regime in Nicaragua. The "danger of international friction" arising from such rulings is acute, which is the very danger underpinning the limitations on civil RICO. *See Nabisco,* 579 U.S. at 348.

Notwithstanding – (1) CDM's Texas domicile (which is irrelevant under *Yegiazaryan*); (2) that *some* of the Defendants are in the United States; and (3) that *some* of the monetary transactions occurred there – the relevant question is where the injury to CDM's "business and property" occurred. *See* 18 U.S.C. § 1964(c). That is Nicaragua. This Court should dismiss Count I (and II, III, and IV) for failure to plead facts to plausibly show a domestic injury.

        **iii.**        **In the Alternative, CDM Fails to Plead Facts Sufficient to Show an Injury Attributable to Defendants Maish, Constantino, Semenza, Boothby, or Agora.**

Should this Court not dismiss Count I in its entirety, it should at least dismiss Count I as to Defendants Maish, Costantino, Semenza, Boothby, and Agora. A civil claim for violation of Section 1962(c), like any claim under Section 1964(c), requires that the plaintiff show that the alleged RICO violation "have proximately caused the injury . . . ." *Yegiazaryan*, 599 U.S.at 544 n.3. CDM has failed to plead a pattern of predicate acts of racketeering that have that causal connection to its claimed injuries as to those Defendants.

Characteristic of its scattershot approach to pleading, CDM invokes five categories alleged crimes to attempt to establish "racketeering activity" within the definition under 18 U.S.C. § 1961(1), which are: (1) mail/wire fraud; (2) extortion; (3) money laundering; (4) transporting stolen money; and (5) traveling in aid of racketeering. For the purposes of this Motion *only*, Defendants assume that the allegations of mail/wire fraud are sufficiently tied to CDM's alleged injuries. The balance of the predicate acts, however, are not. This is material because Count I is against Defendants Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Geerling, Boothby, and Agora, but the mail/wire fraud allegations do not include Maish, Semenza, Boothby, or Agora. Because the other four alleged predicate acts of racketeering involving those latter four Defendants are insufficient, at a minimum the RICO claims against those four should be dismissed. Defendants address each in turn:

        **(a)**        **Extortion.**

The predicate acts of extortion (attributed to Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Boothby, and Agora) allege that this subset of Defendants extorted dues payments from CDM, *See* Compl. ¶¶ 278, *et seq.* Extortion under 18 U.S.C. § 1951(b)(2), refers to "the obtaining of property from another, with his consent, induced by wrongful use of actual or

threatened force, violence, or fear, or under color of official right." CDM does not allege actual or threatened force, violence, or fear, but relies on "color of official right," claiming that these Defendants asserted lien power through the HOA, and that Maish "acted to cut off CDM's water under the authority of the Nicaraguan government." *Id*. ¶¶ 281, 283.

Neither Maish nor any of the other Defendants is a public official. In this Circuit, as elsewhere, "[u]sually, only public officials are charged with extorting property under color of official right." *United States v. Rashad*, 687 F.3d 637, 642 (5th Cir. 2012). Private persons may be so charged with "official extortion" only in rare cases in which they have "conspired with corrupt public officials, masqueraded as public officials, aided or abetted extortion by public officials, or were speaking for a public official." *Id*. (citations omitted). Merely claiming that enforcing lien rights or remedies "under the authority of the Nicaraguan government"—*i.e.*, that doing so was lawful – is not the same as pretending to be a public official or aiding a public official in extorting property. At its core, extortion under color of official right "is the 'rough equivalent of what we would now describe as "taking a bribe."'" *Ocasio v. United States*, 578 U.S. 282, 285 (2016) (quoting *Evans v. United States*, 504 U.S. 255, 260 (1992)). That is not at all what is alleged in this case, and Section 1951 is therefore not well cited as a predicate act.

### (b)    Money Laundering.

CDM next invokes 18 U.S.C. § 1956 (money laundering) and § 1957 (engaging in monetary transactions derived from specified unlawful activity) as RICO predicate acts, charging Defendants Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, and Agora with such. *See* Compl. ¶¶ 291, *et seq.* The elements of money laundering under Section 1956 are "(1) [the defendant] conducted or attempted a financial transaction, (2) which he knew involved proceeds arising from unlawful activity, (3) with the intent to promote or further those illegal actions, or (4) with the knowledge that the transaction's design was to conceal or disguise the nature or source of

46

the illegal proceeds." *United States v. Pennell*, 409 F.3d 240 (5th Cir. 2005). The elements of a violation of Section 1957 are: "(1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity." *United States v. Fuchs*, 467 F.3d 889, 907 (5th Cir. 2006).

As to each, CDM attempts to plead extortion under color of official right as the "specified unlawful activity" underpinning the Section 1956 and Section 1957 violations. *See* Compl. ¶ 293.[2] For the same reason set forth above under Part C.2.iii.a, CDM has not alleged facts to show extortion under color of official right. Resultantly, it cannot serve as the predicate "specified unlawful activity" for a charge of money laundering, *see* 18 U.S.C. § 1956(a)(1), (a)(2)(A), (a)(3)(A), & (c)(7), nor for a charge of engaging in monetary transactions in property derived from specified unlawful activity, *see* 18 U.S.C. § 1957(a) & (f)(3). As that element fails, so too does the factual bases for both RICO predicate acts.

Moreover, even had Section 1956 or 1957 been properly pleaded as RICO predicate acts, CDM fails to show how it was harmed by subsequent alleged acts of money laundering or engaging in monetary transactions. The standard remains that the RICO violation must have "proximately caused the injury." *Yegiazaryan*, 599 U.S. at 544 n.3. More specifically, a civil RICO plaintiff must show "that a RICO *predicate offense* 'not only was a "but for" cause of his injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (emphasis added) (citation omitted). CDM cannot show how the alleged acts of money laundering or engaging in monetary transactions in that property *themselves* caused CDM any injury. Once CDM

---

[2] In Paragraph 293 of the Complaint, and only in that Paragraph, CDM alternatively attempts to support its charge of extortion based on a "threat of violence to property." CDM does not articulate what violent threat to property was made, by whom, or against whom.

paid dues, its hypothetical injury was complete. No later transaction with that money impacted that alleged injury in any way.

Thus, CDM has not pleaded facts to establish money laundering or engaging in monetary transactions in property derived from specified unlawful activity as predicate acts under RICO.

### (c)    Transporting Stolen Money.

Similarly, CDM has not pleaded facts to establish 18 U.S.C. § 2314 and 2315 as predicate RICO offenses *See* Compl. ¶¶ 300–302. It is unclear from CDM's scant three paragraphs under this part of Count I which of the six paragraphs of § 2314 and which of the four paragraphs of § 2315 the "Money-Laundering Defendants" are alleged to have violated. More directly, however, the Complaint does not explain how CDM is alleged to have suffered any injury proximately caused by the transfer of dues and architectural review fees. For this reason, CDM has not pleaded facts to show a RICO injury from transporting stolen money.

### (d)    Traveling in Aid of Racketeering.

Finally on this point, in paragraphs 303 to 310 of the Complaint, CDM invokes 18 U.S.C. § 1952 (Interstate and foreign travel or transportation in aid of racketeering enterprises) as a basis for RICO liability as to Defendants Bonner, Ford, Turner, Costantino, and Agora. It is not clear from these paragraphs which of the three forms of Section 1952(a) these five Defendants are alleged to have violated, as the Complaint alleges little more than the fact of travel "to further the fraudulent scheme of the Agora Enterprise," but, as with the two prior predicate acts, the Complaint is lacking as to how that travel proximately caused injury to CDM. *See* Compl. ¶ 303, Thus, CDM has not pleaded facts sufficient for a RICO injury based on traveling in aid of racketeering.

48

> **(e)** **Because Extortion, Money Laundering, Transporting Stolen Money, and Traveling in Aid of Racketeering Fail, So Too Do CDM's Claims Against Defendants Maish, Costantino, Semenza, Boothby, and Agora Under Count I.**

Therefore, because none of CDM's allegations on extortion, money laundering, transporting stolen money, and traveling in aid of racketeering plead sufficient facts to establish a RICO predicate act, and because Defendants Maish, Costantino, Semenza, Boothby, and Agora are identified in the alleged RICO activity solely on those failed predicate acts —if this Court does not dismiss Count I in its entirety, it should at a minimum dismiss Count I as to those Defendants.

### c.   This Court Should Dismiss Count II (18 U.S.C. § 1962(a)).

For many of the same reasons as Count I, this Court should dismiss Count II —also a civil RICO claim but against a different group of Defendants and relating to 18 U.S.C. § 1962(a)—for failure to state a claim upon which relief can be granted.

### i.   Elements of a Claim Under 18 U.S.C. § 1962(a).

Under 18 U.S.C. § 1962(a), "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." To state a civil claim arising from Section 1962(a), "a plaintiff must . . . show that its injuries resulted from the investment or use of racketeering proceeds," *i.e.*, "this Circuit, like virtually all the other circuits who have reviewed this issue, has intimated that such an injury cannot just flow from the predicate acts themselves," *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 443 (5th Cir. 2000).

### ii. CDM's Count II Fails to Plead Facts to Show an "Investment Injury."

Attempting to plead an investment injury, CDM alleges that "[t]he Syndicate [*i.e.*, Defendants Bonner, Ford, and Turner, *see* Compl. ¶ 1] has reinvested its unlawfully captured income into Rancho Santana's common areas and resort, both of which is ultimately owns," and that, in turn, that funding "led to a blockade of CDM's efforts to finish building the home on G16." *See id.* ¶ 316, 319; *see also id.* ¶¶ 248–269, 287 (characterizing the "blockade" as an effort to extort fees from CDM by cutting off workers' access to the undeveloped lot).

This does not qualify as an investment injury but is instead a continuation of the same alleged racketeering acts that underly CDM's claim. As this Court expressed in *Vanderbilt Mortgage & Finance, Inc. v. Flores*, 735 F. Supp. 2d 679, 700-01 (S.D. Tex. 2010), "[a]lthough the Fifth Circuit has not specifically ruled on this issue, courts within the circuit have generally rejected Section 1962(a) claims based upon allegations that the defendant merely reinvested the proceeds into its business for purposes of perpetuation or expansion. As one court has stated, '[i]t is not sufficient to merely show that a defendant invested or used the income derived from its pattern of racketeering activity to facilitate its own operations and that the continuing operation of the enterprise injured the [claimant].'" *Id.* at 700 (citations omitted). Thus, failing to find any investment injury that could be "distinguished from the alleged injury caused by the various predicate acts," *id.* at 701, the *Vanderbilt* court dismissed the Section 1962(a) count.

So too here. CDM's claimed investment injury, while narrower than the injuries claimed from the alleged predicate acts, are not distinguished from them. CDM's claims do not fit within Section 1962(a), and this Court should therefore dismiss Count II.

### iii.   CDM's Count II Fails to Plead Facts to Show a "Domestic Injury."

Likewise, to the extent that CDM claims any plausible investment injury at all, it is an injury that lies solely in the Republic of Nicaragua. CDM is claiming to be shut out of the Nicaraguan real estate market by Defendants' actions. That, by definition, is not a "domestic injury" and therefore is not cognizable under civil RICO. *See supra* Part III.C.2.b.ii. For this additional reason, Count II fails to state a claim upon which relief can be granted.

### iv.   CDM's Count II Fails to Plead Facts to Show a Nexus to Foreign Commerce.

Third, Count II fails to plead facts to establish a nexus to foreign commerce. *See* 18 U.S.C. § 1962(a) (requiring an "enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce"); *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 153–54 (1987) (citing the "nexus to interstate or foreign commerce" as "a jurisdictional element of a civil RICO claim"). As the Supreme Court clarified in *Nabisco* as to Section 1962:

> We do not take this reference to "foreign commerce" to mean literally all commerce occurring abroad. Rather, a RICO enterprise must engage in, or affect in some significant way, commerce directly involving the United States—*e.g.,* commerce between the United States and a foreign country. Enterprises whose activities lack that anchor to U.S. commerce cannot sustain a RICO violation.

579 U.S. at 344.

As to what CDM seeks to frame as the investment injury, CDM's claim "lack[s] that anchor." *See id.* CDM's claim is that the "RICO(a) Defendants": (1) collected dues and review fees from owners of property in Nicaragua, *see* Compl. ¶ 313; (2) reinvested those fees to develop common areas and a resort in Nicaragua, *see id.* ¶ 316; and (3) as a result, CDM: (a) had been injured by a "blockade" on building a home on the property in Nicaragua, *id.* ¶ 319; (b) has been blocked from entering the real estate market and competing with non-RSVP property owners in Nicaragua. *Id.* ¶¶ 320–321. Under this Count, the only tether to the United States is the earlier

51

"funneling" of money to certain businesses and individuals in the United States. *See id*. ¶¶ 314–315. By the time of the actual "investment," however, which is the core of Section 1962(a), that U.S. connection is absent, and there is no indication that the "enterprise" invested in (*i.e.*, the resort and common areas) are engaged in commerce between the United States and Nicaragua in a way that injures CDM. For this additional reason, this Court should dismiss Count II.

> **v.    In the Alternative, CDM, Count II Fails to Plead Facts Sufficient to Show an Injury Attributable to Defendants Maish, Constantino, Semenza, Agora, Tola, RS Inc., International Living, or Rancho SRL Attributable to a Violation of 18 U.S.C. § 1962(a) or Any RICO Predicate Act.**

Finally, as to Count II, should any part of that Count survive, this Court should at least dismiss that Count as to Defendants Maish, Constantino, Semenza, Agora, Tola, RS Inc., International Living, and Rancho SRL. Section 1962(a) proscribes the "use or invest[ment], . . . acquisition of any interest in, or establishment or operation of" the enterprise. Under Count II, it is only the so-called "Syndicate" [*i.e.*, Defendants Bonner, Ford, and Turner, *see* Compl. ¶ 1] who are alleged to have "re-invested" their income into Rancho Santana's common areas and resort. *See id*. ¶ 316. Nothing similar is alleged against Defendants Maish, Constantino, Semenza, Agora, Tola, RS Inc., International Living, and Rancho SRL.[3] For this reason, at a minimum, Count II should be dismissed as to those eight Defendants.

> **d.    This Court Should Dismiss Count III (18 U.S.C. § 1962(b)) for Failure to State a Claim Upon Which Relief Can Be Granted.**

Count III—a civil RICO claim under 18 U.S.C. § 1962(b)—suffers from similarly fatal defects in pleading. This Court should likewise dismiss Count III.

---

[3] Indeed, as to Tola, RS Inc., International Living, and Rancho SRL, CDM does not even allege a RICO predicate act. *See* Compl. ¶¶ 276, 278, 291, 300 & 303. And, as to Defendants Maish, Costanio, Semenza, and Agora, CDM does not plead sufficient facts to show participating in a RICO predicate act, for the reasons set forth in Part III.C.2.iii.(e), *supra*.

**i.        Elements of a Claim Under 18 U.S.C. § 1962(b).**

Under 18 U.S.C. § 1962(b), "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." A claim under § 1962(b) requires the plaintiff to show injuries "'proximately caused by a RICO person gaining an interest in, or control of, the enterprise through a pattern of racketeering activity.'" *Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007). The purpose of § 1962(b) is "'to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking.'" *Vanderbilt Mortgage*, 735 F. Supp. 2d at 701 (citation omitted).

**ii.        CDM's Count III Fails to Plead Facts Showing That Defendants Infiltrated an "Enterprise."**

Count III fails to plead facts to show that the RICO(b) Defendants gained acquired or maintained any interest or control of an enterprise. Importantly, for this Count, CDM introduces a new alleged "enterprise" separate from the so-called "Agora Enterprise." For the purposes of Count III, CDM introduces "Rancho Santana, itself an enterprise as an association in fact, if not in law," as the enterprise Defendants are alleged to have seized through a pattern of racketeering activity. *See* Compl. ¶ 325.

Rancho Santana, as CDM frames it early in its Complaint, is neither a legal entity nor the kind of associated-in-fact enterprise that would bring it within the term enterprise under RICO. As CDM pleads, Rancho Santana is an unincorporated, unrestricted residential community. *See* Compl. ¶ 5. CDM cannot point to any kind of hierarchy or decision-making structure concerning that community that would change the nature of that geographic area into an enterprise that might be acquired under RICO. *See Plambeck*, 802 F.3d at 673. Even to the extent that CDM could, it

has not shown which Defendants are alleged to have acquired any additional interests or levels of control in that community through racketeering activity. For this first reason, this Court should dismiss Count III for failure to state a claim upon which relief can be granted.

### iii. CDM's Count III Fails to Plead a Distinct Injury Proximately Caused by Any Defendant Acquiring an Interest in the Enterprise.

Like Count II, Count III also fails a proximate-cause analysis. CDM's claimed injuries are its having paid fees (*see* Compl. ¶ 331 ("CDM [has] no equity to show for [its] longtime contributions to Rancho Santana's common areas.")) and the same alleged acts of extortion forming the RICO predicate acts (*see id*. ¶ 332 ("Not only that, RICO(b) Defendants have injured CDM directly in its business and property by engaging in a pattern of racketeering, causing trespass to its land and home, and taking control of CDM's investment, to the unjust enrichment of their own interest."). This does not suffice under § 1962(b). Section 1962(b), like § 1962(a), requires that "'[t]he injury caused by the acquisition or maintenance . . . be distinct from the injury caused by the predicate acts under Section 1962(b).'" *Vanderbilt*, 735 F. Supp. 2d at 701 (quoting *Blanchard & Co., Inc. v. Contursi*, 2000 WL 574590, at *2 (E.D. La. May 11, 2000)). This is lacking from CDM's brief statement of alleged injuries under Count III. CDM instead argues that the respective Defendants engaged in racketeering and that CDM was harmed "directly" by that racketeering. *See* Compl. ¶ 332. Simply put, Section 1962(b) is not designed to address the conduct at issue in this case.

### iv. CDM's Count III Fails to Plead Facts to Show a "Domestic Injury."

Further, like Counts I and II, Count III fails to plead a "domestic injury" under *Nabisco* and *Yegiazaryan*. *See supra*, Part III.C.2.b.ii. Defendants will not belabor the point, but CDM's allegations regarding its injury in its business and property in Nicaragua, trespass to land in

Nicaragua, and loss of control of investment in Nicaragua, all concern Nicaragua and not the United States. Under the context-specific test prescribed by the Supreme Court, CDM's Count III does not state a claim under civil RICO.

### v. CDM's Count III Fails to Plead Facts to Show a Nexus to Foreign Commerce.

CDM's Count III further fails to plead facts to establish a nexus to foreign commerce. *See supra*, Part III.C.2.b.ii. Like Count II, Count III solely concerns the collection of dues from property owners in Nicaragua and the impacts of CDM's property rights in Nicaragua. There is no tether to U.S. commerce with Nicaragua here, let alone an enterprise that "engage[s] in, or affect[s] in some significant way, commerce directly involving the United States." *Nabisco*, 579 U.S. at 344. For this additional reason, this Court should dismiss Count III.

### vi. In the Alternative, CDM's Count III Fails to Plead Facts Sufficient to Show Defendant Maish, Costantino, Semenza, Boothby, or Agora Participated in a RICO Predicate Act.

Finally as to Count III, in the alternative, this Court Should Dismiss the claims against Defendants Maish, Costantino, Semenza, Boothby, and Agora. For the same reasons set forth in Part III.C.2.iii.(e), CDM has failed to plead facts sufficient to show participation in any RICO predicate act, which is part of the essential element of "a pattern of racketeering activity" under § 1962(b). *See supra*.

### e. This Court Should Dismiss Count IV (18 U.S.C. § 1962(d)) for Failure to State a Claim Upon Which Relief Can Be Granted.

This Court should dismiss Count IV, brought for RICO conspiracy under 18 U.S.C. § 1962(d). A violation of § 1962(d) requires a plaintiff "to establish that a conspiracy was formed and that the acts of the conspirators violated § 1962, subsections (a), (b) or (c)." *Sheshtawy v. Conservative Club of Houston, Inc.*, No. 4:16-CV-733, 2016 WL 5871463, at *4 (S.D. Tex. Oct.

7, 2016), *aff'd sub nom. Sheshtawy v. Gray*, 697 F. App'x 380 (5th Cir. 2017). Because, for the reasons set forth above, Counts I through III fail, Count IV likewise fails. *See N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 203 (5th Cir. 2015) ("Since North Cypress failed to properly plead a claim under §§ 1962(a), (b), or (c), it correspondingly failed to properly plead a claim under § 1962(d).").

Moreover, CDM has not pleaded facts to show the essential elements of such a conspiracy. Section 1962(d) requires CDM to plead facts to show that all 14 Defendants came to such an agreement, and that each Defendant "knew of and agreed to the *overall objective* of the RICO offense." *United States v. Rosenthal*, 805 F.3d 523, 530 (5th Cir. 2015) (emphasis in original) (citation omitted). Here, through extensive group pleading and layered speculation, CDM wildly infers each Defendant's role in the decision-making, even seeking to drag four neighboring homeowners into the alleged "conspiracy" based upon facially innocuous communications. *See supra* at Part II.K (statements of allegations as to Defendants Currey, Semenza, Geerling, and Boothby). More is required to proceed in federal court, especially against persons with no connections to this District. This Court should dismiss Count IV.

### 3. The Court Should Dismiss Count V (Sherman Act) for Failure to State a Claim Upon Which Relief Can Be Granted.

As to Count V under the Sherman Act, the Complaint alleges two per se Section 1 violations: a group boycott through enforcement of the Community Guidelines, *see* Compl. ¶¶ 345–350, and a price-fixing scheme via a resort-managed rental program, *id.* ¶¶ 351–358. CDM's antitrust allegations fail to plead a viable claim for the following reasons, each of which is an independent ground for dismissing the claims:

(1) The per se theories of "group boycott" and "price fixing" are not plausibly pleaded because the alleged facts describe, at most, unilateral or vertical conduct and do not plausibly allege

56

a horizontal agreement among independent competitors or a "hub and spoke" conspiracy with a rim.

(2) Once the per se theory falls away, the Complaint fails under the "rule of reason" because it does not plausibly allege a cognizable relevant market, market power, or antitrust injury-that is harm to competition as opposed to harm to a single property owner.

(3) CDM has not pleaded antitrust injury or proximate causation. The injuries alleged arise from a property governance dispute and project-level rules, not market-wide reduction in output, quality, or price competition.

(4) The Foreign Trade Antitrust Improvements Act and related principles of extraterritoriality foreclose the claim because the challenged conduct and relevant markets are in Nicaragua. The Complaint's conclusory allegation that the relevant geographic market is the United States is offered without any support and ignores that the effective area of competition is Nicaragua.

### a.     Legal Standard.

A claim under Section 1 of the Sherman Act requires plausible allegations of an actual agreement, whether "contract, combination …, or conspiracy" among independent economic actors, not conclusory invocations of "agreement" or mere adherence to a developer's or association's rules. *MM Steel L.P. v. JSW Steel (USA) Inc.,* 806 F.3d 835 (5th Cir. 2015) ("Section 1 requires an *agreement* among separate economic actors; mere allegations of parallel conduct plus opportunity to conspire are insufficient."). Parallel conduct alone does not plausibly plead a Section 1 agreement. A plaintiff must allege facts suggesting agreement rather than independent action. *Twombly*, 550 U.S. at 555–70. "A naked allegation of conspiracy or agreement, without more specific factual allegations, is not to be accepted as sufficient to state a claim under Section 1 of the Sherman Act*." Norris v. Hearst Tr.*, 500 F.3d 454, 464 (5th Cir. 2007); *see also Austin*

*Legal Video, LLC v. Deposition Solutions, LLC*, 2024 WL 5184485, at *6 (W.D. Tex. 2024) (dismissing claims against those defendants as to which the complaint contained no allegations of specific actions in furtherance of the alleged conspiracy).

"Per se" treatment is confined to naked horizontal restraints among competitors at the same level of the market which, in the common experience of courts, have such predictable anticompetitive effects that they warrant condemnation without extended market analysis. *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5 (1958); *see State Oil v. Khan*, 522 U.S. 3, 10 (1997) (reluctance to adopt per se rules to restraints imposed in context of business relationships where economic impact of the practice is not obviously pernicious). The Fifth Circuit has repeatedly refused to extend per se treatment to rule-governed associations, *see Viazis v. American Ass'n of Orthodontists*, 314 F.3d 758 (5th Cir. 2002) (association rules and membership standards do not constitute per se group boycotts), to vertical or mixed restraints,  *see PSKS, Inc. v. Leegin Creative Leather Prods*., 615 F.3d 412 (5th Cir. 2010), or to collaborations with plausible procompetitive rationales, *see Spectators' Commc'n Network v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001), requiring instead a rule-of-reason inquiry.

Antitrust claims involving agreements that do not fall into the "per se" category are evaluated under the "rule of reason." *Ohio v Am. Express Co.*, 585 U.S. 529, 541 (2018). To state a claim for a violation of Section 1 of the Sherman Act under the rule of reason, a plaintiff must allege that defendants engaged in a conspiracy to restrain trade in a relevant market, which consists of both a relevant product market and geographic market. *Rx Solutions, Inc. v. Caremark, LLC*, 164 F.4th 436, 442 (5th Cir 2026). Failure to plausibly allege a relevant geographic and product market is fatal to a rule of reason claim. *Apani Sw., Inc. v. Coca Cola Enters., Inc.*, 300 F.3d. 620 (5th Cir. 2002); *see also Rx Solutions*, 164 F.4th at 442 ("A district court can dismiss Sherman Act

claims for failure to properly define the relevant market."). In addition, under the rule of reason, a complaint must plausibly allege that the conspirators had market power in the relevant market. *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883 (5th Cir. 2016). Finally, the Fifth Circuit enforces a rigorous antitrust standing or antitrust-injury requirement. Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

### b.   CDM Has Failed to Plausibly Plead a Per Se Antitrust Violation.

The per se group boycott theory fails at the threshold because the facts pleaded do not plausibly allege a horizontal *agreement among competitors* or a hub-and-spoke conspiracy with a "rim." The Complaint alleges that the developer promulgated Community Guidelines and Rental Guidelines, proclaimed a desire for uniformity of offerings, and that "many owners have already bought into it." *See* Compl. ¶¶ 188(*l*), 231, 350 & 353. Those are allegations of a unilateral policy by a project operator and, at most, vertical adherence by owners. Allegations that market participants complied with a central actor's rules, adopted common standards, or bought into a program do not, without more, plausibly plead a horizontal agreement. *See Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 541 (1954) (following the leader or parallel business behavior by itself does not establish an agreement, much less a Sherman Act violation).

A viable hub-and-spoke boycott requires factual matter showing not only a "hub" coordinating with "spokes," but also an agreement among the spokes themselves—the "rim"—to refuse to deal. *PSKS, Inc. v. Leegin Creative Leather Products, Inc*., 2009 WL 938561, at *7 (E.D. Tex. 2009) (finding the rim of the wheel is the connecting agreements among the horizontal

59

competitors that form the spokes), *aff'd*, 615 F.3d 412 (5th Cir. 2010). The Complaint identifies no meetings, communications, or other plus factors from which the Court could reasonably infer that independent homeowners agreed among themselves to exclude non-program competitors. *In re Pool Products Distribution Market Antitrust Litigation*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013) ("[E]xistence of these plus factors tends to ensure that courts punish 'concerted action' – an actual agreement – instead of the 'unilateral, independent conduct of competitors.") (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)). Rather, each owner's alleged adherence is explained by self-interest in a branded resort community and by common vertical ties to the developer. That is not a per se horizontal boycott.

The per se "price-fixing" theory is likewise implausible because the pleaded conduct is vertical or mixed, not a naked horizontal price agreement. The Complaint alleges that the resort "dictates the price points" for properties within its branded rental program and imposes a Resort Fee on non-program guests. *See* Compl. ¶ 232. Vertical price maintenance and program-based pricing are not per se unlawful, and the Fifth Circuit has enforced that distinction. *See Leegin Creative Products, Inc. v. PSKS*, 551 U.S. 877, 881 (2008) (holding vertical price restraints are to be judged by the rule of reason). To the extent the Complaint implies horizontal uniformity among participating owners, it pleads no facts showing an agreement among those owners to fix prices; at most, it alleges adherence to a vertical, centrally administered program with standard fees subject to rule-of-reason analysis. Assertions that non-program owners face differential access fees or that third-party managers are disfavored likewise do not transform this into a per se horizontal price-fixing pact. In short, the per se labels are not supported by nonconclusory facts, and per se treatment is unavailable on these allegations under controlling law.

### c.    Market Definition, Market Power, and Rule-of-Reason Defects.

Once the per se labels fall away, the plausibility of the claim must be tested under the rule of reason. The Complaint fails that test. The Complaint alleges that the geographic market is "all of the United States" and offers as rationale only that most buyers or renters reside in the United States. *See* Compl. ¶ 339. The geographic market is the area of effective competition where buyers can practically turn for alternative sources and where sellers compete, not the location of customers' residences. There are no facts alleged regarding the area of effective competition, the commercial realities of the industry, or anything other than an unsubstantiated allegation to support a conclusion of economic significance in the identified market. *See Rx Solutions*, 164 F.4th at 443. Here, the alleged conduct concerns the sale and rental of property on Nicaragua's Emerald Coast. The Complaint's own product-market definitions concede that the location of competition is the Emerald Coast of Nicaragua. Under these facts, a geographic market of "all of the United States" based on customer location is not plausible.

The product markets are similarly unsupported. The Fifth Circuit requires allegations of reasonable interchangeability and cross-elasticity of demand; bare labels like "higher-end" and a carve-out based on "unique surf access" do not suffice. *See Apani,* 300 F.3d at 626 (citing *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 (5th Cir. 1985)). The Complaint pleads no facts about substitutes within Nicaragua or across proximate resort geographies, price sensitivity, or cross-elasticity. If a plaintiff fails to allege a "proposed relevant market that clearly does not encompass all interchangeable product substitutes even when all factual inferences are granted in the plaintiff's favor," then the "relevant market is legally insufficient, and a motion to dismiss may be granted." *Rx Solutions*, 164 F.4th at 442 (quoting *Apani*, 300 F.3d at 628). Without a cognizable product and geographic market, a rule-of-reason claim fails as a matter of law. *Id.*

61

(citing *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries,,* 56 F.4th 1026, 1036 (5th Cir. 2023)).

The Complaint is devoid of allegations that the purported conspirators possessed market power. The Complaint does not allege market shares, barriers to entry, or durable power over price or output in any properly defined market. Nor does it plead facts showing a reduction in output, quality, innovation, or price competition in any market. Assertions that a branded resort program standardizes offerings or imposes fees on non-program users describe, at most, vertical brand management; they do not, without more, demonstrate harm to competition. Fifth Circuit cases involving rule-governed associations and sports or hobby markets underscore that private standards and eligibility rules are not anticompetitive absent market power and demonstrated adverse market-wide effects. *See Viazis*, 314 F.3d at 766 (showing association rules challenged under antitrust laws require a showing of market power and actual anticompetitive effects). The Complaint is silent on those fundamentals.

### d. CDM Does Not Plead Antitrust Injury and Proximate Causation.

The Fifth Circuit enforces a demanding antitrust-injury requirement that independently defeats the claim here. "[A]n antitrust plaintiff must do more than meet the requirements of Article III to establish its standing to bring suit." *Rx Solutions*, 164 F.4th at 443 (citing *Sanger Ins. Agency v. HUB Int'l Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015)). A plaintiff only has standing to bring an antitrust case where he can show antitrust injury. *See Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). Antitrust injury is an injury of the type the antitrust laws were intended to prevent and must flow from the challenged restraint's effect on the competitive process, not merely from harm to a single competitor or private disputes. *See Brunswick*, 429 U.S. at 489. "In short, the question underlying antitrust injury is whether

62

*consumers – not competitors – have been harmed." Rx Solutions*, 164 F.4th at 444 (emphasis in original). The Complaint is silent on this core requirement. Rather, CDM's sole focus is on the payment of dues, a purported threat of blacklisting, and being "literally barred" from finishing a home because of project-level utility and access rules. *See* Compl. ¶¶ 349–350. Those are governance and property-specific grievances, not competition injuries. *Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir. 1994) (noting that a Sherman Act plaintiff "may not just show that defendants' actions injured him but must also demonstrate that the defendants' actions unreasonably restrained competition"). The Complaint alleges no facts to show the alleged conspiracy resulted in any lost customers to any of the homeowners, or that output of vacation rentals declined. CDM can only posit speculative, prospective lost profits from a home not yet completed and conjectural "eliminat[ion]" from a market it has not entered. *See* Compl. ¶ 356. These alleged injuries are neither derived from, nor measure, harm to competition.

The Complaint also fails on causation. The pleaded utility shutoffs, access limits, and program rules are policies administered by the developer. Even were those policies unwise or wrongful in some other sense, CDM does not plausibly allege an antitrust injury proximately caused by an agreement among any alleged conspirators that harms market-wide competition. On the Complaint's own terms, the immediate causes of CDM's harms are its disputes over fees and building or rental compliance, not a market-wide boycott or horizontal price-fixing pact.

> **e.      Extraterritoriality and the Foreign Trade Antitrust Improvements Act Bar the Claim as Pleaded.**

Finally, the Foreign Trade Antitrust Improvements Act ("FTAIA") (15 U.S.C. § 6a) bars Sherman Act claims based on conduct outside of the United States unless there is a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic commerce and the claim proximately arises from that effect. *Den Norske Stats Oljeselskap AS v. HeereMac Vof*, 241 F.3d.

420 (5th Cir. 2001). The antitrust allegations challenges conduct centered in a Nicaraguan real estate development and rentals, administered by entities operating a resort and community in Nicaragua. CDM is not a participant in the rental market it attempts to define, because CDM's home is not currently being marketed. Defining the geographic market as the United States based on where customers reside does not cure the foreign locus of the conduct and markets. *See* discussion, *supra*. CDM does not plausibly allege a direct and substantial effect on U.S. domestic prices, output, or competition or that CDM was harmed by this impact on the alleged U.S. market, as opposed to incidental effects on U.S. residents who travel abroad. Nor does it plausibly allege that CDM's injuries such as cessation of utilities, inability to finish a house, and alleged differential resort fee, arise from a domestic effect on U.S. commerce. *See Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015) (holding plaintiff's injury must arise out of the domestic effect from the foreign conduct). These pleading defects warrant dismissal. For these reasons, this Court should dismiss Count V.

### 4.    This Court Should Dismiss Count VI (Lanham Act).

Next, this Court should dismiss CDM's Count VI under the Lanham Act for failure to state a claim upon which relief can be granted. Section 43(a) of the Act provides a cause of action against those who make a "false or misleading description of fact, or false or misleading representation of fact," which "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B); *Boltex Mfg. Co. v. Galperti, Inc.*, 827 F. App'x 401, 405–06 (5th Cir. 2020). To prevail, a plaintiff must show (1) a false or misleading statement of fact about a product; (2) this statement was deceptive; (3) the deception was material insofar as it is likely to influence a consumer's purchasing decision; (4) the product in question is in interstate commerce; and (5) plaintiff has been injured or is likely to be injured as a result. *Boltex*, 827 F.

64

App'x at 406 (citing *Logan v. Burgers Ozark Country Cured Hams, Inc*., 263 F.3d 447, 462 (5th Cir. 2001)). CDM fails to plead facts to meet those elements.

### a. The Alleged Misrepresentations Are Not "Commercial Advertising or Promotion."

For representations to constitute "commercial advertising or promotion" under § 43(a)(1)(B), they must be:

> (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Seven-Up Co. v. Coca-Cola Co*., 86 F.3d 1379, 1384 (5th Cir. 1996).

Here, the Complaint targets website narratives and generalized statements about the development's "ethos," lifestyle, and governance model. These are not pleaded as systematic, commercial advertising or promotion directed to influence purchasing decisions in commerce. These are statements from owner listservs, subscription-based services, and personal emails regarding the governance of a development in Nicaragua They do not constitute commercial advertising or promotion as defined by the Fifth Circuit.

Nor are any statements tied to CDM's competitive position. In fact, CDM never explains *how* it is in commercial competition with any Defendant. CDM is unable to have guests stay at its property on the development, because, nearly 13 years after purchasing G16, there is still no house on the property. *See* Compl. ¶¶ 98, 269. To claim commercial competition would require CDM to have had at least one rental guest before it could have entered the competitive market. Accordingly, CDM fails to establish it is in commercial competition with any Defendant.

### b. The Alleged Misrepresentations Are Non-Actionable Puffery and/or Opinions.

Statements characterizing the development as a residential community, an "accidental development," or opining about lifestyle and amenities, are classic, non-actionable puffery or opinion, not specific, measurable factual claims capable of being proven true or false.

A statement of fact is one that is susceptible to "empirical verification," or in other words, capable "of being adjudged true or false." *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 235 (5th Cir. 2014) (citing *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986)). Statements of general opinion or mere "puffery" are not actionable. *Pizza Hut*, *Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496–97 (5th Cir. 2000). Puffery takes two forms: (1) an "exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying"; and (2) a "general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion." *Id*. However, because courts assess promotional statements with reference to their broader context, even general or vague representations that would otherwise constitute statements of opinion can be transformed into statements of fact depending on the context within which they are made. *See id*. at 498-502 (advertising slogan, "Better Ingredients. Better Pizza." was actionable under Lanham Act when combined with other statements in adverts that provided "fact-specific reasons" why rival pizza company's pizzas were superior); *AT&T Mobility LLC v. T-Mobile USA Inc.*, No. 22-cv-760, 2023 WL 311287, at *3 (E.D. Tex. Jan. 18, 2023).

Statements characterizing the development as an "accidental development," Compl. ¶ 370, or opining about the lifestyle and amenities, *id.* ¶¶ 75-89, are classic, non-actionable puffery or opinion. Indeed, these statements constitute general claims of superiority over comparable real estate in California, Nicaragua, and other Central and South American countries. These are not

66

specific, measurable factual claims capable of being proven true or false as to real estate investments and the accompanying development of the same.

         **c.**        **CDM Has Inadequately Pleaded Materiality and Competitive Injury.**

In *Lexmark International Inc. v. Static Control Components, Inc.*, the Supreme Court observed that the Lanham Act is meant to protect businesses from "injuries to business reputation and present and future sales." 572 U.S. 118, 131 (2014). *Lexmark* held that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id*. at 131–32. To satisfy the proximate cause requirement, a plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id*. at 133. *Lexmark* thus held that "[t]o invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id*. at 140.

CDM does not plausibly allege that any statement materially deceived consumers in a way that influenced purchase or rental decisions to CDM's competitive detriment. Conclusory references to "misleading the international real estate buyer" are insufficient to plead an injury to a commercial interest in sales or business reputation. Moreover, CDM erroneously asserts that it "competes with Lanham Act Defendants for those guests and has been injured by their misrepresentations." *See* Compl. ¶ 372. Not so. Defendants dispute CDM "competes for guests" as CDM's property is incomplete and not presently habitable, let alone accessible to guests. Therefore, there is no market that Defendants are competing in CDM against.

**5.      This Court Should Dismiss the Remaining Tort Claims.**

Upon dismissing the federal claims, this Court should decline jurisdiction over the remaining claims under 28 U.S.C. § 1367(c)(3). In the alternative, this Court should dismiss each for failure to state a claim upon which relief can be granted.

**a.      This Court Should Decline to Exercise Jurisdiction Over the Tort Claims Not Within Its Original Jurisdiction.**

None of Counts VII through XI arises under federal law. Nor has CDM included a prayer for relief in excess of $75,000 to invoke diversity jurisdiction under 28 U.S.C. § 1332(a). Indeed, CDM omitted § 1332(a) from its jurisdictional allegations. *See* Compl. ¶ 44. Thus, the sole basis for jurisdiction over Counts VII through XI comes through 28 U.S.C. § 1367. If this Court dismisses each of the federal claims at Counts I through VI, it should decline to exercise that supplemental jurisdiction, as authorized under 28 U.S.C. § 1367(c)(3) after "the district court has dismissed all claims over which it has original jurisdiction." While the statute is discretionary, "the general rule in the Fifth Circuit is to dismiss state law claims when the federal claims they supplement are dismissed." *Reed v. Marshall*, 699 F. Supp. 3d 563, 588 (S.D. Tex. 2023), *aff'd*, 142 F.4th 338 (5th Cir. 2025). Nothing in this matter counsels for a deviation from that rule, especially given that the remaining claims have no connection to this District.

**b.      If this Court Retains Jurisdiction, It Should Dismiss the Tort Claims for Failure to State a Claim Upon Which Relief Can Be Granted.**

If this Court retains jurisdiction over the tort claims, however, it should dismiss each for failure to state a claim upon which relief can be granted. Defendants will address each in turn.

**i.      Count VII (Texas Free Enterprise and Antitrust Act).**

Under Count VII, CDM invokes the Texas Free Enterprise and Antitrust Act (the "TFEAA") to seek a civil remedy under state law for Defendants' alleged anticompetitive behavior

affecting the real estate market in Nicaragua. *See* Compl. ¶¶ 373–378. As stated above, CDM's federal antitrust claim fails. *See supra* Part III.C.3. The same rationale applies to CDM's claims under the State antitrust law, which is generally to be "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes . . . ." *See* TEX. BUS. & COM. CODE § 15.04; *Caller-Times Publ'g Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576 (Tex. 1992).

Further, under Texas law, there is a "strong presumption against extraterritorial application of a Texas statute, which cannot be overcome by implication 'but only when such intent is clear.'" *Pohl v. Cheatham*, 718 S.W. 3d 173, 183 (Tex. 2025). Here, that presumption is not only unrebutted, it is included in the statute. TEX. BUS. & COM. CODE § 15.04 declares the purpose of the TFEAA as "to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state." *See also Destec Energy, Inc. v. Southern California Gas Co.*, 5 F. Supp. 2d 433, 464 (S.D. Tex. 1997) (dismissing claims under TFEAA where conduct occurred in California, noting that the statute "does not provide that any conduct that has some effect on a Texas entity is subject to Texas antitrust laws"), *aff'd*, 172 F.3d 886 (5th Cir. 1999).

The six paragraphs of CDM's Count VII set forth only vague, threadbare allegations that "Antitrust Defendants' unlawful conduct has hurt competition and injured consumers in Texas, where CDM resides." *See* Compl. ¶ 375. This Court should disregard CDM's "formulaic recitation" of that element of the TFEAA. *See Gonzalez v. Bayer Healthcare Pharmaceuticals, Inc.*, 930 F. Supp. 2d 808, 810 (S.D. Tex. 2013) (quoting *Twombly*, 550 U.S. 544). The Complaint *barely mentions* the State of Texas, which is cited in only three factual paragraphs: (1) the averment of CDM's state of organization, principal place of business, and residence of its managing member, *see* Compl. ¶ 9; (2) the averment that Defendant Ford sent marketing messages "far and wide,

69

including in Texas" between 2011 and 2013, *see id.* ¶ 76; and (3) that Julapalli sent his 2014 Dues payment from a Texas bank, *see id.* ¶ 152. None of these allegations refers to anticompetitive behavior affecting Texas consumers—and, even if they did, they would be well outside of the four-year statute of limitations under TEX. BUS. & COM. CODE § 15.25. This Court should dismiss Count VII.

### ii.   Count VIII (Fraud).

Next, this Court should dismiss CDM's Count VIII for fraud. In Texas,[4] common-law fraud claims consist of five elements: (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury. *Wesdem, L.L.C. v. Illinois Tool Works, Inc.*, 70 F.4th 285, 291 (5th Cir. 2023). Federal Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." "[T]he Rule 9(b) standards require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.* 407 F.3d 690, 696 (5th Cir.2005). Thus, "the who, what, when, and where must be laid out before access to the discovery process is granted." *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 178 (5th Cir. 1997); *see also id.* at 177 (concluding that State-law fraud claims do not escape Rule 9(b)'s pleading requirement). Count VIII is subject to that heightened pleading standard, and CDM

---

[4] Defendants cannot discern from the sparse allegations of Counts VIII, X, and XI what State's or country's law should be applied. For the purposes of this Motion only, Defendants assume Texas law, as that appears to be what CDM intended to plead.

cannot establish the elements of its fraud claim with particularity. *See Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 550–51 (5th Cir. 2010).

Count VIII is the epitome of a mere formulaic recitation of the elements of a tort, constituting only five sentences literally reciting those elements. The best that Defendants can discern as to what from the general allegations might constitute fraud on which CDM could have relied would be: (1) subscription materials in 2012 to 2013 that led CDM to purchase the lot in Rancho Santana, *see* Compl. ¶¶ 75-99; and/or (2) demands for dues, which CDM paid through 2022, *see* Compl. ¶¶ 149-172. Neither of these, however, is supported by sufficient allegations. The first of these is time-barred under Texas's four-year statute of limitations for fraud. The act taken in reliance—the purchase of the lot—predated the Complaint by more than a decade. *See* TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4); [5] *see also* Compl. ¶¶ 94–98. The second of these (presentation of invoices for dues) would be time-barred for all *except* the final dues payment. *See* Compl. ¶¶ 152, 155, 157, 162, 167, 169, 172. As to that theory, however, the claim does not plead with the requisite particularity of how that actor (Constantino) knew that the invoices he was sending were false, *see id*. ¶¶ 149–172, let alone does CDM show scienter as to any of the ten other Defendants under Count VIII, *see id*. ¶¶ 379–384; *Wesdem*, 70 F.4th at 292 ("While [plaintiff] alleges that the promise was false and that [defendant] knew it was false, these conclusory allegations are unadorned and devoid of further factual enhancement."). As such, this Court should dismiss Count VIII.

---

[5] That any claim would have accrued, if at all, in Nicaragua is irrelevant to the limitations analysis. With some exceptions not applicable, "Texas courts do not undertake a 'choice of law' analysis when it comes to statutes of limitations; they simply enforce Texas's own limitations periods." *In re BP p.l.c. Sec. Litig.*, 51 F. Supp. 3d 693, 697 (S.D. Tex. 2014).

### iii.    Count IX (Trespass).

Next, this Court should dismiss CDM's trespass claim, which is plainly time-barred. Count IX alleges that Rancho SRL's agents entered onto CDM's property and into the home on that property. Compl. ¶ 387. CDM alleges this trespass occurred during a "water skirmish" between August 28, 2023 and September 6, 2023. *Id*. ¶¶ 252–255. The statute of limitations for a trespass claim in Texas is two years. *See* TEX. CIV. PRAC. & REM. CODE § 16.003(a). CDM filed the Complaint on December 22, 2025, which is more than two years after any claim accrued. This Court should dismiss Count IX.

### iv.    Count X (Tortious Interference).

Next, this Court should dismiss Count X for tortious interference. A tortious interference with a prospective relation claim requires proof of the following five elements: (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *Coinmach Corp. v. Aspenwood Apartment Corp.,* 417 S.W.3d 909, 923 (Tex. 2013).

CDM does not plead facts showing a reasonable probability of a specific prospective relation; rather, CDM alleges a general intent to enter the rental market at an unspecified time. Tortious interference requires more. CDM must show a business relation was "reasonably probable, considering all of the facts and circumstances attendant to the transaction." *See Richardson-Eagle, Inc. v. William M. Mercer, Inc.,* 213 S.W.3d 469, 475-76 (Tex. App. 2006) (further noting that a plaintiff must show "more than mere negotiations occurred" with the prospective customer for tortious interference). CDM points to nothing. Indeed, more than 13 years

after purchasing the property (and with ten years elapsing between that purchase and the alleged interference, *see* Compl. at ¶¶ 96-98, 252–269), CDM still has no home on the lot. CDM cannot plead a prospective business relationship with which Defendants interfered.

CDM's claim also requires "independently tortious or unlawful conduct." As shown above, the predicate theories for RICO, antitrust, fraud, and trespass necessarily fail. Policy decisions and fee schedules within a development—even if disputed—are not independently tortious or unlawful as pleaded, and CDM's tortious interference with a prospective business relationship claim should be dismissed.

<strong>v.      Count XI (Civil Conspiracy).</strong>

Finally, this Court should dismiss CDM's civil conspiracy claim under Count XI. Under Texas law, "civil conspiracy [is] a 'derivative tort,' meaning it depends on some underlying tort or other illegal act." *See e.g.*, *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140-41 (Tex. 2019); *Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008); *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). The "use of the word 'derivative' in this context means a civil conspiracy claim is connected to the underlying tort and survives or fails alongside it." *Agar*, 580 S.W.3d at 140–41. Here, each of CDM's underlying claims fail, therefore, Count XI must also fail.

**IV.    Conclusion.**

For the foregoing reasons, this Court should dismiss this case for: (1) *forum non conveniens*; (2) lack of personal jurisdiction; and/or (3) failure to state a claim.

73

Respectfully submitted,

By: */s/ Emma L. Short*
    **Emma L. Short**
    Texas Bar No. 24101001
    Federal ID No. 3501711
    **BAKER, DONELSON, BEARMAN,**
    **CALDWELL & BERKOWITZ. P.C.**
    1301 McKinney Street, Suite 3700
    Houston, Texas 77010
    Telephone: (713) 650-9700
    Facsimile:  (713) 650-9701
    eshort@bakerdonelson.com

    ***Attorney for Defendants***

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with counsel for CDM about this Motion and the relief sought herein on March 2, 2026, via telephone conference. After discussing the relief sought in the Motion and the grounds supporting the arguments therein, CDM noted its opposition to the Motion in its entirety.

*/s/ Emma L. Short*
Emma L. Short

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been served upon all parties of record via the ECF filing system on March 3, 2026.

*/s/ Emma L. Short*
Emma L. Short

74