**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| CASA DE MARAVILLA, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 4:25-cv-6183 |
| v. | § | |
| | § | TRIAL BY JURY DEMANDED |
| BONNER, WILLIAM; FORD, MARK; | § | |
| TURNER, MATTHEW; MAISH, LUCAS; | § | |
| CURREY, CHRIS; COSTANTINO, PAUL; | § | |
| SEMENZA, MATT; GEERLING, GAIL; | § | |
| BOOTHBY, CHRISTOPHER; | § | |
| MONUMENT & CATHEDRAL | § | |
| HOLDINGS, LLC F/K/A AGORA, INC.; | § | |
| TOLA DEVELOPMENT GROUP, LLC; | § | |
| RANCHO SANTANA, INC.; | § | |
| PROPIEDADES HABITACIONALES | § | |
| INTERNACIONALES, S.A.; | § | |
| RANCHO SANTANA INC. & CÍA LTDA., | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF CASA DE MARAVILLA, LLC'S**
**FIRST AMENDED COMPLAINT**

---

Plaintiff Casa de Maravilla, LLC ("CDM"), by and through its undersigned attorney, files this First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) against all Defendants and respectfully shows the Court as follows:

**INTRODUCTION**

1. This case is about a Baltimore-based publishing conglomerate—The Agora Companies, also known as Monument & Cathedral Holdings, LLC ("Agora")—that used its mass-marketing

apparatus to lure American investors, including CDM, into purchasing property in a Nicaraguan coastal development called Rancho Santana. Over more than two decades, Agora and its co-Defendants extracted millions of dollars annually from hundreds of property owners through a fraudulent homeowners' association ("HOA") structure that they knew had no legal basis, laundered the proceeds through a byzantine network of U.S.-based entities, transformed the residential community into a developer-controlled resort that competes directly with the very owners who funded it, and are now retaliating against any owner who questions the scheme.

2. This is not a Nicaraguan property dispute. It is a case about racketeering, antitrust conspiracy, consumer fraud, and false advertising orchestrated by U.S. citizens, directed from U.S. headquarters, marketed through U.S. publications to U.S. consumers, and financed through U.S. banks. The U.S. Securities and Exchange Commission, the Federal Trade Commission, and two state attorneys general have all brought enforcement actions against Agora or its subsidiaries for the same pattern of deceptive conduct that underlies this case. CDM brings this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Sherman Antitrust Act, the Lanham Act, and Texas statutory and common law to recover for the injuries Defendants have caused to its business and property.

**PARTIES**

*Plaintiff*

3. Plaintiff Casa de Maravilla, LLC ("CDM") is a Texas limited liability company with its principal place of business in greater Houston, Texas. CDM is managed by its managing member, Venodhar R. Julapalli ("Julapalli"). CDM owns Lot G16 in the Rancho Santana development on

the Pacific coast of Nicaragua. CDM's mailing address is 2950 F.M. 2920, Suite 180, Spring, Texas 77388.

### *Individual Defendants*

4. Defendant William Bonner ("Bonner") is a citizen of the United States. He founded Agora in Baltimore, Maryland, in 1978. Agora's own website describes Bonner as one of "The Visionaries Behind Agora." He is a co-founder of the Rancho Santana development and a member of its Board of Directors. Bonner maintains a home in France, conducts business operations in the United States, and owns property in Rancho Santana.

5. Defendant Mark Ford ("Ford") is a citizen of the United States. He has worked intimately with Bonner and Agora since 1987, and Agora's own website describes Ford as one of "The Visionaries Behind Agora." Ford is a co-founder of the Rancho Santana development, a member of its Board of Directors, and a homeowner in Rancho Santana. Ford served as the initial head of the Rancho Santana development. He resides in Florida.

6. Defendant Matthew Turner ("Turner") is a citizen of the United States. He is a co-founder of the Rancho Santana development and member of its Board of Directors, and he served as Chief Executive Officer ("CEO") of Rancho Santana from approximately 2010 to 2020. Turner served as General Counsel of Agora and was its point person for legal and organizational matters relating to Rancho Santana. He is a homeowner in Rancho Santana and resides in Maryland.

7. Defendant Lucas Maish ("Maish") is a citizen of the United States. He has served as the CEO of Rancho Santana since approximately 2020 and has been with the organization since 2014. Maish lives and works in Nicaragua.

8. Defendant Chris Currey ("Currey") is a citizen of the United States. He serves as Executive Vice President of Real Estate for Rancho Santana and sits on its Board of Directors. Currey has been with Rancho Santana since at least 2010 and lives and works in Nicaragua.

9. Defendant Paul Costantino ("Costantino") is a citizen of the United States. He serves as Chief Financial Officer ("CFO") of Rancho Santana. In that capacity, Costantino has served as the primary point of contact for owner dues collection, sending invoices, payment instructions, and enforcement communications from Baltimore, Maryland, to property owners throughout the United States, including CDM in Houston, Texas. He resides in Maryland.

10. Defendant Matt Semenza ("Semenza") is a citizen of the United States. He is affiliated with the Rancho Santana Architectural Review Committee ("ARC") and has communicated with CDM regarding building guidelines, fines, and access restrictions. Semenza lives and works in Nicaragua.

11. Defendant Gail Geerling ("Geerling") is a citizen of the United States. She served as General Manager of Rancho Santana from 1997 to approximately 2001 and remains a homeowner in the development.

12. Defendant Christopher Boothby ("Boothby") is a citizen of the United States. Boothby is a homeowner in Rancho Santana who rents his property through the Rancho Santana Vacation Rentals ("RSVR") program. He has publicly advocated for Defendants' rental policies and for enforcement actions against owners who do not pay the disputed dues. He resides in New Hampshire and operates a business there.

*Entity Defendants*

13. Defendant Monument & Cathedral Holdings, LLC, formerly known as Agora, Inc. ("Agora"), is a Maryland limited liability company with its principal place of business in Baltimore, Maryland. Agora is the parent company of a network of dozens of subsidiary companies operating in publishing, information services, health supplements, and real estate. Agora describes itself as a "$1.5 billion+ company." The consumer protection organization Truth in Advertising estimated Agora's annual revenue at approximately $500 million in 2021.

14. Defendant Tola Development Group, LLC ("Tola") was a Maryland limited liability company affiliated with Agora. Tola had been used as a vehicle for Rancho Santana–related financial transactions, including the collection of owner dues through U.S. bank accounts.

15. Defendant Rancho Santana, Inc. ("RS Inc.") is a business company registered in the British Virgin Islands. RS Inc. holds a controlling interest in both Propiedades Habitacionales Internacionales, S.A. and Rancho Santana Inc. & Cía Ltda. RS Inc. is not mentioned in any of Defendants' public-facing materials, and its existence was discovered by Julapalli through independent investigation and confirmed through the British Virgin Islands corporate registry.

16. Defendant Propiedades Habitacionales Internacionales, S.A. ("International Living") is a Nicaraguan sociedad anónima (the Nicaraguan equivalent of a corporation). International Living was the entity formed by the founders to acquire the Nicaraguan property underlying the Rancho Santana development. Its name mirrors that of Agora's flagship publication, *International Living*, which has been used to market Rancho Santana to American consumers since the development's inception.

17. Defendant Rancho Santana Inc. & Cía Ltda. ("Rancho SRL") is a Nicaraguan limitada (the Nicaraguan equivalent of a limited liability company). Rancho SRL is the operating entity of the Rancho Santana development and resort. It is controlled by RS Inc. and, through it, by Defendants Bonner, Ford, and Turner.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 (RICO), 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 15 (Clayton Act, treble damages), and 15 U.S.C. § 26 (Clayton Act, injunctive relief). This Court has supplemental jurisdiction over CDM's state-law claims pursuant to 28 U.S.C. § 1367.

19. This Court has personal jurisdiction over all Defendants. At least one Defendant—Costantino—has purposefully directed a decade of communications into this forum, including dozens of emails sending invoices, payment instructions, and enforcement threats to CDM at its Houston, Texas, address, and directing CDM to wire funds from Houston banks to Agora-affiliated accounts in Baltimore. Agora and its subsidiaries have purposefully availed themselves of the Texas forum by directing mass-marketing campaigns through their publications—including *International Living* and the *Palm Beach Letter*—to subscribers in Texas, including CDM's managing member, for the express purpose of soliciting property purchases in Rancho Santana. CDM's claims arise directly from and relate to these Texas-directed contacts.

20. In addition, 18 U.S.C. § 1965 provides for nationwide service of process in RICO actions. Because personal jurisdiction exists over at least one Defendant in this District through traditional due process analysis, and because CDM's RICO claims are colorable, this Court may exercise personal jurisdiction over all Defendants under § 1965(b). *See ESPOT, Inc. v. MyVue*

*Media, LLC*, 492 F. Supp. 3D 672, 686 (E.D. Tex. 2020) ("so long as at least one defendant has engaged in sufficient minimum contacts with Texas related to the alleged RICO claim, its nationwide-service-of-process provision will grant personal jurisdiction over all other defendants when the 'ends of justice' so require under section 1965(b)").

21. Further, 15 U.S.C. § 22 (Clayton Act § 12) provides for nationwide service of process in antitrust actions against corporations. Defendants RS Inc. (a British Virgin Islands business company) and International Living (a Nicaraguan sociedad anónima) are corporations within the meaning of § 12 that transact business in the United States.

22. Additionally, 18 U.S.C. § 1956(f) provides for extraterritorial jurisdiction over money laundering offenses, which CDM alleges as predicate acts of racketeering.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to CDM's claims occurred here, including the receipt of fraudulent solicitations, the transmission of dues payments from Houston-area banks, and the injury to CDM's business and property. Venue is also proper under 28 U.S.C. § 1391(b)(3) and (c)(3), and under 18 U.S.C. § 1965.

**FACTS**

**A.  The Agora Enterprise and Its U.S. Operations**

24. The Agora Companies ("Agora") is a Baltimore-based publishing conglomerate founded by Defendant Bonner in 1978. Over more than four decades, Agora has grown into a sprawling network of dozens of subsidiary companies that publish newsletters and magazines in investing, travel, business, and health, and that sell dietary supplements and other wellness products. Agora describes itself as a "$1.5 billion+ company," and the consumer protection

organization Truth in Advertising estimated its annual revenue at approximately $500 million in 2021.

25. Agora operates from a block of historic rowhouses in downtown Baltimore that it has purchased and restored. It provides centralized human resources, legal, technology, and financial infrastructure for all the companies in its network. As described by a former employee, Agora is the "uncontested 800-lb gorilla of the financial publishing world."

26. Agora's business model is built on "direct-response copywriting": writing advertisements that convince consumers to purchase products on the spot. A former employee described the strategy as "front end" acquisition (selling a modestly priced newsletter subscription) followed by "back end" monetization (upselling expensive investment clubs, stock-picking webinars, and wellness supplements). The same model was applied to Rancho Santana: Agora's publications were the "front end" that acquired property buyers, and the property purchase, ongoing dues, and resort fees have been the "back end."

27. A former Agora employee described the company's structure as "The Octopus Model": operating through a cluster of subsidiaries rather than a centralized company, which drives internal competition but also means that "when the company gets in trouble, the trouble often doesn't go all the way to the top." The same former employee observed that "[n]either Bill Bonner nor Mark Ford has ever been arrested or accused of fraud or wrongdoing."

28. Despite the structural insulation, federal and state regulators have repeatedly pursued Agora and its subsidiaries for consumer fraud:

a. In 2003, the U.S. Securities and Exchange Commission sued several Agora subsidiaries for advertising insider trading tips. A federal judge ordered $1.5 million in restitution and civil penalties.

b. In 2016, the attorneys general of Pennsylvania and Oregon sued an Agora subsidiary for misleading consumers with false claims that they could receive benefits from tobacco settlements. The company settled with both states.

c. In 2019, the Federal Trade Commission ("FTC") sued several Agora entities for tricking seniors into purchasing publications that falsely promised a cure for Type 2 diabetes or promoted a nonexistent government benefits program. In 2021, Agora settled with the FTC, agreed to pay more than $2 million in consumer refunds, and was barred—along with its parent company Monument & Cathedral Holdings and all of its subsidiaries—from making unsubstantiated health claims and misleading financial representations.

d. As reported by Forbes in July 2025, The Agora "has done little to change its ways" despite regulatory action and continues to spend millions placing advertisements containing "outlandish claims" on social media platforms, reaching hundreds of millions of Americans.

29. Among the businesses in Agora's network is a luxury resort in Nicaragua—Rancho Santana. As Forbes reported, the resort "offers timeshares, holotropic breathwork workshops, and a 'Path to Vitality Longevity Experience.'" Rancho Santana was not independently conceived; it was created by Agora's principals as a vehicle to sell property to Agora's publication subscribers.

30. Defendant Ford, a co-founder of both Agora and Rancho Santana, admitted on a publicly available video in 2023: "[M]y original plan was just to sell property to make money.

We're not professional real estate developers. We were publishers."[1] He further explained that the idea was to "lottify" the property and "sell to our customers"—meaning Agora's publication subscribers.[2] Laura Davis, a Rancho Santana executive from 2001 to 2010, admitted on the same video that "the theory was when you go in you sell all the land, you turn the HOA over to the community, and you get out. That just didn't happen."[3]

31. The enterprise that Defendants built around Rancho Santana—the enterprise that is the subject of this lawsuit—consists of U.S. citizens (Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Geerling, and Boothby) operating through a network of entities (Agora, Tola, RS Inc., International Living, and Rancho SRL) that share common ownership, leadership, and financial infrastructure. This enterprise exists independently of the racketeering activity alleged herein: it has operated continuously for more than twenty-five years, employs hundreds of people, manages a 3,000-acre development, and generates millions of dollars in annual revenue through legitimate hospitality, real estate, and property management operations. The racketeering activity is what has corrupted the enterprise's relationship with property owners like CDM.

**B. The Marketing Scheme: Luring American Investors to Rancho Santana**

32. From its inception, Rancho Santana was conceived not as an independent real estate venture but as a product to be sold through Agora's publishing network to American consumers. The marketing of Rancho Santana to U.S. investors has been continuous, deliberate, and directed from the United States for more than twenty-five years.

---

[1] *The Pacific Frontier: The Story of Rancho Santana*, available at https://youtu.be/hLpEaP7HbuM?t=303 (hereinafter "The Story"). Unless otherwise noted, all video citations in this Amended Complaint refer to The Story.
[2] The Story, at https://youtu.be/hLpEaP7HbuM?t=114.
[3] The Story, at https://youtu.be/hLpEaP7HbuM?t=574.

33. In late 1997, Bonner, Ford, and Turner channeled the resources of their Agora publication, *International Living*, to acquire approximately 2,700 acres along Nicaragua's Pacific Southwest coast—an area known as the "Emerald Coast." As Ford explained in a publicly available video, *International Living*'s intent was to have its own development, "something big" that "we could buy and then we could 'lottify' and sell to our customers."[4] The "customers" were the subscribers of Agora's publications, particularly *The Oxford Club*.

34. Ford was candid about the self-interest underlying the venture. As he admitted, "When we first saw how beautiful this place was, we thought, well, we could sell lots to our subscribers. But then we thought, well, let's keep some of it for ourselves."[5] Ford also recognized that the more expensive part of the development would not be acquiring the land but establishing infrastructure; "so then we thought, well, maybe we should do something that allows us to bring in more income. And so that's where we got the idea of actually having a community."[6] In other words, the "community" was not an end in itself—it was the mechanism by which the founders would use subscriber capital to build out an increasingly valuable property that they themselves would retain a controlling interest in.

35. Turner, then serving as General Counsel of Agora, wrote the first sales letter offering Rancho Santana lots to subscribers of *The Oxford Club*. Those lots sold out in approximately 48 hours, providing International Living the capital to begin developing Rancho Santana's infrastructure.[7]

---

[4] The Story, *supra* note 2.
[5] The Story, at https://youtu.be/hLpEaP7HbuM?t=449.
[6] The Story, at https://youtu.be/hLpEaP7HbuM?t=558.
[7] The Story, at https://youtu.be/hLpEaP7HbuM?t=706.

36. The pitch to prospective buyers aligned with the values Agora cultivated in its subscriber base: shrewd investing, personal autonomy, political freedom, and minimal encroachment on personal liberty. On May 12, 2000, the founders advertised on ranchosantana.com that lots were available "for a fraction of what you'd expect to pay," describing the property as "a home in the tropics or an investment of a lifetime" at "10 to 50 times" less than comparable property in the United States, and developed with "privacy in mind." No mention was made of plans to build or operate a multimillion-dollar resort on the property.

37. Turner specifically emphasized home rental as a means to finance buying into and retiring in the Rancho Santana community, both at its inception and for many years afterward. According to a current homeowner who had sold property in Rancho Santana as an agent, Turner continued to pitch Rancho Santana to numerous groups of clients as a "Residential, resort community with a capital 'R' on 'Residential' and a lowercase 'r' on 'resort.'" Over one hundred new owners were sold on that pitch.

38. Agora's marketing apparatus was not limited to a single publication. *International Living*, Agora's first publication, devoted to working, investing, and retiring overseas, heavily promoted Nicaragua—and specifically Rancho Santana—as a "perfect retirement or second home destination" with costs at a fraction of those in the United States. *The Oxford Club* provided the initial buyer pool. And beginning in 2011, Ford co-founded the *Palm Beach Letter* under the Agora umbrella, a newsletter focused on investment, entrepreneurial, and retirement advice—including owning a revenue-producing second home in Nicaragua. Ford used Agora's marketing muscle to distribute the *Palm Beach Letter* to subscribers across the United States, including in Texas.

39. Through a *Palm Beach Letter* series called "Retire Next Year," Ford sent regular emails from October 1, 2012, through December 16, 2013, designed to "inspire you to consider some retirement lifestyles that you may have never considered before," including "blueprints for relocating outside of North America and Europe, to places where you can live like royalty on a modest income." Those places included areas in and around Rancho Santana. In a *Palm Beach Letter* email on December 15, 2012, Ford explained his own investment in Rancho Santana and included a pitch from Rancho Santana's sales manager describing the development as a "spectacularly beautiful property in a country that boasts the lowest crime rate in Central America," where "Rancho Santana is attracting investors, second homeowners, and retirees."

40. In a February 9, 2013, email Ford explained that most homeowners lived in Rancho Santana only part-time and that many "rent out their houses or condos when they are not in residence, as I do." In a series called "Rental Real Estate 101," running from October 16, 2012, through August 14, 2013, Ford taught subscribers how to invest in rental real estate—and specifically extolled the idea of investing overseas in Nicaragua, where he described turning a $50,000 initial investment "into several million dollars."

41. A September 2022 survey of 101 Rancho Santana property owners confirmed the effectiveness of the U.S.-directed marketing campaign. When asked how they first heard about Rancho Santana, 35.64% of respondents identified an Agora publication, and 36.63% identified a family member or friend—many of whom were themselves Agora subscribers. Several respondents who selected "Other" also traced their introduction to Agora, identifying "Oxford Club," "Sales person for Agora: Tommy Gordon," and "Email surf advertisement 2003" as their

entry points. Only 2.97% identified a realtor. The overwhelming majority of Rancho Santana's property owners were acquired through Agora's U.S.-based publishing and marketing network.

42. CDM's managing member, Venodhar Julapalli, was one of the American consumers who responded to these solicitations in Texas and across the United States. In 2012, Julapalli became a subscriber to the *Palm Beach Letter*. Through Ford's "Retire Next Year" series, "Rental Real Estate 101" series, and cross-promotions between the *Palm Beach Letter* and *International Living*, Julapalli received regular emails from October 2012 through December 2013 promoting investment and retirement opportunities in and around Rancho Santana.

43. On March 9, 2013, Julapalli subscribed to *International Living*, through which he received access to a report titled "20 Beach Towns Where You Can Buy For Less Than $100,000." That report promoted Rancho Santana's "very affordable" prices and "luxurious surroundings, yet casual and relaxed." Separately, on March 6, 2013, Julapalli had contacted the *Palm Beach Letter* to follow up on its Nicaragua investment recommendations and was referred to Tom Gordon, Rancho Santana's independent sales manager—the same individual Ford had featured in his "Retire Next Year" series.

44. Julapalli's trust in the representations made by the founders and their publications was a significant factor in his decision to invest. All three founders—Bonner, Ford, and Turner—built homes in Rancho Santana, and Bonner and Ford spent time there with their families and friends—facts emphasized in the marketing materials. Julapalli relied on these representations and on the personal involvement of Agora's principals in the development, and chose to purchase property within Rancho Santana rather than independently in Nicaragua's broader real estate market.

45. Gordon arranged a visit by Julapalli to Rancho Santana in early April 2013. That visit led to an agreement to purchase an unimproved lot designated G16. G16 abuts the Pacific Ocean to the southwest; the only ingress to the lot is from the northeast via the main road leading from entry gates manned by Rancho SRL security:



46. Key to Julapalli's decision to purchase G16 was its proximity to the Pacific and world-class surf breaks, which had been pitched as significantly raising both private residential and vacation rental real estate market value.

47. On May 14, 2013, Julapalli organized CDM as a Texas limited liability company, under whose authority the Rancho Santana property would be owned and operated. On that same day, CDM signed a property purchase and sale agreement for G16. The agreement represented, among other things, that CDM and G16 were subject in perpetuity to the Declaration for the Rancho Santana Master Homeowners Association ("APROSA") and Bella Vista sub-association

documents. The agreement incorporated the terms and conditions of the HOA documents, including the obligation to pay dues for maintenance of common elements. The deed of transfer likewise represented that the owners were legally organized into two nonprofit associations, one of which was APROSA:

MEMBRESIA).- Debido a que el lote de terreno Número **G GUIÓN DIECISEIS (G-16)** descrito y deslindado, objeto de la presente Escritura se encuentra físicamente ubicado dentro de la urbanización privada de viviendas o sitios para descanso y habitación, denominada "**RANCHO SANTANA**", cuyos propietarios se encuentran jurídicamente organizados dentro de dos Asociaciones sin fines de lucro, denominadas, la primera "**APROSA**", con personalidad jurídica y debidamente legalizada ante las instituciones competentes, rigiéndose por su Acta Constitutiva, Estatutos y Reglamentos internos, y la Asociación de Propietarios de la Vecindad; su representada, la Sociedad **CASA DE MARAVILLA, LLC,** se obliga a suscribir los documentos para incorporarse como miembro de la asociaciones referidas, con todos los derechos y obligaciones inherentes a cada miembro. Obligándose inmediatamente después de suscribir esta escritura a incorporarse como miembros activos de las Asociaciones, obtener su Certificado de Membresía y su Registro en el Libro de Registro de miembros de la Asociación; y a cumplir con todos los requisitos y pagos establecidos para los miembros activos.- Hablan los señores **DONALD**

48. Thus, from *The Oxford Club*'s initial sales letter in the late 1990s through the *Palm Beach Letter*'s solicitations in 2012 and 2013, Bonner, Ford, and Turner—acting through Agora's publishing network—conducted an organized, continuous, U.S.-directed marketing campaign that was designed to, and did, lure hundreds of American investors, including CDM in Texas, into purchasing property at Rancho Santana under representations of a private residential community with a functioning HOA. These U.S.-directed activities establish both the purposeful availment of the U.S. forum, including Texas, and the beginning of the fraudulent scheme that is the subject of CDM's RICO claims.

## C. The Fraudulent HOA Structure

### The Serial HOAs

49. From 1998 through 2022, Bonner, Ford, and Turner—acting through International Living and its successor entities—created, dissolved, and replaced a series of HOA structures at Rancho Santana. At various times, these entities collected dues from property owners and performed governance functions. But the founders serially replaced each structure with a new one —without following the existing bylaws—never permitted any HOA to mature into a legitimate, owner-controlled governance body, and ultimately treated the entire succession of HOAs as never having been legitimately organized. By the time of APROSA's formal termination in 2022, the HOA framework had been quietly abandoned for years—even as purchase agreements, transfer deeds, invoices, and website representations continued to tell buyers that a functioning HOA existed, that they were members of it, and that their dues obligations were enforceable by lien.

50. On June 2, 1998, shortly after the founders purchased the property through International Living, an HOA called "La Asociación de Propietarios de Playa Rosada" ("APROSA") was constituted and municipally recorded. APROSA's formation document, which included bylaws, laid the groundwork for governance through an HOA: it was to serve as a non-profit organization of indefinite duration, with a Board of Directors of three to five members, equal rights among all members, and democratic decision-making through voting procedures.

51. In May 2002 several early property owners, including John Edwards ("Edwards"), were flown to Baltimore by International Living and Agora. Each of the three founders also attended. In Baltimore, the founders and the property owners formed the first neighborhood HOA, "Playa HOA," and held their first board meeting.

52. Questions about how the HOA was executing its duties arose almost immediately. Edwards received an invoice dated October 25, 2003, for HOA dues and property tax payments from Geerling. On November 20, 2003, Geerling sent owners a letter lauding the growth of Nicaragua's "premier private residential community" and explaining the need for a shift in expenses from International Living to the HOA for ongoing costs—including improvements, amenities, maintenance, security, and staff. Geerling noted that HOA fees were to be paid to APROSA and deposited directly into the HOA bank account. However, the October 2003 invoice itself directed payments to be sent to Geerling at a P.O. Box address in Miami, Florida.

53. In a letter from Baltimore to owners on March 3, 2004, Turner pitched the creation of a new HOA with new and expanded powers (the "2004 Covenants"). In that letter, Turner acknowledged, "I am also, like you, a lot owner," and noted that development had been "[s]upported by the world wide advertising and public relations muscle of Agora, Inc. (reaching more than a million investors a year)." Turner explained that "only the HOA is recorded and no by-laws were ever officially adopted or recorded," and proposed new covenants with lien power, annual increases limited to 10 percent without two-thirds owner approval, and covenants running with the land. The resulting 2004 Covenants created a new entity, Rancho Santana Association, S.A. ("RSA").

54. On February 18, 2005, International Living introduced the 2005 Covenants, proposing a super-HOA called Greater Rancho Santana Association, S.A. ("GRSA") above RSA and all other sub-associations. On April 28, 2005, Turner sent Edwards, then-President of Playa HOA, by FedEx from Baltimore two signed copies of the 2005 Covenants; Bonner also signed them as

President of International Living. The 2005 Covenants were intended to extend to December 31, 2060.

55. For approximately two years, from 2004 through 2006, Edwards and other officers ran the HOAs and collected dues from owners. The HOAs reviewed bids from competing providers and paid International Living annually through collected dues for agreed-upon services.

56. In 2006, without following the existing HOA bylaws, International Living introduced yet another set of covenants—the "Master Declaration of Covenants, Conditions and Restrictions For Rancho Santana Community" (the "2006 Covenants")—a declaration that expanded from 27 pages (2004) and 12 pages (2005) to over 90 pages. The 2006 Covenants were the brainchild of the founders, International Living, Agora, and Edward Popkin, a Florida-based attorney and real estate developer. Among the 2006 Covenants' provisions: International Living was given exclusive Class B control until 95% of residential lots were sold, or December 31, 2036, or whenever International Living determined in its sole discretion to relinquish control; APROSA was recast as "Rancho Santana Community Association" ("RSCA"); a new category of "Private Amenities" was created for a hotel, inn, or similar accommodations; and liens on owner property to secure payment of assessments were maintained. Lots owned by International Living were exempt from assessments.

57. On January 19, 2007, the 1998 APROSA formation document was amended to parallel the 2006 Covenants and municipally recorded. Under the amendments, a member could no longer resign from APROSA, and the developer—that is, the founders through their varied entities—had the exclusive right to appoint or remove any member of the Board of Directors.

58. The introduction of the 2006 Covenants was not well received by many owners. According to Edwards, International Living refused to recognize the pending third-year election

for Directors of the then-existing HOA. Owners at that time emphasized that the main reason they had bought into Rancho Santana was that the founders, International Living, and Agora had represented it as a private, gated, residential community—not a resort.

59. Meanwhile, even as owners raised concerns about the 2006 Covenants and the legitimacy of developer-controlled governance, ranchosantana.com continued to represent to prospective and existing property owners that functioning HOAs existed. From at least March 2009 through August 2012, on dozens of captured snapshots of the website, ranchosantana.com stated: "A master association and various sub-associations exist so that you can be assured that high and consistent standards of quality will be maintained. See the Master Plan for specific subdivisions." These representations appeared on the following dates, among others:

| | | |
|---|---|---|
| March 31, 2009 | May 1, 2009 | September 19, 2009 |
| December 17, 2009 | January 9, 2010 | January 22, 2010 |
| March 5, 2010 | March 30, 2010 | April 30, 2010 |
| May 1, 2010 | May 14, 2010 | May 16, 2010 |
| June 6, 2010 | July 4, 2010 | July 18, 2010 |
| August 4, 2010 | August 28, 2010 | September 17, 2010 |
| September 29, 2010 | October 31, 2010 | November 17, 2010 |
| December 1, 2010 | December 27, 2010 | January 17, 2011 |
| January 28, 2011 | January 29, 2011 | March 1, 2011 |
| March 2, 2011 | March 20, 2011 | April 3, 2011 |
| May 4, 2011 | May 19, 2011 | May 21, 2011 |
| June 5, 2011 | July 5, 2011 | July 20, 2011 |
| July 22, 2011 | August 5, 2011 | September 20, 2011 |
| September 24, 2011 | October 22, 2011 | November 15, 2011 |
| November 20, 2011 | December 16, 2011 | January 14, 2012 |
| January 19, 2012 | February 19, 2012 | March 20, 2012 |
| March 27, 2012 | April 21, 2012 | May 24, 2012 |
| May 27, 2012 | June 27, 2012 | July 28, 2012 |
| August 2, 2012 | | |

60. In addition, in a 2007 FAQ document published on ranchosantana.com, the website represented that the HOA then in place owned or would own Rancho Santana's common facilities.

That never happened. And in March 2010, a blog post from Rancho Santana's sales manager reassured the audience that "Rancho Santana is a safe and prudent decision" where you would "know the developer and the development in a way that you can trust," and where the accounting books would not be "'cooked.'" These assurances concealed the rise and fall of the HOA governance structure that had occurred throughout Rancho Santana's first decade.

61. These website representations were not incidental. They formed part of an organized campaign to penetrate the U.S. real estate demand market, directed at American consumers through a website accessible from and marketed to the United States. Currey, as a longtime Board Member and Executive Vice President of Rancho SRL, was responsible along with the founders for representing on ranchosantana.com from at least March 7, 2007, through August 2, 2012, that operative HOAs existed—when Currey and the founders knew they did not. By December 2009, the last captured snapshots of the "Homeowner's Association Documents" and "Developer" pages appeared on the website; by 2010, those pages had quietly disappeared.

### Laura Davis and the Board Memorandum: Knowledge That No HOA Would Be Turned Over

62. Laura Davis, a Rancho Santana executive from 2001 to 2010, admitted on the same publicly available 2023 video referenced above that "the theory was when you go in you sell all the land, you turn the HOA over to the community, and you get out. That just didn't happen."[8] This admission establishes that the founders' own executives understood the standard real estate development model—create an HOA, sell lots, and turn governance over to owners—and that the founders deliberately chose not to follow it.

---

[8] The Story, *supra* note 3.

63. That deliberate choice was memorialized in a September 21, 2022, memorandum from Bonner, Ford, Turner, and Myles Norin to Rancho Santana property owners (the "Board Memorandum"). In the Board Memorandum, the founders endorsed Maish as CEO with full authority to govern Rancho Santana and stated: "This corporate model may not be perfect, but we chose it over the 'owner controlled' model that we believe creates more dissension, inferior product, group think and group battles, and usually lousy food!" The Board Memorandum thus confirmed the founders' knowing rejection of owner-controlled governance in favor of unilateral developer control—even as purchase agreements, deeds, and invoices continued to represent that APROSA existed as a functioning HOA with lien authority.

### Maish Confirms: "There Is No Homeowners' Association"

64. At an in-person meeting of Rancho Santana property owners on May 15, 2023 (the "2023 Owners Meeting"), Maish made a series of admissions that further revealed the scope of the HOA fraud. Maish confirmed, "There is no homeowners' association." He described the annual payments from owners not as "dues" owed to an HOA but as a "fee for service"—even though purchase agreements, deeds, and years of invoices from Costantino had represented the payments as HOA dues enforceable by lien.

65. Maish further stated that "people that decide they're not going to pay dues, we're basically going to have to get real about that . . . you'll be denied access . . . denied the services . . . water and electricity too." He declared: "We're not a democracy." And: "we do not have any intention to create an infrastructure that . . . lets the property owners in."

66. At a subsequent owners meeting in May 2024 (the "2024 Owners Meeting"), Maish repeated and expanded on these admissions: "it's not governed by an HOA . . . there's no plans to

create an HOA . . . there's no intention to create an HOA . . . there's no clear legal path." He described Rancho Santana as "a gated resort community" in which "Rancho Santana has the right to basically create rules, impose fees."

### *The Termination of APROSA*

67. On October 31, 2022, the Nicaraguan government published an announcement that APROSA had failed to report its Board of Directors or financial statements from 2014 to 2021, was noncompliant with the law governing non-profits, and was, as a result, formally terminated.

68. Bonner, Ford, Turner, and Maish may have anticipated this termination. New "Rancho Santana Community Guidelines" (the "Community Guidelines"), with an effective date of June 1, 2022—five months before APROSA's formal termination—were discovered to have been posted without notice to owners on ranchosantana.com in November 2022, replacing the 2006 Covenants. Among the Community Guidelines' provisions: the "initial governance structure envisioned for Rancho Santana has since been repurposed by Developer [Rancho SRL], and transformed into a developer operated project, which allows for uniformity of the offer"; conditions for turnover of Rancho Santana to owners were eliminated; Rancho SRL claimed the exclusive right to limit access to its property and to charge separate fees for such access; and liens on owner property to secure payment of assessments could still be attached, now by Rancho SRL.

69. On February 7, 2023, Rancho SRL's legal counsel sent a letter to an inquiring owner explaining that APROSA had served as a non-profit vehicle to receive dues and avoid taxes, and that "[w]ith the recent change in tax law and NGO law, the use of the entity ceased to be practical." Counsel added: "APROSA does not longer exist and considering you cannot be part of something

that does not exist, this obligation is null and void." No mention was made that APROSA had been terminated because it had failed to fulfill its legal obligations as an HOA for years.

70. On March 20, 2023, Maish sent owners an email titled "State of The Union, Rancho Santana," in which he characterized APROSA's formation as a failed experiment: "The process failed, or rather, the process failed to offer an attractive path forward for anyone involved, and the initiative was abandoned for good." Maish represented that APROSA had been closed by "tax authorities" following a "private investigation . . . led by an RS property owner or group of owners." He did not disclose the actual grounds for APROSA's termination—its failure to report its Board or financials for years—and instead blamed the owner who had investigated.

### *The Dues Pipeline: Rotating Entities, Same Destination*

71. Throughout the serial HOAs and their eventual collapse, one thing remained constant: the flow of owner dues from property owners across the United States to Agora-affiliated bank accounts in Baltimore. Costantino, Rancho SRL's CFO, served as the dues enforcer, sending invoices, payment instructions, and enforcement communications from Baltimore to property owners throughout the United States, including CDM in Houston, Texas.

72. From 2013 through 2024, Costantino's email communications with CDM came from several different domains—agorapublishingg-group.com, agora-inc.com, rsownerdues@ranchosantana.com, and 14west.us (the domain for 14W Administrative Services, LLC, formerly known as Agora Management, LLC). Despite the changing domains, the destination for dues payments was always Baltimore. The payee entities rotated through a succession of Agora-affiliated companies: Publishing Services, LLC (formerly Agora Publishing, LLC); APROSA; PPNDS, LLC; Tola Development Group, LLC; and 14W Administrative

Services, LLC. Each entity received payments at or near Agora's headquarters address of 14 West Mt. Vernon Place, Baltimore, Maryland.

73. The annual dues collected from approximately 423 property owners grew steadily: $1,993,561 in 2021; $2,041,030 in 2022; approximately $2.1 million in 2023; approximately $2.39 million in 2024; and an estimated $2.52 million in 2025. In total, more than $10 million in owner dues flowed annually into U.S. bank accounts controlled by Agora and its affiliates.

74. CDM's own dues payments followed this pattern exactly. Costantino emailed Julapalli annual invoices from February 2014 through March 2022, each time representing the payments as "Rancho Santana Owner's Dues" with payment instructions directing funds to Baltimore. CDM paid by wire transfer from a Houston bank to Publishing Services, LLC in Baltimore (2014, 2015), by check mailed from Houston to APROSA c/o Costantino in Baltimore (2016, 2022), and by credit card (2017–2021), with receipts showing PPNDS, LLC or other Agora-affiliated entities as the merchant. In certain years, Julapalli paid the dues personally on CDM's behalf, in effect loaning funds to CDM while he waited for the opportunity to build a home on G16 and generate rental income sufficient to repay him—a financial arrangement premised entirely on the representations that CDM was a member of a functioning HOA in a residential community with rental opportunities. The dues increased annually—from $2,040 in 2014 to $4,576 in 2023—with percentage increases typically between 4.7% and 5%, punctuated by a 57% increase in 2021 that Currey described as "unavoidable" for Rancho Santana "to reach its full potential as a viable and sustainable community."

*Ford's Continuing Misrepresentation*

75. Even after APROSA's termination, the HOA fiction persisted. As late as June 6, 2023, Ford represented on his personal blog that Rancho Santana still had HOA bylaws, writing of a friend's development in Argentina: "And yet, the last time I visited his resort, their book of homeowner association bylaws looked to be even thicker than ours!"[9]

76. To date on ranchosantana.com, an "Employers' Compliance" document contains three separate references to an HOA, including a social responsibility policy referencing "members of the Association of Owners of Houses of Playa Rosada"—that is, APROSA. And the current Community Guidelines, effective March 1, 2024, still grant Rancho SRL a lien that could attach to owner property to secure payment of delinquent assessments—an enforcement power derived from the very HOA structure that no longer exists.

*Geerling's Evasion and Maish's Continued Misrepresentations*

77. On September 14, 2023, Edwards sent an email to a distribution list of many owners, including Geerling and Julapalli (the "Listserv"), calling out Maish's misrepresentations regarding the HOA. Edwards noted that he had sent copies of the 2005 Covenants establishing GRSA to Maish, Ford, and Turner.

78. On September 15, 2023, Geerling responded on the Listserv by asking Edwards whether he had evidence that the 2005 Covenants had been legally executed in Spanish, "to legitimize in Nicaragua the English documents you've provided." Edwards responded the same day, stating that he assumed Geerling had always been aware of the 2005 Covenants, recalling the

---

[9] Mark Ford, *Rules: Who Needs Them?* (June 6, 2023), https://www.markford.net/2023/06/06/.

2002 meeting in Baltimore where the first neighborhood HOA had been formed, and asking Geerling directly where her personal stance on the HOA situation lies.

79. On September 18, 2023, a fellow owner made a similar inquiry of Geerling on the Listserv, asking her to share information on the HOA situation as she understood it—particularly since she had been employed by International Living and served as its legal representative during the early years of Rancho Santana.

80. On September 19, 2023, Geerling replied that she believed there had been official meetings of the Board of Directors of APROSA but could not form an opinion because she had no written record of them or access to the minutes book. As she put it, "[t]hose corporate Board documents would be different than a meeting that took place out of country, minuted in English with English agreements."

81. On October 30, 2023, the same owner reminded Geerling on the Listserv that the original Playa HOA Board—which had included three homeowner representatives and two developer representatives—had been annulled by International Living due to apparent errors in the filing of paperwork. The owner asked Geerling point-blank: "Can you let me know why you think the Developer never called elections for our Home Owner Association after 2007?" To date, Geerling has not responded to that question.

82. In an email to an owner on July 17, 2023, Maish represented: "Some property owners would prefer an HOA type approach, but that's simply not how we've ever managed the property, and many of our owners and buyers understand and support our method to running the property." The first part of that statement is revealing but false. As the history set forth above demonstrates, HOA structures did exist at Rancho Santana from 1998 through at least 2007. They collected dues.

For a brief period from 2004 to 2006, owner-elected officers ran a neighborhood HOA, reviewed bids from competing providers, and paid International Living annually through collected dues for agreed-upon services. But the founders kept replacing each structure, refused to recognize scheduled elections, never relinquished developer control, and ultimately treated the entire succession of HOAs as never having been legitimately organized—even as they continued to represent their existence to buyers and invoke their authority to collect payments. What Maish meant by "that's simply not how we've ever managed the property" is that the founders never intended to cede governance to owners.

**D. The Transformation from Residential Community to Developer-Controlled Resort**

### *The Resort Vision Was Always There*

83. While Bonner, Ford, and Turner marketed Rancho Santana to American consumers as a private residential community, a resort may always have been the endgame. As Currey revealed in the 2023 video, the vision of both the original sellers of the 2,700 acres and the founders was to develop Rancho Santana into a resort, and "doing so, they would need the resources and influence from foreign investors."[10] In other words, the property owners who purchased lots in reliance on representations of a residential community were the "foreign investors" whose capital would fund the resort.

84. Ford further explained on the same video that "we were able to . . . grow the property into a greater and greater vision by putting tens of millions of dollars into it that we didn't need to get back immediately."[11] Whether those "tens of millions" came from the founders' own capital, from the owner dues pipeline described in Section C, or from some combination of both, the result

---

[10] The Story, at https://youtu.be/hLpEaP7HbuM?t=228.
[11] The Story, at https://youtu.be/hLpEaP7HbuM?t=1341.

was the same: the owners who purchased lots in reliance on representations of a residential community were funding the transformation of that community into a resort that would compete directly with them.

### Turner Builds the Inn

85. By 2010, the transformation was underway. Turner, then serving as CEO of Rancho Santana, led the way. As Turner admitted on the 2023 video, he realized that no residential community—"even if you're renting the homes"—would get the travel press coverage he sought. "The Press was never interested in covering us . . . they said, well you need to have an inn or a hotel; we just don't cover residential communities."[12] Turner convinced his co-founders to demolish the small existing four-unit hotel and erect a 17-room inn. The inn opened in March 2015.

86. Maish, who succeeded Turner as CEO in approximately 2020, described this openly as "the second phase of Rancho Santana . . . the phase of building the resort, putting Rancho Santana on the map."[13] Eventually, more accommodations and amenities were added to promote the resort: condos, residential suites, five-star chefs, wedding packages, and surfing and wellness retreats.

87. The implications for property owners were significant. As Currey admitted on the 2023 video, the resort component "allows us to have the price points, the occupancy, and the type of guest that you'd want to stay in your home."[14] Currey was referring to RSVR, the exclusive rental management program owned by Rancho SRL through which participating owners rent their homes. In other words, Rancho SRL's resort—a direct horizontal competitor to independently

---

[12] The Story, at https://youtu.be/hLpEaP7HbuM?t=1962.
[13] The Story, at https://youtu.be/hLpEaP7HbuM?t=2109.
[14] The Story, at https://youtu.be/hLpEaP7HbuM?t=2411.

renting property owners—was now dictating the terms under which those owners could rent their own homes.

***The Community Guidelines, Rental Guidelines, Building Guidelines, and Broker Regulations***

88. To consolidate developer control over the community-turned-resort, Rancho SRL promulgated a series of unilateral rules and regulations without owner consent: the Community Guidelines (effective June 1, 2022, described in Section C above), Rental Guidelines (September 2023), Building Guidelines (updated in 2025), and Broker Regulations (September 2024). Each of these instruments was drafted by Rancho SRL and imposed on property owners without negotiation, agreement, or vote.

89. The Rental Guidelines are particularly revealing. In late August 2022, Maish sent a letter to select owners announcing that beginning in 2023, third-party vacation rentals would not be permitted in Rancho Santana. All rentals would be funneled through the exclusive RSVR program, owned by Rancho SRL. As part of the rationale, Maish stated: "Rancho Santana should be differentiating itself and competing with other destinations rather than competing against ourselves."

90. On August 31, 2022, over one hundred owners, including CDM, sent a letter to Maish and the founders expressing concern "about the direction Rancho Santana is taking, as we believe it affects our property values, lifestyle and investments."

91. Maish responded by modifying the policy into the current Rental Guidelines, updated in September 2023. The Rental Guidelines provide, among other things, that Rancho SRL charges a "Resort Fee" of $15 plus taxes per guest per full day (capped at 15 days) for guests renting self-managed or third-party-managed owner properties who access Rancho SRL's private amenities.

Collecting the Resort Fee is the owner's responsibility, not Rancho SRL's, and the owner is subject to paying the Resort Fee and a penalty if a guest accesses a private amenity. Non-RSVR owners must report guest names, email addresses, and phone numbers to Rancho SRL within 72 hours of booking. Noncompliant property managers are subject to fines and suspensions.

92. The Rental Guidelines state explicitly: "rental management options should be limited to Rancho Santana's program offerings." Third-party commercial activity is "not allowed in Rancho Santana as a general rule," and the current exception for non-RSVR rentals "will continue only for as long as it's proving to be valuable and productive."

### The Discriminatory Resort Fee

93. The Resort Fee is discriminatory by design. RSVR owners are not charged the Resort Fee. Rancho SRL fixes their rental prices by agreement and takes a monthly fee, along with 35% of gross rental income. Non-commercial guests of owners—regardless of their participation in RSVR—are not charged the Resort Fee. Walk-in commercial guests who make dinner reservations at Rancho SRL's restaurants are likewise not charged the Resort Fee. Only the commercial guests of independently renting, non-RSVR owners are assessed the fee. The effect is to impose a tax on competition with Rancho SRL's own resort operations while exempting Rancho SRL and its RSVR partners from the same cost.

94. The resort component has also proven expedient to Rancho SRL in other ways. Rancho SRL has been known to shunt guests away from RSVR homes to Rancho SRL's own inn. Rancho SRL has also been known to house multiple employees overnight in empty RSVR homes without owner knowledge. Currey has admitted as much, though the overnight stays were purportedly for

quality control purposes only. Non-RSVR owners are not spared either: resort representatives have also been known to shunt guests of non-RSVR homes to RSVR homes.

### The Broker Regulations

95. The Broker Regulations, dated September 4, 2024, further entrench Rancho SRL's control over the real estate market within Rancho Santana. Under the Broker Regulations, as soon as a broker engages with a client within the Rancho Santana community, the broker must register the client's name with Rancho SRL. "Engagement" includes sharing content about Rancho Santana properties. A broker cannot represent past, present, or future guests renting any Rancho SRL accommodation. The broker must share the listing agreement, including list price, with Rancho SRL. The broker must share buyer and seller closing statements with the Rancho SRL real estate team before closing, which must include a reconciliation of the dues. "Failing these requirements will result in broker privileges being revoked and possible access restrictions to the new owner."

96. All listings must state: "This is an exclusive listing of Rancho Santana Property & Luxury Real Estate." The Broker Regulations thus require independent brokers to represent that Rancho SRL has an exclusive listing on properties that Rancho SRL does not own.

97. The Broker Regulations have been favorable to Rancho SRL. At the 2025 Owners Meeting, Maish reported that in 2024, over $19 million in real estate sales and more than 50 transactions had occurred in Rancho Santana, with 94 percent handled in-house through Rancho SRL's own brokerage. Maish also reported that almost all new buyers come as resort guests— whom independent brokers cannot represent because it is prohibited by the Broker Regulations.

98. On August 18, 2022, Maish spoke by phone with a non-RSVR owner who felt his property value, rental income, and ultimate livelihood would be threatened by the Broker Regulations and Rental Guidelines. Turner and other principals had specifically represented the freedom of home rentals as a means to buy into the Rancho Santana community. On that call, Maish repeatedly referred to Rancho Santana as a "resort property" and opined that the founders were free to manage it at will. Maish also noted that the founders and Board of Rancho SRL were aware of and involved in crafting the Rental Guidelines.

99. Currey, a Board member, was marketing Rancho Santana to prospects in a higher wealth class than legacy owners—prospects for whom rental income was not as important. As Currey put it, even amid a financial loss to the RSVR owner, "having the resort component allows us to have the price points, the occupancy, and the type of guest that you'd want to stay in your home."[15]

100. At the time of filing of this suit, under Maish's management, ranchosantana.com falsely represented that it is owned by "Tola Development Group," a group of colleagues and friends managing an "'accidental development'" that "has and continues to develop naturally from the interests our residents have in a certain lifestyle." That representation belies the truth buried in the Community Guidelines, where every owner must acknowledge that "Rancho Santana is a master planned community"—controlled by developers who have assumed the power of an HOA, who feel no need for formalities like a contract manifesting mutual agreement on services offered.

---

[15] The Story, *supra* note 13.

**E. The Retaliation Against CDM**

***CDM Stops Paying the Dues***

101. CDM's managing member, Julapalli, did not learn that no operative HOA had existed for years until 2023. It was that year that CDM decided to stop paying the so-called "dues" until Julapalli could obtain a more transparent accounting of what services the payments were purchasing.

102. On March 21, 2023—the day after Maish sent his "State of The Union, Rancho Santana" email—Costantino emailed Julapalli the invoice for the 2023 dues, then up to $4,576 and up 5% from 2022. Check and wire instructions were still directed to the Baltimore area.

103. When pressed to provide more details regarding line items in the budget, Costantino responded to Julapalli on May 22, 2023: "Mostly all the questions were answered according to Luke [Maish] at the [Owners] meeting and in his FAQ document. If there is a additional data you would like to see you in next year's budget, please send your request to Luke and I and we will review it during the budgeting period . . . We are not hiding anything, but at the same time don't have the bandwidth to field questions from 400+ owners."

104. After several more email exchanges about the budget, Julapalli emailed Costantino on May 28, 2023, that he was open to making a payment but first needed more trust about what the payment would be buying. Julapalli noted that along with many other owners he had been under the assumption for years, based on numerous representations, that the annual payments had the authority of an HOA behind them—when no such HOA had existed, as management had known all along.

### *Costantino's Threats*

105. Costantino's email response on June 7, 2023, included the following ultimatum: "If you are opting to not to pay, then you will be passed on to our legal team and that will give us cause to cut water and electrical service to your lot." Costantino added, "Again, I hope all is going well with your house and I will be sure to drive by it when I am there in a few weeks since I didn't know you were building."

106. Costantino's reference to driving by CDM's house was not casual. Costantino traveled from Baltimore to Rancho Santana in mid-June 2023 to do precisely that, and again in May 2024 and May 2025 to attend the annual Owners Meetings. These trips further demonstrate that Costantino's dues-enforcement activities were directed from the United States and carried out through regular travel between Baltimore and Rancho Santana.

107. In numerous emails from March 21, 2023, through August 27, 2025, Costantino continued to represent the annual payments as "dues"—not as a demand for payment with no contractual agreement in place for transparently defined services between Rancho SRL and CDM. On August 27, 2025, Costantino sent Julapalli a semi-annual update that the balance owed on the dues was $17,552.62. CDM did not make the 2023, 2024, or 2025 dues payments.

### *The Water Skirmish and Blockade*

108. As taught by Ford in the *Palm Beach Letter*'s "Rental Real Estate 101" series, Julapalli had always intended, through CDM, to build a vacation rental home on G16 and to use a third party to rent it out. To that end, CDM broke ground on building a home on G16 in late June 2022.

109. Before breaking ground, Semenza, the ARC Administrator, requested two payments by email: a "Conceptual Review" fee of $1,000 plus tax on September 6, 2021, and a "Construction

Review and Inspections" fee of $2,677 (calculated based on square footage) on April 7, 2022. CDM paid the fees by wire transfer on October 8, 2021, and April 7, 2022, respectively. On both occasions the wire transfers went to a United States Wells Fargo account with "Tola Development Group, LLC" at 14 West Mt. Vernon Place in Baltimore as the recipient.

110. Julapalli never received nor signed building guidelines from Semenza, Rancho SRL, Tola, or any other party either at the time of purchase of G16 or around the time of the build.

111. From August 28, 2023, through September 6, 2023, after CDM had not made the 2023 dues payment, Maish and Costantino attempted to follow through on their threats to "get real." On multiple occasions during that period, Rancho SRL personnel tampered with the water meter and attempted to destroy the pipes leading to G16 and the adjacent lot of a neighbor, who had also stopped paying the dues until he knew exactly what the payments were purchasing.

112. One occasion involved an attempt to dig out the water line with a backhoe, which the neighbor, having just returned from surfing, stymied with an hours-long sit-in:



113. During this water skirmish, the neighbor witnessed Rancho SRL personnel entering onto the private property of G16 and into CDM's partially built home:



### *The False Claim of Governmental Authority*

114. Nicaraguan civil law guarantees basic services to consumers, including drinking water and electricity.

115. Rancho SRL was eventually forced to concede, on reprimand from the national water authority, that it could not cut off water or electricity to the property of CDM or any other owner.

116. Nevertheless, on a call in Nicaragua between Maish, a homeowner, and an attorney on May 12, 2025, Maish stated that he had acted to cut the water to G16 and the neighbor's adjacent

home under the authority of the Nicaraguan government. The reality was the opposite: the Nicaraguan government reprimanded Rancho SRL for distributing water without following the law. Maish did not have governmental authority to cut CDM's water; the government told Rancho SRL it could not do so.

117. On May 14, 2025, when the neighbor posted to fellow owners on the Listserv details about rights to water and electricity guaranteed under Nicaraguan law, Boothby responded: "Guys, Weren't you going to take this offline and argue with the other 2 owners who have decided not to contribute to the Rancho Santana community? This isn't the forum to air personal grievances. Move it off of this community wide communication channel please." Boothby's effort to suppress public discussion of the water and electricity rights issue on the Listserv is consistent with the pattern of concerted action described in Section G below.

### *The ARC Fines*

118. On multiple emails to Julapalli from April 10, 2024, through December 2, 2024, Semenza declared that fines would ensue for failure to comply with Rancho SRL's Building Guidelines.  On information and belief, Semenza knew that there was no signed agreement between Rancho SRL and Julapalli or CDM binding both parties to building terms.  And he certainly knew there was no HOA under whose authority he could enforce the Building Guidelines.

119. In an email to Julapalli on December 2, 2024, Semenza misrepresented that Julapalli had received the Building Guidelines when he had purchased the property.  Julapalli had not.

### *Continued Denial of Access*

120. The retaliation against CDM has continued and escalated. CDM's contractors, third parties, and guests have been denied access to G16 through Rancho SRL's control of the entry

gates and main road—the sole ingress to CDM's property, as depicted in the map in Section B above.

121. On information and belief, Rancho SRL personnel have entered onto G16 and CDM's partially built home without authorization on one or more occasions beyond those described above. Rancho SRL controls the sole point of access to G16, and CDM has no means of monitoring its property between visits.

122. As a direct result of the blockade, CDM's home on G16 remains partially built and uninhabitable. CDM has been unable to complete construction, unable to enter the vacation rental market, and unable to generate the rental income that was the entire purpose of its investment—an investment made in reliance on the very representations that Bonner, Ford, Turner, and their publications made to Julapalli from 2012 through 2013.

123. CDM's primary investment—the G16 property and its partially completed home—has been rendered unproductive by the conduct described herein. The financial depletion caused by the blockade has been felt in Texas, where CDM is organized, where its managing member resides, and where its bank accounts have been maintained. CDM has suffered and continues to suffer actual damages including loss of anticipated rental income, cost of interrupted construction, loss of use of its property, property deterioration, and diminution in property value.

**F. The Nicaraguan Easement Proceeding**

124. There is a pending proceeding in Nicaragua between CDM, several other property owners, and Propiedades Habitacionales Internacionales, S.A. ("International Living") concerning a recorded easement providing access to G16 and other lots (the "Nicaraguan Easement

Proceeding"). The Nicaraguan Easement Proceeding is a narrow dispute over the scope and enforceability of a recorded easement.

125. The Nicaraguan Easement Proceeding has been pending for multiple years. In January 2026, the presiding judge visited the property. In early March 2026, counsel for International Living argued that the proceeding had been brought against the wrong defendant, on the theory that International Living had sold most of the property to Rancho SRL. The court rejected that argument. A decision on the merits remains pending.

126. The Nicaraguan Easement Proceeding involves a single cause of action against a single defendant—International Living. By contrast, CDM's claims in this action involve nine individual defendants and five entity defendants, span more than twenty-five years of conduct, and arise under RICO, the Sherman Act, the Lanham Act, and Texas statutory and common law.

## G. The Pattern Affecting Other Owners

127. CDM's experience is not isolated. The conduct described in this complaint has affected hundreds of property owners at Rancho Santana, the full dimensions of which are not yet known. The following facts, drawn from owner communications, meeting transcripts, and survey data, illustrate the broader pattern.

### *The 2023 Owners Meeting*

128. At the 2023 Owners Meeting, multiple owners questioned the basis for the dues and the legal authority under which they were being collected. Julapalli challenged Maish directly on the inconsistency of tying dues to services while charging empty-lot owners—who received no services—the same amount as owners with completed homes.

129. Maish's response was revealing. He stated that "people that decide they're not going to pay dues, we're basically going to have to get real about that . . . you'll be denied access . . . denied the services . . . water and electricity too." When an owner asked, "Since the HOA was shut down . . . is there a legal finding, a legal document binding the owners and developers?" Maish responded that "there's basically our community guidelines and rules." He added: "We're not a democracy." And: "we do not have any intention to create an infrastructure that . . . lets the property owners in."

130. When asked by an owner whether an external auditor would be brought in to review the basis for the dues, Maish responded, "This idea of auditing a company and all this, it's not something we're gonna sign up for."

131. At the same meeting, Maish sought to rally owner support for his enforcement posture: "Many, many, many owners have already bought into it." Maish was not merely announcing a developer policy; he was actively enlisting property owners as participants in a collective effort to enforce the dues against those who questioned them.

132. Geerling and her husband were also present at the meeting. Geerling's husband spoke at length, aligning himself with the developer's position and directing hostility at owners who had stopped paying the disputed dues. He acknowledged that dissatisfied owners "feel peeved because they bought into something and it's now becoming something else"—a concession that the transformation from residential community to resort was real and recognized. But he dismissed their grievances: "We don't own the company that started this. It's not open for us to own it. It's a private company." He characterized non-paying owners as people who "can't even come to this meeting because they actually haven't paid their dues." He warned that owners with access to many

of the resources at Rancho Santana, "whether we like this or not, we're not legally entitled to" and that access to such resources was "a matter of goodwill." He vouched for the founders as "cute, intelligent, extremely good businessmen" who were "not out to rook anyone." And he concluded by addressing Maish directly: "But believe me, you're not getting a seat on a board in a private company of this nature." Many of the attending owners applauded in agreement. But these statements, made in Geerling's presence and with her apparent endorsement, reinforced the developer's position that Rancho Santana is not subject to owner governance and that owners who object to the dues or the resort transformation should accept unilateral developer control or leave.

### The 2024 Owners Meeting

133. At the 2024 Owners Meeting, Maish repeated and expanded on his position: "it's not governed by an HOA . . . there's no plans to create an HOA . . . there's no intention to create an HOA . . . there's no clear legal path." He described Rancho Santana as "a gated resort community" in which "Rancho Santana has the right to basically create rules, impose fees."

134. The 2024 Owners Meeting also revealed the hostility directed at owners who had stopped paying the disputed dues. One owner stated: "This policy was brought on because there's a handful of people who don't pay dues who are essentially saying fuck you and fuck all the other residents here."

135. The same owner went further, suggesting that if a non-paying owner "gets in a car accident, it happens to hit" electrical infrastructure serving the non-payer's property—in other words, suggesting "accidental" sabotage of utilities to punish owners who did not pay. A number of attendees laughed following the suggestion. Maish, who had been rallying owners to side with

management on the dues issue throughout the meeting, did not disavow the suggestion. His only response was to say, belatedly: "So what you can do is soft action . . . not hard action."

136. These statements were not isolated outbursts. They reflect a concerted atmosphere in which paying owners—encouraged by Rancho SRL's management—have aligned with the developer to pressure, ostracize, and punish owners who question the legitimacy of the dues or the absence of an HOA.

### *Boothby's Advocacy*

137. Boothby has been a particularly vocal participant in this dynamic. On a September 6, 2022, Listserv email to fellow owners titled "A Step in the Right Direction," Boothby described Maish's initially proposed rental policy as "fiscal and amenity equity." He characterized non-paying owners as those who "haven't contributed fully to our Community" and who "rent their homes at submarket rates and provide their guests a submarket experience."

138. On April 25, 2023, Boothby sent another Listserv email to fellow owners titled "Contribute to Our Rancho Santana Community." He urged owners to contribute because "[t]he Developer has invested tens of millions of dollars into the project without profit as a motivator." Boothby then advised owners who questioned the dues or the Resort Fee: "If you cannot see this future with you in it than life is way too short to create a mythical battle over low annual dues or $25 a day resort fee. It might be a healthier choice to benefit financially and then find a new option for yourself."

139. On information and belief, Boothby is one of the owners who has been pressing Costantino to collect dues from owners who have stopped paying. Boothby's Listserv advocacy, his participation in the RSVR program, and his efforts to suppress discussion of water and

electricity rights (as described in Section E above) are consistent with a horizontal agreement among participating owners and the developer to exclude non-compliant owners from the Rancho Santana market.

### *The Owner Survey*

140. The September 2022 survey of 101 Rancho Santana property owners, referenced in Section B above, confirmed the breadth of the marketing scheme and the owner base it created. The survey also revealed the depth of owner engagement with the community—and, by implication, the number of owners affected by the conduct described in this complaint. Approximately 423 independently owned lots exist at Rancho Santana, each paying annual dues that have grown from modest amounts in the early 2000s to nearly $6,000 per lot by 2025.

141. The pattern of conduct described in this complaint—the serial HOA fraud, the transformation to a developer-controlled resort, the discriminatory rental and brokerage restrictions, and the retaliation against owners who question the scheme—affects not only CDM but all property owners at Rancho Santana. Many of those owners fear, should they push back, what retaliation will befall them. The full dimensions of the harm are not yet known.

**COUNT I**
**Violation of RICO**
**[18 U.S.C. § 1962(c)]**
**(against Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza,**
**Geerling, Boothby, and Agora)**
**(collectively, "RICO(c) Defendants")**

142. CDM re-alleges and incorporates by reference all preceding paragraphs.

143. Pursuant to 18 U.S.C. § 1961(3), each RICO(c) Defendant is a "person" capable of holding a legal or beneficial interest in property.

144. Pursuant to 18 U.S.C. § 1961(4), RICO(c) Defendants, together with Tola, RS Inc., International Living, and Rancho SRL, constitute an enterprise (the "Agora Enterprise"). The Agora Enterprise is an association-in-fact of individuals and entities that share a common purpose, maintain an ongoing organizational structure, and function as a continuing unit. The Agora Enterprise exists independently of the racketeering activity alleged herein: it has operated continuously for more than twenty-five years, employs hundreds of people, manages a 3,000-acre development and resort, and generates millions of dollars in annual revenue through hospitality, real estate, and property management operations.

145. At the hub of the Agora Enterprise are Bonner, Ford, Turner, and Agora. Tola, RS Inc., International Living, and Rancho SRL have served as its operational vehicles. Maish, Currey, Costantino, Semenza, Geerling, and Boothby have served as managers, enforcers, and advocates at its periphery.

146. The Agora Enterprise has an ascertainable structure apart from its racketeering activity. The enterprise's legitimate operations—developing property, managing a resort, providing hospitality services—are distinct from the racketeering conduct that has corrupted the enterprise's relationship with property owners.

147. Each RICO(c) Defendant has conducted or participated, directly or indirectly, in the conduct of the Agora Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

**Predicate Acts of Racketeering**

*Mail Fraud and Wire Fraud [18 U.S.C. §§ 1341, 1343]*

148. RICO(c) Defendants Bonner, Ford, Turner, Currey, Geerling, and Agora devised and participated in a scheme to defraud property owners, including CDM, by representing Rancho Santana as a private residential community with rental opportunities and a functioning HOA—while furthering a scheme to transform Rancho Santana into a developer-controlled resort through a fraudulent HOA structure. Numerous mails and wires furthered that scheme, including but not limited to the following:

a. In repeated email and post-mail cross-promotions by Agora's *Palm Beach Letter* and *International Living* from October 1, 2012, through December 16, 2013, Ford pitched Julapalli the promise of investing, retiring, and making rental income in Nicaragua—including specifically Rancho Santana. These solicitations were sent by wire from Agora's operations in Baltimore to Julapalli in Texas.

b. In a letter sent by mail from Baltimore to owners on March 3, 2004, Turner pitched the 2004 Covenants, which replaced purportedly invalid bylaws, created a new HOA with lien power, limited annual increases in the dues to 10 percent without two-thirds owner approval, and declared the covenants to run with the land.

c. By FedEx from Baltimore on April 28, 2005, Turner and Bonner sent Edwards two signed copies of the 2005 Covenants, which were intended to extend to December 31, 2060, and created an HOA that actually ran for only two years.

d. On numerous dates from March 7, 2007, through August 2, 2012, Currey, as a longtime Board Member and Executive Vice President of Rancho SRL, was responsible along with

the founders for representing on ranchosantana.com that operative HOAs existed—when Currey and the founders knew they did not. These representations were transmitted by wire to consumers in the United States.

e. In a letter to owners on November 20, 2003, Geerling represented Rancho Santana as Nicaragua's "premier private residential community" while announcing an increase in HOA fees. She noted the fees were to be paid to APROSA and deposited directly into the HOA bank account, while her invoice directed payments to herself at an address in Miami.

f. In a series of email exchanges between Geerling and owners from September 15, 2023, through October 30, 2023, Geerling evaded direct questions about her knowledge of the HOAs and their legal legitimacy, as described in the Facts above.

g. The founders represented to CDM on its July 24, 2013, deed that CDM was to become a member of APROSA, with all attendant rights and obligations.

h. As late as June 6, 2023, on his personal blog, Ford represented that Rancho Santana still had HOA bylaws.

149. RICO(c) Defendants Maish, Costantino, and Semenza knew that Rancho Santana had no operative HOA, at least as far back as 2007 when no duties attendant to a properly functioning HOA were being performed. Yet they continued to make numerous representations over mail and wire to further the fraudulent scheme of extracting payments from owners in the name of fees and "dues," including but not limited to the following:

a. In emails to Julapalli from November 21, 2013, through March 16, 2022, Costantino repeatedly and fraudulently represented annually requested payments as "dues." These emails were transmitted by wire from Baltimore to Julapalli in Houston, Texas. CDM's reliance on

Costantino's characterization was justified because CDM's purchase and sale agreement and transfer deed explicitly stated that CDM was subject to APROSA, with all rights and obligations, backed by the power of lien.

b. CDM's payments, directed by Costantino's emails, were made by wire transfer from Houston, by check mailed from Houston, and by credit card. The beneficiaries rotated—Publishing Services, LLC; APROSA; PPNDS, LLC; Tola; 14W Administrative Services, LLC—but the destination was always Baltimore.

c. In an email on March 20, 2023, Maish admitted to owners that APROSA had been considered a failure and intentionally abandoned as an HOA. Maish then misrepresented that APROSA had been closed by "tax authorities"—when it had actually been terminated because it had failed to fulfill its legal obligations for years.

d. In numerous emails from March 21, 2023, through August 27, 2025, Costantino continued to represent the annual payments as "dues," not as a demand for payment with no contractual agreement in place for transparently defined services.

e. Semenza sent email requests for two payments on September 6, 2021, and April 7, 2022, as "review" fees under building guidelines that were purportedly enforceable on CDM's build on G16. CDM wired payments for the fees to Baltimore, under the impression that CDM was subject to an HOA.

f. On multiple emails to Julapalli from April 10, 2024, through December 2, 2024, Semenza declared that fines would ensue for failure to comply with Rancho SRL's Building Guidelines. On information and belief, Semenza knew that there was no signed agreement between Rancho SRL and CDM binding both parties to building terms.  Even assuming there was, Semenza

furthered the fraudulent scheme of enforcing Building Guidelines and Community Guidelines giving him and his co-conspirators quasi-HOA powers—including lien power—when they knew there was no HOA.

***Extortion [18 U.S.C. § 1951]***

150. RICO(c) Defendants Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Boothby, and Agora have committed, attempted to commit, or conspired to commit extortion.

151. These Defendants have known for years that there was no operative HOA binding owners to pay dues. Yet, still calling them "dues," they have extracted payments from CDM and other owners for "services" that they have refused to disclose fully or have audited by an independent third party.

152. They have done so under color of official right: invoking the authority of a nonexistent HOA with lien power that the Community Guidelines continue to proclaim to this day. The Community Guidelines, effective March 1, 2024, still grant Rancho SRL a lien that could attach to owner property to secure payment of delinquent assessments—an enforcement power derived from an HOA structure that no longer exists.

153. Executing their "get real" plan, Maish and Costantino have threatened owners who withhold payment pending transparent accounting with denial of access, denial of services, and cutoff of water and electricity.

154. Maish has acted on these threats. On a call on May 12, 2025, Maish stated that he had acted to cut CDM's water under the authority of the Nicaraguan government. The Nicaraguan government in fact reprimanded Rancho SRL for distributing water without following the law.

Maish did not have governmental authority to cut CDM's water; the government told Rancho SRL it could not do so.

155. Boothby has furthered the extortionate scheme by publicly pressuring non-paying owners to comply, euphemizing the dues as "Contribute to Our Rancho Santana Community," advising dissenters to "find a new option for yourself," and attempting to suppress owner discussion of water and electricity rights on the Listserv.

***Money Laundering [18 U.S.C. §§ 1956, 1957]***

156. RICO(c) Defendants Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, and Agora have committed money laundering and unlawful monetary transactions.

157. These Defendants have known for years that there was no HOA through which they were authorized to collect "dues" and architectural "review fees." Nevertheless, they have collected the dues fraudulently and under color of official right, as set forth above.

158. Over more than two decades, these Defendants have conducted numerous financial transactions transferring the proceeds by wire, credit card, check, and other means between banks of owners throughout the United States and abroad and banks primarily in Baltimore. The proceeds have flowed through a succession of Agora-affiliated entities—Publishing Services, LLC; APROSA; PPNDS, LLC; Tola; 14W Administrative Services, LLC—each receiving funds at or near Agora's headquarters address in Baltimore.

159. The financial transactions were designed to conceal or disguise the nature and source of the proceeds, by routing owner payments through rotating entities that obscured the fact that the funds were flowing to Agora and its principals.

*Transportation of Stolen Property [18 U.S.C. §§ 2314, 2315]*

160. RICO(c) Defendants Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, and Agora have transported and caused to be transported in interstate and foreign commerce funds obtained by fraud, in violation of 18 U.S.C. § 2314. These Defendants have also received, concealed, and disposed of funds moving in interstate and foreign commerce knowing them to have been obtained by fraud, in violation of 18 U.S.C. § 2315.

161. The funds transported include the annual owner dues—totaling approximately $2 million or more per year—collected from hundreds of property owners across the United States and abroad under the fraudulent representation that the payments were HOA dues enforceable by lien. The funds were transmitted by wire, check, and credit card from owners in Texas and other states, as well as from owners in foreign countries, to Agora-affiliated accounts in Baltimore, Maryland, through a succession of entities as described in the Facts above. CDM's own payments were transmitted from Houston, Texas, to Baltimore. The value of the funds transported in interstate and foreign commerce has exceeded $5,000 per year in each year from at least 2014 through 2025. In 2024 and 2025, individual owner dues alone exceeded $5,000 per lot.

*Travel Act [18 U.S.C. § 1952]*

162. RICO(c) Defendants Bonner, Ford, Turner, Costantino, and Agora have violated the Travel Act by traveling in interstate and foreign commerce and using facilities of interstate and foreign commerce with the intent to promote, manage, establish, carry on, and facilitate the unlawful activity described herein.

163. Agora has sent numerous United States mails via its publishing network to promote Rancho Santana. Over twenty-five years, the founders have traveled back and forth between the

United States and Nicaragua to promote investment in Rancho Santana by subscribers in Agora's publishing network, including CDM's managing member. Costantino has also engaged in such travel, including in May 2024 and May 2025 to attend the annual Owners Meetings, and in June 2023 to inspect CDM's property when it had not paid the dues.

*Pattern of Racketeering Activity*

164. The predicate acts described above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The predicate acts are related to each other through their common purpose—extracting payments from property owners through fraudulent HOA representations and enforcing compliance through threats and retaliation—and pose a continuing threat of racketeering activity, as the scheme remains ongoing.

165. The fraudulent HOA structure is the heart of CDM's RICO claims. Through a succession of entities and covenants—APROSA, Playa HOA, RSA, GRSA, RSCA, and the Community Guidelines—the founders and their affiliates created the appearance of legitimate homeowner governance in order to extract mandatory dues from hundreds of property owners. Those dues were then routed through rotating Agora-affiliated entities to bank accounts in Baltimore, where they were used to fund the development of a resort that competes directly with the property owners who helped pay for it.

*Domestic Injury*

166. CDM's injuries flow directly from this scheme. CDM purchased G16 in reliance on representations that it would be a member of APROSA with all attendant rights and obligations. CDM paid annual dues from 2014 through 2022 in reliance on those representations. And CDM's

managing member did not learn that no operative HOA had existed for years until 2023—at which point CDM stopped paying the so-called "dues."

167. CDM has suffered a domestic injury as a result of the pattern of racketeering activity. CDM is a Texas limited liability company with its principal place of business in greater Houston, Texas. CDM received the fraudulent solicitations in Texas. CDM transmitted dues payments from Houston-area banks. CDM's managing member resides in Texas and has felt the financial depletion of CDM's resources in Texas. CDM's primary investment has been rendered unproductive by the conduct described herein, and that injury has been experienced in Texas, where CDM's business operations, bank accounts, and managing member are located. Under the context-specific analysis prescribed by *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), CDM's injury is domestic.

168. As a proximate result of RICO(c) Defendants' violations of 18 U.S.C. § 1962(c), CDM has suffered injury to its business and property and is entitled to recover threefold damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II
### Violation of RICO
### [18 U.S.C. § 1962(a)]
**(against Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Agora, Tola, RS Inc., International Living, and Rancho SRL)
(collectively, "RICO(a) Defendants")**

169. CDM re-alleges and incorporates by reference all preceding paragraphs.

170. Pursuant to 18 U.S.C. § 1961(3), each RICO(a) Defendant is a "person" capable of holding a legal or beneficial interest in property.

171. RICO(a) Defendants have received income derived, directly or indirectly, from a pattern of racketeering activity in which they participated as principals, and have used and invested

a part of that income in the acquisition, establishment, and operation of the Agora Enterprise, which is engaged in and whose activities affect interstate and foreign commerce, in violation of 18 U.S.C. § 1962(a).

172. The income derived from the pattern of racketeering activity includes the annual dues and architectural review fees collected from hundreds of property owners, including CDM, through the fraudulent HOA scheme described above. That income has been funneled through Agora-affiliated entities in the United States—including Tola, PPNDS, and Agora itself—to bank accounts primarily in Baltimore.

173. The income has also been funneled into the pockets of the founders, along with the managers who run Rancho SRL's daily operations and implement its policies: Maish, Currey, Costantino, and Semenza.

174. The founders have reinvested the income derived from the pattern of racketeering activity into Rancho Santana's common areas and resort—both of which the founders ultimately own and control through RS Inc. This reinvestment has directly and proximately caused injury to CDM that is distinct from the injury caused by the predicate acts themselves: the reinvestment funded the transformation of Rancho Santana from a residential community into a developer-controlled resort that competes directly with CDM, erected barriers to CDM's entry into the vacation rental market, and led to the blockade of CDM's efforts to complete its home on G16.

175. CDM has suffered a domestic injury for the same reasons set forth in Count I.

176. As a proximate result of RICO(a) Defendants' violations of 18 U.S.C. § 1962(a), CDM has suffered injury to its business and property and is entitled to recover threefold damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT III**
**Violation of RICO**
**[18 U.S.C. § 1962(b)]**
**(against Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Agora,**
**Tola, RS Inc., International Living, and Rancho SRL)**
**(collectively, "RICO(b) Defendants")**

177. CDM re-alleges and incorporates by reference all preceding paragraphs.

178. Pursuant to 18 U.S.C. § 1961(3), each RICO(b) Defendant is a "person" capable of holding a legal or beneficial interest in property.

179. Through a pattern of racketeering activity, RICO(b) Defendants have acquired and maintained, directly or indirectly, an interest in and control of the Agora Enterprise, which is engaged in and whose activities affect interstate and foreign commerce, in violation of 18 U.S.C. § 1962(b).

180. The founders acquired and have maintained their controlling interest in the Agora Enterprise—including their ownership of Rancho Santana's resort, common areas, and operating entities through RS Inc.—in substantial part through income derived from the pattern of racketeering activity described above. The serial HOA fraud, the dues pipeline, and the rotating entities described in the Facts above were the mechanisms by which the founders acquired and maintained their control.

181. RICO(b) Defendants' acquisition and maintenance of control of the Agora Enterprise through a pattern of racketeering activity has directly and proximately injured CDM's business and property: CDM has been subjected to the rules, fees, and enforcement actions of an enterprise whose control was acquired through fraud, and has been blockaded from completing its home and entering the rental market by the very enterprise that was built with CDM's dues.

182. CDM has suffered a domestic injury for the same reasons set forth in Count I.

183. As a proximate result of RICO(b) Defendants' violations of 18 U.S.C. § 1962(b), CDM has suffered injury to its business and property and is entitled to recover threefold damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT IV**
**Violation of RICO**
**[18 U.S.C. § 1962(d)]**
**(against All Defendants)**

184. CDM re-alleges and incorporates by reference all preceding paragraphs.

185. Each Defendant has conspired to violate 18 U.S.C. § 1962(a), (b), and (c), in violation of 18 U.S.C. § 1962(d).

186. Each Defendant knew of and agreed to the overall objective of the RICO conspiracy: to extract payments from property owners through a fraudulent HOA structure, launder the proceeds through rotating Agora-affiliated entities, reinvest the proceeds in a developer-controlled resort, and retaliate against any owner who questioned the scheme.

187. Each Defendant's role in the conspiracy is set forth in the Facts above. The founders conceived and directed the scheme. Maish, Currey, Costantino, and Semenza implemented and enforced it. Geerling facilitated it through her early role in establishing the HOA framework and her later evasion of owner inquiries. Boothby furthered it through his public advocacy on the Listserv and his pressure on management to enforce dues collection against non-paying owners. Agora provided the marketing infrastructure and financial backbone. Tola, RS Inc., International Living, and Rancho SRL served as the operational vehicles through which the conspiracy was carried out.

188. As a proximate result of the conspiracy, CDM has suffered injury to its business and property and is entitled to recover threefold damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT V**
**Violation of Sherman Act Section 1**
**[15 U.S.C. §§ 15(a), 26]**
**(against Bonner, Ford, Turner, Currey, Geerling, Boothby, Agora,**
**Tola, RS Inc., International Living, and Rancho SRL)**
**(collectively, "Antitrust Defendants")**

189. CDM re-alleges and incorporates by reference all preceding paragraphs.

190. The relevant geographic market on the demand side is the United States, where the majority of buyers, owners, and vacation renters of Rancho Santana properties reside and from which purchasing and rental decisions are made.[16] The competition for buyers and renters takes place in the United States, through U.S.-directed marketing, U.S.-based publications, and U.S. financial transactions, even though the properties themselves are in Nicaragua.

191. The relevant product markets on the supply side are situated along Nicaragua's Emerald Coast, where the competing properties are located. There are two relevant product markets: (1) the higher-end private residential real estate market along Nicaragua's Emerald Coast, and (2) the higher-end vacation rental real estate market along Nicaragua's Emerald Coast. These market definitions are conservative because they include private residential and vacation rental properties along the Emerald Coast that do not offer the kind of access to world-class surf that properties within Rancho Santana uniquely do.

---

[16] Amber Gibson, Nicaragua's Accidental Resort Community Celebrates 20 Years, Forbes (July 26, 2017, 03:50pm EDT),  https://www.forbes.com/sites/ambergibson/2017/07/26/nicaraguas-accidental-resort-community-celebrates-20-years/.

192. Bonner, Ford, Turner, Currey, Geerling, and Boothby (collectively, "Antitrust Individual Defendants") all own homes in Rancho Santana. At least Ford and Boothby rent their homes to the U.S. market through the RSVR program. As independent homeowners, each Antitrust Individual Defendant has an independent economic interest in one or both of the relevant product markets, separate and apart from any interest held by Agora, Tola, RS Inc., International Living, and Rancho SRL (collectively, "Antitrust Corporate Defendants"). They are separate economic actors capable of conspiring within the meaning of Section 1 of the Sherman Act.

193. Antitrust Individual Defendants have conspired with each other, certain fellow property owners, and one or more of Antitrust Corporate Defendants to restrain trade in the relevant markets. The conspiracy involves two categories of conduct that are per se illegal under Section 1 of the Sherman Act: group boycott and price fixing.

***Group Boycott***

194. Antitrust Individual Defendants have conspired with each other and one or more of Antitrust Corporate Defendants to create and enforce the Community Guidelines, Rental Guidelines, Building Guidelines, and Broker Regulations—unilateral instruments promulgated without owner consent that restrict the ability of independent property owners, including CDM, to compete in the relevant markets.

195. This is not a case of an association enforcing its own rules on its members. There is no association. There is no HOA. There are no bylaws adopted by or agreed to by the property owners. The Community Guidelines, Rental Guidelines, Building Guidelines, and Broker Regulations were drafted by Rancho SRL and imposed on property owners without negotiation, agreement, or vote. The instruments derive their purported enforcement power from an HOA structure that does

not exist.  And as Maish admitted when he introduced the new Rental Guidelines, the common purpose of the conspiracy is to promote anti-competitive conduct: "Rancho Santana should be differentiating itself and competing with other destinations rather than competing against ourselves."

196. The conspiracy has been accompanied by plus factors establishing that the agreement goes beyond mere parallel conduct or vertical adherence to a developer's policies: At the 2023 Owners Meeting, Maish actively rallied owners to side with management on dues enforcement, stating: "Many, many, many owners have already bought into it." At the 2024 Owners Meeting, an owner publicly condemned non-paying owners and suggested "accidental" sabotage of infrastructure serving non-payers' properties; other attendees laughed, and Maish did not disavow the suggestion. Boothby, an independent homeowner and RSVR participant, has publicly advocated for the Rental Guidelines on the Listserv, on information and belief pressured Costantino to collect dues from non-paying owners, characterized non-payers as owners who "haven't contributed fully to our Community," advised dissenters to "find a new option for yourself," and attempted to suppress discussion of water and electricity rights. Costantino has threatened CDM and other non-paying owners that their properties will be blacklisted with respect to all prospective brokers. And Rancho SRL has closed its gates to CDM's contractor and denied access to CDM's guests, third parties, and invitees—physically excluding CDM from the relevant markets.

197. Geerling's participation in the antitrust conspiracy is independently established. As a longtime homeowner with an independent economic interest in the residential real estate market at Rancho Santana, Geerling benefits from the exclusion of independent competitors and the

maintenance of the developer-controlled resort model that supports her property values. Geerling is uniquely positioned among the Antitrust Individual Defendants to have revealed the illegitimacy of the HOA framework: she served as International Living's General Manager and legal representative during the foundational years of Rancho Santana and personally collected HOA fees from owners as early as 2003. Yet when owners sought information about the HOA's history and legitimacy on the Listserv in September and October 2023, Geerling evaded their questions, deflected with procedural objections about Spanish-language execution, claimed she could not form an opinion, and refused to answer a direct question about why elections were never held after 2007. Geerling's deliberate suppression of information that would have armed owners to challenge the dues-enforcement scheme and the group boycott is an overt act in furtherance of the conspiracy. At the 2023 Owners Meeting, Geerling's husband—speaking in her presence—endorsed the developer's position that Rancho Santana is "a private company," that owners are "not getting a seat on a board," that non-paying owners "can't even come to this meeting," and that continued access to resources is merely "a matter of goodwill." These statements, made with Geerling's apparent endorsement, demonstrate the Geerling household's active participation in the concerted effort to enforce unilateral developer control and exclude owners who question the scheme.

198. The group boycott has caused CDM to be barred from completing its home on G16 and from entering the relevant markets to compete with Antitrust Defendants for the U.S. consumer.

### *Price Fixing*

199. The RSVR program serves as a price-fixing mechanism. As Currey admitted in the 2023 video, Rancho SRL's resort dictates the price points for independently owned rental

properties participating in RSVR—properties that are horizontal competitors to Rancho SRL's own inn and accommodations.

200. Rancho SRL fixes RSVR rental prices by agreement with participating owners and takes a monthly fee along with 35% of gross rental income. Boothby, an RSVR participant, has endorsed this scheme, characterizing independent non-RSVR owners as those who charge "submarket rates" and provide a "submarket experience"—defining the "market" not by free competition but by the prices that Rancho SRL sets through its own program. The Rental Guidelines further restrict competition by imposing the discriminatory Resort Fee on non-RSVR owners' commercial guests while exempting RSVR owners, non-commercial guests, and walk-in resort guests. The effect is to penalize independent competition and coerce owners into the RSVR program—where Rancho SRL captures revenue through RSVR fees, commissions on rental income, maintenance fees, and brokerage fees, leaving participating owners with little or no profit.

201. The Rental Guidelines explicitly state that "rental management options should be limited to Rancho Santana's program offerings" and that third-party commercial activity "is not allowed in Rancho Santana as a general rule." The current exception for non-RSVR rentals "will continue only for as long as it's proving to be valuable and productive."

202. The Broker Regulations further entrench the conspiracy by requiring all independent brokers to register clients with Rancho SRL, share listing agreements and closing statements with Rancho SRL, and represent on all listings that the property is "an exclusive listing of Rancho Santana Property & Luxury Real Estate." Non-compliance results in "broker privileges being revoked and possible access restrictions to the new owner." The result, as Maish reported at the

2025 Owners Meeting, is that 94 percent of real estate transactions are handled in-house through Rancho SRL's own brokerage.

### *Antitrust Injury*

203. CDM has suffered antitrust injury—injury of the type the antitrust laws were intended to prevent. CDM is an independent property owner and prospective competitor in both relevant product markets. CDM has been physically excluded from completing its home and entering the vacation rental market. CDM is also unable to sell G16 at a price reflecting fair market value, because the Broker Regulations funnel 94 percent of transactions through Rancho SRL's own brokerage, the Community Guidelines impose a lien for unpaid dues that CDM disputes, and any sale requires a "Clearance Certificate" from Rancho SRL showing no outstanding payments—effectively conditioning CDM's ability to exit on submission to the very scheme CDM challenges. CDM's exclusion from both the rental and resale markets is the direct result of a concerted refusal to deal, not a unilateral business decision by a single actor. The injury flows from the anti-competitive character of the conspiracy, not merely from a property-governance dispute.

### *FTAIA*

204. The Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, does not bar CDM's claims. The conduct described herein—marketing directed at U.S. consumers, dues collected from U.S. owners through U.S. banks, rental and brokerage restrictions affecting U.S. property owners competing for U.S. guests—has a direct, substantial, and reasonably foreseeable effect on U.S. domestic commerce. Hundreds of U.S. property owners are affected. Millions of dollars in annual dues flow to U.S. bank accounts. The marketing campaign was conceived in Baltimore, executed

through U.S. publications, and directed at U.S. consumers. CDM's antitrust claims arise directly from that effect on U.S. commerce.

205. Antitrust Defendants have therefore violated 15 U.S.C. § 1, and CDM seeks treble damages and injunctive relief for its antitrust injury pursuant to 15 U.S.C. §§ 15(a) and 26.

**COUNT VI**
**Violation of Lanham Act Section 43(a)**
**[15 U.S.C. § 1125(a)(1)(B)]**
**(against Bonner, Ford, Turner, Maish, Currey, Agora,**
**Tola, RS Inc., International Living, and Rancho SRL)**
**(collectively, "Lanham Act Defendants")**

206. CDM re-alleges and incorporates by reference all preceding paragraphs.

207. Lanham Act Defendants have violated 15 U.S.C. § 1125(a)(1)(B) by making false and misleading representations of fact in commercial advertising and promotion in connection with the sale of real property and vacation rental services at Rancho Santana.

208. The false and misleading representations include, but are not limited to, the following:

a. from at least May 2000 through the present, representations on ranchosantana.com that Rancho Santana is an "accidental development" that "has and continues to develop naturally from the interests our residents have in a certain lifestyle"—when in fact it is a "master planned community" controlled by the developer;

b. from at least March 2009 through at least August 2012, representations on ranchosantana.com that "[a] master association and various sub-associations exist so that you can be assured that high and consistent standards of quality will be maintained"—when in fact no legitimate, owner-accountable HOA existed during that period;

c. in a 2007 FAQ document on ranchosantana.com, a representation that the HOA then in place owned or would own Rancho Santana's common facilities—which never happened;

d. in a March 2010 blog post on ranchosantana.com, a representation that "Rancho Santana is a safe and prudent decision" where you would "know the developer and the development in a way that you can trust" and where the accounting books would not be "'cooked'"—while the developer and development were concealing the dysfunctional HOA governance structure and have been refusing any attempt to determine whether the accounting book are being "cooked";

e. in cross-promotional emails between the *Palm Beach Letter* and *International Living* from October 2012 through December 2013, representations to U.S. consumers that Rancho Santana was a residential community with rental opportunities, a functioning HOA, and privacy—while the founders were transforming Rancho Santana into a developer-controlled resort;

f. in the Broker Regulations, a requirement that all listings state "This is an exclusive listing of Rancho Santana Property & Luxury Real Estate"—compelling independent brokers to make a false representation; and

g. to date on ranchosantana.com, representations in an "Employers' Compliance" document containing three separate references to an HOA, including a social responsibility policy referencing "members of the Association of Owners of Houses of Playa Rosada"—that is, APROSA, an entity terminated by the Nicaraguan government in October 2022.

209. These representations constitute "commercial advertising or promotion" within the meaning of 15 U.S.C. § 1125(a)(1)(B). Under the test adopted by the Fifth Circuit in *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996), representations qualify as "commercial advertising or promotion" when they are (1) commercial speech, (2) by a defendant in commercial competition with the plaintiff, (3) for the purpose of influencing consumers to buy the defendant's

goods or services, and (4) disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. Each element is satisfied here. The representations were commercial speech by competitors in the real estate and vacation rental markets, made for the purpose of influencing U.S. consumers to purchase property and rental services at Rancho Santana, and disseminated widely through Agora's publications, ranchosantana.com, social media, and travel websites. A September 2022 survey of 101 Rancho Santana owners confirmed that 35.64% first heard about Rancho Santana through an Agora publication and another 36.63% through a family member or friend, many of whom were themselves Agora subscribers. The representations were part of an "organized campaign to penetrate the relevant market." *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).

210. The representations were false or misleading. Rancho Santana was not an "accidental development." No legitimate, owner-accountable HOA existed during the periods of the website representations. The community was not developed with "privacy in mind"—it was developed as a resort. The Broker Regulations' compelled "exclusive listing" language is false on its face.

211. The representations were material. They went to the core of the purchasing decision: whether Rancho Santana was a private residential community with owner governance, rental opportunities, and privacy—or a developer-controlled resort in which owners had no voice, no vote, and no independent ability to compete.

212. CDM has been injured by the false representations. CDM purchased G16 in reliance on representations of a residential community with a functioning HOA and rental opportunities. CDM's property has been rendered commercially unproductive by Lanham Act Defendants'

conduct—the same conduct that Lanham Act Defendants' false advertising concealed. CDM is a competitor in the relevant markets and falls within the zone of interests protected by the Lanham Act. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014).

213. CDM's competitive injury is directly traceable to Lanham Act Defendants' misrepresentations. CDM's inability to complete its home and enter the vacation rental market is the result of the blockade, the discriminatory Resort Fee, the Broker Regulations, and the retaliatory enforcement actions described in the Facts above. CDM is also unable to sell G16 at fair market value, as the title has been artificially encumbered by disputed liens and clearance-certificate requirements imposed under the authority of an HOA that does not exist. Lanham Act Defendants created the disability they now cite as evidence that CDM cannot compete.

214. The same enterprise that the FTC found in 2021 was deceiving consumers through unsubstantiated health claims and misleading financial representations was simultaneously deceiving property buyers through the misrepresentations described above. The FTC consent order barred Agora, Monument & Cathedral Holdings, and all subsidiaries from making unsubstantiated claims and misleading representations. The conduct alleged herein falls squarely within that pattern.

215. CDM seeks damages, including Lanham Act Defendants' profits derived from the wrongful acts, and injunctive relief pursuant to 15 U.S.C. § 1125(a).

**COUNT VII**
**Violation of Texas Free Enterprise and Antitrust Act ("TFEAA")**
**[Tex. Bus. & Com. Code § 15.21]**
**(against Antitrust Defendants)**

216. CDM re-alleges and incorporates by reference all preceding paragraphs.

217. Antitrust Defendants have engaged in a conspiracy to restrain trade that is per se unlawful, as described in Count V above.

218. Antitrust Defendants' unlawful conduct has injured competition involving Texas. Agora's publications—including the *Palm Beach Letter* and *International Living*—were directed at Texas consumers and solicited them to purchase property and enter the vacation rental market at Rancho Santana. CDM, a Texas LLC, was one such consumer. The Community Guidelines, Rental Guidelines, Broker Regulations, Resort Fee, and group boycott restrain the ability of Texas-based property owners to compete in the relevant markets and restrain the ability of Texas consumers to access competitive alternatives in those markets. The financial effects of the anti-competitive conduct have been felt in Texas, where CDM's business operations, bank accounts, and managing member are located, and where dues payments were transmitted from Texas banks to Baltimore.

219. Antitrust Defendants' unlawful conduct has injured CDM's business and property.

220. Antitrust Defendants' unlawful conduct has been willful and flagrant.

221. CDM therefore brings this action against Antitrust Defendants under the TFEAA for violating Tex. Bus. & Com. Code § 15.05(a).

**COUNT VIII**
**Common-Law Fraud**
**[Texas]**
**(against Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Agora,
Tola, RS Inc., International Living, and Rancho SRL)**
**(collectively, "Fraud Defendants")**

222. CDM re-alleges and incorporates by reference all preceding paragraphs.

223. Fraud Defendants made multiple material and false representations to CDM, including but not limited to the following:

a. that Rancho Santana was a private residential community with a functioning HOA that owned or would own common facilities, when in fact the developers never intended to relinquish control to owners and serially created, replaced, and abandoned HOA structures without permitting any to mature into a legitimate, owner-controlled governance body.;

b. that CDM was a member of APROSA with all attendant rights and obligations, as represented in CDM's purchase and sale agreement and transfer deed, when in fact APROSA was not functioning as an HOA and had not fulfilled its legal obligations for years before being formally terminated by the Nicaraguan government in October 2022.;

c. that the annual payments were "dues" owed to an HOA and enforceable by lien, when in fact no operative HOA existed and the payments were routed through a succession of Agora-affiliated entities to bank accounts in Baltimore;

d. that Rancho Santana offered rental opportunities for property owners, when in fact Fraud Defendants were simultaneously transforming Rancho Santana into a developer-controlled resort that would compete directly with independently renting owners and restrict their ability to rent through the Rental Guidelines, Resort Fee, and Broker Regulations; and

e. that CDM was subject to building guidelines enforceable by fines, when in fact CDM never received nor signed any building guidelines, and no contractual agreement existed between Rancho SRL and CDM binding both parties to building terms.

224. Fraud Defendants either knew the representations were false or made the representations recklessly, as positive assertions, and without knowledge of their truth. The knowledge element is established by, among other facts: Laura Davis's admission that "the theory was when you go in you sell all the land, you turn the HOA over to the community, and you get out.

That just didn't happen"; the September 2022 Board Memorandum in which Bonner, Ford, Turner, and Myles Norin expressly chose the "corporate model" over the "owner controlled model"; Maish's admission at the 2023 Owners Meeting that "There is no homeowners' association"; and APROSA's failure to report its Board of Directors or financial statements from 2014 through 2021.

225. Fraud Defendants made the representations with the intent that CDM act on them—specifically, that CDM purchase property at Rancho Santana and pay annual dues.

226. CDM justifiably relied on the representations. CDM's purchase and sale agreement and transfer deed explicitly stated that CDM was subject to APROSA with all rights and obligations. CDM paid annual dues from 2014 through 2022 in reliance on Costantino's repeated characterization of the payments as HOA "dues." CDM did not discover that no operative HOA had existed for years until 2023, when it stopped paying the purported dues.

227. CDM's reliance on the representations has caused it injuries, including but not limited to the loss of dues payments made under false pretenses, the loss of architectural review fees paid under false pretenses, the cost of interrupted construction, loss of anticipated rental income, loss of use of its property, property deterioration, and diminution in property value.

228. CDM seeks actual and exemplary damages for its injuries. CDM's fraud claims are timely under the injury-discovery rule. The history of the serial HOAs at Rancho Santana was intentionally obscured by Fraud Defendants, as described in the Facts above. CDM did not discover, and could not through reasonable diligence have discovered, the full scope of the fraudulent HOA structure until 2023, when Maish's "State of The Union" email in March 2023 and his admissions at the 2023 Owners Meeting revealed that no operative HOA had existed for years. Even then, the extent to which a legitimate, owner-controlled HOA had never functioned as

represented to buyers—as distinguished from having merely lapsed—did not become apparent until further investigation by CDM and other owners in 2023. CDM filed this action on December 22, 2025, well within the applicable four-year limitations period.

**COUNT IX**
**Trespass to Real Property**
**[Texas]**
**(against Rancho SRL)**

229. CDM re-alleges and incorporates by reference all preceding paragraphs.

230. CDM owns real property—G16 and the partially completed home on it.

231. On multiple occasions, one or more agents of Rancho SRL entered onto G16 and into the home without authorization. These entries include the incidents during the water skirmish from August 28, 2023, through September 6, 2023, described in the Facts above, when Rancho SRL personnel were witnessed entering CDM's property and occupying CDM's partially built home. On information and belief, Rancho SRL personnel have entered onto G16 and the home without authorization on one or more additional occasions, as described in the Facts above. Rancho SRL controls the sole point of access to G16, and CDM has no means of monitoring its property between visits.

232. Each entry was physical, intentional, voluntary, and unauthorized.

233. The trespass has been deliberate and willful, has resulted from fraud, malice, or gross negligence, and has caused actual property damage.

234. Rancho SRL's trespass has caused injury to CDM's right of possession.

235. The trespass is ongoing and continuing. Rancho SRL's control of the sole access point to G16 gives it the ability—and, as the factual record demonstrates, the willingness—to enter CDM's property at will without CDM's knowledge or consent. CDM's claims are not time-barred

because the trespass is continuing in nature and CDM has alleged entries occurring within the limitations period.

236. CDM seeks actual and exemplary damages, as well as injunctive relief.

**COUNT X**
**Tortious Interference with Prospective Business Relations**
**[Texas]**
**(against All Defendants)**

237. CDM re-alleges and incorporates by reference all preceding paragraphs.

238. There was a reasonable probability that CDM would have entered into business relationships by marketing its home on G16, once completed, as a vacation rental property to U.S. consumers. CDM's managing member purchased G16 for precisely this purpose, as taught by Ford's "Rental Real Estate 101" series in the *Palm Beach Letter*. CDM organized as a Texas LLC, purchased G16, broke ground on a home in June 2022, paid architectural review fees, and was in the process of completing construction—all in preparation for entering the vacation rental market.

239. There was also a reasonable probability that CDM would have entered into a business relationship to sell G16 at fair market value, had the title not been artificially encumbered by disputed liens and clearance-certificate requirements imposed under the authority of an HOA that does not exist.

240. Each Defendant intentionally interfered with the formation of these relationships through one or more of the following independently tortious or unlawful acts: fraud, extortion, illegal boycott, and trespass, as set forth in the preceding Counts.

241. Each Defendant's specific role in the interference is set forth in the Facts above. The founders conceived and directed the scheme. Maish, Currey, Costantino, and Semenza implemented the blockade, the dues enforcement, the ARC fines, and the access restrictions.

Geerling facilitated the fraudulent HOA structure and evaded owner inquiries. Boothby advocated for enforcement against non-paying owners and pressured management to act. Agora provided the marketing and financial infrastructure. Tola, RS Inc., International Living, and Rancho SRL served as the vehicles through which the interference was carried out.

242. Each Defendant's interference has caused injuries to CDM, for which it seeks actual and exemplary damages.

## COUNT XI
### Civil Conspiracy
### [Texas]
### (against All Defendants)

243. CDM re-alleges and incorporates by reference all preceding paragraphs.

244. Each Defendant knowingly combined to facilitate the operation of the Agora Enterprise and to interfere with CDM's business relations through one or more of deception, fraud, racketeering, anticompetitive collusion, and trespass.

245. One or more of the co-conspirators committed unlawful, overt acts to further the operation of the Agora Enterprise, as described in the Facts and preceding Counts above.

246. Each Defendant's role in the conspiracy is set forth in the Facts and in Count IV above.

247. CDM has suffered injuries as a result of those wrongful acts, including actual and exemplary damages.

### PRAYER FOR RELIEF

248. Accordingly, CDM prays that this Court enter judgment against Defendants and award the following:

a. actual damages, including general damages and special damages of (i) loss of anticipated profits, (ii) mental anguish, (iii) cost of repair of land and improvements, (iv) loss of use

of land and improvements including loss of rental value, (v) mitigation costs, and (vi) stigma damages;

b. treble damages pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 15(a);

c. exemplary damages;

d. profits derived by Lanham Act Defendants from their wrongful acts, pursuant to 15 U.S.C. § 1125(a);

e. reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 15(a);

f. court costs;

g. prejudgment interest at the highest rate allowed by law;

h. postjudgment interest at the highest rate allowed by law;

i. permanent injunctive relief; and

j. all other and further relief to which CDM may be justly entitled.

## JURY DEMAND

249. CDM demands trial by jury on all issues so triable.

Dated: March 24, 2026      Respectfully submitted,

                 **JULAPALLI LAW FIRM, P.C**
                 By: */s/ Venodhar Julapalli*
                 **Venodhar R. Julapalli**
                 Texas Bar No. 24149116
                 Southern District of Texas
                 Federal ID No. 3943389
                 2950 F.M. 2920, Suite 180
                 Spring, Texas  77388
                 Telephone: (832) 699-1007
                 Facsimile: (281) 880-4889
                 drj@julapalliforjustice.com

                 ATTORNEY-IN-CHARGE
                 FOR PLAINTIFF
                 CASA DE MARAVILLA, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served on all parties of record through the ECF filing system on March 24, 2026.

*/s/ Venodhar Julapalli*
Venodhar R. Julapalli