**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CASA DE MARAVILLA, LLC | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | **CIVIL ACTION NO: 4:25-cv-06183** |
| | § | |
| WILLIAM BONNER, *et al.,* | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

<u>**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**</u>

Defendants, William Bonner, Mark Ford, Matthew Turner, Lucas Maish, Chris Currey, Paul Costantino, Matt Semenza, Gail Geerling, Christopher Boothby, Monument & Cathedral Holdings, LLC ("Agora"), Tola Development Group, LLC ("Tola"); Rancho Santana, Inc. ("RS Inc."); Propiedades Habitacionales Internacionales, S.A. ("International Living"); and Rancho Santana Inc. & Cía Ltda. ("Rancho SRL"), hereby file this Motion to Dismiss First Amended Complaint ("Motion").[1] The points and authorities in support of this Motion follow.

---

[1] On February 26, 2026, this Court granted leave to Defendants to file a Motion to Dismiss of up to 75 pages (ECF No. 22), which was granted before Defendants filed their Motion to Dismiss the original Complaint. A further Unopposed Motion for Leave to Exceed Page Limit was filed on March 31, 2026 (ECF No. 31), which remains pending before this Court. Because ECF No. 31 is still pending, Defendants file the instant Motion under the extant authority of ECF No. 22.

**TABLE OF CONTENTS**

I.    Introduction. .......................................................................................................... 10

II.   Summary of Allegations. ...................................................................................... 10

      A.   The Origin of Rancho Santana. ...................................................................... 10

      B.   The Governance of Rancho Santana. ...............................................................11

      C.   The Alleged "Transformation" of Rancho Santana from a Community to a Resort. .... 12

      D.   The *Palm Beach Letter* Reaches Venodhar Julapalli. ....................................... 13

      E.   Julapalli Forms CDM, Which Purchases Lot G16. .......................................... 13

      F.   For a Time, CDM and Julapalli Pay CDM's Dues. .......................................... 14

      G.   The Community Guidelines, Rental Guidelines, Building Guidelines, Broker Regulations. .................................................................................................. 14

      H.   The Termination of APROSA by the Nicaraguan Government. .................................. 15

      I.   CDM Stops Paying. ....................................................................................... 15

      J.   The "Blockade" of Lot G16. ........................................................................... 16

      K.   Allegations Specific to Defendants Currey, Semenza, Geerling, and Boothby. ............ 17

            1.   Chris Currey. ....................................................................................... 17

            2.   Matt Semenza. ..................................................................................... 18

            3.   Gail Geerling. ...................................................................................... 18

            4.   Christopher Boothby. ............................................................................. 19

III.  Argument. ............................................................................................................ 19

      A.   This Court Should Dismiss for *Forum Non Conveniens*. ................................... 19

            1.   Nicaragua Provides an Adequate Alternative Forum. ............................... 20

            2.   The Public and Private Interest Factors Weigh in Favor of Dismissal. ................... 21

      B.   This Court Should Dismiss for Lack of Personal Jurisdiction. .................................... 23

            1.   None of the Defendants Is Subject to General Jurisdiction in Texas. ...................... 23

            2.   None of the Defendants Is Subject to Specific Jurisdiction in Texas. ...................... 24

            3.   RICO's Nationwide Service Provision Does Not Apply. .......................................... 26

            4.   The Clayton Act's Nationwide Service Provision Does Not Apply. ......................... 28

            5.   18 U.S.C. § 1956(f) Does Not Apply. ....................................................... 30

      C.   This Court Should Dismiss the First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted. .............................................................. 30

            1.   Legal Standard. ................................................................................... 30

            2.   This Court Should Dismiss the Counts I to IV (RICO Claims). ............................ 31

a.  This Court Should Dismiss Count I (18 U.S.C. § 1962(c)). .............................. 31

   i.  Elements of a Claim Under 18 U.S.C. § 1962(c)......................................... 31

   ii.  CDM's Count I Fails to Plead Facts to Show a "Domestic Injury." ............ 31

   iii.  In the Alternative, CDM Fails to Plead Facts Sufficient to Show an Injury Attributable to Defendants Maish, Costantino, Semenza, Geerling, or Boothby. ...................................................................................................... 33

        (a)  Mail/Wire Fraud as to Gail Geerling. .................................................. 34

        (b)  Extortion. ............................................................................................. 36

        (c)  Money Laundering................................................................................ 37

        (d)  Transporting Stolen Money.................................................................. 39

        (e)  Travelling in Aid of Racketeering........................................................ 39

        (f)  Because Mail/Wire Fraud (as to Geerling), Extortion, Money Laundering, Transporting Stolen Money, and Traveling in Aid of Racketeering Fail, So Too Do CDM's Claims Against Defendants Maish, Costantino, Semenza, Geerling, and Boothby Under Count I. ................................................................................................ 40

b.  This Court Should Dismiss Count II (18 U.S.C. § 1962(a))............................. 41

   i.  Elements of a Claim Under 18 U.S.C. § 1962(a)........................................ 41

   ii.  CDM's Count II Fails to Plead Facts to Show a "Domestic Injury."........... 41

   iii.  CDM's Count II Fails to Plead Facts to Show a Nexus to Foreign Commerce. .................................................................................................. 42

   iv.  In the Alternative, CDM, Count II Fails to Plead Facts Sufficient to Show Any RICO Predicate Act Attributable to Defendants Maish, Costantino, Semenza, Tola, RS Inc., International Living, or Rancho SRL. .................. 43

c.  This Court Should Dismiss Count III (18 U.S.C. § 1962(b)) for Failure to State a Claim Upon Which Relief Can Be Granted............................................ 43

   i.  Elements of a Claim Under 18 U.S.C. § 1962(b). ...................................... 43

   ii.  CDM's Count III Fails to Plead Facts to Show a "Domestic Injury" or a Nexus to Foreign Commerce. ..................................................................... 44

   iii.  CDM's Count III Fails to Plead Facts Showing That Defendants Infiltrated an "Enterprise."........................................................................................... 44

   iv.  CDM's Count III Fails to Plead a Distinct Injury Proximately Caused by Any Defendant Acquiring an Interest in the Enterprise............................... 45

   v.  In the Alternative, CDM's Count III Fails to Plead Facts Sufficient to Show Defendant Maish, Costantino, Semenza, Geerling, Boothby, Tola, RS Inc., International Living, or Rancho SRL Participated in a Pattern of RICO Predicate Acts........................................................................................... 45

3

d.  This Court Should Dismiss Count IV (18 U.S.C. § 1962(d)) for Failure to State a Claim Upon Which Relief Can Be Granted. ........................................... 46

3.  The Court Should Dismiss Count V (Sherman Act) for Failure to State a Claim Upon Which Relief Can Be Granted. ................................................................. 47

a.  Extraterritoriality and the Foreign Trade Antitrust Improvements Act Bar the Claim as Pleaded. .............................................................................................. 48

b.  Even Absent the FTAIA Bar, Count V Fails to State a Claim Upon Which Relief Can Be Granted. ....................................................................................... 49

i.  Legal Standard. ........................................................................................... 49

ii.  CDM Has Failed to Plausibly Plead a Per Se Antitrust Violation. .............. 51

iii.  Market Definition, Market Power, and Rule-of-Reason Defects................. 53

iv.  CDM Does Not Plead Antitrust Injury and Proximate Causation. .............. 54

4.  This Court Should Dismiss Count VI (Lanham Act). ............................................... 56

a.  The Alleged Representations Do Not Constitute "Commercial Advertising or Promotion." ....................................................................................................... 56

b.  Several Alleged Representations are Non-Actionable Puffery, Opinion, or Omissions. ......................................................................................................... 57

c.  CDM Fails to Plausible Allege Competitive Injury. ........................................ 59

d.  CDM Fails to Allege the Representations Were Made "In Connection With" Goods or Services in Commerce. ..................................................................... 60

e.  CDM's Claims Are Untimely as to Certain Representations. ........................... 61

5.  This Court Should Dismiss the Remaining Tort Claims. .......................................... 62

a.  This Court Should Decline to Exercise Jurisdiction Over the Tort Claims Not Within Its Original Jurisdiction. ...................................................................... 62

b.  If this Court Retains Jurisdiction, It Should Dismiss the Tort Claims for Failure to State a Claim Upon Which Relief Can Be Granted. ......................... 63

i.  Count VII (Texas Free Enterprise and Antitrust Act). ................................. 63

ii.  Count VIII (Fraud). ..................................................................................... 65

iii.  Count IX (Trespass). ................................................................................... 70

iv.  Count X (Tortious Interference). ................................................................. 71

v.  Count XI (Civil Conspiracy). ...................................................................... 72

IV.  Conclusion. ................................................................................................................... 73

## TABLE OF AUTHORITIES

Cases　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page(s)

*Abraham v. Singh*,
　480 F.3d 351 (5th Cir. 2007)................................................................. 43, 44

*Agar Corp. Inc. v. Multi-Fluid Inc.*,
　No. 95-5105, 1997 WL 829340 (S.D. Tex. June 25, 1997) ..................... 25

*Agar Corp. v. Electro Circuits Int'l, LLC*,
　580 S.W.3d 136 (Tex. 2019) .................................................................. 72

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
　483 U.S. 143 (1987) .............................................................................. 42

*Apani Sw., Inc. v. Coca Cola Enters., Inc.*,
　300 F.3d. 620 (5th Cir. 2002)..................................................... 50, 53, 54

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) .......................................................................... 30, 31

*Austin Legal Video, LLC v. Deposition Solutions, LLC*,
　2024 WL 5184485 (W.D. Tex. 2024) ..................................................... 49

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 544 (2007) ................................................................. 30, 49, 71

*Bittinger v. Wells Fargo Bank*,
　744 F. Supp. 2d 619 (S.D. Tex. 2010) ................................................... 73

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
　429 U.S. 477 (1977) .......................................................................... 51, 55

*C & H Transp. Co. v. Jensen & Reynolds Constr. Co.*,
　719 F.2d 1267 (5th Cir. 1983)................................................................ 25

*Calder v. Jones*,
　465 U.S. 783 (1984) .............................................................................. 24

*California Clippers, Inc. v. U. S. Soccer Football Ass'n*,
　314 F. Supp. 1057 (N.D. Cal. 1970) ...................................................... 28

*Caller-Times Publ'g Co. v. Triad Commc'ns, Inc.*,
　826 S.W.2d 576 (Tex. 1992)................................................................... 63

*Chu v. Hong*,
　249 S.W.3d 441 (Tex. 2008).................................................................. 72

*Coinmach Corp. v. Aspenwood Apartment Corp.*,
　417 S.W.3d 909 (Tex. 2013)................................................................... 71

*Collins v. Morgan Stanley Dean Witter*,
　224 F.3d 496 (5th Cir. 2000).................................................................. 31

*Daimler AG v. Bauman*,
　571 U.S. 117 (2014)............................................................................... 23

*Defense Distributed v. Grewal*,
　971 F.3d 485 (5th Cir. 2020).................................................................. 24

*Den Norske Stats Oljeselskap AS v. HeereMac Vof*,
　241 F.3d. 420 (5th Cir. 2001)................................................................. 48

*de Pacheo v. Martinez*,
　515 F. Supp. 2d 773 (S.D. Tex. 2007) ................................................... 32

5

*Derrick Mfg. Corp. v. Southwestern Wire Cloth, Inc.*,
    934 F. Supp. 796 (S.D. Tex. 1996) ....................................................................... 61
*Destec Energy, Inc. v. Southern California Gas Co.*,
    5 F. Supp. 2d 433 (S.D. Tex. 1997), aff'd, 172 F.3d 866 (5th Cir. 1999) ................................ 63
*Diagnostic Affiliates of Ne. Houston, LLC v. Aetna, Inc.*,
    654 F. Supp. 3d 595 (S.D. Tex. 2023) .................................................................. 28
*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
    123 F.3d 301 (5th Cir. 1997) ............................................................................ 55
*Dominguez v. Target Corp.*,
    No. 5:18-CV-23, 2019 WL 1004569 (S.D. Tex. Feb. 8, 2019) .................................... 71
*Dunsby v. Transocean, Inc.*,
    329 F. Supp. 2d 890 (S.D. Tex. 2004) .................................................................. 22
*Edmark Indus. SDN. BHD. v. S. Asia Intern. (H.K.) Ltd.*,
    89 F. Supp. 2d 840 (E.D. Tex. 2000) .................................................................. 61
*Evans v. United States*,
    504 U.S. 255 (1992) ........................................................................................ 39
*F. Hoffman-LaRoche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) ........................................................................................ 48
*Fellows v. Universal Rests., Inc.*,
    701 F.2d 447 (5th Cir. 1983) ............................................................................ 27
*Frank v. PNK (Lake Charles) LLC*,
    947 F.3d 331 (5th Cir. 2020) ............................................................................ 23
*Gen. Retail Servs. v. Wireless Toyz Franchise, LLC*,
    255 F. App'x 775 (5th Cir. 2007) ...................................................................... 24
*Glenn v. BP p.l.c.*,
    27 F. Supp. 3d 755 (S.D. Tex. 2014), aff'd, 602 F. App'x 199 (5th Cir. 2015) ....................... 22
*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
    547 F.2d 266 (5th Cir. 2008) ............................................................................ 49
*GovernmentGPT Inc. v. Axon Enter. Inc.*,
    769 F. Supp. 3d 959 (D. Ariz. 2025) .................................................................. 28
*Greater Houston Transp. Co. v. Uber Techs., Inc.*,
    155 F. Supp. 3d 670 (S.D. Tex. 2015) ................................................................ 58
*Green v. State Bar of Texas*,
    27 F.3d 1083 (5th Cir. 1994) ............................................................................ 55
*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ........................................................................................ 36
*Halliburton Energy Servs. Inc. v. Ironshore Specialty Ins. Co.*,
    921 F.3d 522 (5th Cir. 2019) ............................................................................ 25
*Hanson v. Denckla*,
    357 U.S. 235 (1958) ........................................................................................ 24
*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010) ........................................................................................... 38
*Holland v. CryptoZoo Inc.*,
    No. 1:23-CV-00110, 2025 WL 2493065 (W.D. Tex. July 7, 2025) ...................... 26, 27
*Hydrokinetics, Inc. v. Alaska Meek, Inc.*,
    700 F.2d 1026 (5th Cir. 1983) .......................................................................... 25

*In re Pool Products Distribution Market Antitrust Litigation*,
  988 F. Supp. 2d 696 (E.D. La. 2013)................................................................................52
*Ipsen Biopharm Ltd. v. Galderma Lab'ys, L.P.*,
  660 F. Supp. 3d 538 (N.D. Tex. 2023)..............................................................................22
*IQ Products Co. v. Pennzoil Products Co.*,
  305 F.3d 368 (5th Cir. 2002)............................................................................................59
*Johnson v. TheHuffingtonPost.com, Inc.*,
  21 F.4th 314 (5th Cir. 2021)..............................................................................................26
*Karim v. Finch Shipping Co.*,
  265 F.3d 258 (5th Cir. 2001)............................................................................................19
*Leegin Creative Products, Inc. v. PSKS*
  551 U.S. 877 (2008) .........................................................................................................52
*Lexmark International, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)..........................................................................................................59
*McFadin v. Gerber*,
  587 F.3d 753 (5th Cir. 2009)............................................................................................24
*Monkton Ins. Services, Ltd. v. Ritter*,
  2013 WL 12100550 (W.D. Tex. Aug. 23, 2013), aff'd, 768 F.3d 429 (5th Cir. 2014) .............25
*Moody Nat. Realty v. Ozark Mgmt., Inc.*,
  No. 4:07-CV-3239, 2008 WL 8082760 (S.D. Tex. Apr. 22, 2008)...........................................70
*Motorola Mobility LLC v. AU Optronics Corp.*,
  775 F.3d 816 (7th Cir. 2015)............................................................................................48
*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
  781 F.3d 182 (5th Cir. 2015)............................................................................................46
*Norris v. Hearst Tr.*,
  500 F.3d 454 (5th Cir. 2007)............................................................................................49
*Northern Pacific R. Co. v. United States*,
  356 U.S. 1 (1958) ............................................................................................................50
*Ocasio v. United States*,
  578 U.S. 282 (2016) .........................................................................................................37
*Ohio v Am. Express Co.*,
  585 U.S. 529 (2018) .........................................................................................................50
*Patterson v. Dietze, Inc.*,
  764 F.2d 1145 (5th Cir. 1985)..........................................................................................25
*Pervasive Software, Inc. v. Lexware GMBH & Co. KG*,
  688 F.3d 214 (5th Cir. 2012)............................................................................................24
*Peykoff v. Cawley*,
  No. 24-10186, 2025 WL 1380070 (5th Cir. May 13, 2025)....................................................72
*Pillar Panama, S.A. v. DeLape*,
  No. CIV. A. H-07-1922, 2008 WL 1967118 (S.D. Tex. May 1, 2008)......................................61
*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981) ....................................................................................................20, 21
*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
  227 F.3d 489 (5th Cir. 2000)..................................................................................57, 58, 59
*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir.2005)..............................................................................................65

*Pohl v. Cheatham*,
 718 S.W. 3d 173 (Tex. 2025) ................................................................................. 63
*PSKS, Inc. v. Leegin Creative Leather Prods.*,
 615 F.3d 412 (5th Cir. 2010) ........................................................................... 49, 50
*Radiance Found., Inc. v. N.A.A.C.P.*,
 786 F.3d 316 (4th Cir. 2015) ................................................................................. 61
*Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*,
 428 F.3d 214 (5th Cir. 2005) ................................................................................. 22
*Reed v. Marshall*,
 699 F. Supp. 3d 563 (S.D. Tex. 2023) ................................................................... 64
*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
 842 F.3d 883 (5th Cir. 2016) ................................................................................. 50
*RJR Nabisco v. European Community*,
 579 U.S. 325 (2016) ................................................................. 31, 32, 33, 42, 44
*Rush v. Savchuk*,
 444 U.S. 320 (1980) ............................................................................................... 24
*Rx Solutions, Inc. v. Caremark, LLC*,
 164 F.4th 436 (5th Cir 2026) ........................................................... 50, 53, 54, 55
*Seiferth v. Helicopteros Atuneros, Inc.*,
 472 F.3d 266 (5th Cir. 2006) ................................................................................. 24
*Seven-Up Co. v. Coca-Cola Co.*,
 86 F.3d 1379 (5th Cir. 1996) ................................................................................. 57
*Sheshtawy v. Conservative Club of Houston, Inc.*,
 No. 4:16-CV-733, 2016 WL 5871463 (S.D. Tex. Oct. 7, 2016) ............................ 46
*Sonnier v. State Farm Mut. Auto. Ins. Co.*,
 509 F.3d 673 (5th Cir. 2007) ................................................................................. 31
*Spectators' Commc'n Network v. Colonial Country Club*,
 253 F.3d 215 (5th Cir. 2001) ................................................................................. 50
*St. Paul Mercury Ins. Co. v. Williamson*,
 224 F.3d 425 (5th Cir. 2000) ................................................................................. 41
*State Oil v. Khan*,
 522 U.S. 3 (1997) ................................................................................................... 50
*Sullivan v. Leor Energy, LLC*,
 600 F.3d 542 (5th Cir. 2010) ................................................................................. 65
*Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*,
 346 U.S. 537 (1954) ............................................................................................... 51
*Tilton v. Marshall*,
 925 S.W.2d 672 (Tex. 1996) .................................................................................. 72
*Tour Strategy LLC v. Star-Telegram, Inc.*,
 No. 4:18-CV-074-A, 2018 WL 3242280 (N.D. Tex. July 3, 2018) ......................... 64
*United States v. Fuchs*,
 467 F.3d 889 (5th Cir. 2006) ................................................................................. 38
*United States v. Pennell*,
 409 F.3d 240 (5th Cir. 2005) ................................................................................. 38
*United States v. Rashad*,
 687 F.3d 637 (5th Cir. 2012) ................................................................................. 37

*United States v. Rosenthal*,
  805 F.3d 523 (5th Cir. 2015)................................................................................ 46
*Van Duzer v. U.S. Bank Nat. Ass'n*,
  995 F. Supp. 2d 673 (S.D. Tex.), aff'd 582 F. App'x 279 (5th Cir. 2014)................................. 35
*Vanderbilt Mortgage*,
  735 F. Supp. 2d ...................................................................................... 44, 45
*Vasquez v. Bridgestone/Firestone, Inc.*,
  325 F.3d 665 (5th Cir. 2003)............................................................................... 20
*Veba-Chemie A.G. v. M/V Getafix*,
  711 F.2d 1243 (5th Cir. 1983).............................................................................. 20
*Viazis v. American Ass'n of Orthodontists*,
  314 F.3d 758 (5th Cir. 2002).......................................................................... 50, 54
*Wesdem, L.L.C. v. Illinois Tool Works, Inc.*,
  70 F.4th 285 (5th Cir. 2023)............................................................................... 65
*Williams v. WMX Technologies, Inc.*,
  112 F.3d 175 (5th Cir. 1997)............................................................................... 65
*World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*,
  803 F. Supp. 3d 1136 (W.D. Wash. 2025).................................................................... 28
*Yegiazaryan v. Smagin*,
  599 U.S. 533 (2023) ..................................................... 32, 33, 34, 35, 36, 38, 44

Statutes
15 U.S.C. § 6......................................................................................... 48
15 U.S.C. § 22........................................................................................ 28
15 U.S.C. § 1125..................................................................................... 60
15 U.S.C. § 1127..................................................................................... 61
18 U.S.C. § 1951.................................................................................. 36, 37
18 U.S.C. § 1952.................................................................................. 39, 40
18 U.S.C. § 1956.............................................................................. 31, 38, 39, 41
18 U.S.C. § 1957.............................................................................. 37, 38, 40
18 U.S.C. § 1961.................................................................................. 34, 36
18 U.S.C. § 1962.................................................... 31, 33, 36, 40, 41, 42, 43, 44, 46
18 U.S.C. § 1964.............................................................................. 31, 32, 33
18 U.S.C. § 1965.................................................................................. 26, 27
18 U.S.C. § 2314..................................................................................... 39
18 U.S.C. § 2315..................................................................................... 39
28 U.S.C. § 1332..................................................................................... 62
28 U.S.C. § 1367..................................................................................... 62
Tex. Bus. & Com. Code § 15 ..................................................................... 63, 64, 65
Tex. Civ. Prac. & Rem. Code § 16 ................................................................... 61, 70

Rules
Fed. R. Civ. P. 8................................................................................ 26, 30
Fed. R. Civ. P. 12............................................................................... 26, 30
Fed. R. Civ. P. 9........................................................................ 65, 66, 69, 70

## I.      Introduction.

On December 22, 2025, Plaintiff Casa de Maravilla, LLC ("CDM") filed a 113-page Complaint seeking to leverage the jurisdiction of this Court to address a dispute involving a parcel of real property on the Pacific Coast of Nicaragua. Rather than oppose Defendants' Motion to Dismiss, CDM elected to file the First Amended Complaint ("FAC"). While CDM made some changes to its pleading, those amendments are substantively superficial. The First Amended Complaint remains badly overpleaded (as CDM scours the United States Code and the common law to manufacture claims that might lead to relief in this Court) but ultimately empty. This Court should dismiss for three reasons: (1) under *forum non conveniens* to be heard in Nicaragua; (2) for lack of personal jurisdiction; and (3) for failure to state any plausible claim for relief.

## II.      Summary of Allegations.[2]

The First Amended Complaint spans 249 paragraphs. They can be summarized as follows:

### A.      The Origin of Rancho Santana.

1.      This action concerns CDM's interest in "Lot G16," located in the Rancho Santana development on the Pacific Coast of Nicaragua. FAC ¶ 3.

2.      CDM alleges that Defendants created Rancho Santana, a luxury resort in Nicaragua "as a vehicle to sell property" to subscribers of Agora, which is a publishing company in Baltimore. *Id*. ¶¶ 24 & 29.

3.      Defendants Bonner, Ford, and Turner caused the property that became Rancho Santana to be acquired in late 1997. *Id*. ¶ 33. Defendant Propiedades Habitacionales Internacionales, S.A. – which CDM calls "International Living" in the First Amended Complaint,

---

[2] Defendants assume the truth of all allegations for the purposes of this Motion only.

a rough translation of the Spanish name – was formed in Nicaragua to acquire that property in Nicaragua. *Id*. ¶ 16.

4.      Agora is alleged to have marketed that development through several of its publications, including *International Living* (and, beginning later in 2011, the *Palm Beach Letter*). *Id.* ¶ 38. Defendant Turner is alleged to have sent its first sales letter in or around 1997 offering Rancho Santana lots to subscribers of another publication, *The Oxford Club*, which lots sold out in approximately 48 hours. *Id*. ¶¶ 33 & 35.

**B.      The Governance of Rancho Santana.**

5.      CDM alleges that over 24 years, Defendants Bonner, Ford, and Turner – acting through International Living and unnamed "successor entities" – created, dissolved, and replaced a series of HOA structures at Rancho Santana. *Id*. ¶ 49.

6.      The first HOA entity, referred to in the First Amended Complaint as "APROSA," was formed and recorded in Nicaragua on June 2, 1998. *Id*. ¶ 50.

7.      Four years later, in May 2002, the founders and then-property owners formed "Playa HOA." *Id*. ¶ 51.

8.      In 2004, Defendant Turner pitched a new HOA. *Id*. ¶ 53. Turner explained that this was permitted because no bylaws were ever adopted or recorded. *Id*. Under a new set of 2004 Covenants, a new entity known as Rancho Santana Association S.A. came into being. *Id*.

9.      In 2005, International Living introduced a new set of 2005 Covenants proposing Greater Rancho Santana Association, S.A. as a super-HOA. *Id*. ¶ 54.

10.      In 2006, International Living introduced a new set of 2006 Covenants, which CDM alleges were the "brainchild" of the "founders" (presumably, based on context, intended to refer to Defendants Turner, Bonner, and Ford), International Living, Agora, and a nonparty Florida

11

Attorney and real estate developer. *Id*. ¶ 56. The 2006 Covenants recast APROSA as "Rancho Santana Community Association." *Id*.

11.    In 2007, the APROSA formation document was amended to parallel the 2006 covenants and was recorded. *Id*. ¶ 57.

12.    CDM alleges that the 2006 Covenants were not well received by unidentified "owners," who expressed that the reason that they had bought into Rancho Santana was that they understood it would be a private, gated residential community and not a resort. *Id*. ¶ 58.

13.    CDM alleges that, on various dates between March 31, 2009 and August 2, 2012, Rancho Santana's website represented that a functioning HOA existed, *id*. ¶ 59, and that a 2007 document on the website represented that the HOA owned or would come to own the "common facilities," which did not occur, *id*. ¶ 60. CDM also alleges that in March 2010, a blog post from an unidentified Rancho Santana sales manager touted Rancho Sanatana as "a safe and prudent decision" and made other related assurances. *Id*.

14.    The HOA documents and "developer" pages no longer appeared on the website by 2010. *Id*. ¶ 61.

### C.    The Alleged "Transformation" of Rancho Santana from a Community to a Resort.

15.    CDM alleges that the vision of both the "original sellers" and the "founders" was to develop Rancho Santana into a resort, and the property owners became "foreign investors" whose capital funded that development. *Id*. ¶ 83.

16.    By 2010, what CDM alleges was the "transformation" was underway. *Id*. ¶ 85. To further develop press attention to Rancho Santana, Defendant Turner and the co-founders built a 17-room inn, which opened in March 2015. *Id*. CDM alleges that, through the rental management

program owned by Rancho SRL, that resort dictated the terms under which owners could rent their homes in competition with the resort. *Id*. ¶ 87.

D.   The *Palm Beach Letter* Reaches Venodhar Julapalli.

17.   In 2012, Venodhar Julapalli (who would later become the managing member of CDM, *see id*. ¶ 3, and is counsel in this case) subscribed to the *Palm Beach Letter*, *id*. ¶ 42, and Julapalli further subscribed to *International Living* in March 2013, *id*. ¶ 43.

18.   CDM alleges that Julapalli received regular emails between October 2012 and December 2013 promoting and investment opportunities in and around Rancho Santana. *Id*. ¶¶ 42-43. One of the emails, which Julapalli received on March 9, 2013, touted Rancho Santana's affordability and surroundings. *Id*. ¶ 43.

E.   Julapalli Forms CDM, Which Purchases Lot G16.

19.   CDM alleges that Julapalli noted that Defendants Turner, Bonner, and Ford all owned homes in Rancho Santana, which influenced him to invest in property there. *Id*. ¶ 44.

20.   Julapalli travelled to Rancho Santana in April 2013, which led to an agreement to purchase the undeveloped lot designated G16. *Id*. ¶ 45.

21.   CDM admits that the "key" fact behind the decision to purchase Lot G16 was "its proximity to the Pacific and those world-class surf breaks, which were pitched as significantly raising private residential and vacation rental real estate market value." *Id*. ¶ 46. Because it is waterfront property, Lot G16 lacks direct access to the main road, so to reach Lot G16 requires travel across Rancho Santana property. *Id*. ¶¶ 45 & 121.

22.   Julapalli formed CDM on May 14, 2013 to purchase Lot G16, and CDM executed a purchase and sale agreement that same day. *Id*. ¶ 47.

23.     CDM's First Amended Complaint does not allege that any Defendant in this case was the seller of Lot G16. *See generally id.*[3]

24.     The purchase agreement disclosed that G16 was subject to the Rancho Santana Master Homeowners Association ("APROSA") and was to pay dues for maintenance of common elements. *Id.* ¶ 47. The deed, likewise, reflected that the owners were legally organized into two nonprofit associations. *Id.*

### F.     For a Time, CDM and Julapalli Pay CDM's Dues.

25.     CDM alleges that, between February 2014 and March 2022, Defendant Costantino emailed invoices to Julapalli for CDM's dues payments. *Id.* ¶ 74. CDM alleges that it paid those dues in those years, although that "[i]n certain years, Julapalli paid the dues personally on CDMs behalf, in effect loaning funds to CDM . . . ." *Id.*

### G.     The Community Guidelines, Rental Guidelines, Building Guidelines, Broker Regulations

26.     CDM alleges that Rancho SRL thereafter established a set of guidelines unilaterally binding the owners. *See id.* ¶ 88.

27.     The first of these was the "Community Guidelines," promulgated either June 1, 2022 or March 1, 2024 (the First Amended Complaint is inconsistent), which purport to reflect lien rights for delinquent assessments. *Id.* ¶¶ 76 & 88.

28.     The second are "Rental Guidelines" that prohibit third-party vacation rental other than through Rancho SRL's RSVR program. *Id.* ¶¶ 89-92. The Rental Guidelines also include a Resort Fee of $15 per day (capped at 15 days) to be paid for each guest of an owner (other than owners in the RSVR program) for use of Rancho SRL's private amenities. *Id.* ¶ 91.

---

[3] CDM's Original Complaint admitted that the seller of Lot G16 was a "private property owner." *See* Original Complaint, Doc. No. 1, at ¶ 92. CDM's First Amended Complaint conveniently omits this fact.

29.     The third are "Building Guidelines," which CDM alleges it never received. *Id*. ¶¶ 88 & 110.

30.     The fourth are the "Broker Regulations," which require a broker engaging with a client in the Rancho Santana community to register the client's name with Rancho SRL. *Id*. ¶¶ 88 & 95-98.

**H.     The Termination of APROSA by the Nicaraguan Government.**

31.     On October 31, 2022, APROSA was terminated by the Nicaraguan government for failure to make reports concerning its governance and finances. *Id*. ¶ 67.

32.     Contemporaneously, a new set of Community Guidelines, effective June 1, 2022, were posted on ranchosantana.com, which replaced the former 2006 Covenants. *Id*. ¶ 68. The Community Guidelines recited that Rancho SRL had repurposed the initial governance structure and assumed certain rights to charge fees and assessments and responsibilities to maintain the common areas and provide security. *Id*.

33.     In response to inquiries from owners, legal counsel to Rancho SRL explained that APROSA had been established as a nonprofit legal vehicle to receive dues and avoid taxes, which was no longer practical because of recent changes in tax law and NGO law. *Id*. ¶ 69. Rancho SRL confirmed that APROSA no longer existed. *Id*.

34.     In a March 20, 2023 email, Defendant Maish confirmed that APROSA was intended to provide a tax shield for owners, but that APROSA no longer existed. *Id*. ¶ 70. At an owners' meeting two months later, Maish confirmed that there was "no homeowners' association" and that the payments from owners were not to be "dues" but a "fee for service" *Id*. ¶¶ 64-65.

**I.     CDM Stops Paying.**

35.     CDM stopped paying invoices for dues in 2023. *Id*. ¶ 101.

36. On June 7, 2023, Costantino emailed Julapalli stating that if CDM would not pay its dues, it would be passed on to the legal team and would give cause to cut water and electric service to Lot G16. *Id.* ¶ 105.

### J. The "Blockade" of Lot G16.

37. CDM alleges that, after CDM stopped paying its annual dues in 2023, Maish and Costantino took steps to enforce those obligations. This is alleged to have occurred between August 28, 2023 and September 6, 2023. *Id.* ¶ 111.

38. CDM alleges that Rancho SRL attempted to disconnect the water line leading to CDM's property and the property of another neighbor who was delinquent on his dues. *Id.*

39. One of those efforts, occurring between August 28 and September 6, 2023, resulted in a sit-in, during which CDM alleges that an unidentified member of Rancho SRL personnel entered CDM's property on Lot G16. *Id.* ¶¶ 112-113.

40. CDM alleges that Maish has continued to assert that Rancho SRL has the right to cut off water to Lot G16 and the adjoining delinquent neighbor under the authority of the Nicaraguan government. *Id.* ¶ 116.

41. CDM further alleges that Defendant Semenza emailed Julapalli on April 10, 2024 that the construction on Lot G16 had exceeded the 18-month timeline and that there had been talk among Rancho SRL's Architectural Review Committee ("ARC") of imposing penalties or fines. *Id.* ¶¶ 10, 118-119. CDM alleges that, as a result, Rancho SRL have denied access to contractors, third parties, and guests of CDM through Rancho SRL's gate, leaving the home on Lot G16 incomplete and uninhabitable. *Id.* ¶¶ 120-123.

**K.**     **Allegations Specific to Defendants Currey, Semenza, Geerling, and Boothby.**

42.     Four Defendants (Currey, Semenza, Geerling, and Boothby) have particularly attenuated dealings, or no dealings at all, with CDM under the allegations of the First Amended Complaint.

**1.     Chris Currey.**

43.     Chris Currey is the Executive Vice President of Real Estate for Rancho Santana and resides in Nicaragua. *Id*. ¶ 8. Currey owns a home in Rancho Santana. *Id.* ¶ 192.

44.     CDM summarily alleges that, in that role, Currey is responsible for the content of the website ranchosantana.com between March 7, 2007 and August 2, 2012. *Id*. ¶ 61 & ¶ 148(d).

45.     Currey is alleged to have described a dues increase in 2021 as "unavoidable" for Rancho Santana to "reach its full potential as a viable and sustainable community." *Id*. ¶ 74.

46.     Currey stated in a YouTube video in 2023 that the goal was to develop a resort at Rancho Santana. *Id*. ¶¶ 83 & 87. Currey is alleged to have stated in that video that Rancho SRL dictates price points for rental properties participating in Rancho SRL's rental program. *Id*. ¶ 199.

47.     Currey is said to have admitted that Rancho SRL had let employees stay in empty RSVR homes without owner knowledge. *Id*. ¶ 94. (This would not have affected CDM, of course, which does not have a home on Lot G16.).

48.     Currey is alleged to have marketed Rancho Santana to higher wealth class owners for whom rental income was not important. *Id*. ¶ 99.

49.     Currey is vaguely alleged to have benefited from income derived from annual dues and architectural review fees. *Id*. ¶¶ 172-173.

50.     Currey is summarily alleged (with three other Defendants) to have implemented the blockade, dues enforcement, ARC fines, and access restrictions on Lot G16. *Id*. ¶ 241.

### 2.    Matt Semenza.

51.    Semenza is a Nicaragua resident who is affiliated with the Rancho Santana Architectural Review Committee. *Id*. ¶ 10.

52.    Semenza is alleged to have requested payment from CDM (which it paid) in 2021 for review fees under the Building Guidelines. *Id*. ¶ 149(e).

53.    Semenza is alleged to have requested payments from CDM in connection with its breaking ground on Lot G16 in June 2022. *Id*. ¶ 109.

54.    Semenza is alleged to have sent emails to Julapalli in 2024 declaring that CDM would be fined if it failed to comply with the Building Guidelines. *Id*. ¶ 118. CDM alleges that Semenza knew that there was "no signed agreement" binding CDM to the Building Guidelines, *id*, and that he "misrepresented that Julapalli had received the Building Guidelines when he purchased the property," *id*. ¶ 119.

55.    CDM alleges, vaguely and collectively, that Semenza knew that Rancho Santana had no operative HOA as far back as 2007. *Id*. ¶ 149.

56.    Semenza is vaguely alleged to have benefited from income derived from annual dues and architectural review fees. *Id*. at ¶¶ 172-173.

57.    Semenza is summarily alleged (with three other Defendants) to have implemented the blockade, dues enforcement, ARC fines, and access restrictions on Lot G16. *Id*. ¶ 241.

### 3.    Gail Geerling.

58.    Geerling is a homeowner in Rancho Santana, who served as its General Manager from 1997 to 2001 (more than a decade before CDM acquired property there). *Id*. ¶ 11.

59.    Geerling is alleged to have had a role in collecting HOA payments from other owners long before CDM came into existence. *Id*. ¶ 52.

18

60.     Geerling is alleged to have participated (as she was a homeowner) in an email exchange over a distribution list in 2023 concerning the existence of the HOA. *Id*. ¶¶ 77-81 & 148(f).

61.     Geerling is alleged to have been present at a meeting of the owners in 2023, during which Geerling's husband made comments supportive of the collection of dues and critical of owners (like CDM) that had stopped paying. *Id*. at ¶ 132.

62.     Geerling is vaguely and collectively alleged to have participated in a scheme to defraud owners by representing that Rancho Santana had a functioning HOA. *Id*. ¶ 148. The sole specific allegation relating to this concerns a letter to owners dated November 20, 2003, long before CDM came into existence. *Id*. ¶ 148(e); *see also* ¶ 187.

63.     CDM alleges that the above allegations establish Geerling's participation in an antitrust conspiracy. *Id*. ¶ 197.

### 4.     Christopher Boothby.

64.     Boothby is a homeowner in Rancho Santana who participates in the RSVR program. *Id*. ¶¶ 12 & 192.

65.     Boothby is generally alleged to be supportive of Defendants' rental policies and enforcement actions against owners (like CDM) who do not pay their dues. *Id*. at ¶¶ 12, 117, 137-139, 155, 187, 196, 200, & 241.

## III.   Argument.

### A.     This Court Should Dismiss for *Forum Non Conveniens.*

First, this Court should dismiss the First Amended Complaint under the doctrine of *forum non conveniens*. *Forum non conveniens* "enables a court to decline to exercise its jurisdiction if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum." *Karim v. Finch Shipping Co.*, 265

F.3d 258, 268 (5th Cir. 2001). The moving party must show "(1) the existence of an available and adequate alternative forum and (2) that the balance of relevant private and public interest factors favor dismissal." *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003). Private factors include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981), and the public factors include:

> the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Id*.

### 1.    Nicaragua Provides an Adequate Alternative Forum.

Here, Nicaragua provides an available and adequate alternative forum. This element has two components. First, the moving defendant or defendants must be "amenable to process" in the alternative forum. *Veba-Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1246 (5th Cir. 1983). This is met. Nearly all the Defendants reside or own homes in Nicaragua, and, in filing this Motion, all consent to personal jurisdiction in Nicaragua for this dispute. The second component is that the alternative forum be "adequate," *i.e.*, that "there is no danger that [a plaintiff] will be deprived of any remedy or treated unfairly." *Piper Aircraft*, 454 U.S. at 255. Under *Piper Aircraft*, this is satisfied unless "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all . . . ." *Id*. at 254. Here, as shown in the Supplemental Affidavit of Professor Manuel A. Gómez (attached as **Exhibit A** hereto) and Professor Gómez's

prior Affidavit submitted at ECF 23-1, the courts of Nicaragua are adequate to decide and remedy each of CDM's core grievances, *i.e.*, its obligations to pay dues and fees, whether CDM is bound by Rancho Santana's covenants and guidelines, and whether Rancho SRL interfered with or trespassed upon CDM's property. Indeed, as this Court can observe from CDM's Notice of Related Litigation filed at ECF No. 1-1, CDM is already litigating in Nicaragua over an easement issue for the same property. *See also* FAC, Doc. No. 25, at ¶¶ 124-126 (acknowledging its litigation with International Living in Nicaragua). If CDM, as plaintiff in that case, can present a case to a Nicaraguan court concerning one aspect of CDM's property rights, it stands to reason that the same court can address CDM's grievances in this First Amended Complaint.

### 2.    The Public and Private Interest Factors Weigh in Favor of Dismissal.

The private factors counsel for dismissal under the doctrine of *forum non conveniens*. While CDM is domiciled in Texas, "if the balance of conveniences suggests that trial in the [plaintiff's] chosen forum would be unnecessarily burdensome for the defendant[s] or the court, dismissal is proper." *Piper*, 454 U.S. at 255 n.23. In this case, the "relative ease of access to sources of proof" and access to witnesses points to this case being heard in Nicaragua. Here: (1) the property at issue is in Nicaragua and can only be examined there; (2) ten of the Defendants are domiciled or own homes in Nicaragua, *see* FAC at ¶¶ 4, 5, 6, 7, 8, 10, 11, 12, 15 & 17; (3) all the essential nonparty witnesses are in Nicaragua, *id*. ¶¶ 51-58 & 77-78 (homeowner John Edwards) ¶¶ 108-113 (unidentified persons involved in "water skirmish") and generally *id*. (other homeowners); and (4) access to any governmental records relating to the various HOA regimes will be easier in Nicaragua than in the United States (and would need to be translated if the case is heard in this District). It also should not be difficult for the plaintiff to travel to and litigate in Nicaragua. CDM's principal member, Julapalli, has travelled to Nicaragua multiple times just within the facts alleged, *see* FAC at ¶¶ 45 & 128, and CDM's apparent sole purpose is to own

property in Nicaragua. *See id.* ¶ 47. And, it bears repeating, CDM is already litigating a civil matter in Nicaragua's courts. *See supra*. For these reasons, the private factors favor dismissal.

Even if the private factors did not alone warrant dismissal, the public factors tip the balance in favor of Nicaragua. The "local interest in having localized controversies decided at home," *see Dunsby v. Transocean, Inc.*, 329 F. Supp. 2d 890, 895 n.5 (S.D. Tex. 2004), is obvious. This is a dispute among Nicaragua landowners concerning their respective property rights. Nicaragua has an interest in those issues. *See* **Ex. A** at ¶ 10 and ECF No. 23-1 at ¶¶ 34-35. Texas—and indeed the United States—has no such stake in this matter.

Perhaps more importantly, the need to apply foreign law is a factor that, here, "strongly favors dismissal." *See Ipsen Biopharm Ltd. v. Galderma Lab'ys, L.P.*, 660 F. Supp. 3d 538, 554 (N.D. Tex. 2023); *see also Glenn v. BP p.l.c.*, 27 F. Supp. 3d 755, 766 (S.D. Tex. 2014) ("[T]he need to apply foreign law is a very important factor in the forum non conveniens analysis.") , *aff'd*, 602 F. App'x 199 (5th Cir. 2015). This, too, is plain on the face of the First Amended Complaint, which *itself* invokes several principles of Nicaragua law. *See, e.g.*, FAC ¶ 67 (citing Nicaragua law governing nonprofits); ¶¶ 114-117 (claiming water and electricity rights under Nicaragua civil law); *see also* Original Complaint, Doc. No. 1, ¶¶ 285-286 (citing principles of Nicaragua horizontal property law); ¶ 360 (praying antitrust claims "in comity with Nicaragua horizontal property law"). Combining this with CDM's tort claims (Counts VII to XI), each of which could involve issues of Nicaragua law,[4] this First Amended Complaint places a heavy task on this Court

---

[4] Notwithstanding CDM's captioning those claims as "Texas," each seems to concern actions taken in and claims arising in Nicaragua. Thus, while Defendants will assume Texas law applies to those claims for the purposes of this Motion only, *see infra*, if this matter proceeds past the pleadings this Court will need to apply Texas's "most significant relationship" test to determine what law governs those claims. *Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005) (citing Restatement (Second) of Conflict of Laws). If this matter is to develop,

to apply foreign law and eventually places the same heavy task on a Southern District jury to apply that law to its factfinding.

Thus, this Court should dismiss the First Amended Complaint to allow it to be brought in an available and adequate forum in Nicaragua.

### B.       This Court Should Dismiss for Lack of Personal Jurisdiction.

Should this Court not dismiss under the doctrine of *forum non conveniens*, it remains that *this District* is not the proper forum. None of the Defendants is subject to personal jurisdiction in Texas. CDM's claims do not arise out of any purposeful contacts with Texas to establish specific jurisdiction, and the nationwide service provisions of RICO and the Clayton Act do not provide a jurisdictional hook in this District, as those statutes require threshold showings CDM cannot make. Even CDM's fallback theories do not cure these defects. The Court should dismiss the First Amended Complaint as to all Defendants for lack of personal jurisdiction.

### 1.       None of the Defendants Is Subject to General Jurisdiction in Texas.

None of the Defendants is subject to general jurisdiction in this District. Indeed, CDM does not even claim that any Defendant is, as CDM's jurisdictional allegations are focused on specific jurisdiction and the nationwide-service statutes. *See* FAC ¶¶ 18-22. Nor could CDM do so. In *Daimler AG v. Bauman*, the Supreme Court ruled that the only two places where a corporate defendant is "at home," and thus subject to general jurisdiction, absent an "exceptional case," are in the state of incorporation and at the principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 138–39 & n.19 (2014). Similarly, "for an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *See Frank v. PNK (Lake Charles) LLC*, 947 F.3d 331, 337 (5th Cir. 2020). None of the individual Defendants is alleged to reside in Texas, *see*

---

Defendants expect that the Court would determine that Nicaragua – and not Texas – bears the most significant relationship to this Nicaragua property dispute.

23

FAC ¶¶ 4-12, and none of the business-entity Defendants is alleged to be incorporated in or maintain a principal place of business in Texas. *See id.* ¶¶ 13-17.

### 2.    None of the Defendants Is Subject to Specific Jurisdiction in Texas.

Nor has CDM pleaded facts to show specific jurisdiction over any of the Defendants. The Fifth Circuit "has framed the [specific jurisdiction] inquiry as a three-step analysis:

> whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*See Defense Distributed v. Grewal*, 971 F.3d 485, 490–91 (5th Cir. 2020). "[S]pecific personal jurisdiction is a claim-specific inquiry," so a plaintiff must identify how each of the defendants' conduct gives rise to each cause of action. *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009). Obviously, "[i]t is essential . . . that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state." *Pervasive Software, Inc. v. Lexware GMBH & Co. KG*, 688 F.3d 214, 222 (5th Cir. 2012) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). As a result, a plaintiff must "ascribe[] specific conduct or statements" to individual defendants. *Gen. Retail Servs. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 793 (5th Cir. 2007) (citing *Rush v. Savchuk*, 444 U.S. 320, 332–33 (1980)). "A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006). In addition, "[e]ach defendant's contacts with the forum State must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984).

Glaringly, unlike CDM's Original Complaint, which alleged specific jurisdiction over all Defendants, CDM now only pleads facts to attempt to show purposeful availment by two, and only

24

two, of those Defendants, in an apparent effort to piggyback other Defendants into this District through nationwide-service-of-process statutes. *See* FAC ¶ 19. Neither suffices.

First, CDM alleges that *one* of the individual defendants – Costantino – has sent "dozens of emails sending invoices, payment instructions, and enforcement threats to CDM at its Houston, Texas address, and directing CDM to wire funds from Houston banks to Agora-affiliated accounts in Baltimore." FAC ¶ 19. Emails, of course, cannot be sent to a "Houston, Texas address." Emails are sent to email addresses. Regardless, the mere sending of letters, even those threatening litigation "are not enough to show minimum contacts in Texas." *Halliburton Energy Servs. Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 542 (5th Cir. 2019) (citations omitted). So too, the fact that those letters, at times, caused CDM to wire funds from Houston also does not result in personal jurisdiction. *See Monkton Ins. Services, Ltd. v. Ritter*, 2013 WL 12100550, at *5 (W.D. Tex. Aug. 23, 2013) ("In addition, given the material performance occurred in the Cayman Islands, the fact that Butterfield wired money between Geneva's account with Butterfield and Ritter's personal account in Texas does not weigh heavily in the determination."), *aff'd*, 768 F.3d 429 (5th Cir. 2014); *Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1147 (5th Cir. 1985) (finding all material performance occurred in Mexico despite the wiring of payments to Texas); *C & H Transp. Co. v. Jensen & Reynolds Constr. Co.*, 719 F.2d 1267, 1270 (5th Cir. 1983) (holding the fact that payment mailed to Texas is hardly significant in terms of purposeful availment); *Hydrokinetics, Inc. v. Alaska Meek, Inc.,* 700 F.2d 1026, 1029 (5th Cir. 1983) (stating "nor do we weigh heavily the fact that Alaska Mechanical may have mailed payment checks into the forum state . . . .").

Second, CDM alleges a website subscription service operated by *one* of the Defendants (Agora and its undefined "subsidiaries") establishes personal jurisdiction. FAC ¶ 19. This, too, does not suffice under the law of this District to establish personal jurisdiction. *See Agar Corp.*

25

*Inc. v. Multi-Fluid Inc.*, No. 95-5105, 1997 WL 829340, at *5 (S.D. Tex. June 25, 1997) (holding "periodic mailings of national newsletters and publications to Texas residents as part of nationwide mailings do not give rise to personal jurisdiction"). Nor does having a website that was visited by a Texas resident. *Johnson v. TheHuffingtonPost.com, Inc*., 21 F.4th 314, 320 (5th Cir. 2021) ("Making a website that's visible in Texas, of course, does not suffice. . . . That result would not be fair or consistent with defendants' reasonable expectations. Grannies with cooking blogs do not, and should not, expect lawsuits from Maui to Maine.").

CDM is required under Federal Rule 8(a)(1) to include "a short and plain statement of the grounds for the court's jurisdiction." CDM's statements as to Costantino and Agora are insufficient, and, notably, nothing else appears in CDM's jurisdictional allegations about any other Defendant in this case. Thus, CDM has not pleaded a basis for jurisdiction over any Defendant, and this Court should accordingly dismiss under Federal Rule 12(b)(2).

### 3.    RICO's Nationwide Service Provision Does Not Apply.

Under the mistaken belief that it has pleaded sufficient facts to establish traditional jurisdiction over Costantino or Agora, CDM next invokes the nationwide service of process statute under the RICO Act as a basis of personal jurisdiction. *See* FAC ¶ 20 (citing 18 U.S.C. § 1965). "When a plaintiff relies on a federal statute providing for nationwide service of process, the court will have personal jurisdiction over a properly served defendant provided that (1) the federal claim is colorable, and (2) the exercise of personal jurisdiction satisfies the Fifth Amendment's Due Process Clause." *Holland v. CryptoZoo Inc.,* No. 1:23-CV-00110, 2025 WL 2493065 at *16 (W.D. Tex. July 7, 2025) (citation omitted).

RICO's venue and personal-jurisdiction clause provides that a civil action "may be instituted" where a defendant "resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965. Only if at least one defendant is properly before the court under that clause may a plaintiff

26

utilize § 1965(b) to serve other defendants, and only if the "ends of justice" so require. *Id.* Although the Fifth Circuit has yet to explicitly clarify the breadth of RICO's nationwide process provisions, Texas federal courts have noted "[t]he more widely recognized and sound approach is to determine if a plaintiff has raised a 'colorable' RICO claim." *Holland,* 2025 WL 2493065 at *20 (citation omitted).

Although at times considered a surmountable burden, a district court may dismiss RICO claims on jurisdictional grounds if it determines "(1) that the federal claim is immaterial and made solely for the purpose of obtaining jurisdiction, or (2) that the federal claim is wholly insubstantial and frivolous." *Fellows v. Universal Rests., Inc.,* 701 F.2d 447, 449 (5th Cir. 1983). Whether CDM's RICO claim will ultimately prevail on the merits is not at issue; rather, the Court's narrow finding must involve determining whether CDM has alleged facts sufficient to support the finding of personal jurisdiction over Defendants as to the RICO claim. Here, for the same reasons outlined below in Part III.C.2, *infra*, regarding Defendants' 12(b)(6) dismissal of the RICO claims, Plaintiff has not pleaded a colorable RICO claim.

CDM also does not plausibly allege that any RICO defendant resides, is found, has an agent, or "transacts [its] affairs" in this District as that standard is applied. Without an "anchor" defendant in this District, § 1965(b) is unavailable. Nor does § 1965(d) independently authorize aggregating all Defendants in a district that lacks personal jurisdiction over any of the Defendants. In any event, CDM has not shown that the "ends of justice" require bringing out-of-state and foreign defendants into this District for foreign-centered claims.

Even if CDM were to contend that any particular Defendant "transacts his affairs" here, Defendants preserve, in the alternative, that such contacts do not satisfy § 1965(a) and that venue and personal jurisdiction would still be improper as to the remaining Defendants under § 1965(b).

27

Therefore, the ends of justice do not require Defendants to be brought before the Court under RICO's nationwide service provision, where minimum contacts with the State of Texas are wholly lacking and all Defendants can be sued in Nicaragua.

### 4.     The Clayton Act's Nationwide Service Provision Does Not Apply.

CDM further cites 15 U.S.C. § 22 (Clayton Act § 12) as a basis for jurisdiction. *See* FAC ¶ 21. Section 12 provides that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." 15 U.S.C. § 22. The Clayton Act's nationwide service provision operates if the antitrust corporate defendant "inhabit," be "found," or "transact business" in the district.

CDM, likely recognizing that most of the Defendants are not "corporations," only alleges that Defendants RS Inc. and International Living are subject to personal jurisdiction under Section 12 of the Clayton Act. *See* FAC ¶ 21.[5] CDM therefore alleges, in an entirely conclusory manner and without any factual support, that RS Inc. and International Living "are corporations within the meaning of § 12 that transact business in the United States." *See id.* This Court should not credit a conclusory allegation that a defendant "transacts business" as true for determining personal jurisdiction. *See Diagnostic Affiliates of Ne. Houston, LLC v. Aetna, Inc.*, 654 F. Supp. 3d 595,

---

[5] It is correct that, on its terms, Section 12 applies only to actions "against a corporation," *see id.*, and would not apply to the claims against any individual Defendant in this matter, *see, e.g.*, *California Clippers, Inc. v. U. S. Soccer Football Ass'n*, 314 F. Supp. 1057, 1065 (N.D. Cal. 1970) (finding that Section 12 "is directed only at corporations, not individuals"), nor against any unincorporated associations (Monument & Cathedral Holdings, LLC ("Agora"), and Tola Development Group, LLC), *see GovernmentGPT Inc. v. Axon Enter. Inc.*, 769 F. Supp. 3d 959, 979 (D. Ariz. 2025) ("As an LLC, and not a corporation, it is not subject to the jurisdictional hook that 15 U.S.C. § 22 provides."); *see also World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*, 803 F. Supp. 3d 1136, 1170 (W.D. Wash. 2025).

603 (S.D. Tex. 2023) (noting, in determining a personal jurisdiction motion, that "[t]he court does not accept as true conclusory factual allegations, unwarranted factual inferences, or legal conclusions") (citing *Giancarlo v. UBS Fin. Servs. Inc.*, 725 Fed App'x 278, 282 (5th Cir. 2018)).

Nowhere in the First Amended Complaint is it alleged that RS Inc. or International Living transacted business in the United States. RS Inc., as CDM alleges, is a British Virgin Island company that holds interests in certain of the Nicaragua Defendants. FAC ¶ 15. No paragraph of the First Amended Complaint specifies any conduct by RS Inc. occurring within or directed to the United States. *See id*. ¶¶ 15, 17, 21, 31, 144, 145, 174, 180, 187, 192, 241. Likewise, the First Amended Complaint says nothing about the company CDM refers to as "International Living"[6] directing conduct to the United States that was in any way relevant to CDM's claims. International Living, as alleged, was formed in Nicaragua to acquire real property in Nicaragua. *Id*. ¶ 16. It sold parcels of that property – in the late 1990s long before CDM came into being – and began developing Rancho Santana's infrastructure. *Id*. ¶ 35; *see also* ¶ 47 (CDM formed in 2013). International Living is alleged to have had dealings with certain other property owners in Nicaragua in the late 1990s and early-to-mid-2000s. *Id*. ¶¶ 49-58. International Living then disappears from the allegations, with the latest occurring in 2006.[7] *Id*. ¶¶ 56 & 58.

The First Amended Complaint is thus bereft of any specific allegations that RS Inc. or International Living transacted business in the United States. Section 12 of the Clayton Act does not apply.

---

[6] To be clear, the company CDM defines as "International Living" is an approximate English translation of "Propiedades Habitacionales Internacionales, S.A." *See* FAC ¶ 16. It is different from the publication called "*International Living*" occasionally cited in the First Amended Complaint. *See id*.

[7] Other than the fact that CDM has more recently sued International Living in a separate proceeding in Nicaragua. *See id*. ¶¶ 124-126.

**5.      18 U.S.C. § 1956(f) Does Not Apply.**

CDM cites 18 U.S.C. § 1956(f) as a basis for personal jurisdiction. *See* FAC ¶ 22. Subsection 1956(f) is not well cited. Subsection 1956(f) is contained within a criminal statute involving laundering of monetary instruments, and it merely provides for extraterritorial jurisdiction over that criminal conduct. As this Court held in *de Pacheo v. Martinez*, "the federal courts have not recognized a private right of action for breach of § 1956, the money laundering statute." *See* 515 F. Supp. 2d 773, 787 (S.D. Tex. 2007) (citing *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659 (S.D.N.Y. 2000)). Thus, subsection 1956(f) is not a basis for jurisdiction over any Defendant.

For all these reasons, this Court should dismiss this case for lack of personal jurisdiction under Federal Rule 12(b)(2).

**C.      This Court Should Dismiss the First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted.**

Should this Court decide that this case should and can be heard in this Court, all Counts nonetheless fail on the merits. This Court should dismiss under Federal Rule 12(b)(6).

**1.      Legal Standard.**

A court should dismiss a complaint if the plaintiff's factual allegations do not show a right to relief that is plausible and above mere speculation. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).. (internal citations and quotation marks omitted). Rule 8 "does not require 'detailed factual allegations,' but it

demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

To avoid a dismissal for failure to state a claim, a plaintiff must plead specific facts, not merely conclusory allegations. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). The "[f]actual allegations must be enough to raise a right to relief above the speculative level. . . ." *Sonnier v. State Farm Mut. Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007).

### 2. This Court Should Dismiss the Counts I to IV (RICO Claims).

CDM's first four Counts each claim violations of RICO. The First Amended Complaint fails multiple elements of the civil RICO statute at 18 U.S.C. § 1964, the statute describing the underlying violations at Section 1962, and the criminal statutes detailing qualifying predicate acts of racketeering. This Court should dismiss Counts I through IV.

### a. This Court Should Dismiss Count I (18 U.S.C. § 1962(c)).

First, for the reasons set forth herein, this Court should dismiss Count I under 18 U.S.C. § 1962(c) for failure to state a claim upon which relief can be granted.

#### i. Elements of a Claim Under 18 U.S.C. § 1962(c).

Under § 1962(c), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Section 1964(c), in turn, provides for a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . ." 18 U.S.C. § 1964(c).

#### ii. CDM's Count I Fails to Plead Facts to Show a "Domestic Injury."

Under Supreme Court jurisprudence, a civil RICO claim may only lie where the plaintiff alleges a "domestic injury." CDM's claims fail on that score. The seminal case is *RJR Nabisco v.*

*European Community*, 579 U.S. 325 (2016). *Nabisco* concerned the claims of European Community member states that RJR Nabisco was involved in a scheme with foreign drug traffickers in which drug money was used to pay for shipments of cigarettes into Europe. *Id*. at 332. The Eastern District of New York dismissed the plaintiff's civil RICO claim as improperly extraterritorial. *Id*. at 333-34. The Second Circuit reversed. *Id*. at 334. On certiorari, the Supreme Court agreed with the district court and reversed the Second Circuit.

*Nabisco* focuses on the "presumption against extraterritoriality" in statutory interpretation. *See id*. at 335 *et seq.* The Supreme Court concluded that certain *criminal* provisions of RICO overcame the presumption and that, therefore, "a pattern of racketeering that includes predicate offenses committed abroad" could apply extraterritorially. *Id*. at 340. A claim for *civil* RICO under 18 U.S.C. § 1964(c), however, cannot. The Court began with the premise that "[a]llowing recovery for foreign injuries in a civil RICO action, including treble damages, presents [a] danger of international friction," *id*. at 348, and found that nothing in the text of Section 1964(c) clearly indicated congressional intent to create a private right of action for injuries suffered outside of the United States, *id*. at 349. Thus, where a civil RICO claim "rest[s] entirely on injury suffered abroad," it "must be dismissed." *Id.* at 354.

Seven years later, in *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), the Supreme Court further developed what constitutes a "domestic injury" for purposes of civil RICO. *Yegiazaryan* resolved a circuit split between a "'rigid, residency-based test'" placing the location of the injury at the domicile of the plaintiff, and a "'context-specific' approach to the domestic-injury inquiry." *Id.* at 540. The Supreme Court adopted the latter, holding that "in assessing whether there is a domestic injury, courts should engage in a case-specific analysis that looks to the circumstances surrounding the injury." *Id*. at 545. Thus, the Court found that a resident of Russia stated a claim

32

of a "domestic injury" against a California resident for evasion of a California judgment. The residency of the plaintiff was less important in identifying where the injury occurred than where the rights that were violated arose. *See id*. at 546.

Here, that context-specific approach leads to dismissal of Count I for want of a domestic injury. CDM's First Amended Complaint is about CDM's rights in its property in Nicaragua. While the *owner* of that property is an LLC domiciled in Texas, the *property* alleged to be impacted is in Nicaragua. To conclude that the domicile of the owner is the situs of the RICO injury would effectively turn *Yegiazaryan* on its head, and it would call on this Court to rule upon legal issues of Nicaraguan property law and the viability of a horizontal property regime in Nicaragua. The "danger of international friction" arising from such rulings is acute, which is the very danger underpinning the limitations on civil RICO. *See Nabisco,* 579 U.S. at 348.

CDM's First Amended Complaint anticipates this issue by affirmatively pleading (including citing *Yegiazaryan*) that "CDM has suffered a domestic injury." FAC ¶ 167. The facts CDM includes to support this conclusory statement, however, all rely on the mere fact that CDM is a Texas LLC, that it received demands for payment in Texas relating to its Nicaragua property, and paid those from its Texas bank accounts. *See id*. CDM, in short, relies on its domicile, which is irrelevant under *Yegiazaryan*. The relevant question is where the injury to CDM's "business and property" occurred. *See* 18 U.S.C. § 1964(c). That is Nicaragua. This Court should dismiss Count I (and II, III, and IV) for failure to plead facts to plausibly show a domestic injury.

### iii.    In the Alternative, CDM Fails to Plead Facts Sufficient to Show an Injury Attributable to Defendants Maish, Costantino, Semenza, Geerling, or Boothby.

Should this Court not dismiss Count I in its entirety, it should at least dismiss Count I as to Defendants Maish, Costantino, Semenza, Geerling, and Boothby. A civil claim for violation of Section 1962(c), like any claim under Section 1964(c), requires that the plaintiff show that the

alleged RICO violation "proximately caused the injury." *Yegiazaryan*, 599 U.S. at 544 n.3. CDM has failed to plead a pattern of predicate acts of racketeering that have that causal connection to its claimed injuries as to those Defendants.

Characteristic of its scattershot approach to pleading, CDM invokes five categories alleged crimes to attempt to establish "racketeering activity" within the definition under 18 U.S.C. § 1961(1), which are: (1) mail/wire fraud; (2) extortion; (3) money laundering; (4) transporting stolen money; and (5) traveling in aid of racketeering. For the purposes of this Motion *only*, Defendants assume that the allegations of mail/wire fraud – except as to Geerling – are sufficiently tied to CDM's alleged injuries. The balance of the predicate acts, however, are not. This is material because Count I is against Defendants Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Geerling, Boothby, and Agora, but the mail/wire fraud allegations do not include Maish, Costantino, Semenza, or Boothby, and the facts alleged as to Geerling are insufficient to establish the predicate act. Because the alleged predicate acts of racketeering involving those latter five Defendants are insufficient, at a minimum the RICO claims against those five should be dismissed.[8] Defendants address each in turn:

### (a)   Mail/Wire Fraud as to Gail Geerling.

CDM alleges mail/wire fraud as to six Defendants. *See* FAC § 148. "'To state a claim for mail or wire fraud to support a RICO violation under § 1341 or § 1343, a plaintiff must establish three elements; "(1) a scheme or artifice to defraud or to obtain money or property by means of false pretenses, representations, or promises; (2) a use of the interstate mails or wires for the purpose of executing the scheme; and (3) a specific intent to defraud either by [d]evising,

---

[8] And, in turn, to the extent that jurisdiction over these five or any other Defendants is predicated solely on the RICO nationwide-service statute, such Defendant or Defendants should be dismissed for lack of personal jurisdiction.

participating in, or abetting the scheme.”’” *Van Duzer v. U.S. Bank Nat. Ass'n*, 995 F. Supp. 2d 673, 690–91 (S.D. Tex.) (citation omitted), *aff'd*, 582 F. App'x 279 (5th Cir. 2014). Again, Defendants do not contest that CDM has met the very low bar to plead allegations that, assumed to be true and with all inferences running in favor of CDM, would satisfy the pleading standard under this one sub-theory as to five of those Defendants. As to Geerling, however, CDM has failed to plead facts to set forth a plausible case.

As CDM alleges, Ms. Geerling served as Rancho Santana's General Manager decades ago (1997 to 2001) and is presently a homeowner in the development. FAC ¶ 11. Ms. Geerling's role as General Manager was more than ten years before CDM even came into existence. *Id*. ¶ 47. In that earlier time period (November 2003), Ms. Geerling is alleged to have sent *other* owners an letter lauding Rancho Santana as a "premier private residential community" and seeking to collect HOA fees. *Id*. ¶ 52. CDM now identifies that as a predicate act of racketeering, *id*. ¶ 148(e), despite that it was alleged to have been sent more than ten years before CDM even existed, *see id*. ¶ 47. The legal standard is that the RICO violation must have "proximately caused the injury." *Yegiazaryan*, 599 U.S. at 544 n.3. CDM cannot have been harmed by an email that it did not receive because it did not yet exist. CDM makes no effort to explain how it could have been.

The second series of communications that CDM alleges were fraudulent as to Geerling were a series of email communications on a community listserv between September 15 and October 30, 2023. FAC ¶¶ 77-81 & 148(f). During this, Geerling (as a homeowner) discussed with other homeowners the history of various HOA documents from 16 to 18 years before. *See id*. Geerling asked questions, and Geerling was unable to answer one question about an action by the developer 16 years earlier, *see id*. ¶ 81. It is implausible to assume that Geerling's inability to answer that question was a fraudulent act of evasion, but only a reasonable failure of human

35

recollection occurring over an informal listserv of owners. Regardless, by September 2023, *CDM had already stopped paying its dues*. *See id.* ¶¶ 101-104. Therefore, CDM cannot show that anything Geerling stated or did not state during that email exchanges proximately caused CDM any injury. *See Yegiazaryan*, 599 U.S. at 544 n.3.

Finally as to Geerling, even if Geerling's email in November 2003 and participation in the listserv in September/October 2023 might plausibly constitute mail/wire fraud, CDM's allegation fails for lack of continuity. A claim under 18 U.S.C. § 1962(c) requires "a pattern of racketeering activity." The "pattern" requires "at least two acts of racketeering activity . . . the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Nearly 20 years passed between November 2003 and September/October 2023,[9] and there is no allegation (because it is not true) that Geerling was incarcerated between those two events. Thus, CDM has entirely failed to allege continuity as to Defendant Geerling.

### (b)     Extortion.

The predicate acts of extortion (purportedly attributed to Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, Boothby, and Agora) allege that this subset of Defendants extorted dues payments from CDM, *See* FAC. ¶¶ 150, *et seq.* Extortion under 18 U.S.C. § 1951(b)(2) refers to "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." CDM does not allege actual or threatened force, violence, or fear, but relies on "color of official right," claiming that these

---

[9] CDM cannot establish that Geerling's participation in the listserv in 2023, itself, constitutes a pattern of predicate acts. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989).

Defendants asserted lien power through the HOA, and that Maish (and, it bears noting, *only* Maish) "acted to cut off CDM's water under the authority of the Nicaraguan government." *Id*. ¶¶ 154.

Neither Maish nor any of the other Defendants are public officials (indeed, it is not even alleged that Bonner, Ford, Turner, Currey, Costantino, Semenza, Boothby, or Agora purported to act under any such authority). In this Circuit, as elsewhere, "[u]sually, only public officials are charged with extorting property under color of official right." *United States v. Rashad*, 687 F.3d 637, 642 (5th Cir. 2012). Private persons may be so charged with "official extortion" only where they have "conspired with corrupt public officials, masqueraded as public officials, aided or abetted extortion by public officials, or were speaking for a public official." *Id*. (citations omitted). Merely claiming that enforcing lien rights or remedies "under the authority of the Nicaraguan government" – *i.e.*, that doing so was lawful – is not the same as pretending to be a public official or aiding a public official in extorting property. At its core, extortion under color of official right "is the 'rough equivalent of what we would now describe as "taking a bribe.""" *Ocasio v. United States*, 578 U.S. 282, 285 (2016) (quoting *Evans v. United States*, 504 U.S. 255, 260 (1992)). That is not at all what is alleged in this case, and Section 1951 is therefore not well cited as a predicate act.

### (c)    Money Laundering.

CDM next invokes 18 U.S.C. § 1956 (money laundering) and § 1957 (engaging in monetary transactions derived from specified unlawful activity) as RICO predicate acts, charging Defendants Bonner, Ford, Turner, Maish, Currey, Costantino, Semenza, and Agora with such. *See* FAC. ¶¶ 156 *et seq.* The elements of money laundering under Section 1956 are "(1) [the defendant] conducted or attempted a financial transaction, (2) which he knew involved proceeds arising from unlawful activity, (3) with the intent to promote or further those illegal actions, or (4) with the knowledge that the transaction's design was to conceal or disguise the nature or source of the

illegal proceeds." *United States v. Pennell*, 409 F.3d 240 (5th Cir. 2005). The elements of a violation of Section 1957 are: "(1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity." *United States v. Fuchs*, 467 F.3d 889, 907 (5th Cir. 2006).

CDM pleads that the underlying "specified unlawful activity" under these sections is mail/wire fraud and extortion under color of official right. *See* FAC ¶ 157. Again, it is presumed for the purposes of this Motion only that CDM has pleaded sufficient facts as to mail/wire fraud as to Bonner, Ford, Turner, Currey, and Agora. *See supra*. CDM's allegations of a violation of Sections 1956 and 1957 as to Maish and Costantino, however, are predicated solely on "extortion under color of official right," as neither Maish nor Costantino are identified as having participated in wire/mail fraud. *See* FAC ¶¶ 148 & 157. For the same reason set forth above under Part III.C.2.iii.(b), CDM has not alleged facts to show extortion under color of official right. Resultantly, it cannot serve as the predicate "specified unlawful activity" for a charge of money laundering, *see* 18 U.S.C. § 1956(a)(1), (a)(2)(A), (a)(3)(A), & (c)(7), nor for a charge of engaging in monetary transactions in property derived from specified unlawful activity, *see* 18 U.S.C. § 1957(a) & (f)(3). As that element fails, so too do the factual bases for both RICO predicate acts fail as to Maish and Costantino.

Moreover, as to all Defendants, CDM fails to show how it was harmed by subsequent alleged acts of money laundering or engaging in monetary transactions. The standard remains that the RICO violation must have "proximately caused the injury." *Yegiazaryan*, 599 U.S. at 544 n.3. More specifically, a civil RICO plaintiff must show "that a RICO *predicate offense* 'not only was a "but for" cause of his injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of*

38

*New York*, 559 U.S. 1, 9 (2010) (emphasis added) (citation omitted). CDM cannot show how the alleged acts of money laundering or engaging in monetary transactions in that property *itself* caused CDM any injury. Once CDM paid dues, its hypothetical injury was complete. No later transaction with that money impacted that CDM in any way.

Thus, CDM has not pleaded facts to establish money laundering or engaging in monetary transactions in property derived from specified unlawful activity as predicate acts under RICO.

### (d)      Transporting Stolen Money.

Similarly, CDM has not pleaded facts to establish 18 U.S.C. § 2314 and § 2315 as predicate RICO offenses *See* FAC. ¶¶ 160-161. It is unclear from CDM's scant two paragraphs under this part of Count I which of the six paragraphs of § 2314 and which of the four paragraphs of § 2315 the "Money-Laundering Defendants" are alleged to have violated. More directly, however, the First Amended Complaint does not explain how CDM is alleged to have suffered any injury proximately caused by the transfer of dues and architectural review fees. For this reason, CDM has not pleaded facts to show a RICO injury from transporting stolen money.

### (e)      Travelling in Aid of Racketeering.

Finally on this point, in paragraphs 303 to 310 of the First Amended Complaint, CDM invokes 18 U.S.C. § 1952 (Interstate and foreign travel or transportation in aid of racketeering enterprises) as a basis for RICO liability as to Defendants Bonner, Ford, Turner, Costantino, and Agora. It appears that CDM – through the final clause of paragraph 162 of the First Amended Complaint, intends to rely on paragraph (a)(3) of Section 1952, which proscribes "travel[] in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." "Unlawful activity" is a defined term under this statute, however, meaning:

(1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title and (ii) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

18 U.S.C.A. § 1952(b). Paragraphs 162 and 163 do not sufficiently identify any of the forms of "unlawful activity" enumerated under subsection 1962(b). Paragraph 163 alleges that Agora used the United States mails "to promote Rancho Santana." Promoting Rancho Santana is not unlawful activity under subsection 1962(b). Paragraph 163 alleges that the "founders" (presumed from context to be Bonner, Ford, and Turner) traveled "to promote investment in Rancho Santana by subscribers in Agora's network." Promoting investment in Rancho Santana, likewise, is not tied to any form of unlawful activity under subsection 1962(b). CDM's Paragraph 163 also identifies Costantino's travel to Nicaragua for two owners meetings and to inspect CDM's property, but CDM does not identify how that was intended to promote, manage, establish, carry on, or facilitate any unlawful activity within that definition. For these reasons, CDM has not pleaded facts sufficient for a RICO injury based on traveling in aid of racketeering.

> **(f)    Because Mail/Wire Fraud (as to Geerling), Extortion, Money Laundering, Transporting Stolen Money, and Traveling in Aid of Racketeering Fail, So Too Do CDM's Claims Against Defendants Maish, Costantino, Semenza, Geerling, and Boothby Under Count I.**

Therefore, because none of CDM's allegations on mail/wire fraud (as to Geerling), extortion, money laundering, transporting stolen money, and traveling in aid of racketeering pleads sufficient facts to establish a RICO predicate act – and because Defendants Maish, Costantino, Semenza, Geerling, and Boothby are identified in the alleged RICO activity solely on those failed

predicate acts – if this Court does not dismiss Count I in its entirety, it should at a minimum dismiss Count I as to those five Defendants.

### b.    This Court Should Dismiss Count II (18 U.S.C. § 1962(a)).

For many of the same reasons as Count I, this Court should dismiss Count II – also a civil RICO claim but against a different group of Defendants and relating to 18 U.S.C. § 1962(a) – for failure to state a claim upon which relief can be granted.

### i.    Elements of a Claim Under 18 U.S.C. § 1962(a).

Under 18 U.S.C. § 1962(a), "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." To state a civil claim arising from Section 1962(a), "a plaintiff must . . . show that its injuries resulted from the investment or use of racketeering proceeds," *i.e.*, "this Circuit, like virtually all the other circuits who have reviewed this issue, has intimated that such an injury cannot just flow from the predicate acts themselves," *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 443 (5th Cir. 2000).

### ii.    CDM's Count II Fails to Plead Facts to Show a "Domestic Injury."

To the extent that CDM claims any plausible investment injury, it is an injury that lies solely in the Republic of Nicaragua. CDM is claiming to be shut out of the Nicaraguan real estate market by Defendants' actions. That, by definition, is not a "domestic injury" and therefore is not

41

cognizable under civil RICO. *See supra* Part III.C.2.a.ii. For this reason, Count II fails to state a claim upon which relief can be granted.

### iii. CDM's Count II Fails to Plead Facts to Show a Nexus to Foreign Commerce.

Likewise, Count II fails to plead facts to establish a nexus to foreign commerce. *See* 18 U.S.C. § 1962(a) (requiring an "enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce"); *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 153–54 (1987) (citing the "nexus to interstate or foreign commerce" as "a jurisdictional element of a civil RICO claim"). As the Supreme Court clarified in *Nabisco* as to Section 1962:

> We do not take this reference to "foreign commerce" to mean literally all commerce occurring abroad. Rather, a RICO enterprise must engage in, or affect in some significant way, commerce directly involving the United States—*e.g.,* commerce between the United States and a foreign country. Enterprises whose activities lack that anchor to U.S. commerce cannot sustain a RICO violation.

579 U.S. at 344.

As to what CDM seeks to frame as the investment injury, CDM's claim "lack[s] that anchor." *See id.* CDM's claim is that the "RICO(a) Defendants": (1) collected dues and review fees from owners of property in Nicaragua, *see* FAC ¶ 313; (2) reinvested those fees to develop common areas and a resort in Nicaragua, *see id*. ¶ 316; and (3) as a result, CDM: (a) had been injured by a "blockade" on building a home on the property in Nicaragua, *id*. ¶ 319; (b) has been blocked from entering the real estate market and competing with non-RSVP property owners in Nicaragua. *Id*. ¶¶ 320–321. Under this Count, the only tether to the United States is the earlier "funneling" of money to certain businesses and individuals in the United States. *See id*. ¶¶ 314–315. By the time of the actual "investment," however, which is the core of Section 1962(a), that U.S. connection is absent, and there is no indication that the "enterprise" invested in (*i.e.*, the resort

and common areas) are engaged in commerce between the United States and Nicaragua in a way that injures CDM. For this additional reason, this Court should dismiss Count II.

> iv.    **In the Alternative, CDM, Count II Fails to Plead Facts Sufficient to Show Any RICO Predicate Act Attributable to Defendants Maish, Costantino, Semenza, Tola, RS Inc., International Living, or Rancho SRL.**

Finally, as to Count II, should any part of that Count survive, this Court should at least dismiss as to Defendants Maish, Costantino, Semenza, Tola, RS Inc., International Living, and Rancho SRL for failure to plead facts sufficient to show any RICO predicate acts forming a pattern of racketeering activity. Indeed, as to Tola, RS Inc., International Living, and Rancho SRL, CDM does not even summarily allege any RICO predicate act. *See* FAC ¶¶ 148, 150, 156, 160 & 162. And, as to Defendants Maish, Costantino, and Semenza, CDM does not plead sufficient facts to show participation in a RICO predicate act, for the reasons set forth in Part III.C.2.iii, *supra*. For this reason, at a minimum, this Court should dismiss Count II as to those seven Defendants.

> c.    **This Court Should Dismiss Count III (18 U.S.C. § 1962(b)) for Failure to State a Claim Upon Which Relief Can Be Granted.**

Count III – a civil RICO claim under 18 U.S.C. § 1962(b) – suffers from similarly fatal defects in pleading. This Court should likewise dismiss Count III.

> i.    **Elements of a Claim Under 18 U.S.C. § 1962(b).**

Under 18 U.S.C. § 1962(b), "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." A claim under § 1962(b) requires the plaintiff to show injuries "'proximately caused by a RICO person gaining an interest in, or control of, the enterprise through a pattern of racketeering activity.'" *Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007).

43

The purpose of § 1962(b) is "'to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking.'" *Vanderbilt Mortgage*, 735 F. Supp. 2d at 701 (citation omitted).

### ii.   CDM's Count III Fails to Plead Facts to Show a "Domestic Injury" or a Nexus to Foreign Commerce.

Like Counts I and II, Count III fails to plead a "domestic injury" under *Nabisco* and *Yegiazaryan*. *See supra* Part III.C.2.a.ii. Defendants will not belabor the point, but CDM's allegations regarding its injury in its business and property in Nicaragua, trespass to land in Nicaragua, and loss of control of investment in Nicaragua, all concern Nicaragua and not the United States. Under the context-specific test prescribed by the Supreme Court, CDM's Count III does not state a claim under civil RICO.

And, CDM's Count III further fails to plead facts to establish a nexus to foreign commerce. *See supra* Part III.C.2.b.ii. Like Count II, Count III solely concerns the collection of dues from property owners in Nicaragua and the impacts of CDM's property rights in Nicaragua. There is no tether to U.S. commerce with Nicaragua here, let alone an enterprise that "engage[s] in, or affect[s] in some significant way, commerce directly involving the United States." *Nabisco*, 579 U.S. at 344. For these reasons, this Court should dismiss Count III.

### iii.   CDM's Count III Fails to Plead Facts Showing That Defendants Infiltrated an "Enterprise."

CDM further fails to plead facts to show that the relevant Defendants used racketeering activity to "gain[] an interest in, or control of, the enterprise through a pattern of racketeering activity.'" *Abraham*, 480 F.3d at 357. The "enterprise" that CDM pleads Defendants acquired is "the Agora Enterprise," *see* FAC ¶ 179, which is the same "enterprise" that CDM pleads Defendants operated in violation of RICO, *see id*. at ¶ 144. This is hopelessly circular and reveals CDM's misunderstanding of 18 U.S.C. § 1962(b). The purpose of that subsection is, again, to

"prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking." *Vanderbilt*, 735 F. Supp. 2d at 700. Here, CDM points to no such "enterprise" that Defendants would not have been in control of all along. If CDM's reading of subsection 1962(b) were correct, then that subsection, which this court has observed is "rarely used," *id*., would be automatically satisfied in every RICO case. This Court should reject CDM's tortured application of this subsection of RICO.

**iv.    CDM's Count III Fails to Plead a Distinct Injury Proximately Caused by Any Defendant Acquiring an Interest in the Enterprise.**

Like Count II, Count III also fails a proximate-cause analysis. CDM's claimed injuries are its having been subjected to rules and paid fees, *see* FAC ¶ 181, and the same alleged acts of extortion forming the RICO predicate acts, *see id.* (citing the alleged "blockade" and enforcement actions). This does not suffice under § 1962(b). Section 1962(b), like § 1962(a), requires that "'[t]he injury caused by the acquisition or maintenance . . . be distinct from the injury caused by the predicate acts under Section 1962(b).'" *Vanderbilt*, 735 F. Supp. 2d at 701 (quoting *Blanchard & Co., Inc. v. Contursi*, 2000 WL 574590, at *2 (E.D. La. May 11, 2000)). This is lacking from CDM's brief statement of alleged injuries under Count III. Simply put, Section 1962(b) is not designed to address the conduct at issue in this case.

**v.    In the Alternative, CDM's Count III Fails to Plead Facts Sufficient to Show Defendant Maish, Costantino, Semenza, Geerling, Boothby, Tola, RS Inc., International Living, or Rancho SRL Participated in a Pattern of RICO Predicate Acts.**

Finally as to Count III, in the alternative, this Court should dismiss the claims against Defendants Maish, Costantino, Semenza, Geerling, Boothby, Tola, RS Inc., International Living, or Rancho SRL. For the same reasons set forth in Part III.C.2.iii, CDM has failed to plead facts

45

sufficient to show participation in a pattern of RICO predicate acts, which is part of the essential element of "a pattern of racketeering activity" under § 1962(b). *See supra*.

### d. This Court Should Dismiss Count IV (18 U.S.C. § 1962(d)) for Failure to State a Claim Upon Which Relief Can Be Granted.

This Court should dismiss Count IV, brought for RICO conspiracy under 18 U.S.C. § 1962(d). A violation of § 1962(d) requires a plaintiff "to establish that a conspiracy was formed and that the acts of the conspirators violated § 1962, subsections (a), (b) or (c)." *Sheshtawy v. Conservative Club of Houston, Inc.*, No. 4:16-CV-733, 2016 WL 5871463, at *4 (S.D. Tex. Oct. 7, 2016), *aff'd sub nom. Sheshtawy v. Gray*, 697 F. App'x 380 (5th Cir. 2017). Because, for the reasons set forth above, Counts I through III fail, Count IV likewise fails. *See N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 203 (5th Cir. 2015) ("Since North Cypress failed to properly plead a claim under §§ 1962(a), (b), or (c), it correspondingly failed to properly plead a claim under § 1962(d).").

Moreover, CDM has not pleaded facts to show the essential elements of such a conspiracy. Section 1962(d) requires CDM to plead facts to show that all 14 Defendants came to such an agreement, and that each Defendant "knew of and agreed to the *overall objective* of the RICO offense." *United States v. Rosenthal*, 805 F.3d 523, 530 (5th Cir. 2015) (emphasis in original) (citation omitted). Here, through extensive group pleading and layered speculation, CDM wildly infers each Defendant's role in the decision-making, even seeking to drag four individuals into the alleged "conspiracy" based upon facially innocuous communications. *See supra* at Part II.K (statements of allegations as to Defendants Currey, Semenza, Geerling, and Boothby). More is required to proceed in federal court, especially against persons with no connections to this District. This Court should dismiss Count IV.

### 3. The Court Should Dismiss Count V (Sherman Act) for Failure to State a Claim Upon Which Relief Can Be Granted.

As to Count V under the Sherman Act, the First Amended Complaint alleges two per se Section 1 violations: a group boycott through enforcement of the Community Guidelines, *see* FAC ¶¶ 194-198, and a price-fixing scheme via a resort-managed rental program, *id.* ¶¶ 199-202. CDM's antitrust allegations fail to plead a viable claim for the following reasons, each of which is an independent ground for dismissal:

(1) The Foreign Trade Antitrust Improvements Act and related principles of extraterritoriality foreclose the claim because the alleged relevant product markets are in Nicaragua, the alleged antitrust injuries are to foreign commerce, and the U.S. nexus alleged (marketing directed at U.S. consumers and dues collected through U.S. banks) does not satisfy the "gives rise to" requirement, because those contacts do not describe how the alleged anticompetitive constrains operates on domestic trade.

(2) The per se theories of "group boycott" and "price fixing" are not plausibly pleaded because the alleged facts describe, at most, unilateral or vertical conduct and do not plausibly allege a horizontal agreement among independent competitors or a "hub and spoke" conspiracy with a rim.

(3) Once the per se theory falls away, the First Amended Complaint fails under the "rule of reason" because it does not plausibly allege a cognizable relevant market, market power, or antitrust injury that is harm to competition as opposed to harm to a single property owner.

(4) CDM has not pleaded antitrust injury or proximate causation. The injuries alleged arise from a property governance dispute and project-level rules, not market-wide reduction in output, quality, or price competition.

a.      **Extraterritoriality and the Foreign Trade Antitrust Improvements Act Bar the Claim as Pleaded.**

The Foreign Trade Antitrust Improvements Act ("FTAIA") (15 U.S.C. § 6a) bars Sherman Act claims based on conduct outside of the United States unless there is a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic commerce and the claim *proximately arises from that effect*. *See Den Norske Stats Oljeselskap AS v. HeereMac Vof*, 241 F.3d. 420 (5th Cir. 2001). The Supreme Court clarified this test, holding that conduct that is significantly foreign which causes independent foreign harm where that foreign harm gives rise to the plaintiff's claim does not fall within the "direct, substantial, and reasonably foreseeable effect" exception to the FTAIA. *F. Hoffman-LaRoche Ltd. v. Empagran S.A.,* 542 U.S. 155, 165-67 (2004) Here, the alleged anticompetitive conduct is centered in a Nicaraguan real estate development and residential rentals, administered by entities operating a resort and community in Nicaragua. To the extent that CDM alleges antitrust harm, it is harm resulting from not being permitted to participate in the Nicaraguan real estate and residential real estate markets. FAC ¶¶ 194-203. This claim is all about the market in Nicaragua. Attempting to define a demand-side geographic market as the United States based on where customers reside does not cure the foreign locus of the conduct and the foreign antitrust harm that is alleged. CDM does not plausibly allege a direct and substantial effect on U.S. domestic prices, output, or competition or that CDM was harmed by this impact on the alleged U.S. market, as opposed to incidental effects on U.S. residents who travel abroad. The U.S. nexus alleged (marketing directed at U.S. consumers, dues collected through U.S. banks) does not satisfy the "gives rise to" requirement because those actions do not describe how the alleged anticompetitive restraint effected domestic trade. Further, the First Amended Complaint does not plausibly allege that CDM's injuries, such as cessation of utilities, inability to finish a house, and alleged differential resort fee, arise from a domestic effect on U.S. commerce. *See Motorola Mobility LLC*

48

*v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015) (holding plaintiff's injury must arise out of the domestic effect from the foreign conduct). These pleading defects warrant dismissal. This Court should dismiss Count V.

>           **b.    Even Absent the FTAIA Bar, Count V Fails to State a Claim Upon Which Relief Can Be Granted.**

>                   **i.    Legal Standard.**

A claim under Section 1 of the Sherman Act requires plausible allegations of an actual agreement, whether "contract, combination …, or conspiracy" among independent economic actors, not conclusory invocations of "agreement" or mere adherence to a developer's or association's rules. "'[T]he crucial question [in a § 1 claim] is whether the challenged anticompetitive conduct stems from independent decision or from an agreement.'" *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.2d 266, 271 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 553). "Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy required by § 1." *Id.* A plaintiff therefore must allege facts suggesting agreement rather than independent action. *Twombly*, 550 U.S. at 555–70. "A naked allegation of conspiracy or agreement, without more specific factual allegations, is not to be accepted as sufficient to state a claim under Section 1 of the Sherman Act.*" Norris v. Hearst Tr.*, 500 F.3d 454, 464 (5th Cir. 2007); *see also Austin Legal Video, LLC v. Deposition Solutions, LLC*, 2024 WL 5184485, at \*6 (W.D. Tex. 2024) (dismissing claims against those defendants as to which the Amended Complaint contained no allegations of specific actions in furtherance of the alleged conspiracy).

"Per se" treatment is confined to naked horizontal restraints among competitors at the same level of the market which, in the common experience of courts, have such predictable anticompetitive effects that they warrant condemnation without extended market analysis.

*Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5 (1958); *see State Oil v. Khan*, 522 U.S. 3, 10 (1997) (reluctance to adopt per se rules to restraints imposed in context of business relationships where economic impact of the practice is not obviously pernicious). The Fifth Circuit has refused to extend per se treatment to rule-governed associations, *see Viazis v. American Ass'n of Orthodontists*, 314 F.3d 758 (5th Cir. 2002) (association rules and membership standards do not constitute per se group boycotts), to vertical or mixed restraints, *see PSKS, Inc. v. Leegin Creative Leather Prods.*, 615 F.3d 412 (5th Cir. 2010), or to collaborations with plausible procompetitive rationales, *see Spectators' Commc'n Network v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001), requiring instead a "rule of reason" inquiry.

Antitrust claims involving agreements that do not fall into the "per se" category are evaluated under the "rule of reason." *Ohio v Am. Express Co.*, 585 U.S. 529, 541 (2018). To state a claim for a violation of Section 1 of the Sherman Act under the rule of reason, a plaintiff must allege that defendants engaged in a conspiracy to restrain trade in a relevant market, which consists of both a relevant product market and geographic market. *Rx Solutions, Inc. v. Caremark, LLC*, 164 F.4th 436, 442 (5th Cir 2026). Failure to plausibly allege a relevant geographic and product market is fatal to a rule of reason claim. *Apani Sw., Inc. v. Coca Cola Enters., Inc.*, 300 F.3d. 620 (5th Cir. 2002); *see also Rx Solutions*, 164 F.4th at 442 ("A district court can dismiss Sherman Act claims for failure to properly define the relevant market."). In addition, under the rule of reason, a complaint must plausibly allege that the conspirators had market power in the relevant market. *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883 (5th Cir. 2016). Finally, the Fifth Circuit enforces a rigorous antitrust standing or antitrust-injury requirement. Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which

50

makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). As set forth herein, Count V fails each of these requirements.

> **ii.    CDM Has Failed to Plausibly Plead a Per Se Antitrust Violation.**

The per se group boycott theory fails at the threshold because the facts pleaded do not plausibly allege a horizontal *agreement among competitors* or a hub-and-spoke conspiracy with a "rim." The First Amended Complaint admits that every one of the challenged instruments "was drafted by Rancho SRL and imposed on property owners without negotiation, agreement, or vote." FAC ¶ 195. CDM further admits that the "instruments derive their purported enforcement power from the HOA structure." *Id.* The First Amended Complaint admits that the developer promulgated Community Guidelines, proclaimed a desire for uniformity of offerings, and that "many owners have already bought into it." *See* FAC ¶¶ 131 & 196. Those are allegations of a unilateral policy by a project operator and, at most, vertical adherence by owners. Allegations that market participants complied with a central actor's rules, adopted common standards, or bought into a program do not, without more, plausibly plead a horizontal agreement. *See Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 541 (1954) (following the leader or parallel business behavior by itself does not establish an agreement, much less a Sherman Act violation).

A viable hub-and-spoke boycott requires factual matter showing not only a "hub" coordinating with "spokes," but also an agreement among the spokes themselves – the "rim" – to refuse to deal. *PSKS, Inc. v. Leegin Creative Leather Products, Inc*., 2009 WL 938561, at *7 (E.D. Tex. 2009) (finding the rim of the wheel is the connecting agreements among the horizontal competitors that form the spokes), *aff'd*, 615 F.3d 412 (5th Cir. 2010). The Amended Complaint identifies no meetings, communications, or other plus factors from which the Court could

51

reasonably infer that independent homeowners agreed among themselves to exclude non-program competitors. *In re Pool Products Distribution Market Antitrust Litigation*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013) ("[E]xistence of these plus factors tends to ensure that courts punish 'concerted action' – an actual agreement – instead of the 'unilateral, independent conduct of competitors.'") (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)). Rather, the allegation in the First Amended Complaint at ¶ 196 of each owner's alleged adherence is explained by self-interest in a branded resort community and by common vertical ties to the developer. That is not a per se horizontal boycott.

The per se "price-fixing" theory is likewise implausible because the pleaded conduct is vertical or mixed, not a naked horizontal price agreement. The Amended Complaint alleges that the resort "dictates the price points" for properties within its branded rental program and imposes a Resort Fee on non-program guests. *See* FAC ¶¶ 199-200. Vertical price maintenance and program-based pricing are not per se unlawful, and the Fifth Circuit has enforced that distinction. *See Leegin Creative Products, Inc. v. PSKS*, 551 U.S. 877, 881 (2008) (holding vertical price restraints are to be judged by the rule of reason). To the extent the First Amended Complaint implies horizontal uniformity among participating owners, it pleads no facts showing an agreement among those owners to fix prices; at most, it alleges adherence to a vertical, centrally administered program with standard fees subject to rule-of-reason analysis. Assertions that non-program owners face differential access fees or that third-party managers are disfavored likewise do not transform this into a per se horizontal price-fixing pact. In short, the per se labels are not supported by nonconclusory facts, and per se treatment is unavailable on these allegations under controlling law.

52

### iii.    Market Definition, Market Power, and Rule-of-Reason Defects.

Once the per se labels fall away, the plausibility of the claim must be tested under the rule of reason. The First Amended Complaint fails that test. For starters, CDM does not allege that the alleged conduct is unlawful under the rule of reason. The First Amended Complaint alleges that the geographic market is all of "the United States," offering as rationale that most buyers or renters reside in the United States. *See* FAC ¶ 190. This is not the "geographic market" for antirust purposes. Rather, a geographic market for antitrust purposes is the "area of effective competition" where sellers compete and where "buyers can practically turn" for alternative sources. *Apani*, 300 F.3d at 626. It is not the location of customers' residences. There are no facts alleged regarding the area of effective competition, the commercial realities of the industry, or anything other than an unsubstantiated allegation to support a conclusion of economic significance in the identified market. *See Rx Solutions*, 164 F.4th at 443. Here, the alleged conduct concerns the sale and rental of property on Nicaragua's Emerald Coast. *See* FAC. Indeed, the First Amended Complaint's own product-market definitions concede that the location of competition is the Emerald Coast of Nicaragua. Under these facts, a geographic market of "the United States" based on customer location is not plausible.

The product markets are similarly unsupported. If the market is Rancho Santana itself, then the developer's unilateral control of its own community is not an antitrust problem; rather it is a developer managing property. If the market is the Emerald Coast, then it fails because the Fifth Circuit requires allegations of reasonable interchangeability and cross-elasticity of demand; bare labels like "higher-end" and a carve-out based on "unique surf access" do not suffice. *See Apani,* 300 F.3d at 626 (citing *C.E. Servs., Inc. v. Control Data Corp*., 759 F.2d 1241, 1245 (5th Cir. 1985)). The First Amended Complaint pleads no facts about substitutes within Nicaragua or across

proximate resort geographies, price sensitivity, or cross-elasticity. If a plaintiff fails to allege a "proposed relevant market that clearly does not encompass all interchangeable product substitutes even when all factual inferences are granted in the plaintiff's favor," then the "relevant market is legally insufficient, and a motion to dismiss may be granted." *Rx Solutions*, 164 F.4th at 442 (quoting *Apani*, 300 F.3d at 628). Without a cognizable product and geographic market, a rule-of-reason claim fails as a matter of law. *Id.* (citing *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*,, 56 F.4th 1026, 1036 (5th Cir. 2023)).

The First Amended Complaint is devoid of allegations that the purported conspirators possessed market power in the alleged relevant product markets. CDM does not allege market shares, barriers to entry, or durable power over price or output in any properly defined market. Nor does CDM plead facts showing a reduction in output, quality, innovation, or price competition in any market. Assertions that a branded resort program standardizes offerings or imposes fees on non-program users describe, at most, vertical brand management; they do not, without more, demonstrate harm to competition. Fifth Circuit cases involving rule-governed associations and sports or hobby markets underscore that private standards and eligibility rules are not anticompetitive absent market power and demonstrated adverse market-wide effects. *See Viazis*, 314 F.3d at 766 (showing association rules challenged under antitrust laws require a showing of market power and actual anticompetitive effects). The First Amended Complaint is silent on those fundamentals.

### iv.    CDM Does Not Plead Antitrust Injury and Proximate Causation.

The Fifth Circuit further enforces a demanding antitrust-injury requirement that defeats CDM's claim. "[A]n antitrust plaintiff must do more than meet the requirements of Article III to establish its standing to bring suit." *Rx Solutions*, 164 F.4th at 443 (citing *Sanger Ins. Agency v.*

*HUB Int'l Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015)). A plaintiff lacks standing to bring an antitrust case unless he can show antitrust injury. *See Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). Antitrust injury is an injury of the type the antitrust laws were intended to prevent and must flow from the challenged restraint's effect on the competitive process, not merely from harm to a single competitor or private disputes. *See Brunswick*, 429 U.S. at 489. "In short, the question underlying antitrust injury is whether *consumers* – not *competitors* – have been harmed." *Rx Solutions*, 164 F.4th at 444 (emphasis in original). The First Amended Complaint is silent on this core requirement. Rather, CDM solely focuses on the alleged harm it has suffered: exclusion from completing its home; inability to sell its property at fair market value to a hypothetical buyer; and a lien for unpaid dues. FAC ¶ 203. Those are governance and property-specific grievances, not competition injuries. *Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir. 1994) (noting that a Sherman Act plaintiff "may not just show that defendants' actions injured him but must also demonstrate that the defendants' actions unreasonably restrained competition"). CDM alleges no facts to show the alleged conspiracy resulted in any lost customers to any of the homeowners, or that output of vacation rentals in either of the alleged product markets declined. CDM can only posit speculative, prospective lost profits from a home not yet completed and conjectural "eliminat[ion]" from a market it has not entered. *See* FAC. ¶ 203. These alleged injuries are neither derived from, nor measure, harm to competition.

CDM also fails on causation. The pleaded utility shutoffs, access limits, and program rules are policies administered by the developer. Even were those policies unwise or wrongful in some other sense, CDM does not plausibly allege an antitrust injury proximately caused by an agreement among any alleged conspirators that harms market-wide competition. On the First Amended

Complaint's own terms, the immediate causes of CDM's harms are its disputes over fees and building or rental compliance, not a market-wide boycott or horizontal price-fixing pact.

For any or all of these reasons, this Count should dismiss Count V.

### 4. This Court Should Dismiss Count VI (Lanham Act).

Next, CDM's Lanham Act claim (Count VI) fails as a matter of law. CDM's First Amended Complaint attempts to convert decades of real estate governance disputes in Nicaragua into a U.S. false-advertising claim. CDM fails because:

1. The alleged representations are not "commercial advertising or promotion" under the Fifth Circuit's stringent test;

2. CDM fails to plausibly allege competitive injury as Defendants are not in commercial competition with CDM;

3. CDM fails to allege the representations were made "in connection with" goods or services in commerce; and

4. CDM's claims are untimely, at least in part.

Even accepting CDM's 75-page narrative as true, Count VI does not satisfy the elements required under binding Fifth Circuit precedent, therefore, Count VI should be dismissed with prejudice.

### a. The Alleged Representations Do Not Constitute "Commercial Advertising or Promotion."

Under Fifth Circuit precedent, a statement constitutes "commercial advertising or promotion" under the Lanham Act only when it is: (1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy the defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public

to constitute "advertising" or "promotion" within that industry. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996).

Several of CDM's alleged representations fail this test. For example, CDM's allegations about a single FAQ document from 2007, *see* FAC ¶ 208(c), and a single blog post from March 2010, *id.* ¶ 208(d), are isolated statements that were not disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion. A stray FAQ answer and a single blog post by a sales manager are not the type of widespread promotional activity the Lanham Act was intended to reach.

Moreover, the Broker Regulations' required language that listings state "This is an exclusive listing of Rancho Santana Property & Luxury Real Estate," is not advertising by Defendants at all. FAC ¶ 208(f). Rather, it is an internal business rule imposed on brokers. Even if any resulting broker's statement could be actionable (and was actually made, which CDM does not allege), CDM has not alleged that any Lanham Act Defendant itself disseminated the challenged language to the broader, relevant purchasing public.

Finally, the "Employers' Compliance" document containing references to APROSA, *see* FAC ¶ 208(g), is an employment compliance document, not commercial advertising or promotion directed at prospective property purchasers or vacation renters. An internal human resources document containing incidental references to a now-defunct association is simply not commercial speech designed to influence consumers.

> **b.      Several Alleged Representations are Non-Actionable Puffery, Opinion, or Omissions.**

The essential question presented by a Lanham Act claim is "whether the challenged statement is one of fact . . . or one of general opinion." *See Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495–96 (5th Cir. 2000). The former is actionable under the Act, whereas the

latter is not. *See id.* "Bald assertions of superiority or general statements of opinion cannot form the basis of Lanham Act liability." *Id.* at 496. To be actionable, "the statements at issue must be a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" *Id.*

CDM alleges Lanham Act Defendants represented Rancho Santana as being an "accidental development" that "has and continues to develop naturally from the interests our residents have in a certain lifestyle." FAC ¶ 208(a). This is a classic example of puffery. It is a vague, subjective characterization of the community's ethos and evolution that no reasonable consumer would interpret as a specific factual claim susceptible to proof or disproof. *Pizza Hut,* 227 F.3d at 496 (requiring a Lanham Act claim to be a specific and measurable claim capable of being proved false or of being reasonably interpreted as a statement of objective fact); *Greater Houston Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 683 (S.D. Tex. 2015) ("The statement, 'SAFEST RIDE ON THE ROAD—Going the Distance to Put People First' is a bald assertion of superiority—a general, subjective claim that lacks concrete measurability."). Whether a development is "accidental" or "natural" is a matter of characterization and perspective, not a falsifiable factual proposition.

CDM next contends the statement that "Rancho Santana is a safe and prudent decision" where you would "know the developer and the development in a way that you can trust" is actionable under the Lanham Act. CDM is wrong; this is likewise non-actionable opinion and puffery. FAC ¶ 208(d). These representations are merely subjective judgments on certain lifestyle values, not specific factual claims. there is no objective measure that could be used to prove that Rancho Santana is a "safe and prudent decision." Further, the statement that accounting books

would not be "cooked" only emphasizes the colloquial assurance of honesty, not any specific factual representation about accounting practices.

Additionally, to the extent CDM's claims rest on what the Lanham Act Defendants failed to disclose – for example, that they were "concealing the dysfunctional HOA governance structure" or "transforming Rancho Santana into a developer-controlled resort" – such alleged omissions are not actionable under the Lanham Act. *See* FAC ¶ 208(d). Instead, the statute targets affirmative false statements, not failures to disclose. *See IQ Products Co. v. Pennzoil Products Co.,* 305 F.3d 368, 375 (5th Cir. 2002) (distinguishing between affirmative misrepresentations and failures to label a product, holding that the latter did not constitute actionable false advertising under the Lanham Act).

Therefore, because the above-referenced statements cited in the First Amended Complaint, *see* FAC ¶ 208 (a) & (d), are not subject to empirical verification, the Court should find these statements to be non-actionable puffery and therefore fail to state a claim under the Lanham Act. *Pizza Hut,* 227 F.3d at 496.

### c.     CDM Fails to Plausible Allege Competitive Injury.

CDM further fails to allege facts to show a competitive injury. *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), established the test for determining whether a plaintiff has a cause of action under Section 43(a)(1)(B) of the Lanham Act. At the threshold, a plaintiff must fall within the "zone of interests" protected by the statute, meaning a plaintiff must allege "an injury to a commercial interest in reputation or sales." *Id.* at 131–32. CDM fails that element. CDM is a single-lot property owner that has never completed a home, never entered the vacation rental market, and never consummated a sale or rental transaction. FAC ¶ 122. CDM is, at most, an aspiring market participant whose entry has been blocked – but blocked, on

CDM's own allegations, by physical obstruction and regulatory restrictions, not by false advertising.

CDM's theory of competitive injury is therefore circular: it alleges that Defendants' false advertising "concealed" the conduct that ultimately excluded CDM from the market, FAC ¶ 212, but the injury CDM actually seeks to remedy is the exclusion itself, which has nothing to do with advertising. CDM does not allege that any consumer or guest at Rancho Santana chose to purchase or rent from Defendants rather than CDM because of any false advertising, because CDM has no property that can be rented. CDM does not allege any diversion of sales. CDM does not even allege any damage to its commercial reputation. Instead, CDM's injuries are property injuries and governance injuries, the very type of harm that (if it were otherwise well pleaded) sounds in fraud, breach of contract, or property tort, not in the Lanham Act.

### d.     CDM Fails to Allege the Representations Were Made "In Connection With" Goods or Services in Commerce.

The Lanham Act requires that the challenged representations be made "on or in connection with any goods or services" and "in commerce." 15 U.S.C. § 1125(a)(1). CDM's Lanham Act claim fundamentally concerns the governance and management of a Nicaraguan real estate development – not the advertising of goods or services in commerce. Several of CDM's alleged representations concern internal governance matters, such as HOA structures, building guidelines, employer compliance documents, *see* FAC ¶ 208(c), (f), (g), that are not connected to the promotion of goods or services. The Lanham Act is not a general fraud statute and should not be used to police every aspect of a business relationship. Moreover, the representations concern real property. While the Lanham Act may reach certain conduct affecting U.S. commerce, CDM has not adequately alleged that these representations concern "goods or services" within the traditional

60

meaning of the statute. Real estate is not a "good" or "service" in the typical Lanham Act sense,[10] and CDM's attempt to characterize the sale of Nicaraguan real property as the sale of "vacation rental services" does not transform what is, at its core, a real property dispute into a false advertising case.

### e. CDM's Claims Are Untimely as to Certain Representations.

In the alternative, this Court should at least dismiss Count VI as time barred to the extent that it relies on representations occurring earlier than December 22, 2021. The Lanham Act borrows the most analogous state statute of limitations. *Edmark Indus. SDN. BHD. v. S. Asia Intern. (H.K.) Ltd*., 89 F. Supp. 2d 840, 846 (E.D. Tex. 2000). In Texas, that is the four-year residual statute of limitations under Texas Civil Practice and Remedies Code § 16.004. *Derrick Mfg. Corp. v. Southwestern Wire Cloth, Inc.,* 934 F. Supp. 796, 805 (S.D. Tex. 1996) (holding that the Texas four-year statute of limitations applies to Lanham Act claims under § 43(a)).  CDM filed this action on December 22, 2025. *See* ECF No. 1. Any representation made before December 22, 2021, is therefore time-barred absent application of a tolling doctrine.

At least five of CDM's alleged misrepresentations, listed at Paragraph 208(a) through (e) in CDM's First Amended Complaint, were made no later than 2012. FAC ¶ 208(a)-(e). CDM's representation (b), regarding the website statements about HOAs, ended by at least August 2012

---

[10] The Lanham Act does not define "goods" or "services," the meaning of which should therefore be "deduce[d] . . . from other defined terms and common usage." *See Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 323 (4th Cir. 2015). The Fourth Circuit, in *Radiance* offered the following definitions: (1) that a "good" is "best understood as a valuable product, physical or otherwise, that the consumer may herself employ" (citing 15 U.S.C. § 1127 and Black's Law Dictionary (10th ed. 2014)); and (2) that a "service" is "a more amorphous concept, 'denot[ing] an intangible commodity in the form of human effort, such as labor, skill, or advice'" (quoting Black's Law Dictionary). While "'goods and services' remains a broad and potentially fuzzy concept," *id*., real property is neither of those things. *See also Pillar Panama, S.A. v. DeLape*, No. CIV. A. H-07-1922, 2008 WL 1967118, at *5 (S.D. Tex. May 1, 2008), ("The Lanham act only applies to goods and services—not land.") *modified on other grounds*, 326 F. App'x 740 (5th Cir. 2009).

on CDM's own allegations. *Id.* ¶ 208(b). Relatedly, CDM's representation (c) dates to 2007. *Id.* ¶ 208(c). CDM's representation (d) dates to March 2010. *Id.* ¶ 208(d). CDM's representation (e), regarding the *Palm Beach Letter* and *International Living* cross-promotions, ended by December 2013, nearly eight years before the statute of limitations expired. *Id.* ¶ 208(e). CDM cannot plausibly invoke the discovery rule because CDM simultaneously alleges that it was in continuous communication with Defendants, received invoices, attended meetings, and participated in the Rancho Santana community. Indeed, CDM concedes that its managing member relied on these representations when purchasing the lot in 2013, so CDM was aware of the representations at the time they were made. CDM cannot claim it failed to discover the falsity of these representations when the First Amended Complaint alleges that other owners were raising concerns about the HOA structure as early as 2006. FAC ¶¶ 55–58.

For any or all these reasons, this Court should dismiss Count VI.

### 5.     This Court Should Dismiss the Remaining Tort Claims.

Upon dismissing the federal claims at Counts I through VI, this Court should decline jurisdiction over the remaining claims under 28 U.S.C. § 1367(c)(3). In the alternative, this Court should dismiss each for failure to state a claim upon which relief can be granted.

#### a.     This Court Should Decline to Exercise Jurisdiction Over the Tort Claims Not Within Its Original Jurisdiction.

None of Counts VII through XI arises under federal law. Nor has CDM included a prayer for relief in excess of $75,000 to invoke diversity jurisdiction under 28 U.S.C. § 1332(a). Indeed, CDM omitted § 1332(a) from its jurisdictional allegations. *See* FAC ¶ 18. Thus, the sole basis for jurisdiction over Counts VII through XI comes through 28 U.S.C. § 1367. If this Court dismisses each of the federal claims at Counts I through VI, it should decline to exercise that supplemental jurisdiction, as authorized under 28 U.S.C. § 1367(c)(3) after "the district court has dismissed all

62

claims over which it has original jurisdiction." While the statute is discretionary, "the general rule in the Fifth Circuit is to dismiss state law claims when the federal claims they supplement are dismissed." *Reed v. Marshall*, 699 F. Supp. 3d 563, 588 (S.D. Tex. 2023), *aff'd*, 142 F.4th 338 (5th Cir. 2025). Nothing in this matter counsels for departing from that rule, especially given that the remaining claims have no connection to this District.

### b. If this Court Retains Jurisdiction, It Should Dismiss the Tort Claims for Failure to State a Claim Upon Which Relief Can Be Granted.

If this Court retains jurisdiction over the tort claims, however, it should dismiss each for failure to state a claim upon which relief can be granted. Defendants will address each in turn.

### i. Count VII (Texas Free Enterprise and Antitrust Act).

Under Count VII, CDM invokes the Texas Free Enterprise and Antitrust Act (the "TFEAA") to seek a civil remedy under state law for Defendants' alleged anticompetitive behavior affecting the vacation rental market in Nicaragua. *See* FAC ¶ 218. As stated above, CDM's federal antitrust claim fails. *See supra* Part III.C.3. The same rationale applies to CDM's claims under the State antitrust law, which is generally to be "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes . . . ." *See* TEX. BUS. & COM. CODE § 15.04; *Caller-Times Publ'g Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576 (Tex. 1992).

Further, under Texas law, there is a "strong presumption against extraterritorial application of a Texas statute, which cannot be overcome by implication 'but only when such intent is clear.'" *Pohl v. Cheatham*, 718 S.W. 3d 173, 183 (Tex. 2025). Here, not only is that presumption unrebutted, it is included in the statute. TEX. BUS. & COM. CODE § 15.04 declares the purpose of the TFEAA as "to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state." *See also Destec Energy, Inc. v. Southern California Gas Co.*, 5 F. Supp.

63

2d 433, 464 (S.D. Tex. 1997) (dismissing claims under TFEAA where conduct occurred in California, noting that the statute "does not provide that any conduct that has some effect on a Texas entity is subject to Texas antitrust laws"), *aff'd*, 172 F.3d 866 (5th Cir. 1999).

Here, CDM first states that the alleged conduct "has injured competition involving Texas" because the Community Guidelines, Rental Guidelines, Broker Regulations, and "group boycott" restrained CDM as a "competitor" competing in the "relevant markets." *See* FAC ¶ 218. This theory, however, fails to identify any Texas consumers (which, under this theory, would be renters of vacation homes) being harmed, which is the entire purpose of the TFEAA. *See* TEX. BUS. & COM. CODE § 15.04.

Presumably recognizing this, CDM changes hats mid-Paragraph, and suddenly claims that it is the "Texas consumer" (rather than the "competitor") that was solicited to purchase real property through Agora's publications (citing the *Palm Beach Letter* and *International Living*) and was enticed to enter the vacation real estate market as a purchaser. *See* FAC ¶ 218. This theory, however, does not plead facts to fit the mold of a TFEAA claim, which are: "(1) an agreement, conspiracy, or combination of two or more persons or distinct business entities, (2) which is intended to harm or unreasonably restrain competition, and (3) which actually causes injury to competition, beyond the impact of the claimant, within a field of commerce in which plaintiff is engaged." *Tour Strategy LLC v. Star-Telegram, Inc.*, No. 4:18-CV-074-A, 2018 WL 3242280, at *5 (N.D. Tex. July 3, 2018) (TFEAA requires "the same elements of proof" of a claim under Section 1 of the Sherman Act). The First Amended Complaint is bereft of any allegations that any Defendant – let alone all of them – conspired pre-2013 to cut off competitive sellers of other vacation property in Nicaragua or any other relevant market. Indeed, the First Amended Complaint does not even allege that any Defendant sold Lot G16 to CDM. *See generally id*.

Regardless, even if CDM's claim of standing as a "consumer" was anywhere remotely close to plausibility, it would still be subject to dismissal. The latest alleged sending of a publication into Texas is alleged to have occurred only as recently as 2013, which is when CDM purchased Lot G16. *See* FAC ¶¶ 43 & 47. The statute of limitations on a TFEAA claim is four years. TEX. BUS. & COM. CODE § 15.25. The Original Complaint was filed on December 22, 2025. To the extent that any of those publications conceivably constitute an antitrust violation, limitations has run on those claims three times over.

For these reasons, this Court should dismiss Count VII.

### ii. Count VIII (Fraud).

Next, this Court should dismiss CDM's Count VIII for fraud. Common-law fraud claims consist of five elements: (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury. *Wesdem, L.L.C. v. Illinois Tool Works, Inc*., 70 F.4th 285, 291 (5th Cir. 2023). Federal Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "[T]he Rule 9(b) standards require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc*. 407 F.3d 690, 696 (5th Cir.2005). Thus, "the who, what, when, and where must be laid out before access to the discovery process is granted." *Williams v. WMX Technologies, Inc*., 112 F.3d 175, 178 (5th Cir. 1997); *see also id*. at 177 (concluding that State-law fraud claims do not escape Rule 9(b)'s pleading requirement). Count VIII is subject to that heightened pleading standard, and CDM cannot establish the elements of its fraud claim with particularity. *See Sullivan v. Leor Energy,*

*LLC*, 600 F.3d 542, 550–51 (5th Cir. 2010). CDM claims five representations it contends were fraudulent. Defendants will address each in turn.

First, CDM cites under Paragraph 223(a) of the First Amended Complaint the representation "that Rancho Santana was a private residential community with a functioning HOA that owned or would own common facilities, when in fact the developers never intended to relinquish control to owners and serially created, replaced, and abandoned HOA structures without permitting any to mature into a legitimate, owner-controlled governance body." This statement lacks the requisite specificity required under Rule 9(b). Searching elsewhere in the First Amended Complaint, this Court will see vague references to such statements, *see* FAC ¶¶ 48, 59 and 63, but these fail to plead with particularity who was responsible for each statement, how that person knew such claim to be false, which (if any) representations CDM saw and when, nor any facts to show that the person who made that statement knew and intended that CDM would rely.

The closest that CDM can seem to muster as to scienter is a statement from a former Rancho Santana executive (Laura Davis) in a 2023 YouTube video. As CDM selectively quotes Ms. Davis, the former executive stated decades after the fact that "the theory was you go in and sell all the land, you turn the HOA over to the community, and you get out. That just didn't happen." *See* FAC at ¶¶ 30, 62 & 224 (quoting *The Pacific Frontier: the Story of Rancho Santana* ("*The Story*"), https://www.youtube.com/watch?v=hLpEaP7HbuM, at time stamps 9:34 to 9:42). From this, CDM asks this Court to infer that the developers *never* intended to hand over governance to an owner-controlled HOA. CDM conveniently ignores Ms. Davis's statement just seconds before, which establishes the opposite of CDM's inference:

> Davis:   . . . I knew that we were selling a lot of the land to our subscribers who were sort of older and more affluent, and I thought "How are we going to sell these lots in this land to folks when they gotta get off the airplane and drive through these roads?" It was crazy, but

66

> then we got here, and it was so beautiful, and I thought "Oh my gosh." I was probably here three times working, and I called my husband on one of those big satellite phones. He had never been here. I was like, "Guess what? We're going to live in Nicaragua." He's like, "You're crazy. Nicaragua?" So, it's kind of interesting, because *I think the initial thought was that we would get in and out you know that as developers in a foreign country*, and we had all these subscribers, so we had a kind of a base of folks that were going to buy the land.
>
> . . . .
>
> You know, the theory was, when you go in you, sell all the land you turn the HOA over to the community, and you get out. That just didn't happen.

*See The Story*, https://www.youtube.com/watch?v=hLpEaP7HbuM at 8:24 to 9:42.[11] Taken in full, Ms. Davis's statement does not reflect the devious plot that CDM paints, but, rather, that a developer-to-HOA model was the original intent.

Second, CDM cites the representation "that CDM was a member of APROSA with all attendant rights and obligations, as represented in CDM's purchase and sale agreement and transfer deed, when in fact APROSA was not functioning as an HOA and had not fulfilled its legal obligations for years before being formally terminated by the Nicaraguan government in October 2022." FAC ¶ 233(b). CDM does not allege, however, that any Defendant prepared that purchase and sale agreement or transfer deed (having previously admitted in the Original Complaint that CDM purchased the Lot from a private property owner). Likewise, CDM fails to allege with particularity the elements of fraud as to this statement.

Third, CDM cites the representation "that the annual payments were 'dues' owed to an HOA and enforceable by lien, when in fact no operative HOA existed and the payments were

---

[11] This YouTube video was cited throughout the First Amended Complaint by hyperlink, and it is appropriately before this Court in full as incorporated into and made part of the pleading. *See* FAC at footnotes. 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, and 15.

67

routed through a succession of Agora-affiliated entities to bank accounts in Baltimore." FAC ¶ 233(c). CDM does not plead with sufficient particularity who is said to have made such statements and when, let alone how they were made known to CDM prior to its election to stop paying in 2023. The pleading is vague in this regard. *See* FAC ¶ 49 (stating that "buyers" were told of lien rights "by the time of . . . 2022" through "purchase agreements, transfer deeds, invoices, and website representations"); FAC ¶¶ 53 & 148(b) (Turner proposing new covenants in 2004 – nine years before CDM came into existence – with lien rights); ¶ 63 (referring to "purchase agreements, deeds, and invoices" referencing lien rights in 2022); ¶ 76 (citing Community Guidelines effective March 1, 2024 – after CDM stopped paying – granting lien right to Rancho SRL).[12]

Fourth, CDM cites the representation "that Rancho Santana offered rental opportunities for property owners, when in fact Fraud Defendants were simultaneously transforming Rancho Santana into a developer-controlled resort that would compete directly with independently renting owners and restrict their ability to rent through the Rental Guidelines, Resort Fee, and Broker Regulations." FAC ¶ 233(d). This subparagraph of the First Amended Complaint is entirely unclear as to what representation is being referenced. On Defendants' review, the closest referents appear to be: (1) a statement by Defendant Turner in approximately May 2000 and for "many years afterward," in

---

[12] Some paragraphs of the First Amended Complaint come closer but remain deficient. For example, Paragraph 64 cites a statement by Defendant Maish on May 15, 2023 that there was "no homeowners' association" and that the charges were "fee for service," despite what CDM cites as "years of invoices from Costantino [that] represented the payments as HOA dues enforceable by a lien." Something had changed between the sending of those invoices and Maish's May 13, 2025 statement, however, which was the termination of APROSA. *See* FAC ¶ 67. Thus, Maish's statement cannot plausibly reflect Costantino's scienter for any statements on invoices that predated that termination. Or, Paragraph 149(a) states that CDM's 2013 purchase and sale agreement stated that it was "subject to APROSA, with all rights and obligations, backed by the power of lien." CDM does not allege, however, that any Defendant was involved in the drafting of that purchase and sale agreement, knew of its contents or any falsity thereof, or intended that CDM rely on it to CDM's detriment. Nor, indeed, does CDM even allege that such a statement was *false*, as APROSA was still in existence in 2013. *See id*. ¶ 67.

which he is said as part of the original pitch to Agroa subscribers to have "emphasized home rental as a means to finance buying into and retiring in the Rancho Santana community," *see* FAC ¶¶ 36-37; and (2) an email from Defendant Ford on February 9, 2013 that most homeowners are in Rancho Santana part time and rent them out, as Ford himself did, *see id.* ¶ 40. Nowhere in these allegations, or elsewhere in the First Amended Complaint, is it alleged with particularity that these statements were false when made. Indeed, the Rental Guidelines, Resort Fee, and Broker Regulations, with which CDM alleges these statements are in conflict, did not arise until nine to 25 years later. *Cf. id.* ¶ 88. Nor does the First Amended Complaint allege particular facts to show that Turner or Ford knew that these statements were false when made, that Turner or Ford intended CDM or any other purchaser to rely on them, nor that CDM relied on those specific statements (as CDM only vaguely and collectively alleges that CDM's principal placed "trust in the representations made by the founders and their publications," *see id.* ¶ 44).

And <u>fifth</u>, CDM cites the representation "that CDM was subject to building guidelines enforceable by fines, when in fact CDM never received nor signed any building guidelines, and no contractual agreement existed between Rancho SRL and CDM binding both parties to building terms." FAC ¶ 233(e). The referent of this statement seems to be communications from Defendant Semenza in his role as the Architectural Review Committee Administrator. *See id.* at ¶¶ 109-110, 118-119. Semenza is alleged to have: (1) requested payments of $1,000 and $2,677 in 2021 and 2022 for fees relating to the Building Guidelines, which CDM paid in full by April 7, 2022, *id.* at ¶¶ 109-110; and (2) informed Julapalli in 2024 that fines would ensue for failure to comply with the Building Guidelines, although "[o]n information and belief," Semenza "knew there was no signed agreement between Rancho SRL and Julapalli or CDM binding both parties to billing terms," *id.* at ¶¶ 118-119. Both theories fail to state a claim for fraud under Rule 9(b).

69

As to the requests for payments in 2021 and 2022, CDM cannot plead facts to show reliance. If CDM is correct that it did not receive and was therefore not bound by any Building Guidelines, that is a fact that CDM would already have known given CDM's participation in the purchase of the property in 2013. *See id*. ¶¶ 47-48. As to the 2024 statements that fines would accrue for failure to comply with the Guidelines, CDM cannot show reliance or injury, since CDM does not allege taking any action whatsoever in response to those statements. *See id*. ¶¶ 109-110. And, as to both set of statements, CDM fails to plead facts with particularity to show Semenza's knowledge of the alleged "falsity." CDM's allegations in this respect are conclusory and couched as "on information and belief." *Id*. ¶¶ 118-119. This fails Rule 9(b). "Although fraud may be pled on information and belief if the facts relating to the alleged fraud are 'peculiarly within the perpetrator's knowledge,' the Fifth Circuit has warned that 'this exception "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" *Moody Nat. Realty v. Ozark Mgmt., Inc.*, No. 4:07-CV-3239, 2008 WL 8082760, at *6 (S.D. Tex. Apr. 22, 2008) (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). Moreover, "'even where allegations are based on information and belief, the complaint must set forth a factual basis for such belief.'" *Id*. (quoting *Thompson*). This is absent as to Paragraph 233(e) of the First Amended Complaint, which further fails to state a plausible and particularized claim of fraud.

For these reasons, this Court should dismiss Count VIII.

### iii.    Count IX (Trespass).

Next, this Court should dismiss CDM's trespass claim. CDM largely bases this claim on the so-called "water skirmish" event, during which CDM's agents allege that Rancho SRL's agents entered onto CDM's property. FAC ¶¶ 108-113 & 231. This is alleged to have occurred between August 28, 2023 and September 6, 2023. *See id*. The statute of limitations for a trespass claim in

70

Texas is two years. *See* TEX. CIV. PRAC. & REM. CODE § 16.003(a). CDM filed the Complaint on December 22, 2025, which is more than two years after any claim accrued. CDM's principal claim for trespass is therefore time barred.

Attempting to save Count IX from dismissal, CDM now alleges that "[o]n information and belief," Rancho SRL personnel have entered Lot G16 on "one or more additional occasions" on unspecified dates. *Id.* ¶¶ 121 and 231. Plainly, CDM is speculating. In the same breath that CDM states this "information and belief" allegation, CDM pleads that it "has no means of monitoring its property between visits." *Id.* ¶ 121. While it is permissible to plead on information and belief, the pleader must at least have "'sufficient data to justify interposing an allegation on the subject,'" *Dominguez v. Target Corp.*, *Dominguez v. Target Corp.*, No. 5:18-CV-23, 2019 WL 1004569, at *2 (S.D. Tex. Feb. 8, 2019), *report and recommendation adopted*, No. 5:18-CV-23, 2019 WL 1003405 (S.D. Tex. Feb. 28, 2019) (citation omitted), lest the Court allows the case to proceed on allegations that do not "raise a right to relief above the speculative level," *Twombly*, 550 U.S. 555. This Court should not credit CDM's bare speculation and instead dismiss Count IX for failure to state a claim upon which relief can be granted.

### iv.   Count X (Tortious Interference).

Next, this Court should dismiss Count X for tortious interference. A tortious interference with a prospective relation claim has five elements: (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *Coinmach Corp. v. Aspenwood Apartment Corp.,* 417 S.W.3d 909, 923 (Tex. 2013).

CDM's Count X fails the first element of reasonably probability of a business relationship. As summarized by the Fifth Circuit, Texas law requires that a future business relationship would have been "'reasonably probable, considering all the facts and circumstances attendant to the transaction,'" *Peykoff v. Cawley*, No. 24-10186, 2025 WL 1380070, at *6 (5th Cir. May 13, 2025) (quoting *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475-76 (Tex. App. 2006)), and that "Texas courts have rejected claims for tortious interference with business relationships where plaintiffs asserted that 'mere negotiations' occurred," *id*. (citations omitted). Here, CDM supposes that but for the alleged interference, it might have entered the rental market or had a reasonable chance to sell Lot G16 at fair market value. FAC ¶ 239. But, CDM identifies no prospective renter or buyer. *See id*. Thus, CDM alleges *less* than "mere negotiations." This is insufficient as a matter of law to state a claim for tortious interference.

CDM's claim also requires "independently tortious or unlawful conduct." As shown above, the predicate theories for RICO, antitrust, fraud, and trespass necessarily fail. Policy decisions and fee schedules within a development – even if disputed – are not independently tortious or unlawful as pleaded, and CDM's tortious interference with a prospective business relationship claim should be dismissed.

### v.     Count XI (Civil Conspiracy).

Finally, this Court should dismiss CDM's civil conspiracy claim under Count XI. Under Texas law, "civil conspiracy [is] a 'derivative tort,' meaning it depends on some underlying tort or other illegal act." *See e.g.*, *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140-41 (Tex. 2019); *Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008); *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). The "use of the word 'derivative' in this context means a civil conspiracy claim is connected to the underlying tort and survives or fails alongside it." *Agar*, 580 S.W.3d at 140–41. Here, each of CDM's underlying claims fail, therefore, Count XI must also fail.

## IV.    Conclusion.

For the foregoing reasons, this Court should dismiss the First Amended Complaint in its entirety. Further, because CDM has already amended once and any further amendment would be future, that dismissal should be without further leave to amend. *See, e.g.*, *Bittinger v. Wells Fargo Bank*, 744 F. Supp. 2d 619, 626 (S.D. Tex. 2010).

Respectfully submitted,

By: */s/ Emma L. Short*                    
**Emma L. Short**
Texas Bar No. 24101001
Federal ID No. 3501711
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ. P.C.**
1301 McKinney Street, Suite 3700
Houston, Texas 77010
Telephone: (713) 650-9700
Facsimile:  (713) 650-9701
eshort@bakerdonelson.com

*Attorney for Defendants*

By: */s/ Christopher C. Dahl*   
**Christopher C. Dahl**
*Admitted pro hac vice*
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ. P.C.**
**100 Light Street. 19th Floor**
Baltimore, Maryland 21202
Telephone: (410) 862-1134
cdahl@bakerdonelson.com

*Attorney for Defendants*

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with counsel for CDM about this Motion and the relief sought herein on April 2, 2026, via videoconference. After discussing the relief sought in the Motion and the grounds supporting the arguments therein, CDM noted its opposition to the Motion in its entirety.

*/s/ Christopher C. Dahl*             
Christopher C. Dahl

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon all parties of record via the ECF filing system on April 7, 2026.

*/s/ Emma L. Short*               
Emma L. Short