IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CASA DE MARAVILLA, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 4:25-cv-6183 |
| v. | § | |
| | § | |
| | § | |
| BONNER, WILLIAM, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED COMPLAINT**

Plaintiff Casa de Maravilla, LLC ("CDM") respectfully opposes Defendants' Motion to

Dismiss First Amended Complaint, ECF No. 33, and states as follows:

## I.  SUMMARY OF ARGUMENT

• **Personal jurisdiction exists through four distinct bases, including specific jurisdiction over anchor defendants and three federal nationwide-service statutes;**

• **Forum non conveniens fails because Nicaragua lacks any framework for 10/11 counts, and a Nicaraguan attorney attests that CDM cannot obtain a fair trial there.**

• **CDM's RICO injury is overwhelmingly domestic under the Supreme Court's *Yegiazaryan* framework;**

• **Predicate acts are conceded against five Defendants and expressly pleaded against the rest;**

• **Counts II–IV allege distinct §§ 1962(a), (b), and (d) injuries;**

• **The Sherman Act claim survives because Rancho SRL and its co-conspirators are horizontal competitors enforcing per se illegal boycotts and price-fixing;**

• **The Lanham Act claim rests on verifiable falsehoods confirmed false by the CEO himself; and Counts VII–XI state plausible claims surviving limitations through the discovery rule and continuing violation doctrines.**

**TABLE OF CONTENTS**

I. SUMMARY OF ARGUMENT.................................................................................................1

II. FACTUAL BACKGROUND............................................................................................10

    A. Agora's Marketing Muscle and CDM's Purchase .............................................10

    B. The Serial HOA Fraud ........................................................................................12

    C. The Dues Collection Scheme ..............................................................................14

    D. The Collapse and Defendants' Admissions .......................................................15

    E. The Enforcement Campaign Against CDM ........................................................16

    F. The Resort Transformation and Horizontal Competition ...................................18

III. PROCEDURAL BACKGROUND...................................................................................20

IV. STANDARD OF REVIEW.............................................................................................21

    A. Personal Jurisdiction ..........................................................................................21

    B. Forum Non Conveniens ......................................................................................21

    C. Failure to State a Claim ......................................................................................21

V. ARGUMENT...................................................................................................................22

    A. This Court Has Personal Jurisdiction Through Four Distinct Bases—Including
       Defendants' Own Concession of Colorable RICO Claims. ................................22

       1. Specific jurisdiction exists because Costantino's decade of tortious communications
          into Texas "alone constitutes purposeful availment." ....................................23

          a. Costantino and Rancho SRL directed tortious acts toward Texas. ...........23

          b. Agora directed tortious acts toward Texas. .............................................25

          c. Ford directed tortious acts toward Texas. ...............................................26

       2. Three federal statutes/rules independently extend jurisdiction to all Defendants
          through nationwide service of process. ...........................................................26

          a. "The ends of justice" require jurisdiction under 18 U.S.C. § 1965(b). ......26

          b. Personal jurisdiction is satisfied under FRCP 4(k)(2). .............................27

          c. Corporation Defendants are subject to jurisdiction via 15 U.S.C. § 22. ...28

       3. The exercise of jurisdiction is fair and reasonable. ........................................29

    B. Forum Non Conveniens Fails Because Nicaragua Has No Legal Framework for Ten of
       Eleven Counts and is Inadequate to Treat CDM Fairly Under Them. ...............30

       1. Nicaragua cannot adjudicate ten of CDM's eleven counts. ............................30

2. Defendants' expert addressed only property disputes—confirming no expert can opine Nicaragua handles RICO, antitrust, or the Lanham Act. .....................................32

3. As a domestic plaintiff, CDM's forum choice is entitled to maximum deference. .........33

4. Private interest factors favor this Court. ...............................................................34

5. Public interest factors overwhelmingly favor retention in the U.S. ................................35

6. The Nicaraguan easement proceeding is a non sequitur. .....................................36

C. CDM's Injury Is Overwhelmingly Domestic Under *Yegiazaryan*: Stronger Than the Case Itself on Every Factor. ...........................................................................37

1. *Yegiazaryan* requires a context-specific inquiry, not a single-factor test. .......................37

2. Every *Yegiazaryan* factor points to the U.S. ...................................................38

    a. The nature of CDM's injury is domestic. .....................................................38

    b. The racketeering activity is domestic. .........................................................38

    c. The injurious aims and effects are domestic. ...............................................39

3. CDM's case is *stronger* than *Yegiazaryan* on every factor. .............................39

4. Defendants' "international friction" argument cuts against them. ................................40

D. Predicate Acts under RICO are Conceded Against Five Defendants and Expressly Pleaded Against the Rest. ...............................................................................41

1. Mail/wire fraud is plausibly alleged against eight of ten Defendants, on the MTD's *own terms*. .................................................................................................41

    a. Defendants concede mail/wire fraud against five Defendants. .................................41

    b. Defendants stopped reading at paragraph 148. .........................................41

2. Geerling's predicate acts are plausibly alleged. ...........................................43

    a. Two predicate acts in 2003: ...................................................................43

    b. Two more in 2023: ...............................................................................43

    c. Pattern requirement satisfied: ...............................................................44

3. Boothby's predicate acts are plausibly alleged. ..........................................44

4. Defendants ignore CDM's actual extortion theory: fear of economic harm under *Tomblin* and *Rashad*. .............................................................................45

5. Money laundering proximately caused CDM's continued injury. ................................46

6. National Stolen Property and Travel Act violations are plausibly alleged. ....................47

7. The pattern requirement is overwhelmingly satisfied. .................................................48

E. CDM Has Plausibly Alleged Violations of Counts II-IV: §§1962(a), (b), AND (d). .........49

1. Count II: the investment injury is categorically distinct from the fraud. .........................49

   a. CDM has pleaded a distinct §1962(a) investment injury. ..........................................49

   b. The MTD's domestic-injury and commerce-nexus arguments recycle failures from Count I. ...................................................................................................................50

   c. The entity Defendants received racketeering income indirectly. ..............................50

2. Count III: §1962(b) prohibits *maintaining* control through racketeering— which is exactly what happened here. ...........................................................................................51

   a. "Acquire or maintain": Defendants read only the first word. ...................................51

   b. The §1962(b) injury is distinct. .................................................................................52

   c. *RJR Nabisco* forecloses the commerce-nexus argument. ..........................................52

   d. The entity Defendants are liable through vicarious liability. ....................................53

3. Count IV: the conspiracy is pleaded with specificity. ......................................................53

F. Rancho SRL Admits It is "Competing Against" Property Owners, Making Its Restraints Per Se Illegal, Not Vertical Brand Management. ................................................54

1. The FTAIA does not bar CDM's claims because this conspiracy targets U.S. commerce. ..........................................................................................................................55

   a. The domestic effect is direct and substantial. ............................................................55

   b. That domestic effect gives rise to CDM's claim. ......................................................56

   c. Defendants confuse nexus with effect. ......................................................................56

2. CDM plausibly alleges per se violations because the restraints are horizontal, not vertical. ..............................................................................................................................57

   a. The concerted refusal to deal is a per se illegal group boycott. .................................58

   b. Defendants admit to fixing prices on competing properties. .....................................60

3. CDM's antitrust injuries flow directly from the boycott; standing cannot become the tail wagging the dog. ...................................................................................................60

G. The CEO Himself Confirmed the HOA Representations are False; Count VI States a Plausible Lanham Act Claim. .............................................................................................61

1. Defendants' years-long website campaign is commercial advertising under *Seven-Up*. ......................................................................................................................................61

2. The HOA representations are specific, verifiable falsehoods—not puffery. ...................62

3. CDM has competitive standing under *Lexmark* and *Huggins*. ........................................64

4. The discovery rule and continuing violations defeat the statute-of-limitations defense. ..............................................................................................................................65

H. Count VII: CDM States a Plausible Claim Under the TFEAA. .........................................66

1. CDM is a horizontal competitor whose exclusion has harmed Texas consumers. ..........66

2. The anti-competitive conduct occurs partly in Texas and is timely. ..............................67

I. The FAC States a Plausible Claim under Count VIII for Common-Law Fraud. .................68

J. CDM States a Plausible Claim Under Count IX for Trespass to Real Property. .................70

K. CDM States a Plausible Claim Under Count X for Tortious Interference with Prospective Business Relations. ........................................................................................71

L. CDM'S Civil Conspiracy Claim is Adequately Pleaded Under Count XI. .........................72

VI. CONCLUSION.................................................................................................................72

## TABLE OF AUTHORITIES

**Cases**

*Abraham v. Singh,*
480 F.3d 351 (5th Cir. 2007)..................................................................................54

*Access Telecom, Inc. v. MCI Telecommunications Corp.,*
197 F.3d 694 (5th Cir. 1999)..................................................................................28

*Agar Corp. v. Electro Circuits Int'l, LLC,*
580 S.W.3d 136 (Tex. 2019)...................................................................................72

*Am. Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.,*
820 F. Supp. 1072 (N.D. Ill. 1993)........................................................................62

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.,*
300 F.3d 620 (5th Cir. 2002)............................................................................56, 66

*Arista Records, LLC v. Doe 3,*
604 F.3d 110 (2d Cir. 2010)...................................................................................70

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)......................................................................................... 10, 22

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)................................................................................................21

*Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan,*
97 F.3d 822 (5th Cir. 1996)....................................................................................26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977)............................................................................................... 60

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985)............................................................................................... 29

*Busch v. Buchman, Buchman & O'Brien, Law Firm,*
11 F.3d 1255 (5th Cir. 1994)............................................................................22, 26

*C & H Transp. Co. v. Jensen & Reynolds Constr. Co.,*
719 F.2d 1267 (5th Cir. 1983).................................................................................24

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
73 F.3d 725 (9th Cir. 1999).....................................................................................62

*Coinmach Corp. v. Aspenwood Apartment Corp.,*
417 S.W.3d 909 (Tex. 2013)....................................................................................71

*Crowe v. Henry,*
43 F.3d 198 (5th Cir. 1995)...............................................................................51, 53

*Destec Energy, Inc. v. Southern California Gas Co.,*
5 F. Supp. 2d 433 (S.D. Tex. 1997)........................................................................67

*Dominicus Americana Bohio v. Gulf & W. Indus.,*
473 F. Supp. 680 (S.D.N.Y. 1979).........................................................................57

*Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.,*
123 F.3d 301 (5th Cir. 1997)..................................................................................60

*Eastman Kodak Company v. Image Technical Services, Inc.,*
504 U.S. 451 (1992)................................................................................................56

*Ernst & Young v. Pac. Mut. Life Ins. Co.,*
51 S.W.3d 573 (Tex. 2001)................................................................................68, 69

*ESPOT, Inc. v. MyVue Media, LLC,*
  492 F.Supp.3d 672 (E.D. Tex. 2020)................................................................26
*F. Hoffmann-La Roche Ltd. v. Empagran S.A.,*
  542 U.S. 155 (2004)................................................................................55, 56
*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,*
  314 F.3d 48 (2d Cir. 2002)......................................................................61
*H.J. Inc. v. Nw. Bell Tel. Co.,*
  492 U.S. 229 (1989)..............................................................................48
*Halliburton Energy Servs. Inc. v. Ironshore Specialty Ins. Co.,*
  921 F.3d 522 (5th Cir. 2019)....................................................................24
*Harold H. Huggins Realty, Inc. v. FNC, Inc.,*
  634 F.3d 787 (5th Cir. 2011)....................................................................64
*Hydrokinetics, Inc. v. Alaska Meek, Inc.,*
  700 F.2d 1026 (5th Cir. 1983)..................................................................24
*In re Air Crash Disaster Near New Orleans, La.,*
  821 F.2d 1147 (5th Cir. 1987)..............................................................21, 30
*In re Soporex, Inc.,*
  446 B.R. 750 (Bankr. N.D. Tex. 2011).........................................................70
*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.,*
  892 F.3d 719 (5th Cir. 2018)....................................................................70
*Johnson v. TheHuffingtonPost.com, Inc.,*
  21 F.4th 314 (5th Cir. 2021)....................................................................25
*Klor's, Inc. v. Broadway-Hale Stores, Inc.,*
  359 U.S. 207 (1959)..............................................................................58
*Landry v. Air Line Pilots Ass'n Int'l,*
  901 F.2d 404 (5th Cir. 1990)....................................................................43
*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
  551 U.S. 877 (2007)..............................................................................59
*Lewis v. Fresne,*
  252 F.3d 352 (5th Cir. 2001)....................................................................25
*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014)..........................................................................64, 65
*Lormand v. US Unwired, Inc.,*
  565 F.3d 228 (5th Cir. 2009)....................................................................22
*Management Insights, Inc. v. CIC Enters., Inc.,*
  194 F.Supp.2d 520 (N.D. Tex. 2002)........................................................22, 26
*McLennan v. Am. Eurocopter Corp.,*
  245 F.3d 403 (5th Cir. 2001)....................................................................35
*MM Steel, L.P. v. JSW Steel (USA) Inc.,*
  806 F.3d 835 (5th Cir. 2015)....................................................................58
*Monkton Ins. Servs, Ltd. v. Ritter,*
  768 F.3d 429 (5th Cir. 2014)....................................................................24
*Monsanto Co. v. Spray-Rite Serv. Corp.,*
  465 U.S. 752 (1984)..............................................................................58
*Motorola Mobility LLC v. AU Optronics Corp.,*
  775 F.3d 816 (7th Cir. 2015)....................................................................57

*Patterson v. Dietze, Inc.,*
   764 F.2d 1145 (5th Cir. 1985)................................................................................24
*Piper Aircraft Co. v. Reyno,*
   454 U.S. 235 (1981)............................................................................21, 31, 33
*Pizza Hut, Inc. v. Papa John's Int'l, Inc.,*
   227 F.3d 489 (5th Cir. 2000)...........................................................................62, 63
*R.A.G.S. Couture, Inc. v. Hyatt,*
   774 F.2d 1350 (5th Cir. 1985)................................................................................44
*RJR Nabisco v. European Cmty.,*
   136 S. Ct. 2090 (2016).......................................................................40, 50, 52, 53
*Rotella v. Wood,*
   528 U.S. 549 (2000).............................................................................................44
*Salinas v. United States,*
   522 U.S. 52 (1998)...............................................................................................53
*Seven-Up Co. v. Coca-Cola Co.,*
   86 F.3d 1379 (5th Cir. 1996)...........................................................................61, 62
*St. Paul Mercury Ins. Co. v. Williamson,*
   224 F.3d 425 (5th Cir. 2000)................................................................................49
*Submersible Systems, Inc. v. Perforadora Central, S.A.,*
   249 F.3d 413 (5th Cir. 2001)................................................................................27
*Tour Strategy LLC v. Star-Telegram, Inc.,*
   2018 WL 3242280 (N.D. Tex. July 3, 2018)........................................................66
*Trois v. Apple Tree Auction Ctr., Inc.,*
   882 F.3d 485 (5th Cir. 2018)................................................................................24
*United States v. Cauble,*
   706 F.2d 1322 (5th Cir. 1983)................................................................................49
*United States v. Dowl,*
   619 F.3d 494 (5th Cir. 2010)................................................................................44
*United States v. Garcia,*
   907 F.2d 380 (2d Cir. 1990)................................................................................45
*United States v. Gerald,*
   624 F.2d 1291 (5th Cir. 1980)................................................................................45
*United States v. Hoffman,*
   901 F.3d 523 (5th Cir. 2018)...........................................................................43, 44, 54
*United States v. Maltos,*
   985 F.2d 743 (5th Cir.1992)................................................................................53
*United States v. Paramount Pictures, Inc.,*
   334 U.S. 131 (1948).............................................................................................59
*United States v. Posada-Rios,*
   158 F.3d 832 (5th Cir. 1998)...........................................................................53, 54
*United States v. Rashad,*
   687 F.3d 637 (5th Cir. 2012)...........................................................................45, 46
*United States v. Scophony Corp.,*
   333 U.S. 795 (1948).............................................................................................29
*United States v. Tomblin,*
   46 F.3d 1369 (5th Cir. 1995)...........................................................................45, 46

*Vasquez v. Bridgestone/Firestone, Inc.,*
    325 F.3d 665 (5th Cir. 2003)................................................................................30
*Viazis v. American Ass'n of Orthodontists,*
    314 F.3d 758 (5th Cir. 2002)................................................................................57
*Wal-Mart Stores, Inc. v. Sturges,*
    52 S.W.3d 711 (Tex. 2001)..................................................................................71
*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.,*
    517 F.3d 235 (5th Cir. 2008)................................................................................21
*Wien Air Alaska, Inc. v. Brandt,*
    195 F.3d 208 (5th Cir. 1999)............................................23, 24, 25, 26, 29
*Williams v. WMX Techs., Inc.,*
    112 F.3d 175 (5th Cir. 1997)................................................................................67
*Yegiazaryan v. Smagin,*
    143 S. Ct. 1900 (2023)....................................................37, 38, 39, 40

## Statutes

15 U.S.C. § 1................................................................................20, 36, 66
15 U.S.C. §6a................................................................................55
15 U.S.C. § 15................................................................................31
15 U.S.C. § 22................................................................................28, 29
15 U.S.C. § 1125................................................................20, 36, 63, 65
18 U.S.C. § 1951................................................................................44
18 U.S.C. § 1952................................................................................47
18 U.S.C. § 1956................................................................................47
18 U.S.C. § 1961................................................................................44, 45, 47
18 U.S.C. § 1962................................20, 31, 36, 41, 43, 49, 50, 51, 52, 53
18 U.S.C. § 1964................................................................37, 40, 41, 47
18 U.S.C. § 1965................................................................26, 27, 29
18 U.S.C. § 2314................................................................................47
18 U.S.C. §§ 2315................................................................................47
Tex. Bus. & Com. Code § 15.04................................................................66, 67
Tex. Bus. & Com. Code § 15.21................................................................20, 36
Tex. Bus. & Com. Code § 15.25................................................................67
Tex. Civ. Prac. & Rem. Code § 16.003................................................................70

## Rules

Fed. R. Civ. P. 4................................................................................27, 29
Fed. R. Civ. P. 12................................................................................20, 21
Fed. R. Civ. P. 15................................................................................20
Fed. R. Civ. P. 26................................................................................20

## II.    FACTUAL BACKGROUND

The following facts are drawn from CDM's First Amended Complaint ("FAC") and the exhibits and declarations referenced herein. For purposes of this Opposition, all well-pleaded allegations are accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.    Agora's Marketing Muscle and CDM's Purchase

Defendant Monument & Cathedral Holdings, LLC, also known as The Agora Companies ("Agora") is a Baltimore-based publishing conglomerate founded by Defendant William Bonner ("Bonner") in 1978. FAC ¶ 24. Agora describes itself as a "$1.5 billion+ company." *Id.* It operates from a block of historic rowhouses in downtown Baltimore, providing centralized human resources, legal, technology, and financial infrastructure for dozens of subsidiary companies. FAC ¶ 25. A former employee described Agora's structure as "The Octopus Model": operating through a cluster of subsidiaries so that "when the company gets in trouble, the trouble often doesn't go all the way to the top." FAC ¶ 27. The Securities and Exchange Commission, the Federal Trade Commission ("FTC"), and two state attorneys general have all brought enforcement actions against Agora or its subsidiaries for deceptive conduct. FAC ¶ 28. In 2021, the FTC obtained a consent order barring Agora and its subsidiaries from making unsubstantiated health claims and misleading financial representations. *Id.*

In late 1997, Bonner, Defendant Mark Ford ("Ford"), and Defendant Matthew Turner ("Turner") channeled their Agora publication, *International Living*, to acquire approximately 2,700 acres along Nicaragua's Pacific coast through Defendant Propiedades Habitacionales Internacionales, S.A ("International Living"). FAC ¶¶ 16, 33. Ford explained on a publicly available 2023 video that the idea of the development, which became known as Rancho Santana, was to find "something big" that "we could buy and then we could 'lottify' and sell to our

customers"—meaning Agora's subscribers. FAC ¶¶ 30, 33. Laura Davis, a Rancho Santana executive from 2001 to 2010, admitted on the same video: "the theory was when you go in you sell all the land, you turn the HOA over to the community, and you get out. That just didn't happen." FAC ¶ 30.

The founders marketed Rancho Santana through multiple Agora publications. FAC ¶ 38. *International Living* promoted Nicaragua as a "perfect retirement or second home destination." *Id. The Oxford Club* provided the initial buyer pool. *Id.* Beginning in 2011, Ford co-founded the *Palm Beach Letter* under the Agora umbrella, distributing investment, entrepreneurial, and retirement advice—including owning a revenue-producing second home in Nicaragua—to subscribers across the United States ("U.S."), including in Texas. FAC ¶¶ 38–39. Through a series called "Retire Next Year," Ford sent regular emails from October 2012 through December 2013 promoting retirement in and around Rancho Santana. FAC ¶ 39. In a separate series, "Rental Real Estate 101," Ford taught subscribers to invest in overseas rental real estate, describing turning a $50,000 investment "into several million dollars." FAC ¶ 40. The marketing consistently represented Rancho Santana as a private residential community—not a resort. FAC ¶¶ 36–37. Turner pitched it as a "Residential, resort community with a capital 'R' on 'Residential' and a lowercase 'r' on 'resort.'" FAC ¶ 37.

CDM's managing member, Venodhar Julapalli ("Julapalli"), responded to these solicitations in Houston, Texas. FAC ¶¶ 42–43. Julapalli subscribed to the *Palm Beach Letter* in 2012 and *International Living* in 2013. *Id.* On March 6, 2013, Julapalli contacted the *Palm Beach Letter* to follow up on its Nicaragua recommendations and was referred to Tom Gordon, Rancho Santana's sales manager. FAC ¶ 43. In April 2013, Julapalli visited Rancho Santana and subsequently agreed to purchase Lot G16, an unimproved oceanfront lot. FAC ¶¶ 45–46.

On May 14, 2013, Julapalli organized CDM as a Texas limited liability company. FAC ¶ 47. That same day, CDM signed a purchase and sale ("P&S") agreement for G16. *Id.* Both the agreement and the deed of transfer represented that CDM was subject to "APROSA"—the Rancho Santana Master Homeowners Association—with all attendant rights and obligations, including dues enforceable by lien. FAC ¶ 47.

A September 2022 survey of 101 property owners confirmed the reach of the marketing: 35.64% first heard about Rancho Santana through an Agora publication, and 36.63% through a family member or friend, many of whom were themselves Agora subscribers; only 2.97% identified a realtor. FAC ¶ 41.

**B.      The Serial HOA Fraud**

From 1998 through 2022, Bonner, Ford, and Turner created, dissolved, and replaced a series of homeowners' association ("HOA") structures—never permitting any to mature into a legitimate, owner-controlled governance body. FAC ¶ 49.

APROSA was constituted and municipally recorded on June 2, 1998, with bylaws establishing a nonprofit organization with democratic governance. FAC ¶ 50. In May 2002, International Living and Agora flew owners to Baltimore, where they formed "Playa HOA." FAC ¶ 51. In 2004, Turner pitched new covenants from Baltimore creating "Rancho Santana Association," with lien power. FAC ¶ 53. In 2005, International Living proposed yet another entity, "Greater Rancho Santana Association," as a super-HOA. FAC ¶ 54.

For approximately two years, from 2004 through 2006, owner-elected officers ran the HOAs, reviewed competing bids, and paid International Living for services. FAC ¶ 55. Then, without following existing bylaws, International Living introduced 90-page covenants giving the developer exclusive control until 95% of lots were sold or 2036, exempting its own lots from

assessments. FAC ¶ 56. International Living refused to recognize pending elections. FAC ¶ 58. Each HOA was replaced before maturing; the founders never relinquished control. FAC ¶ 49.

The ranchosantana.com website continued to tell prospective buyers that functioning HOAs existed. FAC ¶ 59. A 2007 FAQ on ranchosantana.com represented that the HOA owned or would own Rancho Santana's common facilities; that never happened. FAC ¶ 60. From at least March 2009 through August 2012, on dozens of captured snapshots, the website stated: "A master association and various sub-associations exist so that you can be assured that high and consistent standards of quality will be maintained." FAC ¶ 59. The ranchosantana.com "Employers' Compliance" document still contains three references to an HOA, including a social responsibility policy referencing "members of the Association of Owners of Houses of Playa Rosada": APROSA, the entity the Nicaraguan government had terminated in late 2022. FAC ¶ 76; *see also infra* Section II.D. As late as June 6, 2023, Ford represented on his personal blog that Rancho Santana still had HOA bylaws, writing of a friend's development: "their book of homeowner association bylaws looked to be even thicker than ours!" FAC ¶ 75.

The founders' deliberate rejection of owner governance was memorialized in a September 21, 2022, Board Memorandum. FAC ¶ 63. Bonner, Ford, and Turner endorsed Defendant Lucas Maish ("Maish"), Chief Executive Officer ("CEO") of Defendant Rancho Santana Inc. & Cía Ltda. ("Rancho SRL"), and stated: "This corporate model may not be perfect, but we chose it over the 'owner controlled' model that we believe creates more dissension, inferior product, group think and group battles, and usually lousy food!" *Id.* When owners inquired about the HOAs' existence on a community Listserv in September through October 2023, Defendant Gail Geerling ("Geerling"), Rancho Santana's General Manager from 1997 to 2001 and International Living's former legal representative, evaded direct questions about her

knowledge of the HOAs and has never responded to the question of why the developer never called elections after 2007. FAC ¶¶ 11, 77–81.

## C.    The Dues Collection Scheme

Throughout the period of the serial HOAs and their collapse, the flow of owner dues from property owners across the U.S. to Agora-affiliated bank accounts in Baltimore never stopped. FAC ¶ 71. Defendant Paul Costantino ("Costantino"), Rancho SRL's Chief Financial Officer ("CFO"), served as the dues enforcer, sending invoices, payment instructions, and enforcement communications from Baltimore to property owners, including CDM in Houston. FAC ¶¶ 9, 71.

From 2013 through 2024, Costantino's emails to CDM came from several Agora-affiliated domains—agorapublishinggroup.com, agora-inc.com, rsownerdues@ ranchosantana.com, and 14west.us. FAC ¶ 72. The payee entities rotated through a succession of Agora-affiliated companies: Publishing Services, LLC; APROSA; PPNDS, LLC; Defendant Tola Development Group, LLC ("Tola"); and 14W Administrative Services, LLC. *Id.* Each received payments at or near Agora's headquarters at 14 West Mt. Vernon Place, Baltimore. *Id.*

CDM paid from Houston. FAC ¶ 74. Wire transfers (2014, 2015) went from a Houston bank to Publishing Services, LLC in Baltimore. *Id.* Checks (2016, 2022) were mailed from Houston to APROSA c/o Costantino in Baltimore. *Id.* Credit card payments (2017–2021) showed PPNDS, LLC or other Agora entities as the merchant. *Id.* CDM also wired architectural review fees to a Wells Fargo account held by Tola at 14 West Mt. Vernon Place in Baltimore. FAC ¶ 109.

As early as November 2013, Costantino had Julapalli's Texas address at the time, requested by Costantino from Julapalli "in case email does not work as a form of communication when it comes to collecting Owner Dues at Rancho Santana." Julapalli Aff. ¶ 3. As early as

March 2014, Costantino requested and was given by Julapalli CDM's deed identifying CDM's Texas residence and managing member Julapalli's Texas domicile. *Id.* ¶ 7. In March 2017, Costantino requested, was given by Julapalli, and maintained on file a credit card authorization form with Julapalli's Texas address at the time, through which he charged the annual dues. *Id.* ¶ 10.

The annual dues collected from approximately 423 owners grew steadily: from approximately $2 million in 2021 to an estimated $2.52 million by 2025. FAC ¶ 73. More than $10 million in owner dues during these years alone flowed through U.S. bank accounts controlled by Agora and its affiliates. *Id.*

**D.      The Collapse and Defendants' Admissions**

On October 31, 2022, the Nicaraguan government announced that APROSA had failed to report its Board of Directors or financial statements from 2014 through 2021 and was formally terminated. FAC ¶ 67. Community Guidelines with an effective date five months earlier had been quietly posted without notice to owners. FAC ¶ 68.

On March 20, 2023, Maish sent owners an email titled "State of The Union, Rancho Santana," representing that APROSA had been closed by "tax authorities" following a "private investigation . . . led by an RS property owner or group of owners." FAC ¶ 70. He did not disclose the actual grounds: APROSA's failure to report its Board or financials for years. FAC ¶ 70.

At the 2023 Owners Meeting on May 15, 2023, Maish confirmed: "There is no homeowners' association." FAC ¶ 64. He recharacterized the payments as a "fee for service," though purchase agreements, deeds, and years of invoices had represented them as HOA dues enforceable by lien. *Id.* Maish stated that owners who did not pay would be "denied access . . .

denied the services . . . water and electricity too." *Id.* He declared, "We're not a democracy," and that "we do not have any intention to create an infrastructure that . . . lets the property owners in." FAC ¶ 65. When asked whether an external auditor would review the dues, Maish responded, "This idea of auditing a company and all this, it's not something we're gonna sign up for." FAC ¶ 130.  On buy-in from owners, Maish stated, "Many, many, many owners have already bought into it." FAC ¶ 131.

At the 2024 Owners Meeting, Maish repeated: "it's not governed by an HOA . . . there's no plans to create an HOA . . . there's no clear legal path." FAC ¶ 66. He described Rancho Santana as "a gated resort community" in which "Rancho Santana has the right to basically create rules, impose fees." FAC ¶¶ 66, 133. On those imposed fees, an owner suggested "accidental" sabotage of infrastructure serving non-paying owners; attendees laughed, and Maish did not disavow the suggestion. FAC ¶¶ 134–35.

Furthermore, the Community Guidelines, effective March 1, 2024, still grant Rancho SRL a lien to secure payment of delinquent assessments—enforcement power derived from the HOA structure that no longer exists. FAC ¶ 76.

**E.      The Enforcement Campaign Against CDM**

Julapalli did not learn until 2023 that no operative HOA had existed for years. FAC ¶ 101. At that time CDM stopped paying the so-called "dues" pending a transparent accounting. *Id.* CDM had broken ground on a vacation rental home on G16 in late June 2022, having paid architectural review fees to Tola in Baltimore. FAC ¶¶ 108–109.

On June 7, 2023, Costantino emailed Julapalli: "If you are opting to not to pay, then you will be passed on to our legal team and that will give us cause to cut water and electrical service to your lot." FAC ¶ 105. He added: "I will be sure to drive by [your house] when I am there in a

few weeks since I didn't know you were building." *Id.* Costantino traveled from Baltimore to Rancho Santana in mid-June 2023 to do precisely that. FAC ¶ 106.

From August 28 through September 6, 2023, Rancho SRL personnel tampered with the water meter and attempted to destroy the pipes leading to G16 and an adjacent home of a neighbor. FAC ¶ 111. One attempt involved heavy equipment. FAC ¶ 112. During the water skirmish, Rancho SRL personnel entered G16 and CDM's partially built home without authorization. FAC ¶¶ 113, 121.

The Nicaraguan national water authority reprimanded Rancho SRL, finding it could not cut off water to any owner. FAC ¶¶ 115–116. Nevertheless, on May 12, 2025, Maish stated he had acted to cut CDM's water under governmental authority—the opposite of what occurred. FAC ¶ 116.

Defendant Matt Semenza ("Semenza"), on Rancho Santana's Architectural Review Committee ("ARC"), imposed building fines on CDM from April through December 2024, though no signed building guidelines existed between Rancho SRL and CDM, and no HOA existed under whose authority such fines could be levied. FAC ¶¶ 118–119. The Community Guidelines require a "Clearance Certificate" from Rancho SRL before any owner can sell, conditioned on payment of the disputed dues. FAC ¶¶ 95–97. CDM cannot exit without paying the very charges it contests. FAC ¶ 203.

CDM's contractors, guests, and third parties have been denied access to G16 through Rancho SRL's control of the entry gates—the sole ingress to CDM's property. FAC ¶¶ 120, 122. CDM's home remains partially built and uninhabitable. FAC ¶ 122. CDM has been unable to complete construction, enter the vacation rental market, or generate the rental income that was the entire purpose of its investment. *Id.*

Defendant Christopher Boothby ("Boothby"), a property owner and participant in Rancho SRL's Rancho Santana Vacation Rental program ("RSVR"), publicly advocated for dues enforcement on the Listserv. FAC ¶ 137. Boothby pressured non-paying owners to comply, advised dissenters to "find a new option for yourself," and attempted to suppress owner discussion of water and electricity rights. FAC ¶¶ 117, 138. On information and belief, Boothby is one of the owners who has been pressing Costantino to collect dues from owners who have stopped paying. FAC ¶ 139.

**F.      The Resort Transformation and Horizontal Competition**

While the founders marketed Rancho Santana as a private residential community, the resort may always have been the endgame. FAC ¶ 83. As Defendant Chris Currey ("Currey"), Rancho Santana's Executive Vice President ("EVP") of Real Estate and Board Director, revealed on the 2023 video, the vision was to develop a resort using "the resources and influence from foreign investors"—the property owners. *Id.* Turner built a 17-room inn that opened in March 2015, explaining that "the Press was never interested in covering us . . . they said, well you need to have an inn or a hotel; we just don't cover residential communities." FAC ¶ 85. Maish described this as "the second phase of Rancho Santana . . . the phase of building the resort." FAC ¶ 86. Currey acknowledged that the resort component "allows us to have the price points, the occupancy, and the type of guest that you'd want to stay in your home"—referring to RSVR. FAC ¶ 87.

In other words, through RSVR Rancho SRL's resort—a direct horizontal competitor to independently renting property owners—dictates the terms under which those owners can rent their own homes. *Id.* Participating owners surrender 35% of gross rental income plus a monthly fee. FAC ¶ 93. Rancho SRL's Rental Guidelines impose a discriminatory "Resort Fee" on the

commercial guests of independently renting, non-RSVR owners only—not on RSVR owners, not on non-commercial guests, and not on walk-in resort guests. FAC ¶¶ 91, 93. Its stated policy is that "rental management options should be limited to Rancho Santana's program offerings." FAC ¶ 92. Maish told owners that "Rancho Santana should be differentiating itself and competing with other destinations rather than competing against ourselves." FAC ¶ 89.

Rancho SRL's Broker Regulations, dated September 4, 2024, require all listings to state, "This is an exclusive listing of Rancho Santana Property & Luxury Real Estate"—compelling independent brokers to falsely represent that Rancho SRL holds an exclusive listing on properties it does not own. FAC ¶ 96. At the 2025 Owners Meeting, Maish reported that 94% of 2024 transactions were handled in-house and that almost all new buyers come as resort guests, whom the Broker Regulations prohibit independent brokers from representing. FAC ¶¶ 95, 97.

CDM has been physically excluded from completing its home and entering the rental market. FAC ¶ 122. It cannot sell at fair market value because of the Clearance Certificate requirement and disputed liens. FAC ¶¶ 95–97. The financial depletion caused by the blockade has been felt in Texas, where CDM is organized, where its managing member resides, and where its bank accounts are maintained. FAC ¶ 123.

The dues collected from property owners have been funneled through Agora-affiliated entities in the United States—including Tola, PPNDS, LLC, and Agora itself—to bank accounts primarily in Baltimore. FAC ¶ 172. From there, the founders have reinvested the income into Rancho Santana's common areas and resort infrastructure, the same resort that competes directly with independently renting property owners. FAC ¶¶ 173–74.

### III.   PROCEDURAL BACKGROUND

CDM commenced this action on December 22, 2025, asserting eleven counts against fourteen Defendants—nine individuals and five corporate entities—under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a)–(d); the Sherman Antitrust Act, 15 U.S.C. § 1; the Lanham Act, 15 U.S.C. § 1125(a); the Texas Free Enterprise and Antitrust Act ("TFEAA"), Tex. Bus. & Com. Code § 15.21; and state-law claims for fraud, trespass, tortious interference with prospective business relations, and civil conspiracy. ECF No. 1.

On March 3, 2026, Defendants filed a Motion to Dismiss the Original Complaint, ECF No. 23, and a Motion to Disqualify Venodhar Julapalli as Counsel for Plaintiff Casa de Maravilla, LLC ("Motion to Disqualify"), ECF No. 24.

On March 24, 2026, CDM filed its First Amended Complaint as of right under Federal Rule of Civil Procedure ("FRCP") 15(a)(1)(B), reasserting the same eleven counts with additional factual detail. ECF No. 25.  CDM also opposed the Motion to Disqualify.  ECF. No. 26.

On April 7, 2026, Defendants filed a Motion to Dismiss First Amended Complaint ("MTD"), seeking dismissal on three grounds: forum non conveniens, lack of personal jurisdiction under FRCP 12(b)(2), and failure to state a claim under FRCP 12(b)(6). ECF No. 33. On the same day, Defendants filed a Motion to Stay All Discovery ("Motion to Stay"). ECF No. 34.

CDM opposed the Motion to Stay. ECF No. 37. CDM participated in the FRCP 26(f) conference on April 9, 2026, and worked with Defendants' counsel to file the Joint

Discovery/Case Management Plan on April 13, 2026. ECF No. 36. The Court's Initial Conference was reset to June 11, 2026.  ECF No. 38.

This Opposition addresses Defendants' MTD.

## IV.    STANDARD OF REVIEW

Defendants' MTD seeks dismissal on three grounds, each governed by a distinct standard.

### A.    Personal Jurisdiction

When a court rules on a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdiction. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). The court accepts the plaintiff's uncontroverted allegations as true and resolves all factual conflicts in the plaintiff's favor. *Id.*

### B.    Forum Non Conveniens

On a propounded forum non conveniens ground, the defendant bears the burden of demonstrating both that an adequate and available alternative forum exists as to all defendants and that the balance of private and public interests "heavily" favors dismissal. *In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147, 1164 (5th Cir. 1987) (en banc). A domestic plaintiff's choice of forum is entitled to "greater deference . . . ." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981).

### C.    Failure to State a Claim

A complaint survives an FRCP 12(b)(6) motion so long as it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

**V.   ARGUMENT**

**A.   This Court Has Personal Jurisdiction Through Four Distinct Bases—Including Defendants' Own Concession of Colorable RICO Claims.**

The avenue that Defendants travel to urge this Court to dismiss all Defendants for lack of personal jurisdiction, MTD at 23-30, is convoluted, groundless based on the facts, and backtracked when accounting for their own later concessions. Under binding Fifth Circuit authority, "when a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the *United States*." *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994) (emphasis added). This is undisputedly a federal question case, ECF. No. 36 ¶ 4, invoking multiple federal statutes that provide for nationwide service of process.

The Fifth Circuit recognizes "two distinct avenues" for personal jurisdiction. *Management Insights, Inc. v. CIC Enters., Inc.*, 194 F.Supp.2d 520, 522 (N.D. Tex. 2002). The first, in diversity cases, measures contacts with the forum state. *Id.* at 522-23. The second, "implicated solely in cases arising under federal question jurisdiction, inheres in the existence of a federal statutory grant of jurisdiction broader than that allowed under the traditional minimum contacts inquiry." *Id.* at 523. Defendants' generic discussion of personal-jurisdiction rule standards, MTD at 24, go down the first avenue but not the second—of which they are indeed aware, MTD at 26-30.

As shown below, this Court has personal jurisdiction through *four* distinct bases—all of which get us home. Several Defendants are subject to traditional specific jurisdiction in this forum. The remaining Defendants are brought before this Court through the nationwide service provisions that multiple federal statutes authorize, exactly as the broader federal statutory grants of jurisdiction contemplate in a multi-defendant federal question case.

> **1.      Specific jurisdiction exists because Costantino's decade of tortious communications into Texas "alone constitutes purposeful availment."**

Defendants' claims to the contrary, CDM's well-pleaded facts show that specific jurisdiction exists over at least Costantino, if not Rancho SRL as Costantino's principal, Agora, and Ford. The Fifth Circuit's rule for *intentional tort* cases is categorical: "When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999). A "single act by [a defendant] directed toward Texas that gives rise to a cause of action . . . can support a finding of minimum contacts." *Id.* at 211.  This is a case in tort, a fact that Defendants ignore in their analysis.

> **a.      Costantino and Rancho SRL directed tortious acts toward Texas.**

CDM alleges tortious actions directed to Texas—and not one, but many. From 2013 through 2024, Costantino directed numerous invoices, payment demands, and enforcement threats from Baltimore to CDM at its Houston address. FAC ¶¶ 9, 19, 71–74. Costantino knew he was reaching into Texas every time he billed CDM, as he himself requested and was given Julapalli's Texas address, CDM's deed bearing its Texas address, and an authorization form bearing Julapalli's Texas address for a credit card—which Costantino charged for "dues" year after year after year. Julapalli Aff. ¶¶ 3, 7, 10; FAC ¶ 74.  And on June 7, 2023, Costantino sent CDM an ultimatum threatening to cut water and electricity. FAC ¶ 105.

Each of these communications is not merely a "contact" with Texas; it is itself a predicate act of wire fraud and extortion forming the basis of CDM's RICO claims. FAC ¶¶ 149, 233(c). Under *Wien Air*, the tortious content "alone constitutes purposeful availment." 195 F.3d at 213.

Defendants respond that Costantino's communications are just "letters" insufficient under *Halliburton Energy Servs. Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522 (5th Cir. 2019). MTD at 25. They even quibble that "[e]mails, of course, cannot be sent to a 'Houston, Texas address.'" *Id.* The distinction they miss is dispositive. Defendants cite five cases for the proposition that Costantino's contacts are insufficient: *Halliburton*; *Monkton Ins. Servs, Ltd. v. Ritter*, 768 F.3d 429 (5th Cir. 2014); *Patterson v. Dietze, Inc.*, 764 F.2d 1145 (5th Cir. 1985); *C & H Transp. Co. v. Jensen & Reynolds Constr. Co.*, 719 F.2d 1267 (5th Cir. 1983); and *Hydrokinetics, Inc. v. Alaska Meek, Inc.*, 700 F.2d 1026 (5th Cir. 1983). **Every one is a contract case.** In *Halliburton*, the communications were demand letters in an insurance dispute. 921 F.3d at 542. *Monkton* involved contractual wire transfers, and they were "initiated by Ritter or Geneva"—the plaintiff, not the defendant as in CDM's case. 768 F.3d at 433. *Patterson* was a diversity case where "all material performance occurred in Mexico." 764 F.2d at 1146–47. *C & H*, 719 F.2d at 1270, and *Hydrokinetics*, 700 F.2d at 1029, involved contractual communications insufficient for purposeful availment in contract. None involved fraud, RICO, or extortion.

As the Fifth Circuit has repeatedly held, the minimum-contacts test for intentional torts "differs from that in contract"; in fraud cases, "reaching out to Texas via phone" to make misrepresentations suffices, "even where insufficient for contract." *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 490–92 (5th Cir. 2018). CDM's claims sound in fraud, RICO, and extortion. The tortious content of Costantino's numerous communications into Texas with CDM's managing member for over a decade independently establishes jurisdiction. *Wien Air*,

195 F.3d at 213; *see also Lewis v. Fresne*, 252 F.3d 352, 359 (5th Cir. 2001) (defendant's single tortious act can sufficiently confer personal jurisdiction).

In addition, as Rancho SRL's CFO, Costantino acted as Rancho SRL's agent—which means Rancho SRL is subject to personal jurisdiction in Texas as well.  *See Trois*, 882 F.3d at 490 (personal jurisdiction exists over defendant through activities of its agent within the forum state).

### b.    Agora directed tortious acts toward Texas.

Agora conducted a sustained mass-marketing campaign through *International Living* and the *Palm Beach Letter*—direct-response marketing vehicles specifically designed to convince consumers to purchase products on the spot. FAC ¶ 26. Through these publications, Agora delivered promotional materials about Rancho Santana's residential character and rental opportunities directly to CDM's managing member in Houston. FAC ¶¶ 38–43. Julapalli subscribed to the *Palm Beach Letter* in 2012 and *International Living* in 2013, through which he received regular emails promoting investment and retirement opportunities in and around Rancho Santana. FAC ¶¶ 42–43. A survey of 101 owners confirmed the systematic reach: 35.64% first heard about Rancho Santana through an Agora publication. FAC ¶ 41. Defendants cite *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 320 (5th Cir. 2021), MTD at 26, where the court affirmed that an allegedly libelous article published online was unrelated to any commercial activity directed at the Texas forum. In contrast, CDM's claims *directly arise from* Agora's marketing communications directed at Texas consumers. Defendants' insinuation that those marketing communications are equivalent to "[g]rannies with cooking blogs," *Johnson*, 21 F.14th at 320, is nonsensical.

### c.      Ford directed tortious acts toward Texas.

Ford sent targeted marketing emails through the *Palm Beach Letter* directly to CDM's managing member in Houston from October 2012 through December 2013, promoting investment and retirement opportunities in and around Rancho Santana. FAC ¶¶ 39–40, 42. These emails are predicate acts of wire fraud contributing to the RICO scheme alleged in CDM's claims. FAC ¶ 148. Under *Wien Air*, communications whose content gives rise to intentional tort causes of action constitute purposeful availment. 195 F.3d at 213.

### 2.      Three federal statutes/rules independently extend jurisdiction to all Defendants through nationwide service of process.

Once this Court has personal jurisdiction over even one defendant through traditional specific jurisdiction, multiple federal statutes/rules extend jurisdiction to all remaining defendants. Down this second avenue, the constitutional analysis shifts from the Fourteenth Amendment to the Fifth Amendment, and "the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Busch*, 11 F.3d at 1258. The Fifth Circuit "placed no limitation" on this principle; it applies to any federal statute with nationwide service of process. *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan*, 97 F.3d 822, 825–26 (5th Cir. 1996). For domestic defendants, "the question is answered before it is even asked." *Management Insights*, 194 F.Supp.2d at 523. Here, every individual Defendant is a U.S. citizen. FAC ¶¶ 4–12.

### a.      "The ends of justice" require jurisdiction under 18 U.S.C. § 1965(b).

Section 1965(a) permits suit where a defendant "resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Costantino transacted affairs in this district through a decade of billing, invoicing, and enforcement directed at CDM in Houston. FAC ¶¶ 9, 19, 71–74. With an anchor defendant established, § 1965(b) extends jurisdiction to all remaining defendants when "the ends of justice require" it. *ESPOT, Inc. v. MyVue Media, LLC*, 492 F.Supp.3d 672,

686 (E.D. Tex. 2020). Here, Defendants are scattered across Maryland, Florida, Nicaragua, and the British Virgin Islands. No single forum has jurisdiction over all fourteen defendants. The ends of justice require consolidation in the forum where the victim resides and the injuries were felt.

Defendants argue CDM must plead a "colorable" RICO claim to invoke § 1965. MTD at 27. **They then later concede that point multiple times in their own brief:** "Defendants do not contest that CDM has met the very low bar to plead allegations" satisfying the mail/wire fraud predicate "as to five of those Defendants": Bonner, Ford, Turner, Currey, and Agora. MTD at 34, 35, 38. By their own concession then: a colorable RICO claim exists. The anchor is established. Section 1965(b) applies.

### b.    Personal jurisdiction is satisfied under FRCP 4(k)(2).

FRCP 4(k)(2) applies where claims arise under federal law, notice has been fulfilled through serving a summons or filing a waiver of service, and exercising jurisdiction is consistent with the Fifth Amendment. *Submersible Systems, Inc. v. Perforadora Central, S.A.*, 249 F.3d 413, 420 (5th Cir. 2001). All three requirements are met here: CDM asserts federal RICO, Sherman Act, and Lanham Act claims; all Defendants waived service under FRCP 4(d), ECF Nos. 5-18; and all Defendants have contacts with the U.S. sufficient to satisfy Fifth Amendment due process.

This basis is particularly significant for the foreign-organized entities. RS Inc. holds a controlling interest in both International Living and Rancho SRL, FAC ¶ 15, through which Bonner, Ford, and Turner control the entire Rancho Santana enterprise, FAC ¶ 17. Together with Agora, RS Inc. sits at the apex of a corporate structure whose subsidiaries market to U.S. consumers, routed more than $10 million in dues payments through U.S. bank accounts from

2021-2025 alone, and are operated by U.S. citizens from U.S. offices based in Baltimore. FAC ¶¶ 13–17, 32–48, 71–74. A holding company that exists to control U.S.-facing operations run by U.S. citizens has contacts with the U.S. International Living was founded by Americans and acquired the Rancho Santana property using capital raised from American subscribers, FAC ¶¶ 33, 35; its American employee and legal representative, Defendant Geerling, directed payments from Americans for years through a Miami P.O. Box, FAC ¶¶ 52, 79; it flew property owners to Baltimore for foundational HOA meetings, FAC ¶ 51; its American president, Defendant Bonner, signed governing covenants from Baltimore, FAC ¶ 54; and its operations were managed by U.S. citizens from U.S. offices. FAC ¶ 49. To this day, so are the "dues" operations of Rancho SRL, which it collects in the millions of dollars from hundreds of U.S. property owners through U.S.-based communications, U.S.-based companies, and U.S.-based banks. FAC ¶¶ 71-74. Not one of these facts is a "conclusory allegation," as Defendants declare, MTD at 28 —they are specific acts of transacting business in and directed at the U.S.

### c.    Corporation Defendants are subject to jurisdiction via 15 U.S.C. § 22.

For CDM's Sherman Act claim, Section 22 provides suit "in any district wherein [defendant] may be found or transacts business," with service of process "wherever it may be found." 15 U.S.C. § 22. The Fifth Circuit has endorsed that "[w]hen jurisdiction is invoked under the Clayton Act, the court examines the defendant's contacts with the United States as a whole . . . ." *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 718 (5th Cir. 1999). Defendants object that § 22 applies only to "corporations" and that CDM has not alleged how RS Inc. or International Living "transacted business in the United States." MTD at 28–29. Both are corporations: RS Inc. is a British Virgin Islands business company, FAC ¶ 15, and International Living is a Nicaraguan sociedad anónima (the Nicaraguan equivalent of a corporation), FAC ¶

16. And both transact business in the U.S. *See supra* Section V.A.2.b. Under the Supreme Court's "practical, nontechnical" standard, business "of any substantial character" suffices. *United States v. Scophony Corp.*, 333 U.S. 795, 810 (1948). The business of RS Inc. and International Living exceeds that threshold.

### 3.　　The exercise of jurisdiction is fair and reasonable.

Once minimum contacts are established, Defendants must make a "compelling case" that jurisdiction is unfair. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). "It is rare to say the assertion is unfair after minimum contacts have been shown." *Wien Air*, 195 F.3d at 215. Defendants cannot make that showing. Every individual Defendant is a U.S. citizen. Every entity Defendant operates through U.S. infrastructure and is represented by U.S. counsel in this litigation. CDM is a Texas LLC whose managing member resides in Houston, where all injuries were felt. Texas has a compelling interest in providing a forum for its entities to seek redress for fraud and racketeering directed at them. *See Wien Air*, 195 F.3d at 216. Requiring CDM to litigate in Nicaragua would impose substantial burdens on the victim of the alleged scheme while relieving none on Defendants. Defendants' suggestion that "all Defendants can be sued in Nicaragua," MTD at 28, underscores the weakness of their position: they ask this Court to send a Texas LLC to a Nicaraguan court to litigate federal RICO, Sherman Act, and Lanham Act claims against American citizens who operate from Baltimore.

In sum, this Court has personal jurisdiction through four distinct bases: (1) traditional specific jurisdiction over at least Costantino, Agora, and Ford under the *Wien Air* intentional-tort framework; (2) RICO § 1965(b) nationwide service—triggered by Defendants' own concession of colorable RICO claims; (3) FRCP 4(k)(2); and (4) Clayton Act § 22. Defendants spent seven

pages convoluting the law, contorting the facts, and contradicting themselves in the same brief. Their motion should be denied.

**B.      Forum Non Conveniens Fails Because Nicaragua Has No Legal Framework for Ten of Eleven Counts and is Inadequate to Treat CDM Fairly Under Them.**

Defendants lead their MTD with forum non conveniens for an obvious reason: it is the only argument that lets a court avoid the merits. *See* MTD at 19–23. Every other ground in their MTD requires confronting CDM's allegations: the twenty-five-year racketeering enterprise, the antitrust conspiracy, the false advertising scheme, the millions of dollars in dues extracted through U.S. bank wires. Forum non conveniens requires none of that. It asks only whether some other court might handle this case instead. Defendants are not arguing they did nothing wrong. They are arguing this Court should not be the one to decide.

The argument fails at the threshold. Nicaragua is not an adequate alternative forum because it has no legal framework—none—for adjudicating RICO, Sherman Act, or Lanham Act claims. Defendants know this. Their own expert confirms it.

**1.      Nicaragua cannot adjudicate ten of CDM's eleven counts.**

Forum non conveniens requires the movant to establish "(1) the existence of an available and adequate alternative forum and (2) that the balance of relevant private and public interest factors favor dismissal." *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003). The defendant bears the burden on every element. *In re Air Crash*, 821 F.2.d at 1164. And the doctrine is "the exception rather than the rule." *Id.* n.26.

The threshold is fatal here. "A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum." *Id.* at 1165. "A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly . . . even though they may not enjoy the same benefits as they might receive in an American court." *Id.* at 1165 (citing

*Piper Aircraft*, 454 U.S. at 255). But "dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute." *Piper Aircraft*, 454 U.S. at 254 n.22. Where "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all . . . dismissal would not be in the interests of justice." *Id.* at 254.

This is not a case where the alternative forum provides a lesser remedy. Nicaragua provides no remedy at all for ten of CDM's eleven counts:

**Counts I-IV (RICO):** No Nicaraguan statute creates civil liability for conducting the affairs of an enterprise through a pattern of racketeering activity, permits treble damages, or authorizes the pattern-and-enterprise framework of § 1962. Four of CDM's eleven counts arise exclusively under RICO.

**Count V (Sherman Act Section 1):** No Nicaraguan statute prohibits conspiracies in restraint of trade, authorizes per se condemnation of price fixing and group boycotts, or provides treble damages under the Clayton Act, 15 U.S.C. § 15.

**Count VI (Lanham Act):** No Nicaraguan equivalent creates federal civil liability for false advertising in interstate commerce.

**Counts VII-VIII, X-XI (TFEAA, fraud, tortious interference, civil conspiracy):** These Texas statutory and common law claims arise from conduct directed at a Texas plaintiff by U.S. defendants operating from U.S. headquarters. No Nicaraguan court has jurisdiction to apply Texas law to this conduct.

Ten of eleven counts would be extinguished—not transferred—by dismissal to Nicaragua (the sole count with arguable overlap being Count IX (trespass)). That is the definition of "no remedy at all." *Piper Aircraft*, 454 U.S. at 254.

**2.      Defendants' expert addressed only property disputes—confirming no expert can opine Nicaragua handles RICO, antitrust, or the Lanham Act.**

Professor Manuel Gómez's two affidavits are the centerpiece of Defendants' FNC argument— and they prove CDM's point.

Professor Gómez reviewed the Original Complaint, which asserted all eleven counts, including four RICO counts, a Sherman Act count, and a Lanham Act count. ECF No. 23-1 ¶¶ 7–8. Defendants retained him to address four issues: (1) dues obligations, (2) property use restrictions, (3) interference with contractor access and utilities, and (4) trespass. *Id.* ¶ 3. Four narrow property disputes out of an eleven-count complaint. Not RICO. Not antitrust. Not false advertising.

Defendants chose this scope deliberately. They had the RICO, Sherman Act, and Lanham Act claims in front of them from the outset—and they asked their expert to address only property-related issues. The reason is transparent: no credible expert could opine that Nicaragua has statutory equivalents to RICO, the Sherman Act, or the Lanham Act, because it does not.

The Supplemental Affidavit compounds the problem. *See generally* ECF No. 33-2. After reviewing the FAC, Professor Gómez states that "my conclusions regarding the availability and adequacy of Nicaragua to hear and adjudicate this dispute remain unchanged from the Original Complaint." *Id.* ¶ 3. He then reaffirms the same four property-related conclusions—dues, restrictions, contractor access, trespass—without a single word about whether Nicaragua can adjudicate federal racketeering, antitrust, or false advertising claims. *Id.* ¶¶ 5–8.

This is not an oversight. This is Defendants' own litigation strategy confirming that Nicaragua is inadequate for the claims actually at issue. An expert affidavit that addresses only property disputes cannot establish the adequacy of an alternative forum for a case dominated by federal statutory claims. Defendants had two opportunities, the original and supplemental

affidavits, to present expert testimony that Nicaragua can handle RICO, antitrust, and Lanham Act claims. They presented none. The Court should draw the obvious inference.

Worse, the constitutional authorities Professor Gómez does cite are no longer in force. Articles 5, 44, and 103, which Professor Gómez presented as guaranteeing private property rights and political pluralism, *Id.* ¶ 25 and n.25-27, were substantively repealed by Nicaragua's 2025 constitutional reform. Molina Decl. ¶ 21, Ex. A. Article 44 now addresses political equality between men and women; it contains no property guarantee. *Id.* ¶ 22. Article 103 now concerns access to public utilities; it contains no protection for private ownership. *Id.* ¶ 23. The Declaration of Martha Patricia Molina Montenegro—a Nicaraguan attorney, anti-corruption investigator, and U.S. State Department honoree who fled Nicaragua's collapsed judicial system —further establishes that Nicaragua's courts are neither independent of the executive branch nor impartial and that CDM could not obtain a fair trial there. *Id.* ¶¶ 13–16, 28–30.

### 3.    As a domestic plaintiff, CDM's forum choice is entitled to maximum deference.

Before reaching the interest-factor balancing— which Defendants also lose—the Court must account for the "strong presumption in favor of the plaintiff's choice of forum . . . ." *Piper Aircraft*, 454 U.S. at 255. That presumption applies with maximum force here. CDM is a Texas LLC with its principal place of business in greater Houston, managed by a Texas resident. FAC ¶ 3.  And unless the interest-factor balance is strongly in favor of the defendant, "a plaintiff's choice of forum should rarely be disturbed." *Id.* at 242. Defendants cannot overcome the presumption, and they cannot overcome the balancing burden such that CDM's choice of forum should be disturbed.

### 4.    Private interest factors favor this Court.

The heart of CDM's case is a racketeering enterprise that operated through U.S. wires, U.S. mail, and U.S. banks, directed from U.S. headquarters. The critical evidence is in the United States, not Nicaragua:

**Corporate records:** Agora operates from Baltimore, providing "centralized human resources, legal, technology, and financial infrastructure" for its $1.5 billion+ network. FAC ¶¶ 24–25. The records documenting the enterprise's structure, finances, and decision-making are in Baltimore.

**Banking records:** Over $10 million in owner dues flowed through U.S. bank accounts in Baltimore in just the years 2021–2025—a fraction of the total extracted since the development's inception. FAC ¶¶ 71–73. CDM's own payments were wired from Houston to Baltimore. FAC ¶ 74. Wire transfer records central to proving wire fraud and money laundering are held by U.S. institutions subject to U.S. compulsory process.

**Marketing records:** The scheme that lured hundreds of Americans through *International Living*, *The Oxford Club*, and the *Palm Beach Letter* was created and distributed from the United States. FAC ¶¶ 32–48. Email campaigns, newsletter archives, and subscriber databases are maintained by U.S. entities.

**Defendants:** Every individual Defendant is a U.S. citizen. FAC ¶¶ 4–12. Bonner founded Agora in Baltimore. Turner and Costantino reside in Maryland. Ford resides in Florida. Costantino sends dues invoices from Baltimore to owners across the U.S. FAC ¶¶ 71–72. This Court can compel their testimony and document production. A Nicaraguan court cannot.

Defendants counter that "ten of the Defendants are domiciled or own homes in Nicaragua" and that "all the essential nonparty witnesses are in Nicaragua." MTD at 21. Both

claims obscure more than they reveal. That U.S. citizens maintain second homes in Nicaragua does not make Nicaragua the center of a case about a Baltimore-based racketeering enterprise. And the non-party witnesses Defendants identify, MTD at 21, are not uniquely accessible in Nicaragua. CDM's own key witnesses include an Australia/New Zealand couple, a Canadian property owner, a Californian who resides at Rancho Santana, and a Floridian who formerly owned property there—none of them Nicaraguan citizens, all of them amenable to process in the United States or voluntarily available to CDM. The relevant witnesses for the core claim—the 25-year pattern of wire fraud, mail fraud, extortion, money laundering, and anti-competitive conduct— are the Defendants themselves and the Agora employees, accountants, and marketing personnel who have operated the scheme from Baltimore.

### 5.    Public interest factors overwhelmingly favor retention in the U.S.

Congress enacted RICO, the Sherman Act, and the Lanham Act to combat racketeering, protect competition, and ensure truthful advertising. CDM's claims arise under all three. The SEC and FTC have already brought enforcement actions against Agora for the same pattern of deceptive conduct. FAC ¶¶ 28(a)–(d). Dismissing these claims to Nicaragua would immunize Defendants from accountability under the very statutes designed to reach their conduct.

Texas has a direct stake. CDM is a Texas LLC that was targeted by marketing materials received in Texas and suffered its injury to business and property in Texas. FAC ¶¶ 42–44. Texas has "a strong interest in enforcing its laws against and monitoring the activities" of those who target its citizens. *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 425 (5th Cir. 2001).

Defendants' assertion that "Texas — and indeed the United States — has no such stake in this matter," MTD at 22, is refuted by every material allegation in the FAC. This is a case about American citizens running a racketeering enterprise from Baltimore, defrauding American

consumers through American publications, laundering proceeds through American banks, and violating American antitrust and consumer protection laws. That the real estate is in Nicaragua does not convert a federal racketeering case into a Nicaraguan property dispute.

Defendants emphasize the need to apply foreign law. MTD at 22–23. No foreign law governs CDM's federal claims. RICO, the Sherman Act, and the Lanham Act are federal statutes this Court applies routinely. There is no conflict of laws.

### 6. The Nicaraguan easement proceeding is a non sequitur.

That CDM filed a narrow easement proceeding against a single defendant in Nicaragua does not mean "the same court can address CDM's grievances in this First Amended Complaint," MTD at 21. The Nicaraguan proceeding involves one defendant (International Living), one cause of action (the scope of a recorded easement), and one body of law (Nicaraguan property code). FAC ¶¶ 124–126. It has taken close to two years so far to adjudicate that single claim. It does not involve nine individual defendants, four additional entity defendants, RICO, antitrust, the Lanham Act, fraud, tortious interference, civil conspiracy, or any of the eleven counts here.

The distinction is not merely quantitative—it is jurisdictional. The easement proceeding vindicates a right arising exclusively under Nicaraguan law, enforceable only in Nicaraguan courts against Nicaraguan-situated property. CDM's claims here arise under four federal and state statutes—18 U.S.C. § 1962, 15 U.S.C. § 1, 15 U.S.C. § 1125(a), and Tex. Bus. & Com. Code § 15.21—none of which any Nicaraguan court has jurisdiction or competence to apply. A plaintiff's ability to pursue a local boundary dispute in a local court says nothing about that court's capacity to adjudicate a multi-defendant federal racketeering case brought under statutes that do not exist in the alternative forum's legal system. Indeed, the easement case's glacial two-

year pace for a single-party property dispute underscores how wholly inadequate that forum would be for an eleven-count, fourteen-defendant case of this complexity.

In short, Defendants have not carried their heavy burden. Nicaragua is not an adequate alternative forum because it lacks any statutory framework for ten of eleven counts; its constitutional property guarantees have been repealed; Defendants' expert cited a Constitution that no longer exists; and a Nicaraguan attorney with direct experience in those courts attests that CDM cannot obtain a fair trial there.  Moreover, the private and public interest factors both favor this Court. Dismissal would not transfer CDM's claims to an adequate forum. It would permanently extinguish them. The motion should be denied.

**C.     CDM's Injury Is Overwhelmingly Domestic Under *Yegiazaryan*: Stronger Than the Case Itself on Every Factor.**

Defendants' domestic-injury argument collapses on contact with the very authority it invokes. They reduce the *Yegiazaryan* inquiry to a single question—"where is the property?"—and answer "Nicaragua." MTD at 32–33. That is the bright-line, single-factor test the Supreme Court *rejected*. *Yegiazaryan v. Smagin*, 143 S. Ct. 1900, 1909–10 (2023). Under the context-specific framework *Yegiazaryan* actually establishes, the circumstances of CDM's injury are overwhelmingly domestic—and far more so than those that carried the day in *Yegiazaryan* itself.

**1.     *Yegiazaryan* requires a context-specific inquiry, not a single-factor test.**

The Supreme Court adopted a "context-specific" approach that examined three categories of circumstances: the "nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." *Id.* at 1909. The Court instructed that §1964(c)'s focus is "the injury, not in isolation, but as the product of racketeering activity," requiring courts to "[z]oom[] out" to examine "the circumstances surrounding the injury" rather

than fixate on any single geographic fact. *Id.* at 1910. The Court warned that "focusing solely on" one fact "would miss central features of the alleged injury." *Id.*

Defendants do precisely what *Yegiazaryan* forbids. They isolate one fact—the property's location—and declare the inquiry over. MTD at 32–33. They then claim CDM "relies on its domicile, which is irrelevant under *Yegiazaryan*." MTD at 33. But *Yegiazaryan* never held that a plaintiff's domicile is "irrelevant"; it held that domicile *alone* cannot *determine* the inquiry— rejecting a "rigid, residency-based test" that would locate injury exclusively at the plaintiff's domicile. *Id.* at 1907. There is a canyon between saying domicile is not *dispositive* and saying it is *irrelevant*—and Defendants have fallen into it.

## 2. Every *Yegiazaryan* factor points to the U.S.

Applying *Yegiazaryan*'s three-factor framework to the FAC, every relevant circumstance points to the U.S.

### a. The nature of CDM's injury is domestic.

CDM is a Texas LLC organized under Texas law, with its principal place of business in Houston and its managing member residing in Texas. FAC ¶¶ 3, 167. CDM's injury is financial: it paid fraudulent "dues" for nearly a decade from Houston-area banks, FAC ¶¶ 74, 167; paid construction "review fees" under false pretenses, FAC ¶ 109; and suffered financial depletion experienced in Texas, where its business operations, bank accounts, and managing member have been located. FAC ¶¶ 122–23, 167. These are not allegations of mere domicile. They are the specific domestic circumstances *Yegiazaryan* instructs courts to examine.

### b. The racketeering activity is domestic.

The Agora Enterprise is headquartered in Baltimore. FAC ¶¶ 23–24. Dues invoices were sent from Baltimore to property owners across the United States. FAC ¶ 71. Every payment was

directed to Agora-affiliated bank accounts in Baltimore. FAC ¶¶ 71–72. CDM's own payments were wire transfers from Houston banks to Baltimore and checks mailed from Houston to Baltimore. FAC ¶ 74. The wire fraud predicates used interstate wires: emails from Baltimore to Houston. FAC ¶¶ 148–49. The mail fraud predicates used U.S. mails and FedEx from Baltimore and Miami to property owners worldwide. FAC ¶ 148(b)–(e). The money laundering flowed through U.S. financial institutions processing over $2 million annually. FAC ¶¶ 73, 156–59. The extortion extracted payments from U.S. bank accounts. FAC ¶¶ 150–55.

### c.　The injurious aims and effects are domestic.

The scheme was designed to extract money from American property owners, marketed through Agora's U.S. publishing network using "direct-response copywriting" directed at American subscribers. FAC ¶¶ 26, 32. All nine individual Defendants are U.S. citizens. FAC ¶¶ 4–12. The effects have manifested in the United States: depleted U.S. bank accounts, impaired U.S. business operations, and financial harm experienced by a Texas LLC and its Texas-based managing member. FAC ¶¶ 122–23, 167.

Defendants' characterization of CDM's allegations as resting on "the mere fact that CDM is a Texas LLC," MTD at 33, is a straw man. CDM's allegations identify *where the racketeering originated* (Baltimore), *where the payments flowed* (Houston to Baltimore), *where the fraud was directed* (U.S. property owners), and *where the financial harm landed* (Texas). That is not "domicile." That is the full *Yegiazaryan* analysis—and every factor is domestic.

### 3.　CDM's case is *stronger* than *Yegiazaryan* on every factor.

In *Yegiazaryan*, a *Russian citizen* established a domestic injury based on racketeering "directed from" California that frustrated a California judgment—even though, "in some sense,"

the plaintiff had "felt his economic injury in Russia." 143 S. Ct. at 1910–11. CDM's case is stronger across the board:

| Factor | *Yegiazaryan* | CDM |
|---|---|---|
| **Plaintiff** | Russian citizen | Texas LLC (domestic entity) |
| **Enterprise** | Mixed U.S./foreign | Mixed U.S./foreign; all roads leading to Baltimore |
| **Predicate Acts** | California + abroad | U.S. interstate commerce throughout |
| **Financial Flows** | California assets | Houston → Baltimore banks |
| **Defendants** | California resident + foreign actors | All nine U.S. citizens; foreign entities run by U.S. citizens |
| **Injury Felt** | "In some sense" in Russia | Directly in Texas |

If a Russian national suing over interference with a foreign arbitration award established a domestic injury because the racketeering was "directed from" California, then *a fortiori*, a Texas LLC whose managing member received fraudulent demands in Texas, transmitted payments from Texas banks to Baltimore banks, and suffered financial depletion felt in Texas, as a result of a scheme run by an enterprise headquartered in Baltimore and carried out by nine U.S. citizens through U.S. interstate commerce, has alleged a domestic injury.

**4.      Defendants' "international friction" argument cuts against them.**

Defendants invoke the concern of *RJR Nabisco v. European Cmty.*, 136 S. Ct. 2090 (2016) about "international friction" to suggest this Court would be adjudicating Nicaraguan property rights. MTD at 33. That concern animated *RJR Nabisco*'s holding that §1964(c) does not extend to *purely foreign injuries*: suits by foreign plaintiffs for injuries suffered abroad. 136 S. Ct. at 2111. CDM is an American company suing American citizens over racketeering directed from American soil through American banks. There is no foreign sovereign whose interests are implicated by holding U.S. persons accountable under U.S. law for conduct

executed through U.S. commerce. If anything, the "international friction" cuts the other way: declining to hear this case would tell American plaintiffs that American racketeers can immunize themselves from American RICO liability simply by situating the targeted property offshore.

CDM has alleged a domestic injury under §1964(c). Defendants' motion to dismiss this case on this ground should be denied.

**D.      Predicate Acts under RICO are Conceded Against Five Defendants and Expressly Pleaded Against the Rest.**

Defendants' predicate-act challenge rests on quicksand: a series of concessions, a misreading of the FAC, and a misstatement of the law, all of which resolve the dispute in CDM's favor.

**1.      Mail/wire fraud is plausibly alleged against eight of ten Defendants, on the MTD's *own terms*.**

Five of ten § 1962(c) Defendants are already conceded. The challenge to three collapses based on the next paragraph of the FAC.

**a.      Defendants concede mail/wire fraud against five Defendants.**

The enterprise's three founders (Bonner, Ford, Turner), its EVP of Real Estate (Currey), and its corporate parent (Agora) are conceded to have plausibly committed mail and wire fraud. MTD at 35; *see also id.* at 34, 38. That concession alone establishes a plausible pattern of racketeering activity by the enterprise's leadership.

**b.      Defendants stopped reading at paragraph 148.**

Defendants' principal argument is that "the mail/wire fraud allegations do not include Maish, Costantino, Semenza, or Boothby." MTD at 34. But Maish, Costantino, and Semenza are *not* missing from the FAC—Defendants simply stopped reading one paragraph too soon.

Paragraph 149—which Defendants themselves cited on pages 18 and 68 of their own brief—alleges mail and wire fraud against all three.

Paragraph 149 alleges that Maish, Costantino, and Semenza "knew that Rancho Santana had no operative HOA" yet "continued to make numerous representations over mail and wire to further the fraudulent scheme of extracting payments from owners." FAC ¶ 149. Six sub-paragraphs follow:

i.      **Costantino** "repeatedly and fraudulently represented annually requested payments as 'dues'" in emails transmitted by wire from Baltimore to Houston from November 2013 through March 2022. FAC ¶ 149(a). CDM's payments, "directed by Costantino's emails, were made by wire transfer from Houston, by check mailed from Houston, and by credit card," with "the destination . . . always Baltimore." FAC ¶ 149(b). Costantino continued representing payments as "dues" in emails from March 2023 through August 2025. FAC ¶ 149(d).

ii.      **Maish** admitted in a March 20, 2023, email that APROSA had been "considered a failure and intentionally abandoned as an HOA," then misrepresented that it had been closed by "tax authorities" when it had actually been terminated for failing to fulfill its legal obligations. FAC ¶ 149(c).

iii.      **Semenza** sent email requests for payments on September 6, 2021, and April 7, 2022, as "review" fees under purportedly enforceable building guidelines, and CDM wired payments to Baltimore. FAC ¶ 149(e). Semenza declared by email from April through December 2024 that fines would ensue for failure to comply with building guidelines—furthering the scheme of enforcing quasi-HOA powers when there was no HOA. FAC ¶ 149(f).

These allegations carry the same specificity—dates, senders, recipients, content, and interstate transmission—that Defendants concede satisfies the pleading standard for the five

defendants in paragraph 148. Mail/wire fraud, on Defendants' own terms, is thus plausibly alleged against eight of ten § 1962(c) Defendants.

### 2. Geerling's predicate acts are plausibly alleged.

Geerling committed at least four predicate acts across two time periods, and Defendants' temporal arguments fail under the RICO statutes and binding precedent.

#### a. Two predicate acts in 2003:

Even facially innocuous mailings are predicate acts when they further the fraudulent scheme. *United States v. Hoffman*, 901 F.3d 523, 545-46 (5th Cir. 2018). On October 25, 2003, Geerling sent predecessor owners an invoice for HOA dues. FAC ¶ 52. On November 20, 2003, she sent a letter representing Rancho Santana as Nicaragua's "premier private residential community," announcing a shift in expenses from International Living to APROSA while directing payments to herself in Miami. FAC ¶¶ 52, 148(e). Both communications furthered the fraudulent HOA scheme through U.S. mail.

#### b. Two more in 2023:

"[B]oth communication of half truths and concealment of material facts are actionable under the mail fraud statute." *Landry v. Air Line Pilots Ass'n Int'l*, 901 F.2d 404, 429 n.88 (5th Cir. 1990). Furthermore, "intent to defraud is imputed to civil RICO defendants who act with reckless indifference to the truth or falsity of their representations." *Id.* n.87. In the September–October 2023 Listserv exchange, Geerling was directly asked about the HOAs' existence and "evaded direct questions about her knowledge of the HOAs and their legal legitimacy" across multiple emails. FAC ¶¶ 77–81, 148(f). Concealment of material facts by a former General Manager uniquely positioned to know the truth shows reckless indifference—at minimum—and is independently actionable.

c.      **Pattern requirement satisfied:**

Section 1961(5) requires "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity . . . ." 18 U.S.C. § 1961(5). Defendants frame a 20-year gap between Geerling's 2003 and 2023 acts. MTD at 36. But § 1961(5) does not require that each act by the *same defendant* fall within ten years of her own prior act—it requires the last act occur within ten years of *a prior act of racketeering activity*. The enterprise's predicate acts are continuous from at least 2003 through 2025 with no ten-year gap. Geerling's 2023 acts fall within ten years of predicate acts by co-Defendants in the intervening period. Besides, two related acts of mail fraud *themselves* suffice to form a RICO pattern. *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1355 (5th Cir. 1985). In multiple ways, Geerling thus satisfies the pattern requirement test.

Defendants' remaining temporal arguments, *see* MTD at 35-36, are equally unavailing. CDM need not have existed in 2003 to be injured by a scheme Geerling helped build; the fraudulent HOA structure she promoted was the same structure used to extract payments from CDM beginning in 2014. Her 2003 communications were "'step[s] in the plot.'" *Hoffman*, 901 F.3d at 547 (quoting *United States v. Dowl*, 619 F.3d 494, 499 (5th Cir. 2010)). The statute of limitations looks to discovery of the injury, not the date of predicate acts. *Rotella v. Wood*, 528 U.S. 549, 555 (2000). CDM discovered the fraud in 2023. FAC ¶¶ 226, 228.

3.      **Boothby's predicate acts are plausibly alleged.**

Boothby is alleged to have conspired to extort CDM and other property owners. FAC ¶¶ 117, 137–39, 155. The Hobbs Act reaches anyone who "in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion or *attempts or conspires* so to do." 18 U.S.C. § 1951(a) (emphasis added). Conspiracy to extort is itself a completed violation of § 1951—and

therefore a predicate act under 18 U.S.C. § 1961(1)(B). Boothby "publicly pressur[ed] non-paying owners to comply, euphemizing the dues . . . advis[ed] dissenters to 'find a new option for yourself,' and attempt[ed] to suppress owner discussion of water and electricity rights on the Listserv." FAC ¶ 155.  CDM also alleges, on information and belief, that "Boothby is one of the owners who has been pressing Costantino to collect dues from owners who have stopped paying." FAC ¶ 139.

### 4. Defendants ignore CDM's actual extortion theory: fear of economic harm under *Tomblin* and *Rashad*.

Defendants spend their entire extortion analysis dismantling "color of official right." MTD at 36-37. They can have it. CDM's extortion claim does not depend on whether Defendants qualify as public officials or masqueraded as ones. It rests on the independent and fully sufficient basis of the wrongful use of fear—specifically, fear of economic harm—which the MTD ignores entirely.

"Extortion by wrongful use of fear includes fear of economic harm." *United States v. Tomblin*, 46 F.3d 1369, 1384 (5th Cir. 1995). Fear is assessed "from the perspective of the victim": the question is "the existence of the victim's belief that the defendant had the power to harm it and the victim's fear that the defendant would exploit that power." *Id.* (quoting *United States v. Garcia*, 907 F.2d 380, 385 (2d Cir. 1990)). The defendant "need not create the fear, so long as the defendant uses it to extort property." *Id.* (citing *United States v. Gerald*, 624 F.2d 1291, 1299 (5th Cir. 1980)). And "[e]xtortion of this type . . . occurs where the victim believes that he will lose an investment if he does not cooperate with the perpetrator's demands." *United States v. Rashad*, 687 F.3d 637, 642 (5th Cir. 2012) (citing *Tomblin*, 46 F.3d at 1385).

That is precisely what is alleged here. CDM feared—and experienced—through its principal the loss of existing entitlements:

**Utility cutoffs:** Maish attempted to cut CDM's water, claiming governmental authority the Nicaraguan government reprimanded him and Rancho SRL for exercising. FAC ¶¶ 153–54.

**Denial of property access:** Defendants threatened to deny access to owners who refused to pay. FAC ¶ 153.

**Liens:** The Community Guidelines asserted lien power over delinquent assessments—enforcement power derived from an HOA structure that does not exist. FAC ¶ 152.

**Denial of guest access and services:** Enforcement actions restricted non-paying owners from using their own property. FAC ¶¶ 105–06.

These are not speculative future harms. They are existing entitlements—water, electricity, physical access to homes already owned—that Defendants threatened to revoke and, in CDM's case, did revoke. Property owners who witnessed what happened to CDM remain silent out of fear that the same retaliatory measures will be directed at them. This is textbook *Tomblin*: victims who "believe[] that [they] will lose an investment if [they do] not cooperate with the perpetrator's demands." *Rashad*, 687 F.3d at 642. Defendants' failure to address this theory is itself dispositive; they have not moved to dismiss what CDM actually alleges.

5.      **Money laundering proximately caused CDM's continued injury.**

The routing of payments through rotating Agora-affiliated entities was not incidental to the fraud; it was the mechanism that kept the fraud hidden and the payments flowing. The money laundering concealed the scheme by cycling dues through Publishing Services, LLC; APROSA; PPNDS, LLC; Tola; and 14W Administrative Services, LLC—entities designed to "conceal or disguise the nature and source of the proceeds . . . ." FAC ¶ 159. This concealment prevented owners from discovering the fraud, enabling the enterprise to continue extracting payments year

after year. That is proximate causation: but for the concealment, CDM would have discovered the fraud earlier and stopped paying sooner.

The assertion that "[o]nce CDM paid dues, its hypothetical injury was complete" and "[n]o later transaction with that money impacted that (sp) CDM in any way," MTD at 39, confuses a single payment with a decade-long scheme. CDM paid dues *annually* from 2014 through 2022. FAC ¶ 74. Each year's concealment proximately caused the next year's payment. The money laundering was not downstream of the injury—it was the engine of its repetition.

The separate argument that "federal courts have not recognized a private right of action for breach of § 1956," MTD at 30 (citation omitted), attacks a claim CDM does not bring. CDM asserts RICO claims under § 1964(c). Money laundering is an enumerated predicate act under § 1961(1); RICO predicates need not independently support private civil suits. And section 1956(f) expressly applies extraterritorially when "the conduct is by a United States citizen . . . ." All individual Defendants are U.S. citizens. FAC ¶¶ 4–12.

**6.      National Stolen Property and Travel Act violations are plausibly alleged.**

The National Stolen Property Act ("NSPA") prohibits interstate transportation of goods obtained by fraud exceeding $5,000. 18 U.S.C. §§ 2314–15. Annual owner dues exceeded $5,000 per lot, and approximately $2 million or more per year was collected and transmitted from locales including Texas and other states to Baltimore. FAC ¶ 161. The Travel Act prohibits use of interstate commerce facilities to promote "extortion, bribery, or arson . . . ." 18 U.S.C. § 1952(b). The founders conceived the scheme in Baltimore and traveled between the U.S. and Nicaragua to promote investment by Agora subscribers; Costantino traveled to Nicaragua to enforce dues collection via the enterprise. FAC ¶ 163. The "unlawful activity" is extortion— expressly enumerated in § 1952(b).

### 7.    The pattern requirement is overwhelmingly satisfied.

The pattern requirement in RICO claims entails a showing of (1) relationship between the predicates and (2) continuity of the threat, which can be open- or closed-ended. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239-42 (1989). Relationship means the predicates share "the same or similar purposes, results, participants, victims, or methods of commission . . . ." *Id.* at 240. Here, the predicates share the same purpose (extracting payments through a fraudulent HOA), same results (money flowing to the enterprise), same participants (the founders and operatives whose participation in the enterprise's affairs goes back decades), same victims (hundred of property owners), and same methods (mail/wire communications, Baltimore bank transfers, enforcement threats). Defendants do not contest relationship.

Open-ended continuity is dispositive. The *H.J. Inc.* Court offered this hypothetical: a hoodlum selling "insurance" to storekeepers, "reappearing each month to collect the 'premium.'" *Id.* at 242. That is CDM's case. Defendants demand recurring "dues," threatening utility cutoffs and access denial for nonpayment. The scheme is ongoing. The predicate acts "are a regular way of conducting defendant's ongoing legitimate business . . . ." *Id.* at 243. Closed-ended continuity is also satisfied: the predicates extend from at least 2003 through 2025—over two decades—far exceeding the "substantial period of time" required by *H.J. Inc.*, *id.* at 242.

CDM has plausibly alleged mail/wire fraud (conceded as to five Defendants, expressly pleaded against three more, and supported for Geerling and Boothby through independent predicate theories), extortion through fear of economic harm, money laundering, NSPA violations, and Travel Act violations—forming a pattern spanning over two decades and continuing today. Defendants' motion on these grounds should be denied.

**E.      CDM Has Plausibly Alleged Violations of Counts II-IV: §§1962(a), (b), AND (d).**

The predicate acts are partially conceded, the enterprise challenge is abandoned, and domestic injury is established. *See supra* Sections V.C.-D. Counts II through IV share these foundations; each also stands independently, targeting a distinct species of harm through a distinct statutory mechanism.

**1.      Count II: the investment injury is categorically distinct from the fraud.**

The fraud injury is paying illegitimate dues. The investment injury is being forced to compete against a resort built with those very dues, after the racketeering income was collected through U.S. banks, funneled through U.S. entities, and directed by U.S. persons. Different harms, different causal chains.

**a.      CDM has pleaded a distinct §1962(a) investment injury.**

A §1962(a) plaintiff "'need prove only that illegally derived funds flowed into the enterprise.'" *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 442 (5th Cir. 2000) (citing *United States v. Cauble*, 706 F.2d 1322, 1342 (5th Cir. 1983)). The statute "does not require direct or immediate use of illicit income." *Id.* The injury must result "from the investment or use of racketeering proceeds," not merely from the predicate acts. *Id.* at 443.

The FAC draws that distinction cleanly. Count I's injury is the fraud: CDM was deceived into paying "dues" to a nonexistent HOA for nearly a decade. FAC ¶¶ 74, 166. Count II's injury is what RICO(a) Defendants did with the money. Racketeering income was "funneled through Agora-affiliated entities in the United States—including Tola, PPNDS, and Agora itself—to bank accounts primarily in Baltimore." FAC ¶ 172. That income "funneled into the pockets of the founders [Bonner, Ford, and Turner], along with the managers who run Rancho SRL's daily operations and implement its policies: Maish, Currey, Costantino, and Semenza." FAC ¶ 173.

The founders then "reinvested the income derived from the pattern of racketeering activity into Rancho Santana's common areas and resort—both of which the founders ultimately own and control through RS Inc." FAC ¶ 174. That reinvestment "funded the transformation of Rancho Santana from a residential community into a developer-controlled resort that competes directly with CDM, erected barriers to CDM's entry into the vacation rental market, and led to the blockade of CDM's efforts to complete its home on G16." *Id.*

Paying money you do not owe is one injury. Watching the recipients funnel that money through U.S. entities and into their own pockets, then reinvest it into a competing resort that blocks your construction and excludes you from rental markets, is a different injury.

### b.   The MTD's domestic-injury and commerce-nexus arguments recycle failures from Count I.

The "domestic injury" argument—that CDM is merely "claiming to be shut out of the Nicaraguan real estate market," MTD at 41–42—is the same single-factor geographic framing rejected in Section V.C. The commerce-nexus argument—that "by the time of the actual 'investment,' . . . that U.S. connection is absent," MTD at 42—ignores the domestic investment chain: racketeering income flowed to U.S. entities in Baltimore, FAC ¶ 172, into U.S.-citizen founders' and managers' pockets, FAC ¶ 173, and was reinvested by those U.S. persons into the resort, FAC ¶ 174. The "anchor to U.S. commerce," *RJR Nabisco*, 136 S. Ct. at 2105, is the domestic collection, domestic routing, and domestic direction of the racketeering income—not the final destination of the reinvestment.

### c.   The entity Defendants received racketeering income indirectly.

Section 1962(a) prohibits any person who "has received any income derived, directly or indirectly, from a pattern of racketeering activity" from investing that income in an enterprise. 18 U.S.C. §1962(a). Unlike §§1962(b) and (c), the statute does not require that each defendant

*commit* predicate acts; it reaches anyone who received income *from* a pattern, directly or indirectly. Each entity Defendant received racketeering income through the common founders who own, control, and operate them; the founders collected racketeering proceeds and funneled them through these very entities. FAC ¶ 172. Vicarious liability independently applies: under §§1962(a) and (b), liability attaches "when the principal has derived some benefit from the agent's wrongful acts." *Crowe v. Henry*, 43 F.3d 198, 206 (5th Cir. 1995). These entity Defendants are the corporate vehicles through which the scheme operated and the racketeering income flowed.

**2.      Count III: §1962(b) prohibits *maintaining* control through racketeering— which is exactly what happened here.**

Defendants' "hopelessly circular" argument, MTD at 44–45, misreads the statute by half and unwittingly concedes the critical element.

**a.      "Acquire or maintain": Defendants read only the first word.**

Section 1962(b) is written in the disjunctive: "acquire *or maintain*, directly or indirectly, any interest in or control of any enterprise." 18 U.S.C. §1962(b). Defendants seemingly concede they have been "in control . . . all along." MTD at 45. Precisely. The question is *how* they maintained that control. The answer is racketeering.

Defendants represented to buyers—and their own executives understood—that the developers would transfer governance to homeowners through a functioning HOA and exit. Defendant Ford stated publicly that the theory was to "lottify" the property and "sell to our customers." FAC ¶ 30. A Rancho Santana executive confirmed: "the theory was when you go in you sell all the land, you turn the HOA over to the community, and you get out. *That just didn't happen*." FAC ¶ 30 (emphasis added). Whatever Defendants' original intentions, they used racketeering—the fraudulent HOA scheme, serial wire fraud, extortionate enforcement of

nonexistent authority—to *maintain* control that, by their own representations, should have been relinquished years ago.

### b.      The §1962(b) injury is distinct.

Being defrauded into paying dues is the predicate-act injury. Being *governed by an enterprise whose control was maintained through that fraud*—subjected to the rules, fees, and enforcement actions of a developer-controlled operation that was never supposed to remain developer-controlled—is the §1962(b) injury. FAC ¶ 181. The founders maintained control of CDM's property rights (blocking construction, access, and rental activities, *id.*), governance (suppressing the transition to homeowner control while telling owners "there's no intention to create an HOA," FAC ¶ 66), and the enterprise itself (consolidating ownership through racketeering income, FAC ¶¶ 180–81).

Racketeering → maintenance of control → exercise of that control to CDM's detriment. That is what §1962(b) was enacted to address. The consciousness with which Defendants maintain this control is confirmed by Maish's refusal of any external oversight: "This idea of auditing a company and all this, it's not something we're gonna sign up for." FAC ¶ 130. A legitimate community manager invites transparency; a racketeering enterprise refuses it. Maish has gone further, asserting that Rancho Santana has "the right to basically create rules, impose fees." FAC ¶ 133. That claimed authority—to legislate and tax without accountability—is the very "control" that §1962(b) prohibits maintaining through racketeering activity.

### c.      *RJR Nabisco* forecloses the commerce-nexus argument.

Defendants' commerce-nexus argument under §1962(b), MTD at 44, is foreclosed by *RJR Nabisco*, the very case Defendants cite. The *RJR Nabisco* Court held that "Congress intended the prohibitions in 18 U.S.C. §§1962(b) and (c) to apply extraterritorially in tandem

with the underlying predicates, *without regard to the locus of the enterprise*." 136 S. Ct. at 2105 (emphasis added). The Court was explicit: "RICO—or at least §§1962(b) and (c)—applies abroad . . . regardless of whether [the patterns of racketeering] are connected to a 'foreign' or 'domestic' enterprise." *Id.* at 2104. The enterprise here is U.S.-headquartered, U.S.-run, and U.S.-funded—but even if it were not, the location of the enterprise "does not impose an independent constraint" on §§1962(b) and (c). *Id.*

### d.    The entity Defendants are liable through vicarious liability.

Contrary to Defendants' contentions, MTD at 45, as to individual Defendants Maish, Costantino, and Semenza, predicate acts are plausibly alleged. *See supra* Section V.D.1.b. As to the entity Defendants, vicarious liability applies under §§1962(a) and (b) "when the principal has derived some benefit from the agent's wrongful acts." *Crowe*, 43 F.3d at 206. Here, each entity Defendant derived substantial benefit from the founders' and managers' racketeering; they are the corporate vehicles through and for which the scheme was conducted. FAC ¶¶ 172–74.

### 3.    Count IV: the conspiracy is pleaded with specificity.

The agreement, guilty knowledge, and participation in a §1962(d) conspiracy "all may be inferred from the 'development and collocation of circumstances.'" *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998) (quoting *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir.1992)). A defendant need not know "all of the details of the unlawful enterprise or the number or identities of all of the co-conspirators . . . ." *Id.* A conspiracy "may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1998).

The FAC specifies each Defendant's role: the founders "conceived and directed the scheme"; Maish, Currey, Costantino, and Semenza "implemented and enforced it"; Geerling

"facilitated it through her early role in establishing the HOA framework and her later evasion of owner inquiries"; Boothby "furthered it through his public advocacy on the Listserv and his pressure on management to enforce dues collection"; and the entity Defendants "served as the operational vehicles through which the conspiracy was carried out." FAC ¶¶ 186–87. Interlocking corporate relationships, coordinated enforcement actions, and common financial routing through Baltimore are precisely the "development and collocation of circumstances" *Posada-Rios* holds sufficient. 158 F.3d at 858.

That is not "group pleading and layered speculation," MTD at 46. It is what *Abraham v. Singh*, 480 F.3d 351 (5th Cir. 2007), requires: a complaint that "allege[s] specifically such an agreement" and describes each defendant's participation. 480 F.3d at 357. Once the agreement is established, "any of the . . . conspirators is liable for any acts of mail and wire fraud committed during the conspiracy that were foreseeable and that furthered the agreement." *Hoffman*, 901 F.3d at 544. Here, there were numerous acts of mail/wire fraud that were more than foreseeable and furthered the agreement among all Defendants.

Counts II through IV each allege distinct injuries through distinct statutory mechanisms, supported by well-pleaded facts and binding Fifth Circuit authority. Defendants' motion to dismiss these counts should be denied.

**F.      Rancho SRL Admits It is "Competing Against" Property Owners, Making Its Restraints Per Se Illegal, Not Vertical Brand Management.**

Defendants' antitrust arguments rest on a fiction: that Rancho Santana involves a disinterested developer managing its community from above. In fact, Rancho SRL owns and operates a 17-room inn, residential suites, condominiums, the RSVR vacation rental program, five-star dining, wedding packages, and wellness retreats—all competing *directly* with independently renting property owners like CDM for the same U.S. consumer dollar. FAC ¶¶ 85

–87, 93, 199. Maish himself admitted it: Rancho Santana has been "competing against ourselves." FAC ¶ 89. The Community Guidelines, Rental Guidelines, Broker Regulations, and Resort Fee are not neutral rules; they are the competitive weapons of a horizontal rival that has arrogated regulatory power over its competitors. Every antitrust argument in the MTD collapses once this reality is acknowledged.

### 1. The FTAIA does not bar CDM's claims because this conspiracy targets U.S. commerce.

This case is not "all about the market in Nicaragua," MTD at 48. This case is about an anti-competitive conspiracy conceived in the United States, funded by U.S. capital, marketed to U.S. consumers, and directed at restraining competition *for the American buyer and renter* in both the higher-end residential real estate and vacation rental markets along Nicaragua's Emerald Coast.

The Foreign Trade Antitrust Improvements Act ("FTAIA") bars Sherman Act claims involving foreign commerce unless (1) the challenged conduct has "a direct, substantial, and reasonably foreseeable effect" on U.S. domestic commerce, and (2) that domestic effect "gives rise to" the plaintiff's claim. *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004); 15 U.S.C. §6a. Both prongs are satisfied.

### a. The domestic effect is direct and substantial.

The group boycott and price-fixing scheme—enforced through the Community Guidelines, Rental Guidelines, Broker Regulations, and Resort Fee—excludes CDM and other non-compliant owners from competing for U.S. consumers in both the vacation rental and residential real estate markets. FAC ¶¶ 190, 196, 199–203. U.S. consumers are the demand side: through the "world wide advertising and public relations muscle of Agora," Defendants have marketed Rancho Santana to millions of Americans. FAC ¶¶ 38, 53, 204. All dues and fees flow

through U.S. bank accounts in Baltimore. FAC ¶ 204. The conspiracy reduces competition in markets that serve American consumers: fewer independent rental operators, higher prices, and Defendants' consolidation of control over both the rental and resale channels. FAC ¶¶ 97, 199–200.[1]

### b.    That domestic effect gives rise to CDM's claim.

CDM does not allege "independent foreign harm" that happens to have a U.S. echo. *Cf. Empagran*, 542 U.S. at 165–67. CDM's injuries—exclusion from the vacation rental market, inability to sell at fair market value, inability to complete its home—are the direct manifestation of the harm to domestic competition. FAC ¶¶ 196, 203. When horizontal competitors foreclose a rival from competing for American consumers, the resulting injury to the excluded competitor *is* the domestic effect.

### c.    Defendants confuse nexus with effect.

Defendants dismiss CDM's alleged U.S. nexus of U.S. marketing and Baltimore bank accounts as failing to show "how the alleged anti-competitive restraint effected domestic trade." MTD at 48. But the marketing and financial flows are evidence of the markets' *domestic character*; the *effect* is the restraint on competition within those markets. The utility shutoffs, gate closures, and access restrictions are the enforcement mechanisms by which the boycott eliminates independent competitors so Defendants can consolidate control. FAC ¶¶ 97, 196, 199

---

[1] Defendants argue a U.S. market based on customer location is not cognizable. MTD at 53. But the geographic market is the "area of effective competition" where buyers can "practically turn" for alternatives. *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002). That area is not the physical location of the real property—it is where buyers evaluate, compare, and purchase vacation rentals and residential real estate along the Emerald Coast. Defendants and other Emerald Coast property owners compete for those buyers through U.S.-directed publications, U.S. websites, and U.S. financial channels—the very channels from which CDM has been excluded. FAC ¶¶ 83, 190–91, 196, 204. Market definition, in any event, "can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451, 482 (1992).

–200, 203. *See Dominicus Americana Bohio v. Gulf & W. Indus.*, 473 F. Supp. 680, 687–88 (S.D.N.Y. 1979) (denying motion to dismiss Sherman Act claim where dominant resort operator used coercion to exclude competing development marketed to U.S. tourists). Defendants' own citation, *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015), required the plaintiff's injury to "arise out of" the domestic effect—which is exactly what CDM alleges.

**2. CDM plausibly alleges per se violations because the restraints are horizontal, not vertical.**

Defendants' reliance, MTD at 54, on *Viazis v. American Ass'n of Orthodontists*, 314 F.3d 758 (5th Cir. 2002)—a case about a *voluntary* professional association whose product recommendations were *nonbinding* and which exercised *no coercive power*, *id.* at 764–66—is inapposite on its face. There is no association; there is no HOA; there are no bylaws adopted by a deliberative body of property owners. FAC ¶ 195. The Community Guidelines, Rental Guidelines, and Broker Regulations "were drafted by Rancho SRL and imposed on property owners without negotiation, agreement, or vote." FAC ¶ 88. As Maish told homeowners: "We're not a democracy." FAC ¶ 129. In other words, nothing here is voluntary, and nothing is nonbinding.

Defendants' central error is characterizing Rancho SRL as a "central actor" sitting atop a vertical chain, with homeowners as subordinate "spokes" who merely "adhere" to its rules. MTD at 51–52. But Rancho SRL is not CDM's supplier, franchisor, or upstream principal. Rancho SRL owns and operates the inn, residential suites, condominiums, and RSVR—all competing directly with independently renting property owners for the same U.S. vacation consumer. FAC ¶¶ 85–87, 93. Maish said it himself when announcing the Rental Guidelines: "Rancho Santana should be differentiating itself and competing with other destinations rather than competing against ourselves." FAC ¶ 89. "Ourselves" is the tell. Defendants know they are competitors.

When a horizontal competitor drafts, imposes, and enforces rules that channel all rental demand through its own program, restrict independent pricing, and funnel 94 percent of real estate transactions through its own brokerage, FAC ¶ 97, that is not vertical brand management—it is a per se illegal group boycott and price-fixing scheme.

### a.    The concerted refusal to deal is a per se illegal group boycott.

"[G]roup boycotts involving a horizontal conspiracy to foreclose a market participant are considered per se violations of § 1." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015). The Rental Guidelines require all vacation rentals to be channeled through RSVR or subjected to a discriminatory Resort Fee. FAC ¶¶ 91, 93. The Broker Regulations funnel 94% of transactions through Rancho SRL's in-house brokerage. FAC ¶¶ 95, 97. Owners non-compliant with so-called dues payments face gate closures, utility shutoffs, and blacklisting. FAC ¶¶ 134-36, 196. "Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups." *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 213 (1959).

Defendants claim the FAC pleads no "meetings, communications, or other plus factors" showing horizontal agreement. MTD at 51–52. The record says otherwise. The FAC alleges a "conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984):

i.    Maish rallied property owners at the 2023 Owners Meeting to enforce dues against dissenters: "Many, many, many owners have already bought into it." FAC ¶¶ 131, 196.

ii.    At the 2024 Owners Meeting, an owner suggested "accidental" sabotage of infrastructure serving non-paying owners; attendees laughed; Maish did not disavow it. FAC ¶¶ 134–35.

iii.     Boothby—an independent homeowner and RSVR participant who competes directly with CDM—advocated for the Rental Guidelines on the community Listserv, pressured Costantino to collect dues, and advised dissenters to "find a new option for yourself." FAC ¶¶ 137–39.

iv.     Costantino threatened to blacklist CDM's property with all prospective brokers. FAC ¶ 196.

v.     Geerling's husband, speaking at the 2023 Owners Meeting in her presence, publicly endorsed the developer's position and directed hostility at non-paying owners, conduct attributable to Geerling as a knowing participant. FAC ¶¶ 132, 197.

These are not inferences from "parallel business behavior" as Defendants intimate, MTD at 51. The written Guidelines and Regulations are the agreement: direct documentary evidence of a common scheme, collectively adopted and enforced. Under *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948), it makes no difference whether the developer fomented the scheme or homeowners demanded it: "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." Knowingly joining suffices. *MM Steel*, 806 F.3d at 844.

### b.     Defendants admit to fixing prices on competing properties.

Defendants invoke *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), for the proposition that the RSVR program is "[v]ertical price maintenance." MTD at 52. But *Leegin* addressed a manufacturer setting resale prices for its own branded goods through independent dealers—a vertical relationship. Here, Currey admitted that "the resort dictates the price points" for independently owned rental properties participating in RSVR—properties that are *horizontal competitors* to Rancho SRL's own inn and accommodations. FAC ¶ 199. A

horizontal competitor admitting it fixes prices on other competitors' properties is not *Leegin*; it is anti-competitive behavior and per se illegal. Rancho SRL also takes 35% of gross rental income from RSVR participants and imposes a discriminatory Resort Fee on guests of non-program owners, penalizing any owner who competes independently for guests while giving other guests (non-commercial, walk-in) a pass. FAC ¶¶ 93, 200. That too is anti-competitive behavior.

### 3. CDM's antitrust injuries flow directly from the boycott; standing cannot become the tail wagging the dog.

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). CDM's injuries—exclusion from the vacation rental market, inability to sell at fair market value, and inability to complete its home—flow directly from the per se illegal group boycott and price-fixing scheme. FAC ¶¶ 196, 203.

Defendants demand that CDM allege "facts to show the alleged conspiracy resulted in any lost customers to any of the homeowners, or that output of vacation rentals in either of the alleged product markets declined." MTD at 55. The Fifth Circuit has squarely rejected this gatekeeping. In *Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301 (5th Cir. 1997), the court held that "the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing," warning that "standing should not become the tail wagging the dog in 'classical' antitrust cases such as this one by an allegedly excluded competitor." *Id.* at 305–06. That is exactly what Defendants ask this Court to do: require CDM to prove market-wide competitive harm at the pleading stage as a precondition to standing. The Court should decline.

For all of these reasons, Count V states a plausible claim under Section 1 of the Sherman Act, and Defendants' motion should be denied.

**G.   The CEO Himself Confirmed the HOA Representations are False; Count VI States a Plausible Lanham Act Claim.**

Defendants raise four challenges to Count VI: that CDM's allegations do not constitute commercial advertising, that the representations are non-actionable puffery, that CDM lacks standing, and that certain claims are time-barred. MTD at 56-62. Each fails.

**1.   Defendants' years-long website campaign is commercial advertising under *Seven-Up*.**

The attempt to reduce CDM's allegations to "[a] stray FAQ answer and a single blog post," MTD at 57, mischaracterizes the record. The FAC identifies over 50 specific dates between 2009 and 2012 on which ranchosantana.com—the primary commercial website through which Defendants marketed to U.S. consumers—represented that "[a] master association and various sub-associations exist so that you can be assured that high and consistent standards of quality will be maintained." FAC ¶ 59. A September 2022 survey of 101 owners confirmed that 35.64% first heard of Rancho Santana through an Agora publication and another 36.63% through a friend or family member, many of whom were themselves Agora subscribers. FAC ¶ 41. This was, as the FAC alleges, "an organized campaign to penetrate the relevant market." FAC ¶ 209 (citing *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002)).

Under the Fifth Circuit's binding test in *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379 (5th Cir. 1996), representations constitute "commercial advertising or promotion" when they are (1) commercial speech, (2) by a defendant in commercial competition with the plaintiff, (3) for the purpose of influencing consumers, and (4) "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Id.* at 1384. Critically, "[t]he level of circulation required to constitute advertising and promotion will undeniably vary from industry to industry and from case to case." *Id.* at 1385 (quoting *Am.*

*Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*, 820 F. Supp. 1072, 1078 (N.D. Ill. 1993)). In *Seven-Up* itself, a presentation shown to as few as two bottlers out of a target audience of seventy-four qualified as commercial advertising because it was "specifically developed and designed . . . to target these independent bottlers and convince them . . . to switch." *Id.* at 1386. Rancho Santana's purchasing public is a finite group of prospective property buyers; Defendants' website and Agora's publications were the primary channels for reaching every one of them.

The Broker Regulations' compelled representation that all listings state, "This is an exclusive listing of Rancho Santana Property & Luxury Real Estate," FAC ¶ 96, is not merely "internal" as Defendants claim, MTD at 57. A rule that requires independent brokers to make a false representation to every prospective buyer—the entirety of the relevant purchasing public for Rancho Santana real estate—is commercial advertising by any measure. Maish reported at the 2025 Owners Meeting that 94% of transactions were handled through Rancho SRL's own brokerage, meaning the compelled language reaches virtually every buyer. FAC ¶ 97.

### 2.　The HOA representations are specific, verifiable falsehoods—not puffery.

A "'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact'" is actionable under the Lanham Act. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000) (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999)). Whether a master association and sub-associations "exist" is the paradigmatic falsifiable claim—either they existed or they did not. Maish, the CEO himself, confirmed the answer in May 2023: "There is no homeowners' association." FAC ¶ 64. He doubled-down in July 2023: "[an HOA is] simply not how we've ever managed the property . . . ." FAC ¶ 82. The 2007 FAQ document represented that the HOA

"owned or would own Rancho Santana's common facilities"—that never happened. FAC ¶ 60. Ranchosantana.com claimed for years that "[a] master association and various sub-associations exist"—they did not. These are specific and measurable claims about a governance structure that Defendants knew was fictional.

The "accidental development" characterization fares no better. That is not "a vague, subjective characterization of the community's ethos and evolution," as Defendants would have it. MTD at 58. The Community Guidelines require every owner to acknowledge that "Rancho Santana is a master planned community." FAC ¶ 100. A development cannot be both "accidental" and "master planned"—and Defendants' own governing documents establish which is true. As *Pizza Hut* instructs, the determination of whether a statement is puffery is "driven by the context in which the statement is made," and courts "should not succumb to the temptation to hastily rule a phrase to be unactionable under the Lanham Act." 227 F.3d at 497.

Defendants' objection that omissions are not actionable, MTD at 59, misses the mark. CDM's claim rests on *affirmative* false statements: that HOAs "exist," that the HOA owned common facilities, that properties are "exclusive listings" of Rancho SRL. FAC ¶ 208(a)-(g). And these misrepresentations fall squarely within the pattern the FTC identified in 2021 when it obtained a consent order barring Agora and its subsidiaries—including the same enterprise operating Rancho Santana—from making "unsubstantiated claims and misleading representations." FAC ¶ 214.

Nor does the "not goods or services" argument, MTD at 60-61, rescue Defendants. Section 43(a) prohibits misrepresentations in connection with "goods, services, or commercial activities . . . ." 15 U.S.C. § 1125(a)(1)(B). Defendants operate a resort with amenities, timeshares, a vacation rental program, a property management service, an exclusive brokerage,

wedding packages, wellness retreats, holotropic breathwork workshops, and a "Path to Vitality Longevity Experience." FAC ¶¶ 29, 86-87. The notion that these are not "commercial activities" defies the plain language of the statute.

> ### 3.    CDM has competitive standing under *Lexmark* and *Huggins*.

CDM's competitive injury is not "circular" as Defendants proclaim, MTD at 60; it is the textbook case described by *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). A Lanham Act plaintiff must allege (1) "an injury to a commercial interest in reputation or sales" and (2) that such injury was "proximately caused" by defendant's misrepresentations. *Id.* at 131-32. CDM owns property purchased for the express purpose of competing in the Rancho Santana vacation rental market. FAC ¶¶ 44-47. The Fifth Circuit has held that "[d]eterioration of competitive position is precisely the kind of injury the Lanham Act was intended to redress." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 798 (5th Cir. 2011). In *Huggins*, real estate professionals had standing where the defendant's false representations enabled it to compete against them, even where competitive injury was developing rather than fully realized. *Id.* at 797-98.

That CDM has not yet completed its home or consummated a rental proves CDM's case, not Defendants'. It is Defendants' own conduct—the construction blockade, the discriminatory Resort Fee, the exclusionary Broker Regulations, and more—that prevented market entry. "Lanham Act Defendants created the disability they now cite as evidence that CDM cannot compete." FAC ¶ 213. And CDM was itself a consumer deceived by Defendants' false advertising into purchasing property in reliance on the HOA representations—a dual role that *Lexmark* expressly contemplates, recognizing that "all commercial injuries from false advertising are derivative of those suffered by consumers deceived by the advertising" and that this

"intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute." 572 U.S. at 133.

**4.     The discovery rule and continuing violations defeat the statute-of-limitations defense.**

Awareness of a representation is not awareness of its falsity. CDM purchased Lot G-16 in 2013 relying on the HOA representation, FAC ¶ 47; naturally, CDM was "aware" of what it was told. The question is when CDM discovered the representation was *false*, and that is a factual question this Court cannot resolve against CDM at the pleading stage.

The depth of the deception speaks for itself: as late as fall 2022, property owners remained so confused about whether a functional HOA existed that they submitted formal questions to Maish; Defendants' own Nicaraguan counsel did not respond until early 2023. FAC ¶ 69. It was not until the 2023 Owners Meeting that Maish publicly confirmed: "There is no homeowners' association." FAC ¶ 64. That other owners raised concerns about HOA *governance* as early as 2006, MTD at 62, is beside the point—disputes about *how* an HOA is managed are categorically different from discovering that the HOA is entirely fictional. That distinction is the fraud.

Moreover, Defendants' false representations are ongoing. The website still references an HOA and APROSA (an entity terminated in October 2022). FAC ¶ 76. The Community Guidelines still assert lien authority derived from the nonexistent HOA. *Id.* Ford's personal blog referenced "homeowner association bylaws" as late as June 2023. FAC ¶ 75. Each continued representation independently restarts the limitations clock.

Count VI states a plausible Lanham Act claim under 15 U.S.C. § 1125(a). Defendants' motion to dismiss it should be denied.

**H.    Count VII: CDM States a Plausible Claim Under the TFEAA.**

The TFEAA is "modeled after" federal antitrust law, and "Texas courts are statutorily instructed to interpret the TFEAA in harmony with federal judicial interpretations of equivalent federal laws." *Apani*, 300 F.3d at 628; Tex. Bus. & Com. Code § 15.04. The TFEAA requires "the same elements of proof." *Tour Strategy LLC v. Star-Telegram, Inc.*, No. 4:18-CV-074-A, 2018 WL 3242280, at *5 (N.D. Tex. July 3, 2018). Defendants concede this harmonization principle. MTD at 63-64. Because CDM has adequately pleaded a Section 1 Sherman Act violation, *see supra* Section V.F., it has also adequately pleaded a TFEAA violation.

**1.    CDM is a horizontal competitor whose exclusion has harmed Texas consumers.**

Defendants seize on a single reference to CDM as a "Texas consumer" in FAC ¶ 218 to recast CDM's entire antitrust theory. MTD at 64. But that reference was a statement about the Texas nexus: CDM was among the Texas-based purchasers solicited by Agora's publications. FAC ¶ 218. CDM's TFEAA theory, like its Sherman Act theory, is that CDM is a *horizontal competitor* of the antitrust Defendants in the vacation rental and residential real estate markets. The FAC makes this plain: the Community Guidelines, Rental Guidelines, Broker Regulations, Resort Fee, and group boycott "restrain the ability of Texas-based property owners to compete in the relevant markets and restrain the ability of Texas consumers to access competitive alternatives in those markets." FAC ¶ 218. As established above in Section V.F., CDM's exclusion does not merely injure CDM; it eliminates an independent competitor, entrenches Defendants' monopoly control over vacation rental and residential real estate pricing at Rancho Santana, and reduces consumer choice in the U.S., including Texas. The TFEAA exists "to maintain and promote economic competition . . . and to provide the benefits of consumers in the state." Tex. Bus. & Com. Code § 15.04. That is exactly what CDM's claim vindicates.

### 2.    The anti-competitive conduct occurs partly in Texas and is timely.

The TFEAA applies to trade and commerce "occurring wholly or *partly* within the State of Texas . . . ." Tex. Bus. & Com. Code § 15.04 (emphasis added). CDM is a Texas LLC whose business operations, bank accounts, and managing member are located in Texas. FAC ¶ 218. The anti-competitive instruments—the Rental Guidelines, Broker Regulations, and Resort Fee—restrain CDM's ability to operate its Texas-based business. *Id.* Dues payments were transmitted from Texas banks to Baltimore. *Id.* Unlike *Destec Energy, Inc. v. Southern California Gas Co.*, 5 F. Supp. 2d 433, 464 (S.D. Tex. 1997), where the conduct occurred entirely in California with only an attenuated Texas effect, here the conspiracy directly targeted a Texas-based property owner and imposed ongoing economic harm to competition experienced in Texas.

Defendants' statute-of-limitations argument, MTD at 65, mischaracterizes the claim as based on 2013 Agora publications into Texas. CDM's TFEAA cause of action is based on the Rental Guidelines (September 2023), the Broker Regulations (September 2024), the discriminatory Resort Fee (ongoing), the group boycott (ongoing), and the price fixing through RSVR (ongoing). FAC ¶¶ 88-97, 217-18. The Original Complaint was filed December 22, 2025. Every challenged instrument falls well within the four-year limitations period. Tex. Bus. & Com. Code § 15.25.

Count VII states a claim under the TFEAA and should not be dismissed.

### I.    The FAC States a Plausible Claim under Count VIII for Common-Law Fraud.

The misrepresentations underlying CDM's fraud claim are the same representations detailed in the RICO predicate analysis. *See supra* Sections V.C-D. FRCP 9(b) requires "the who, what, when, and where" of the fraud. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). CDM has supplied all four: specific speakers (Bonner, Ford, Turner, Maish, Currey,

Costantino, Semenza), specific statements (HOAs "exist," payments are "dues," properties are subject to APROSA with lien and architectural-fee power), specific dates (50-plus website snapshots from 2009-2012, Costantino's emails from 2013-2022, Ford's blog post of June 6, 2023, Maish's May 2023 admission), and specific channels (ranchosantana.com, Agora publications, invoices, transactional documents). *See, e.g.*, FAC ¶¶ 37, 40, 47, 53-54, 59, 60, 62-64, 68, 72-75, 107, 109, 223-26.

Defendants parse the five representations in FAC ¶ 223—introduced with "including but not limited to"—and claim each fails individually. MTD at 66-70. They are wrong on all five, though three warrant specific response.

First, on the P&S agreement, FAC ¶ 223(b), Defendants note that CDM purchased from a private owner and does not allege that any Defendant prepared the P&S agreement. MTD at 67-68. But CDM does not need to. The P&S agreement and transfer deed incorporated APROSA: an entity Defendants created, controlled, and held out as a functioning HOA. FAC ¶¶ 47, 226. Under Texas law, fraud lies "where a party makes a false representation . . . with the intent or knowledge that it should be exhibited or repeated to a third party for the purpose of deceiving him . . . ." *Ernst & Young v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001). Defendants built the HOA fiction into the transactional architecture of every sale at Rancho Santana, then collected "dues" on that basis over two decades. A fraudster who embeds false representations into the structure of a transaction does not escape liability because a third party handed over the document.

Second, Defendants invoke Laura Davis's statement that "the initial thought was that we would get in and out" as evidence of good faith. MTD at 66-67. But that is a non sequitur: CDM's fraud claim does not rest on Defendants' subjective intent about their overall plan—it

rests on their knowledge of the HOA. Davis confirmed what the founders knew: the plan to turn the HOA over to owners never materialized. FAC ¶ 62. Yet Defendants continued to represent that HOAs "exist" and to collect "dues" on that basis for years afterward. The September 2022 Board Memorandum confirms the decision was conscious: Bonner, Ford, and Turner expressly chose the "corporate model" over the "owner controlled model." FAC ¶ 224. That is the scienter.

Third, as to Semenza and the building guidelines, ¶ 223(e), Defendants argue CDM cannot show reliance because CDM would have known since 2013 whether it signed Building Guidelines. MTD at 69-70. But CDM did not pay architectural review fees because it had independently verified a signed agreement—it paid because Defendants' representations of a functioning HOA made the ARC's authority appear legitimate. FAC ¶ 226. Semenza, as ARC Administrator, knew there was no HOA under whose authority he could enforce those Guidelines. FAC ¶ 118. That satisfies scienter whether characterized as knowing or reckless—and Texas fraud requires only that the misrepresentation be made knowingly *or* recklessly. *Ernst & Young*, 51 S.W.3d at 577.

On reliance, CDM's managing member purchased G16 in reliance on the HOA representations, representations made on Defendants' own website and embedded in the transactional documents. FAC ¶¶ 47, 226. CDM paid annual "dues" from 2014 through 2022 in reliance on Costantino's repeated characterization of those payments as HOA obligations. FAC ¶ 226. CDM did not discover the fraud until 2023, when Maish confirmed that "[t]here is no homeowners' association." FAC ¶ 228. The discovery rule makes the claim timely for the same reasons stated above in Section V.G.4.

Count VIII states a claim for common-law fraud. The motion to dismiss it should be denied.

**J.      CDM States a Plausible Claim Under Count IX for Trespass to Real Property.**

Trespass is among the torts to which the continuing-tort doctrine "has most typically been applied." *In re Soporex, Inc.*, 446 B.R. 750, 779 (Bankr. N.D. Tex. 2011). Under that doctrine, tortious conduct "repeated day by day" creates a separate cause of action each day, and the cause of action "does not accrue until that tortious act ceases." *Id.*

The FAC does not allege a single, isolated trespass in 2023. It alleges that during the water skirmish from August 28 through September 6, 2023, Rancho SRL personnel were witnessed entering G16 and occupying CDM's partially built home without authorization. FAC ¶¶ 113, 231. It further alleges, on information and belief, that Rancho SRL personnel have entered G16 without authorization on additional occasions. FAC ¶¶ 121, 231. And it alleges that the trespass "is ongoing and continuing" because Rancho SRL "controls . . the sole access point to G16" and has demonstrated both "the ability—and . . . the willingness—to enter CDM's property at will without CDM's knowledge or consent." FAC ¶ 235. Each continued entry creates a new cause of action and restarts the two-year limitations period. Tex. Civ. Prac. & Rem. Code § 16.003(a).

Defendants dismiss CDM's information-and-belief allegations as speculation because CDM has no means of monitoring its property between visits. MTD at 71. But that is precisely the circumstance in which information-and-belief pleading is appropriate. The Fifth Circuit permits such allegations "'where the facts are peculiarly within the possession and control of the defendant . . . .'" *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). Rancho SRL controls the sole ingress to G16, mans the entry gates with its own security,

and has ready physical access to CDM's property. FAC ¶¶ 45, 121, 231. If any party knows whether additional entries occurred, it is Rancho SRL.

Count IX states a claim for trespass to real property. The motion to dismiss should be denied.

**K.      CDM States a Plausible Claim Under Count X for Tortious Interference with Prospective Business Relations.**

For tortious interference with prospective business relations to hold, Texas law does not require a plaintiff to identify a specific third party by name; it requires "a reasonable probability" that a business relationship would have formed. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). CDM organized as a Texas LLC, purchased G16, broke ground on a home in June 2022, paid architectural review fees, and was completing construction for the express purpose of entering the vacation rental market. FAC ¶ 238. CDM also had a reasonable probability of selling G16 at fair market value, but for the artificial encumbrances: disputed liens and clearance-certificate requirements imposed under the authority of an HOA that does not exist. FAC ¶ 239. This is not speculation about what "might" happen; it is an investment actively in progress that Defendants systematically foreclosed.

Defendants' assertion that their conduct is not "independently tortious or unlawful," MTD at 72, is parasitic on their other failed arguments. The independently-tortious element requires only "conduct that would violate some other recognized tort duty." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). As demonstrated in the preceding sections, CDM has plausibly alleged fraud (*see supra* Section V.I.), RICO predicate acts (*see supra* Sections V.C.-E.), antitrust violations (*see supra* Section V.F., H.), false advertising (*see supra* Section V.G.) and trespass (*see supra* Section V.J.)—each of which independently satisfies this element. CDM identifies each Defendant's specific role in the interference. FAC ¶¶ 240-41.

Characterizing fraud, extortion, and illegal boycott as mere "[p]olicy decisions and fee schedules," MTD at 72, does not make them so.

Count X states a claim for tortious interference. The motion to dismiss should be denied.

**L.      CDM'S Civil Conspiracy Claim is Adequately Pleaded Under Count XI.**

Civil conspiracy under Texas law "survives or fails alongside" the underlying tort. *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140-41 (Tex. 2019). Defendants' sole argument is that the underlying claims fail. MTD at 72. They do not. As demonstrated above in Sections V.C.-K., CDM has plausibly alleged fraud, RICO violations, antitrust violations, false advertising, trespass, and tortious interference. Count XI survives with them, and the Court should deny Defendants' motion to dismiss it.

### VI.      CONCLUSION

For all the foregoing reasons, CDM respectfully requests that this Court deny Defendants' Motion to Dismiss First Amended Complaint in its entirety and grant all other relief to which it may be entitled.

Dated: May 5, 2026

Respectfully submitted,

**JULAPALLI LAW FIRM, P.C**
By: */s/ Venodhar Julapalli*
**Venodhar R. Julapalli**
Texas Bar No. 24149116
Southern District of Texas
Federal ID No. 3943389
2950 F.M. 2920, Suite 180
Spring, Texas  77388
Telephone: (832) 699-1007
Facsimile: (281) 880-4889
drj@julapalliforjustice.com

ATTORNEY-IN-CHARGE
FOR PLAINTIFF
CASA DE MARAVILLA, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served on all parties of record through the ECF filing system on May 5, 2026.


*/s/ Venodhar Julapalli*
Venodhar R. Julapalli