**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **CASA DE MARVILLA, LLC** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO: 4:25-cv-06183** |
| **WILLIAM BONNER, _et al.,_** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**<u>REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT</u>**

CDM's 73-page Opposition confirms what the Motion to Dismiss established: CDM has dressed a Nicaraguan real estate dispute in federal statutory clothing to attempt to shoehorn this case into the Southern District of Texas. In Opposition, CDM layers the same insufficient facts, advances new allegations it did not plead via affidavit,[1] and mischaracterizes Defendants' arguments. As set forth below, this Court should dismiss the First Amended Complaint.[2]

**I.     This case should be dismissed under _forum non conveniens_.**

CDM opposes Defendants' _forum non conveniens_ argument on two bases: (1) Nicaragua lacks statutory equivalents to RICO, the Sherman Act, and the Lanham Act, and (2) Nicaragua is somehow too corrupt to adjudicate the dispute. Neither withstands scrutiny.

The absence of identical statutes in the forum does not render Nicaragua "inadequate." Under _Piper Aircraft Co. v. Reyno_, 454 U.S. 235, 254 (1981), a forum is inadequate only where "the _remedy_ provided by the alternative forum is so clearly inadequate or unsatisfactory that it is

---

[1] This Court should decline to consider Mr. Julapalli's new affidavit and attachments, which are entirely inappropriate for an opposition to a Rule 12(b)(6) motion.

[2] Under this Court's page limits, Defendants cannot respond to every argument in the Opposition. Failure to address any should not be viewed as a concession. Defendants endeavor to focus on significant issues addressing entire counts or groups of counts.

no remedy at all." The Supreme Court has squarely rejected the proposition that a foreign forum is inadequate merely because it does not provide the *same* causes of action or remedies available in the United States, stating that "the possibility that the [foreign] forum's law is less favorable to the plaintiff" does not "render it inadequate." *Id*. at 254. CDM conflates the unavailability of *specific* federal statutes with the unavailability of *any* remedy. Nicaragua provides remedies for the property disputes, fraud, and governance grievances at the heart of this case, as Professor Gómez's Second Supplemental Affidavit further confirms. *See* **Exhibit A**. As to the constitutional amendments CDM highlights, Professor Gómez addresses the 2025 reforms and confirms that the rights cited in the original Affidavit *remain* in the Nicaraguan Constitution, just under different Articles. *See id*.

CDM's "Molina Declaration" does not rebut that conclusion. Ms. Molina addresses general political conditions in Nicaragua[3] – not the capacity of Nicaraguan courts to adjudicate civil property disputes. In fact, Ms. Molina says nothing about whether an owner of a Nicaraguan property would be unable to adjudicate its claims against *other owners of Nicaraguan properties*. Ms. Molina focuses on CDM's U.S. domicile as supposedly disadvantaging it in Nicaraguan courts, but, as CDM observes, most of the *Defendants* are also U.S. citizens. And, as to one of the few Nicaraguan entities on the Defendant's side of the case – International Living – CDM has shown no hesitation or disadvantage in currently litigating against that entity in the courts of Nicaragua. If CDM can present a case to a Nicaraguan court concerning one aspect of its property rights, it follows that the same court can address CDM's core grievances in this case.

---

[3] The irony should not be lost of CDM's reliance on an affidavit stating that U.S. citizens should not travel to Nicaragua, *see* ECF 45-2 at p.16, in a case in which CDM alleges economic losses for being excluded from the rental market for U.S. tourists. Should this matter survive dismissal, CDM should be estopped from taking any contrary position in its liability or damages case.

Finally, the private and public interest factors continue to weigh heavily in favor of dismissal. The property is in Nicaragua; the witnesses are predominantly in Nicaragua; the conduct at issue occurred in Nicaragua; and Nicaraguan law will need to be applied to the tort claims (which CDM does not contest, *cf.* Opp. at 36) that form the core of this case.

## II.     CDM cannot establish jurisdiction under any of its asserted bases.

CDM's jurisdictional theory depends on bootstrapping: CDM claims specific jurisdiction over Costantino, Agora, and (while not pleaded) Ford through the *Wien Air* intentional-tort framework, then invokes three nationwide-service statutes to sweep in the remaining Defendants. Opp. at 23–26. This cascading theory fails at each step. CDM cites *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999), for the proposition that "the actual content of communications with a forum gives rise to intentional tort causes of action" and that "this alone constitutes purposeful availment." *Id.* But the Texas Supreme Court expressly rejected this "directed tort" rationale for "purposeful availment" six years later in *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 788–90 (Tex. 2005). CDM cannot point to a single post-*Michiana* case that supports CDM's "directed tort" theory.

Since *Michiana* (and quoting *Michiana*), this Court has concluded that "focusing on where the defendant allegedly directed a tort incorrectly emphasized the relationship among the plaintiff, the forum, and the litigation, rather than among the defendant, the forum, and the litigation." *Finn v. Doyle*, 2017 WL 7806378, at \*5 (S.D. Tex. Aug. 10, 2017). Sending such communications to a Nicaragua property owner (albeit a Texas resident) involving that property is too "random and attenuated" to cause that person to be haled into Texas. *Id*. at \*6. Under *Walden*, the relevant fact is "the defendant's contacts with the forum state itself, not the defendant's contacts with the persons who reside there." *Id*. (citing *Walden v. Fiore*, 571 U.S.

277 (2014)). CDM's principal could have opened those emails from anywhere in the world or paid those invoices from a bank account anywhere in the world. Defendants did not cause either to occur in or from Texas. *See Ice Melon, LLC v. Morgan*, 2020 WL 12863808, at *4 (S.D. Tex. 2020) (declining to find purposeful availment where plaintiff "fortuitously opened [emails] in Texas" and where there was "no evidence that [defendant] directed [plaintiff] to wire money *from* Texas").

Even if the Court determines CDM's "directed tort" theory holds merit, however, CDM elides the critical threshold: the tort must be well-pleaded. As to Costantino, CDM alleges only emailed "threats." *See* FAC ¶ 19. The respective "threatening" RICO predicate act attributed to Costantino was "extortion under color of official right," which fails as a matter of law. CDM concedes that point, *see* Opp. at 45 ("They can have it."), and pivots to "fear of economic harm" extortion. But, CDM did not plead that latter theory, only "color of official right." FAC ¶ 154. CDM cannot amend its pleading through its Opposition. As to Agora, CDM relies on nationwide publications from more than a decade ago alleged to have reached him in Texas, Opp. at 25, which is likewise too attenuated to support jurisdiction. Again, CDM's principal could have opened his emails from anywhere. CDM challenges Defendants' reliance on *Johnson v. Huffington Post*, *see id*., but notably cites no distinguishing authority for CDM's broad theory of jurisdiction. As to Ford, CDM cites those same 13-to-14-year-old emails, *see id*. at 26, which fail for the same reason. (And, of course, CDM did not plead Ford as an anchor defendant subject to specific jurisdiction, *see* FAC ¶ 19, as required to plead jurisdiction under Federal Rule 8(a)(1)).

Even if specific jurisdiction exists over any of the foregoing, CDM's nationwide-service theories do not reach the remaining Defendants. For RICO's nationwide-service provision under § 1965(b) to apply, CDM must first establish a "colorable" RICO claim. As demonstrated below,

although Defendants agree that CDM pleaded *one* predicate act (mail fraud) against *some* Defendants, all of CDM's RICO *counts* all fail for want of a "domestic injury." A claim that fails the domestic-injury requirement of *RJR Nabisco* is not "colorable" merely because it is weak on the merits—it is jurisdictionally barred. Likewise, CDM's reliance on Clayton Act § 22 is foreclosed by CDM's own allegations: neither RS Inc. nor International Living is alleged to have transacted business in the United States. RS Inc. is a British Virgin Islands holding company, and International Living is a Nicaraguan entity that acquired Nicaraguan real property.[4]

### III.    Failure to state a claim.

####    A.    The RICO claims should be dismissed.

#####        1.    CDM misapplies *Yegiazaryan*.

All four RICO counts fail under *Yegiazaryan*. CDM acknowledges *Yegiazaryan* as controlling but misapplies it. The parties agree that *Yegiazaryan* requires a "context-specific inquiry" to determine whether CDM alleges a "domestic injury," and the face of the pleading shows that this is a case about Nicaragua. *See, e.g.*, FAC at ¶ 1 (summarizing the claim as entirely "connected to a development on the Pacific coast of Nicaragua"); *see generally id*. The word "Nicaragua" or its variants appear 46 times in the FAC, and the word "Rancho" (the Nicaraguan development in question) appears nearly 250 times. This case is not about the United States. CDM accuses Defendants of focusing on CDM's domicile supposedly ignoring other factors under *Yegizaryan*. But CDM's error is laid bare in the table on page 40 of its Opposition. If CDM's domicile were not Texas but instead, say, Paris, nearly all the alleged U.S. contacts

---

[4] CDM's belated invocation of Rule 4(k)(2) fares no better. Rule 4(k)(2) is a gap-filler for defendants who lack contacts with any single state but have sufficient aggregate contacts with the United States. It does not transform a case lacking personal jurisdiction into one that has it merely because federal claims are asserted. More importantly, however, Rule 4(k)(2) was not pleaded *anywhere* in the complaint, as required under Rule 8(a)(1).

would change. CDM would be left with the sole fact that *some* Defendants are in the U.S., although with all recent allegations concerning actions concerning a *Nicaraguan* community.

The "international friction" under *Nabisco* is likewise acute. CDM claims that "[t]here is no foreign sovereign whose interest are implicated." *See* Opp. at 40. CDM is wrong. CDM's claims boil down to property rights in Nicaragua. If CDM is wrong about those, nothing else matters. Indeed, following CDM's argument to its logical conclusions: there are hundreds of thousands of HOAs in the United States, and nothing precludes foreign persons from purchasing property in those communities. Does a HOA officer submit to foreign laws (however draconian) and jurisdiction by sending assessments to such a foreign owner, and does a foreign court get to decide whether the assessments are legitimate? Does a neighbor submit to that jurisdiction by voicing disagreement with that owner on a community listserv? CDM must believe so, which would lead to a chaotic regime for American property law. So too here. Nicaragua should get to decide this issue, regardless of what federal statute CDM tries to force its allegations into.

### 2.    CDM's remaining "predicate acts" arguments fail.

While Defendants cannot address every other issue within page limits, they will hit some highlights. The first is CDM's argument concerning the "mail fraud" allegations at Paragraphs 148 and 149. *See* Opp. at 41. Consistent with CDM's other allegations, Defendants read the first paragraph under the predicate act as identifying the actors, and the balance as identifying the facts, meaning that Paragraph 149 identified additional persons acting as agents for those identified in Paragraph 148. CDM says that is not the case. If so, it changes nothing. The allegations under Paragraph 149 relate to mundane communications collecting fees and assessments by lower-level functionaries. That is hardly the stuff of "mail fraud." *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 1990 WL 92522, at *3 (E.D. Pa. June 28, 1990), *aff'd,* 926 F.2d

1406 (3d Cir. 1991) ("Transforming the rather mundane act of a bank in mailing out a monthly statement into an act of mail fraud, and from there into a racketeering act, is more an exercise in creative lawyering than an effective allegation in a RICO case.").

So too do CDM's remaining "predicate acts" arguments fail. As to Geerling, CDM argues "two predicate acts" in each of 2003 and 2023. *See* Opp. at 43. Defendants addressed that in footnote 9 of their Memorandum, which CDM ignored. CDM also tries to establish continuity through the alleged acts of other Defendants while Geerling was absent. Opp. at 44. CDM cites no authority for that principle, which would dramatically expand civil RICO.[5] Under "extortion," CDM concedes that it lacks sufficient facts for "color of official right," *see* Opp. at 45, arguing instead for extortion by "fear of economic harm." As set forth above, however, that is not what CDM pleaded. *See* FAC ¶ 152. CDM likewise fails to connect the dots between: (1) "money laundering"/"transporting stolen money"/"travelling in aid of racketing" and; (2) its alleged injury. Opp at 46-47. The suggestions these were "the engine of [the injuries'] repetition," *id*. at 47, should not persuade this Court. CDM's gripe is that certain Defendants sent invoices and other communications by email. No such "engine" is needed to click "send" on an email.

### 3.    Counts II through IV fail.

CDM further fails to grasp the differences between its primary RICO claim under § 1962(c) and the claims under the remaining three subsections. Count II under § 1962(a) fails for lack of a nexus to foreign commerce. *See* Mot. at 42. CDM argues that the mere alleged receipt of money by some U.S. Defendants satisfies this element. Opp. at 50. *RJR Nabisco* requires more – it requires that the enterprise "engage in, or affect *in some significant way*, commerce directly

---

[5] CDM's full-throated attack on Boothby on pages 44 to 45 is likewise grossly disproportionate to Boothby's innocuous, minimal involvement in community affairs. *Cf.* Motion at ¶¶ 64 & 65. CDM's Opposition shows nothing to the contrary but only reveals the willingness of CDM's principal/lawyer to sue his neighbors – and others – for having the temerity to disagree with him.

involving the United States." 579 U.S. at 344 (emphasis added). If the mere fact that Rancho Santana has U.S. investors were sufficient, it is difficult to conceive that this "nexus" limitation under § 1962(a) has any real meaning. Section 1962(b) (Count III), as set forth in *Vanderbilt*, 735 F. Supp. 2d at 701, is intended to prevent "the takeover of a legitimate business through racketeering," *see* Mot. at 44. CDM does nothing to address that authority and identifies no such business alleged to have been seized through extortion or loansharking. Count IV for conspiracy under § 1962(d) likewise fails. CDM relies on *Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007) but fails to identify where in the First Amended Complaint the Defendants were "allege[d] *specifically* [to have reached] such an agreement" (emphasis added). For these reasons, and as set forth previously, this Court should dismiss Counts I through IV.

## D.    The Sherman Act claim should be dismissed.

### 1.    Lack of subject-matter jurisdiction.

The Foreign Trade Antitrust Improvements Act ("FTAIA") is a limit on federal subject-matter jurisdiction. *See Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d. 420 (5th Cir. 2001). Consequently, where CDM has failed to plead the substantial effects on U.S. commerce that give rise to plaintiff's injury under the antitrust laws, the court lacks subject-matter jurisdiction over the dispute. The FTAIA only permits jurisdiction where the foreign conduct complained of had "direct, substantial and reasonably foreseeable effects in the United States and the effects giving rise to the jurisdiction are the basis for the alleged injury." *Id.*

Here, the alleged injuries: exclusion from the rental market *in Nicaragua*, inability to sell the parcel *in Nicaragua* at fair market value, and inability to complete the home *in Nicaragua*, is conduct that affects commerce in Nicaragua. FAC ¶ 203. The only nexus to U.S. commerce is incidental and includes things like banking services. Even if CDM alleged that U.S. travelers suffered higher prices, those effects did not give rise to CDM's claim of lost sales. Rather, CDM

alleges it lost sales *because* it was unable to finish building its home in Nicaragua. *See e.g., S. Megga Telecomm. Ltd. v Lucent Technologies*, 1997 WL 86413 (D. Del. Feb. 14, 1997) (anticompetitive domestic effect of higher prices for United States consumers did not "give rise" to plaintiff's claim for lost sales). There are therefore no "domestic" effects that "gives rise" to the plaintiff's antitrust claim. *Den Norske Stats*, 242 F.3d at 428-29. In response, CDM misleadingly cites *Dominicus Americano Bohio v. Gulf & War Indus*. 473 F. Supp. 680 (S.D.N.Y. 1979), a case abrogated by the FTAIA. Indeed, the Supreme Court found that *Dominucus* analyzed factors not relevant to the FTAIA, which requires that U.S. antitrust law should not apply to foreign conduct that causes independent foreign harm giving rise to plaintiff's claim. *See F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 169–72 (2004).

### 2.     No agreement, no violation of the Sherman Act.

CDM admits there was no agreement: "The Community Guidelines, Rental Guidelines, and Broker Regulations 'were drafted by Rancho SRL and **imposed** on property owners **without agreement** or vote.'" Opp. at 57 (citing FAC ¶ 129) (emphasis added). There can be no violation of Section 1 without an agreement. *See* Mot. at 49.

### E.     CDM cannot cure its deficient Lanham Act claim.

CDM has not cured the deficiencies in Count VI. The representation that HOAs "exist" *see* Opp. at 63–65, on a website does not constitute "commercial advertising or promotion" under *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996). Statements about community governance structures are not made "for the purpose of influencing consumers to buy defendant's goods or services." *Id.* CDM's competitive-injury theory remains circular: it alleges false advertising "concealed" the conduct that excluded CDM from the market, but the alleged injury is the exclusion itself. This arises from property governance disputes—not from

advertising. Furthermore, real property is not a "good" or "service" within the traditional meaning of the Lanham Act, and CDM's attempt to recharacterize its claim as one about the "resort with amenities," etc., *see* Opp at 63-64, does not transform this property dispute into a false advertising case. *Pillar Panama, S.A. v. DeLape*, 2008 WL 1967118, at *5 (S.D. Tex. May 1, 2008), *order modified*, 326 F. App'x 740, 744 (5th Cir. 2009). Particularly so, as CDM neither purchased nor offers any such "resort with amenities" services.

**F.     The Court should decline supplemental jurisdiction over the state law claims.**

Upon dismissal of the federal claims, this Court should decline supplemental jurisdiction over Counts VII through XI under 28 U.S.C. § 1367(c)(3). CDM does not contend otherwise. Even if retained, each claim fails for the reasons stated in the Motion to Dismiss.

**IV.     Conclusion**

This Court should dismiss CDM's First Amended Complaint, without leave to amend.

Respectfully submitted,

By: */s/ Emma L. Short*
**Emma L. Short**
Texas Bar No. 24101001
Federal ID No. 3501711
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ. P.C.**
1301 McKinney Street, Suite 3700
Houston, Texas 77010
Telephone: (713) 650-9700
eshort@bakerdonelson.com
***Attorney for Defendants***

By: */s/ Christopher C. Dahl*
**Christopher C. Dahl**
*Admitted pro hac vice*
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ. P.C.**
100 Light Street. 19th Floor
Baltimore, Maryland 21202
Telephone: (410) 862-1134
cdahl@bakerdonelson.com
***Attorney for Defendants***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been served upon all parties of record via the ECF filing system on May 12, 2026.

*/s/ Emma L. Short*

10